# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Case No. 09-50397** |
| | § | **Chapter 11** |
| **HARVEST OIL & GAS LLC,** *et al* | § | **(Jointly Administered)** |
| | § | |
| | § | **Related to Dkt. No. 593** |
| **DEBTORS.** | § | |
| | § | **JUDGE ROBERT SUMMERHAYS** |

## WAYZATA INVESTMENT PARTNERS LLC'S OBJECTION TO THE DEBTORS' DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE

Wayzata Investment Partners LLC ("Wayzata"),[1] as administrative agent for Wayzata Opportunities Fund LLC ("Wayzata Fund") and Wayzata Opportunities Fund II, L.P. ("Wayzata Fund II"), files this objection ("Objection") to the *Debtors' Disclosure Statement Pursuant to Section 1125 of the United States Bankruptcy Code* (Dkt. No. 593, the "Disclosure Statement") filed by Harvest Oil & Gas LLC, *et al.* (collectively, the "Debtors").[2] In support of the Objection, Wayzata respectfully submits the following:

### BACKGROUND FACTS

1.      On August 17, 2009, the Debtors filed a disclosure statement (Dkt. No. 512) and their initial plan (Dkt. No. 511). A presumably corrected disclosure statement was subsequently filed by the Debtors on August 18, 2009 (Dkt. No. 515).

---

[1] Wayzata holds a valid and perfected lien, subject to permitted liens, including the lien of Macquarie Bank Limited ("Macquarie"), on substantially all of the Debtors' assets to secure indebtedness under that certain Credit Agreement among Wayzata, as agent, Wayzata Fund and Wayzata Fund II, as lenders, and Saratoga, as borrower, and Harvest, THG, Lobo Operating, and Lobo Resources, as guarantors, dated as of July 14, 2008 (the "Credit Agreement"). The principal amount of outstanding indebtedness under the Credit Agreement as of the Petition Date was at least $97,500,000.

[2] The Debtors are Harvest Oil & Gas, LLC ("Harvest"), Saratoga Resources, Inc. ("Saratoga"), The Harvest Group LLC ("Harvest Group"), Lobo Operating, Inc. ("Lobo Operating"), and Lobo Resources, Inc. ("Lobo Resources").

2.     On September 11, 2009, the Debtors filed their Disclosure Statement and *First Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* (Dkt. No. 592, the "Plan").

3.     A hearing to consider approval of the Disclosure Statement has been set for October 6, 2009.

## OBJECTIONS

4.     The Disclosure Statement is objectionable and should not be approved for two primary reasons.   First, the Disclosure Statement should not be approved because the Plan violates multiple provisions of section 1129[3] of the Bankruptcy Code and, as such, is not confirmable as a matter of law.   Second, the Disclosure Statement fails to provide sufficient factual disclosure and adequate analysis of the legal and business risks associated with the Plan to enable the creditors to make an educated vote with respect to the Plan.

**A.     The Plan is Facially Not Confirmable.**

5.     The acceptance or rejection of a plan may not occur unless a disclosure statement, approved by the court as containing "adequate information," is transmitted with such plan.   11 U.S.C. § 1125(b).   If the disclosure statement describes a plan that is so "fatally flawed" that confirmation is "impossible," a bankruptcy court should exercise its discretion and refuse to consider the adequacy of disclosure.   *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).   *See In re Monroe Well Services, Inc.,* 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)

---

[3] As discussed in more detail below, the Plan violates numerous provisions of section 1129(a) including, but not limited to, that: (a) both the Plan and its proponents have failed to comply with the provisions of Title 11, including section 510(a), in violation of section 1129(a)(1) and (2); (b) the Plan was not proposed in good faith in violation of section 1129(a)(3); (c) the Plan fails to meet the "best interests" test of section 1129(a)(7); and (d) the Plan is not feasible, in violation of section 1129(a)(11).   Moreover, the Plan also (a) unfairly discriminates against Wayzata because it seeks to reinstate or immediately pay in full all other secured claims and (b) the plan is not fair and equitable because it fails to pay Wayzata the value of its secured claim and impermissibly shifts the risk of failure to Wayzata.

US 90698v.6

("Occasionally, it may be appropriate to disapprove of a disclosure statement, even if it properly summarizes and provides adequate information about a proposed plan, when a court is convinced that the plan could not possibly be confirmed."). *See, also, In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (stating that "[i]t is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed"); *In re Filcas of America, Inc.*, 147 B.R. 297, 298 (Bankr. D.N.H. 1992) (stating that if a plan "is not confirmable on its face the Court will not proceed further with disclosure statement questions because it will be an obvious exercise in futility"). Summary denial of unconfirmable plans promotes effective and efficient estate administration and, therefore, serves the interests of the creditors. Such an exercise of discretion is appropriate because undertaking the burden and expense of a plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.

6.      The Plan is premised upon the cram down of Wayzata's secured claim and artificial impairment of virtually all creditor classes, notwithstanding the Debtors' assertion that they are solvent and that their asset value greatly exceeds the amount of their debts. Indeed, the Debtors' own proposed Liquidation Analysis provides that up to approximately $64.7 million could be available to the holders of equity interests in a chapter 7 scenario.

7.      Assuming, *arguendo*, that the Debtors' position on valuation is correct, this situation appears to be a unique "solvent debtor" case. If they are solvent to the degree that they contend, the Debtors should easily be able to refinance Wayzata's secured claim with third party debt or equity financing. Notwithstanding this logic, the Plan is proposed to be financed

US 90698v.6

through: (a) use of Wayzata's cash collateral; (b) the reduction of Wayzata's contract interest rate by over 50%; (c) an unsupportable extension of Wayzata's existing maturity date coupled with negative amortization; and (d) the total rewrite of Wayzata's credit documents, particularly Wayzata's previously bargained-for contractual covenants and protections that the Debtors have recognized as "normal covenants" in multiple filings with the SEC.

8.    The end result of the Debtors cram down Plan would be a complete shift of the risk of failure from Saratoga's equity holders (including its current management) to Wayzata. Indeed, the reduction of the interest rate alone effectively shifts approximately $10 million <u>per year</u> in contractual interest payments from Wayzata to the equity holders, who neither contributed cash to facilitate the Harvest acquisition nor who are committed to contribute additional equity capital under the Plan. A review of the Disclosure Statement brings into focus the unmistakable purpose of these chapter 11 cases: the wholesale modification and re-write of bargained-for protections and interest rates in credit documents for the benefit of equity holders, despite a purportedly solvent debtor. The Bankruptcy Code and applicable precedent simply do not allow for this result. If these authorities did, every solvent debtor that disliked the terms of its debt financing would file a chapter 11 case and re-write the terms of its loan documents, and no secured lender would be able to have any confidence that it would receive the benefit of its bargain in the marketplace.

9.    Such an approach to resolving disputes over term debt is not permissible under the Bankruptcy Code and relevant case law because, *inter alia*, (a) when a debtor is solvent courts have generally confined themselves to determining and enforcing whatever prepetition

rights a given creditor has against the debtor[4] and (b) a plan may not shift the risk of failure from the equity holders to the secured creditor.[5]

10.  Because the Plan does not comply with all of the applicable provisions of the Bankruptcy Code, there is no "genuine issue of material fact" regarding confirmability of the Plan. Wayzata is entitled to an order summarily denying both approval of the Disclosure Statement and confirmation of the Plan, as a matter of law.

*(i)*  ***The Plan Violates the "Best Interest" Test because Creditors Would Receive a Greater Recovery Under a Chapter 7 Liquidation.***

11.  Section 1129(a)(7)(A) provides that a dissenting creditor must receive no less under a plan than such holder would receive and impermissibly shifts the risk of failure to Wayzata if the debtor were liquidated under chapter 7. 11 U.S.C. § 1129(a)(7)(A) (the "best interest test"); *see Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe)*, 994 F.2d 1160, 1167-68 (5th Cir. 1993) ("Section 1127(a)(7) requires that each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation").

12.  The Liquidation Analysis[6] is a patent concession by the Debtors that their assets can be immediately liquidated on or before the Plan effective date (the "Effective Date") with the resulting proceeds being sufficient to pay all creditors 100% of their claims and with a return to equity holders of up to $64.7 million. Nonetheless, through their Plan, the allegedly *solvent* Debtors seek to emasculate Wayzata's loan and collateral documents, significantly extend the existing maturity date of Wayzata's financing, and impose a post-confirmation interest rate less

---

[4] *In re Dow Corning Corp.*, 465 F.3d 668, 679 (6th Cir. 2006).

[5] *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 722, 727 (Bankr. M.D. Fla. 2006); *see Anderson Oaks (Phase I), Ltd., P'ship.*, 77 B.R. 108, 111 (Bankr. W.D. Tex. 1987).

[6] A copy of the Debtors' Liquidation Analysis may be found at Exhibit F to the Disclosure Statement.

US 90698v.6

than half of Wayzata's contractual rate. As a consequence, Wayzata is slated to receive less than it would under the liquidation scenario posited by the Debtors. Under the Debtors' Liquidation Analysis, sale of the assets would provide a more certain and immediate return to all creditors. The Plan violates the best interest test and is, therefore, not confirmable as a matter of law.

  *(ii)*  ***The Plan Unfairly Discriminates Against Wayzata's Interests and Artificially Impairs Creditors to Secure a Consenting, Impaired Class.***

<em>The Plan Unfairly Discriminates Against Wayzata</em>

  13.  The "unfair discrimination" standard "is not derived from the fair and equitable rule or from the best interest of creditors test; rather, it preserves just treatment of a dissenting class from the class's own perspective." *In re MCorp Financial, Inc.*, 137 B.R. 219, 234 (Bankr. S.D. Tex. 1992); See H.R. Rep. No. 595, 95th Cong., 1st Sess. 416-17 (1977), reprinted U.S.C.C.A.N. 6372, 6373 (1978). To prevent "unfair discrimination" the plan must "allocate value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor." *See* COLLIER ON BANKRUPTCY ¶ 1129.03 at 1129-69 (15th ed. 1991). The Bankruptcy Code is based on the idea of "equality of treatment" and so "[c]reditors with claims of equal rank are entitled to equal distribution." *In re Sentry Operating Co. of Texas,* 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001).

  14.  The Bankruptcy Code, however, does not provide a standard for determining when "unfair discrimination" is present. Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. *See, e.g., In re Freymiller Trucking, Inc.,* 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.,* 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each

case to give meaning to the proscription against unfair discrimination"). At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justification for doing so. *See In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 656 (9th Cir. 1997).

15. Here, the Plan unfairly discriminates because it seeks to reinstate or pay in full every secured creditor *other* than Wayzata, including Class 2 (Macquarie's secured claims), Class 4 (Oil Well Lien Act Claims), and Class 5 (Other Secured Claims). *See* Plan at §§ 4.2, 4.3, 4.4 and 4.5. On this point, one must look no further than the Debtors' proposed treatment of Macquarie's secured claim (Class 2). Wayzata's contractual protections, including specifically the financial and collateral covenants, are very similar to the financial and collateral covenants set forth in Macquarie's credit documents. The mere fact that Macquarie is retaining its prepetition information rights, while the same prepetition information rights are being deleted from Wayzata's credit documents, is conclusive evidence that the plan is not fair and equitable and discriminates unfairly. The practical effect of removing Wayzata's information rights is that it will have no means of determining whether the Debtors have complied with the few covenants that actually remain in the documents, while Macquarie will fully retain its prepetition information rights and be able to evaluate its covenant package with current information.

16. Further, the Plan provides that Macquarie will receive payment of its postpetition interest in cash on the Effective Date, while Wayzata's postpetition interest will be capitalized. Even more telling is that secured creditors in Classes 4 and 5 will be paid in cash in full on or after the Effective Date, notwithstanding that their lien rights are inferior to those of Wayzata.

US 90698v.6

*The Plan Artificially Impairs Virtually All Claims of the Allegedly Solvent Debtors' Estates*

17.     The Plan attempts to artificially impair virtually each and every class in order to obtain a consenting, impaired class.  Such artificial impairment is prohibited.  *See Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.)*, 7 F.3d 127, 132 (8th Cir. 1993) ("[F]or purposes of [section] 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion."); *Sandy Ridge Dev. Corp v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1353 (5th Cir. 1989) (questioning the good faith of a debtor who appeared to have technically impaired classes in order to obtain a consenting impaired class);[7] *see also Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that, even if a particular classification is permitted by the Bankruptcy Code, such classification may only be undertaken for reasons independent of a debtor's motivation to secure a consenting impaired class.).  This recognized limitation on classification is particularly compelling here, in the case of purportedly solvent debtors who are seeking to retain equity allegedly worth in excess of $64 million.

18.     Virtually each creditor class has been artificially impaired by the Debtors solely to generate one or more consenting classes to accomplish a cram down on Wayzata, even though the Plan purports to pay all other creditors in full.  For example, holders of allowed claims Classes 4 (statutory lien claims), 5 (other secured claims), and 6 (unsecured claims) may choose between receiving 90% of their claim on the Effective Date, with the remaining 10% to follow

---

[7] *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, 690-91 (D. Mass.  2000) (concluding that section 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired" for a proper business purpose); *In re Daly*, 167 B.R. 734, 737 (Bankr. D. Mass. 1994) ("A Debtor may not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying § 1129(a)(10)[.]"); *In re Lettick Typografic, Inc.*, 103 B.R. 32, 39 (Bankr. D. Conn. 1989) ("While the debtor may have achieved literal compliance with § 1129(a)(10), this engineered impairment so distorts the meaning and purpose of that sub-section that to permit it would reduce (a)(10) to a nullity.").

90 days later, or 100% on the Effective Date. The only difference is whether the holder prefers contractual interest or the Federal interest rate.

19. There exists no logical explanation for the proposed treatment of these "impaired" creditors. The Debtors' proposed classification constitutes nothing more than an attempt to manufacture one or more consenting, impaired classes of creditors to overcome the requirements of section 1129(a)(10). In *Windsor on the River Assoc.*, the Eighth Circuit Court of Appeals accurately described the sort of mischief that arises from artificial impairment in a case like this one:

> The possible effects of confirmation under such circumstances are somewhat unsettling. Confirmation might encourage similarly situated debtors to view the bankruptcy code as an alternative to refinancing. First, **debtors with projects lacking the fiscal promise necessary to gain refinancing on the open market might resort to section 1129(a)(10) as the mechanism by which they might draft their own loans from existing lenders. Second, the very threat of such an alternative might coerce lenders into extensions of credit terms that might otherwise not be called for by market conditions.**

*Windsor on the River Assoc.*, 7 F.3d at 132 (emphasis added). In this case, the Debtors have sought artificial impairment for such a purpose. Allowing the Debtors to go forward with a plan whose only impact is a total re-write of the loan held by Wayzata's (the only truly impaired creditor) is not allowed under the Bankruptcy Code and relevant case law.

      (iii)    *The Plan is Not Fair and Equitable Because (a) it Proposes an Improper Interest Rate on Behalf of Allegedly <u>Solvent</u> Debtors and (b) it Impermissibly Seeks to Modify Wayzata's Contractual Protections*

20. Section 1129(b) requires that a cram down be fair and equitable. However, technical compliance with all the requirements of section 1129(b) does not assure that a plan is fair and equitable. Section 1129(b) merely states that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements . . . ." 11 U.S.C. 1129(b) (emphasis added). Section 102(3) of the Bankruptcy Code provides that the word "includes" is not limiting. 11 U.S.C. § 102(3). The Debtors do not state under which provision they would

seek to cram down Wayzata's claim. Section 1129(b)(2)(A)(i) appears most applicable, however, as the Debtors have indicated an intent to retain the collateral.

21.    Section 1129(b)(2)(A)(i) provides:

(A) With respect to a class of secured claims, the plan provides –

(i)(I) that the holders of such claim retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. §1129(b)(2)(A)(i).

<u>*The Contract Rate is the Proper Rate of Interest*</u>

22.    As set forth above, section 1129(b) sets forth the *minimum* requirements for "fair and equitable treatment," and mere technical compliance with this section can be insufficient to support confirmation. *See In re Sandy Ridge Dev. Corp.*, 881 F.2d at 1352 ("To begin with, simple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. Instead, this section merely sets minimal standards that a plan must meet, and does not require that 'every plan not prohibited be approved.'"); *In re Briscoe*, 994 F.2d at 1168 (same); *In re D&F Construction, Inc.,* 865 F.2d 673, 675-76 (5th Cir. 1989) (finding that a plan "literally" met the requirements of section 1129(b)(2)(A), but was not confirmable). As recognized by the Fifth Circuit:

A Court must consider the entire plan in the context of the rights of creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable."

*Id.*

23.    Notably, in cases involving *solvent* debtors, mere "technical" compliance with section 1129(b) should not be sufficient. In the rare chapter 11 case involving a *solvent* debtor,

US 90698v.6

the court does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006). Instead, the court's limited role is to "enforce the contractual rights of the parties." *Id.*; *see In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 791 F.2d 524, 528 (7th Cir. 1986) ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights."); *In re Good*, 2009 WL 1024651 (Bankr. E.D. Tex. April 13, 2009). Indeed, "[c]ourts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed." *In re Dow Corning Corp.*, 456 F.3d at 680 (citing *In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998) ("[A] default interest rate is generally allowed, unless the higher rate would produce an inequitable result." (citations omitted)); *In re Good*, 2009 WL 1024651, at *8-9; *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d at 530 ("To repeat an earlier point, which is indeed the main point of this opinion, when the debtor is solvent, the judicial task is to give each creditor the measure of his contractual claim, no more and no less." ).

24. Despite this abundance of case law, the Plan seeks to materially modify the contractual terms of the Wayzata Credit Agreement by, *inter alia*, (a) slashing the interest rate by over half; (b) extending the maturity date; (c) eliminating virtually all of Wayzata's information rights, rendering enforcement of any remaining covenants nearly impossible; (d) effectively eliminating all events of default, other than payment default; (e) improperly amortizing the debt; and (f) paying Wayzata a balloon payment of all outstanding amounts on the fifth anniversary of the Effective Date.[8]  Although the Macquarie Credit Agreement and the

---

[8] Notably, the Plan does not provide for the payment of postpetition default interest accruing on the Effective Date, but instead payment of all pre-confirmation amounts will be effectively capitalized and delayed in accordance with the five year schedule set forth above.  It should be noted that Macquarie will receive cash payment of its postpetition default interest accruing as of the Effective Date, Plan at § 4.2(b)(i), as will all other secured and unsecured creditors. *Id.* at Article IV.

Wayzata Credit Agreement are substantially similar, the Debtors do not propose altering the Macquarie Credit Agreement to such a degree (in fact, the Macquarie Credit Agreement will be cured and reinstated).

25.     Indeed, in the case of *In re Good*,[9] Bankruptcy Judge Robert McGuire, sitting in the Eastern District of Texas, followed the reasoning of the Sixth Circuit in *In re Dow Corning Corp.*[10] and held that, in rare cases involving solvent debtors, the contractual rate should apply. *Id.* at *7. As explained by the Sixth Circuit, and as adopted by the *Good* court: "In this context, the rational for use of the contract rate is straightforward:  A debtor with the financial wherewithal to honor its contractual commitments should be required to do so." *Id.* (citing *In re Dow Corning Corp.*, 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999)).  "The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Id.* (citing *In re Dow Corning Corp.*, 244 B.R. at 695 and *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d at 527).  According to the Debtors and their experts, they have more than sufficient assets to pay all creditors (including Wayzata) in full.[11]

26.     The proposed re-write of the Credit Agreement would do nothing more than take over $10 million <u>per year</u> from Wayzata (who is contractually entitled to such amounts) and place it in the pocket of management and current equity holders.  If the Debtors wish to have more lenient credit terms, they should utilize their alleged $200 million equity value to refinance the Wayzata debt.

---

[9] 2009 WL 1024651 (Bankr. E.D. Tex. April 13, 2009).

[10] 456 F.3d 668 (6th Cir. 2006).

[11]  September 15, 2009 Deposition of Thomas F. Cooke (Vol. I), 30:4 – 30:11 (agreeing that Saratoga has assets sufficient to pay Macquarie and Wayzata in full, but that the Debtors are unwilling to liquidate).

US 90698v.6

*The Plan Seeks to Improperly Modify Wayzata's Covenants and Other Contractual Protections*

27.     Further, the Plan seeks to impermissibly modify the covenants and other protections afforded Wayzata in its Credit Agreement and deny Wayzata regular and customary information reporting necessary to enforce such covenants.  As stated above, in the context of an allegedly solvent debtor, the Plan cannot alter Wayzata's credit documents as a matter of law. However, assuming *arguendo*, that modifications are permitted, a plan cannot modify the protective covenants so as to significantly increase the risk allocated to the lender when compared to the terms of the original agreement.  *In re D&F Construction*, 865 F.2d at 676-77 (holding a plan was neither fair nor equitable and could not be crammed down, even if the requirements of section 1129(b) were met, because plan barred lender's exercise of foreclosure rights, required negative amortization, and deferred substantially all repayment of principal); *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 722, 727 (Bankr. M.D. Fla. 2006) ("A plan of reorganization may not unfairly shift the risk of failure to the secured creditor.").   Any modifications to the Wayzata Credit Agreement must still leave reasonable default provisions to protect payment of its claim.  Here, even the covenants that the Debtors do not modify are rendered ineffective by the proposed elimination of any regular reporting requirements and compliance certificates.  Without any ability to verify the Debtors' adherence to covenants through compliance certificates and regular information reporting, Wayzata could never realistically enforce the proposed revised credit agreement.

28.     The Plan would leave Wayzata with nothing but hollow credit documents containing no acceptable covenants or remedies, virtually no foreclosure rights, and substantially deferred payments.  Even a cursory review of the term sheet found at Exhibit B to the Plan indicates that the proposed terms would effectively gut Wayzata's contractual rights.  The Plan would require Wayzata to sit on the sidelines and hope it will receive a balloon payment five

US 90698v.6

years after the Effective Date, which incredibly large balloon payment would have to be funded from rapidly-depleting oil and gas reserves. If the Debtors fail, the entire economic cost of failure will be borne by Wayzata, which is even more egregious given the lack of capital invested by management.

29.     Through use of an artificially extended maturity date, the Plan effectively strips Wayzata's security interest in its collateral. Although the Plan facially states that Wayzata will retain its liens, the Debtors will continue producing and <u>depleting</u> Wayzata's collateral. This fact is particularly troubling, as the extended payments under the Plan (going five years into the future) will occur *after* a substantial portion of the collateral has been depleted and the proceeds of oil and gas production, which will be effectively confiscated by the Debtor from Wayzata's pocket, will likely be spent on the payment of legally inferior claims or the acquisition of assets not subject to Wayzata's liens.

30.     A secured creditor is deemed to retain its liens on its collateral only if it retains the entirety of the property to which such lien attaches until the debtor's debt is paid off in full. *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 49-50 (E.D. Pa. 1996) (holding that a secured creditor must retain its lien on the entirety of its collateral in order to satisfy the Bankruptcy Code's requirement that a secured creditor retain its liens); *In re Monarch Beach Ventures, Ltd.*, 166 B.R. 428, 433 (C.D. Cal. 1993) (same). Under the Plan, however, Wayzata will not be granted replacement liens on new oil and gas properties purchased or discovered with the proceeds of Wayzata's collateral. As such, when the extended payment deadline occurs, Wayzata's collateral will be depleted and there will be insufficient funds generated from the estates' assets to pay Wayzata's claim. Wayzata's initial maturity date specifically took the depleting nature of its collateral into account. The Plan does not.

31.     Although a plan may provide for the "extension of a maturity date" of a loan, 11

U.S.C. § 1123(a)(5)(H), the maturity date should be extended only to the extent that a debtor

proves is necessary to effectuate a plan and not merely for a debtor's convenience.  *See In re

Good*, 2009 WL 1024651 at *9 ("It would offend the priorities of the Bankruptcy Code to allow

[the debtor] to accumulate or reinvest this equity over the next four years, without fully

satisfying [the creditor's] claim, when the undisputed evidence shows that [the creditor's]

allowed secured claim could be satisfied in less than four years.").[12]

32.     Here, the Debtors have given no justification for their proposed maturity date

extension.  Wayzata posits that the only reason for such an extended maturity is that the Debtors'

primary source of Plan funding can be generated only by radically altering Wayzata's

contractual rights and using Wayzata's cash collateral to run the Debtors' operations.   Again,

this scheme impermissibly shifts the risk of failure from the equity holders to Wayzata.

### (iv)     *The Plan, as Proposed, is Not Feasible*

33.     For a plan to be confirmed, it must not be "likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor[.]"    11 U.S.C.

§ 1129(a)(11).  It is the debtors' responsibility to show, by a preponderance of the evidence, that

the plan, as proposed, is feasible, to which, "the bankruptcy court must make a specific finding

that the plan...is feasible."  *Fin. Sec. Assurance Inc. vs. T-H New Orleans Ltd. P'ship (In re T-H

New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997).

34.     Admittedly, the Debtors do not have to assume the worst possible economic

projections when showing that their plan is feasible, *Id.* at 802, but they must show "that there is

---

[12] In addition, the Debtors seek to add a force majeure clause to the Wayzata Credit Agreement (*see* Plan, Exhibit B, at p. B6) whereby they seek the right to unilaterally suspend their payment and performance obligations under the Credit Agreement upon the occurrence of certain events.  While force majeure provisions are often negotiated as part of commercial supply contracts, they are not typically seen in credit agreements and are simply a way to negatively amortize the Wayzata secured claim.  More telling is that the Debtors do not seek to impose a similar provision in the Macquarie Credit Agreement

US 90698v.6

a reasonable prospect of [their] plan's success and that it is workable." *In re M & S Assoc., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992). A number of factors should be analyzed when determining whether a plan is feasible. Among these are the Debtors' capital structure, earning power, management ability, economic conditions, the availability of credit, the adequacy of funds for equipment replacement, provisions for adequate working capital, and "any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *Id.*

35. Importantly, a plan that shifts "virtually all risk of failure onto the secured creditor" should be found to be infeasible. *Anderson Oaks (Phase I), Ltd., P'ship.*, 77 B.R. 108, 111 (Bankr. W.D. Tex. 1987); *see In re Chapin*, 343 B.R. at 727.

36. Here, the Plan is not feasible for multiple reasons, including (a) the Plan does not work to decrease the Debtors' debt load, which has in fact increased since the Petition Date based upon interest accrual and administrative expenses; (b) the Plan does not provide for committed debt or equity financing;[13] (c) over time, the Debtors' hedges will terminate resulting in markedly lower pricing; and (d) the Plan shifts the risk of failure from equity holders (including senior management who receive a 100% recovery, despite no capital investment) to Wayzata (a secured creditor who has already advanced over $97.5 million in debt financing).[14]

37. The Plan provides that Wayzata's secured claims will receive payments with an interest rate of 10% per annum over a five (5) year period and effectively uses negative

---

[13] New financing is not discussed in the Disclosure Statement and Plan; however, the Debtors acknowledged their lack of financing on page 21 of their Form 10-Q filed with the SEC on August 14, 2009: "We have no commitments to provide capital or financing if needed to retire our existing indebtedness and, given the current condition of the capital and credit markets, there is no assurance that any such capital or financing will be available on acceptable terms, or at all, if needed."

[14] On Exhibit A to the Plan, the Debtors provide that the commitment or borrowing base under the Macquarie Credit Agreement shall be increased from $25,000,000 (current limit) to $50,000,000. However, any increase in such commitment requires the consent of Wayzata under its Intercreditor Agreement with Macquarie and therefore can not be accomplished without violating section 510(a) of the Bankruptcy Code. To the extent the Debtor has based its proposed feasibility upon additional debt financing from Macquarie, the Plan is non-confirmable on its face.

amortization by capitalizing all of Wayzata's postpetition accrued interest and fees.  Payments to Wayzata will be interest only for the first twenty four months, with payments of principal and interest in months twenty five through sixty, based upon a twelve year amortization schedule. On the fifth anniversary of the Effective Date, the Plan proposes to pay Wayzata a balloon payment of all remaining amounts.  The proposed negative amortization and inadequate interest rate, coupled with the depleting nature of the assets constituting Wayzata's collateral and the proposed (and wholly unacceptable) modifications to Wayzata's prepetition contractual rights, impermissibly shifts the risk of failure from equity holders -- who have neither committed to infuse capital into the Debtors nor forfeited any rights under the Plan -- to Wayzata.  These factors undeniably suggest the extreme precariousness of the overall feasibility of the Plan.

> **(v)     *The Plan was Not Proposed in Good Faith***

38.     Section 1129(a)(3) requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  When determining whether a plan meets the good faith requirement of section 1129(a)(3), the bankruptcy court looks to the plan and determines whether "in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code."  *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).  "In evaluating the totality of circumstances surrounding a plan a court has considerable judicial discretion…, with the most important feature being an inquiry into the 'fundamental fairness' of the plan."  *In re Coram Healthcare Corp.* 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citations omitted).  In the Fifth Circuit, the inquiry focuses on examining the totality of the circumstances surrounding the proposed plan, and whether the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success.  *B.M. Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).

US 90698v.6

39. Nothing the Debtors have done with respect to Wayzata's treatment can be deemed "fair" or in compliance with the statutory requirements set forth in the Bankruptcy Code or relevant case law. As discussed herein, the Debtors are violating fundamental requirements and creditor protections inherent in the chapter 11 process, including numerous provisions of section 1129. In such respects, the Debtors have not filed their Plan in "good faith."

40. This is further evidenced by the fact that the Plan proposes both a "consensual" and "non-consensual" treatment for Wayzata's secured claim (Class 3). Under either treatment, the Debtors state their intention to pursue litigation against Wayzata. Why would Wayzata ever elect the so-called "consensual" treatment? Such approach highlights the Debtors' lack of good faith in proposing the Plan.

**B.      The Debtors' Omission of Material Information and Risk Factors Prohibits Creditors from Making an Informed Decision Regarding the Plan.**

41. Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

42. "Adequate information" is defined as "information of a kind, and in sufficient detail . . . that would enable . . . a hypothetical investor . . . to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1); s*ee also Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) (discussing adequate information under § 1125(a)(1)). A disclosure statement must adequately inform a creditor how it will be affected by a chapter 11 plan. *See Mickey's Enter., Inc. vs. Saturday Sales, Inc. (In re Mickey's Enter., Inc.),* 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994) (failure to disclose a

US 90698v.6

potential preference claim is inadequate). A disclosure statement should also set forth all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan. *In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

  43. Guidance is provided by the oft-cited *Metrocraft* decision, which lists nineteen "factors" traditionally used to assess the adequacy of a disclosure statement. *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984). In *In re Brass Corp.*, 194 B.R. at 422, Judge Sharp applied the *Metrocraft* factors, many of which are relevant here:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with its affiliates.

*Id.* at 424-25.

  44. "These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996). Disclosure is the pivotal concept in chapter 11. 7 COLLIER ON BANKRUPTCY, ¶ 1125.02 (15th ed. rev. 2003). *See also*

US 90698v.6

09-50397 - #653  File 09/28/09  Enter 09/28/09 17:14:50  Main Document  Pg 19 of 33

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 226 (1977) ("[T]he key to the consolidated chapter

is the disclosure section").  Information required to be in a proposed disclosure statement will

necessarily be governed by the circumstances of the case, but approval should be denied if it is

grossly inaccurate or "replete with deficiencies."  *In re Cajun Elec. Power Coop.*, 150 F.3d 503,

518 (5th Cir. 1998); *In re Hirt*, 97 B.R. 981, 982 (Bankr. E.D. Wis. 1989).

45.     For the following reasons, the Disclosure Statement does not contain adequate

information that would allow creditors to make informed judgments about the Plan.

*(i)       The Disclosure Statement Fails to Discuss the Release the Debtors Signed in
            Favor of Wayzata and How this Release Waives any Alleged Claim Against
            Wayzata.*

46.     The Debtors allege that they hold various claims against Wayzata for causes of

action arising from the financing negotiations and arrangements between it and the Debtors.

However, on November 19, 2008, in connection with Wayzata's waiver of certain defaults,[15] the

Debtors granted a general release in favor of Wayzata any and all claims and causes of action

arising prior to execution of the Waiver.   *See* Waiver at § 4.07 (titled "Release").  Notably,

Macquarie also gave a similar waiver with a release that was executed at or about the same time.

47.     The Disclosure Statement needs to include the release and waiver of the Debtors'

claims against Wayzata and any reference to alleged causes of action against Wayzata arising

from any events prior to November 19, 2008 must be deleted.  A similar disclosure should be

made in connection with the Debtors' release in connection with the Macquarie waiver.

---

[15] A copy of the Waiver is attached hereto as **Exhibit "A."**

*(ii)*    *Failure to Include Material Risk Factors Reported in Saratoga's SEC Filings Paints an Unrealistic and Overly Optimistic Picture of Future Operations and Makes the Disclosure Statement Misleading.*

48.    The Debtors' Disclosure Statement fails to expressly include the same risk factors set forth in Saratoga's most recent 10-K/A filed on May 20, 2009 (the "May 2009 10-K").[16]  In fact, there is no succinct location within the Disclosure Statement where disclosure of material risk factors may be found.  If risk factors are sufficiently material to warrant SEC disclosure, it is axiomatic that such information also be expressly included in the Disclosure Statement and that failure to do so is patently misleading.  Without disclosure of material risk factors, creditors are left only with the Debtors' unrealistic account of future operations and are given no real means to make an informed decision.  At a minimum, the Debtors should be required to include a recitation of each risk factor set forth on pages 14-23 of the May 2009 10-K.[17]

*(iii)*    *The Disclosure Statement Re-Writes History and Fails to Provide an Adequate Description of the Debtors' Pre-Bankruptcy Operations.*

49.    On pages 6 and 7 of the Disclosure Statement, the Debtors paint their version as to how they sought financing with respect to the Harvest acquisition.  To be complete, the Debtors must clarify that: (a) Wayzata, at Saratoga's request, sent an indicative letter of intent and term sheet to the Debtors on February 1, 2008, *before* the Debtors' engagement of Jeffries & Company, Inc. ("Jefferies") on February 11, 2008; and (b) the terms of the Jefferies offering circular were similar to the terms of the February 1, 2008 Wayzata term sheet.

50.    In addition, and more importantly, the Debtors should explicitly disclose that Saratoga and its equity holders did not provide any cash contribution in connection with the Harvest acquisition and that the entire funding came from Wayzata and Macquarie.

---

[16] A true and correct copy of which is attached hereto as **Exhibit "B."**

[17] A list of the relevant factors is attached hereto as **Exhibit "C."**  Article IX of the Disclosure Statement cites to the May 2009 10-K/A as listing risk factors, but makes no effort to discuss or explain such risks.  Mere reference to a separate document should not be considered sufficient to inform creditors of material risks associated with the Plan.

US 90698v.6

51.     Page 7 of the Disclosure Statement posits that the 4.9 million shares issued by Saratoga to the sellers in connection with the Harvest acquisition had an implied value of approximately $48 million.[18]  This contention is a gross overstatement and contradicts statements contained in Saratoga's SEC filings and statements made, under oath, by the Debtors chief accounting officer, Edward Hebert.  In its July 18, 2008 Form 8-K filing with the SEC, Saratoga stated that "[t]he acquisition and related transactions involved $105.7 million in cash and issuance of 4,900,000 shares of Saratoga Resources, Inc. valued at $12.3 million."[19] Similarly, on September 17, 2009, Mr. Hebert stated, under oath, that the value of the stock was approximately $12.5 million.[20]  These statements accurately reflect the maximum market value of the newly-issued stock on the acquisition date.  In the Disclosure Statement, the Debtors are contradicting their prior SEC filings and overstating the Harvest acquisition price by approximately $36 million, an amount nearly 300% of the actual value.

52.     The Disclosure Statement further implies that the pre-acquisition Debtor -- a company with two employees, approximately $30,000 in revenues, and working capital deficit of nearly $2 million -- could issue additional equity interests worth $48,000,000.  This assertion contradicts the Debtors' prior verified statements made in public filings.

53.     On page 9 of the Disclosure Statement, the Debtors claim that the Wayzata Credit Agreement contains "extensive monetary and nonmonetary covenants."  In Saratoga's SEC filings,[21] however, the Debtors have repeatedly described the Wayzata Credit Agreement as

---

[18] On July 14, 2008, the date when the 4.9 million shares were issued, Saratoga's stock closed at $2.55 per share, making the value of such shares as of closing approximately $12.5 million (the product of the stock price and the number of issued shares).

[19] Saratoga's July 18, 2008 Form 8-K at p. F-59.  A copy of the relevant portion of this filing is attached hereto as **Exhibit "D."**

[20] September 17, 2009 Deposition of Eddie Hebert,  93:20 – 93:22.  A copy of the relevant portion of the Herbert transcript is attached hereto as **Exhibit "E."**

[21] As recently as Saratoga's May 2009 10-K.

US 90698v.6

including "normal covenants and credit conditions ...."  May 2009 10-K at 30; F-18 n.5; F-21 n.6.[22]  This same recitation should be included in the Disclosure Statement.

54.     On pages 10-14 of the Disclosure Statement, the Debtors employ the Society of Petroleum Engineers (SPE) valuation methods and NYMEX forward curve pricing to estimate the PV-10 value of their reserves.  This approach is objectionable on several grounds, including:

a.      Saratoga employed an SEC-mandated valuation method in its May 2009 10-K, yet seeks to use a different valuation method in the Disclosure Statement.  As a public company, Saratoga should not be allowed to flee from SEC reporting requirements regarding valuation of reserves.  In particular, the SEC method uses the current spot price for oil and natural gas, rather than the NYMEX forward curve.  At present, the SEC will only allow public companies to use the spot price as the pricing metric in public filings.  Because the Disclosure Statement is akin to an SEC filing, the Debtors should, at a minimum, be required to disclose both the SEC and SPE valuations in their Disclosure Statement.  In the May 2009 10-K, Saratoga reported that its reserves, as of December 31, 2008, had a PV-10 value of $148 million on a pretax basis and $98 million on an after tax basis.  These numbers stand in stark contrast to the reserve value figures set forth in the Disclosure Statement.  The omission of valuation information based on SEC requirements is material and results in misleading interpretations of the Debtors' financial condition.

b.      Further, the Disclosure Statement omits any disclaimer about the risks and imprecision associated with reserve estimates.  The failure to do so is a material omission and is misleading.  The Debtor, at a minimum, must include the following disclaimer, which is contained in the May 2009 10-K:[23]

***Reserve estimates depend on many assumptions that may turn out to be inaccurate and any material inaccuracies in the reserve estimates or underlying assumptions of our properties will materially affect the quantities and present value of those reserves.***

Estimating crude oil and natural gas reserves is complex and inherently imprecise. It requires interpretation of the available technical data and making many assumptions about future conditions, including price and other economic

---

[22] *See also* Saratoga's Form 10-Q filed August 14, 2009 (p. 16); Form 10-K filed April 15, 2009 (pp. 26; F-16 n.4; F-21 n.5); Form 10-Q filed November 19, 2008 (pp. 7 n.1; 19); Form 8-K/A filed August 21, 2008 (p. 4); Form 10-Q filed August 14, 2008 (pp. 9 n.8; 13); Form 8-K filed July 18, 2008 (p. 3) (in each case stating that the Wayzata Credit Agreement includes normal covenants and credit conditions and is subject to the terms of an Intercreditor Agreement with the company and Macquarie Bank Limited).

[23] May 2009 10-K at 18.

09-50397 - #653  File 09/28/09  Enter 09/28/09 17:14:50  Main Document    Pg 23 of 33

conditions. In preparing such estimates, projection of production rates, timing of development expenditures and available geological, geophysical, production and engineering data are analyzed. The extent, quality and reliability of this data can vary. This process also requires economic assumptions about matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. If our interpretations or assumptions used in arriving at our reserve estimates prove to be inaccurate, the amount of oil and gas that will ultimately be recovered may differ materially from the estimated quantities and net present value of reserves owned by us. Any inaccuracies in these interpretations or assumptions could also materially affect the estimated quantities of reserves shown in the reserve reports summarized herein. Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and gas reserves most likely will vary from estimates. In addition, we may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond our control.

55.     In addition to overstating reserve estimates, the Debtors' valuation also fails to reflect material downward changes in spot prices that have occurred since June 30, 2009. In the case of natural gas, the average Henry Hub spot price for September 1-25, 2009 is $2.92 per million cubic feet (Mcf),[24] well below the July Collarini Report forecast of $3.98 per Mcf.[25] Not only does the Collarini Report materially overstate current spot prices, it assumes that natural gas and crude oil prices will, respectively: (a) increase significantly over the next few months,[26] (b) average $6.06 per Mcf[27] and $73.35 per barrel (bbl) next year, and (c) average $6.97 per Mcf and $79.94 per bbl over the next five years. In light of the fact that approximately 60% of the Debtors' alleged reserves consist of natural gas, the Debtors' failure to re-run their reserve report using more current and accurate pricing constitutes a material misstatement regarding the alleged value of their reserves.

---

[24] *See* Bloomberg.

[25] Similarly, the spot price for oil has also declined, though not as severely as natural gas.

[26] Notably, the Collarini Report assumes that natural gas spot market prices will rise more than 50% within the next several months.

[27] More than double the September 2009 month-to-date average

56.     Moreover, unless the Debtors contract against NYMEX pricing, such pricing is unreliable and completely irrelevant to the Debtors' present and future cash flow. For example, on the date of the Harvest acquisition (July 14, 2008), the October 2009 NYMEX price on natural gas contract closed at $11.41 per Mcf, nearly triple to where it currently stands. The Debtors' now ask the Court and Wayzata to rely upon bullish indicative pricing looking more than five years into the future. At a minimum, the Disclosure Statement should be amended to (a) reflect pricing realities and (b) include projections that assume flat commodity pricing (the next logical step after SEC case reserve report pricing) or at least a sensitivity analysis reflecting the effect changes in commodity prices would have on the Debtors' projected financial performance and the proposed Plan. Prices have materially changed and the Debtors' Disclosure Statement should reflect as much.

57.     Moreover, the Debtors' statements that Collarini is acting as an independent reserve engineer must be qualified. According to the Disclosure Statement, Collarini has conducted several full field studies for the Debtors and, upon information and belief, audited its own findings in some instances.[28] There is no evidence that Collarini is, in fact, independent. At a minimum, the Disclosure Statement should state how much money Collarini has been paid for (a) conducting so-called "independent" analysis of the Debtors' alleged reserves; and (b) field study work and other work associated with attempting to "prove" the existence of new reserves, as well as how much of Collarini's annual revenues for oil and gas engineering services are derived from the Debtors compared to its other clients.

---

[28] *See* Disclosure Statement at 12 ("In addition to the aforementioned proved reserves, and pursuant to the Collarini Second Quarterly 2009 Reserve Report, Saratoga has probable reserves of 3,010 MBO plus 43,72 MMCF, with PV10 of $194,475,000 and possible reserves of 12,270 plus 84,129 MMCF, with PV10 of $311,939,000, **all of which have been independently audited by Collarini.**" (emphasis added)). Wayzata has been unable to verify Collarini's actions, however, because the Debtors have not provided unredacted copies of Collarini's invoices.

58. The Disclosure Statement also fails to disclose the inherent problems and caveats to PV-10 reserve valuation set forth in the Debtors' May 2009 10-K. On page F-30 of the Notes to the Consolidated Financial Statements in its May 2009 10-K, Saratoga states that:

> In reviewing the information that follows, we believe that the following factors should be taken into account:
>
> - future costs and sales prices will probably differ from those required to be used in these calculations;
>
> - actual production rates for future periods may vary significantly from the rates assumed in the calculations;
>
> - a 10% discount rate may not be reasonable relative to risk inherent in realizing future net oil and gas revenues [emphasis added]; and
>
> - future net revenues may be subject to different rates of income taxation."

May 2009 10-K at F-30 (emphasis added).

59. At a minimum, the Disclosure Statement should contain these same admonitions that the Debtors placed in an SEC filing made just a few months ago. In particular, the Debtors' failure to mention that the use of a mere 10% discount rate may not be reasonable (as highlighted above) is a material omission in the Disclosure Statement that must be remedied.

60. The Disclosure Statement contains additional misstatements on pages 14-15 regarding pre-purchase valuations of the Harvest Assets. Specifically, paragraph 14 states:

> Prior to the closing of the Harvest Acquisitions, Wayzata engaged Netherland Sewell and Associates, Inc. ("NSAI") to undertake due diligence on 80% of the proved value of the Harvest Companies' assets. It was determined that 80% of the value was contained in the Grand Bay, Main Pass 25 and Vermilion 16 fields so NSAI concentrated its evaluation on those same assets. A comparison of internal (Saratoga) and external (Collarini and NSAI) reserve estimates for proved reserves, as of September 1, 2007, was made for the Grand Bay, Main Pass 25 and Vermilion 16 fields only. A valuation was not available for the Saratoga estimate but note, in the chart below, that the NSAI PV10 valuation of $ 211,670,000 was only 14.8% less than that of Collarini while the NSAI reserve volumes of 49.4 BCFE were less than 9% below Collarini's estimate of 54.3 BCFE (also note that Collarini's estimate for proved reserves was 37.5% of

Saratoga's internal estimate, an example of Collarini's conservatism relative to reserve assessment)

This statement is false and made without any discernible basis.

61.     NSAI, who was retained by Wayzata as part of its due diligence, delivered a reserve report[29] to Wayzata in June of 2008 that stated a PV10 value for proven reserves for the Harvest Assets of approximately $155 million as of January 1, 2008.[30]   Wayzata is not sure on what basis the Debtors allege that NSAI concluded the PV-10 of these assets was $211 million in 2008.  As is clear from NSAI's June 23, 2008 reserve report to Wayzata, the Debtors' statements regarding NSAI's 2008 reserve report are materially misleading.  Far from a mere 14% differential, NSAI's reserve report concluded that the Debtors' reserves, as of January 1, 2008, were less than half the Debtors' alleged January 1, 2008 PV-10 value of $340 million.

62.     Wayzata posits that the reason for the text of the Disclosure Statement set forth above is an attempt to suggest that NSAI and Collarini have similar views regarding the assets.  Nothing could be further from the truth.   Additionally, the text quoted above is misleading because it merely uses an amount of recoverable oil and gas as the basis for implying a valuation of such reserves, rather than considering whether recovering such reserves is economic.   If the Debtors cite to the valuation promulgated by NSAI in 2008, they must do so correctly.

63.     Further, the Debtors' discussion regarding drilling and development is also misleading.  In particular, the Debtors' discussion on page 16 of the Disclosure Statement regarding the developmental "GPLD A-191 Well" fails to tell the whole story.  The Debtors claim that the final cost of the GPLD A-191 Well was approximately $12 million.[31]   The

---

[29] A copy of the June 2008 NSAI Reserve Report will be submitted to the Court in connection with the valuation hearing on October 1 and 2, 2009.

[30] See Cover Letter to June 2008 NSAI Reserve Report

[31] Disclosure Statement at 16.

Debtors originally stated that the GPLD A-191 Well would cost approximately $3-4 million. The Debtors' failure to disclose the material dollar discrepancy between predicted costs of production, especially with respect to the only new well that the Debtors have drilled in over four years, is a material omission. Additionally, the occurrence of these significant cost deviations also mandates that the Debtors disclose the imprecise and unpredictable nature of the cost, timing, and results of drilling and exploration activities. Indeed, in their SEC filings, the Debtors have made similar statements (as they should) as to imprecision and unpredictability. Here, the Debtors ignore their own real-world experiences in an effort to paint an overly optimistic picture of their financial condition. The failure to emphasize the risks and dangers of drilling and exploration in the Disclosure Statement is unquestionably material.

64.     On page 20 of the Disclosure Statement, the Debtors "dispute" that an event of default occurred under the Wayzata Credit Agreement. The Debtors' refusal to acknowledge a default is false and misleading. The Debtors delivered unaudited financials for the fourth quarter of 2008 to Wayzata on February 24, 2009 (several days late and only after Wayzata had requested them on multiple occasions), along with the Debtors' most recent working financial model. The unaudited financials for the fourth quarter of 2009 were plainly identified as such by the Debtors' Chief Accounting Officer in an email to Wayzata. Additionally, Edward Herbert, the Debtors' Chief Accounting Officer, has readily admitted that the Debtors defaulted on their obligations.[32]

65.     In any event, in accordance with the terms of the Credit Agreement, Wayzata tested all covenants against the unaudited quarterly financials. The Debtors' own financials plainly demonstrated breaches of nearly every financial covenant. More alarmingly, the Debtors

---

[32] September 17, 2009 Deposition of Eddie Hebert, 39:23 – 40:70.  A copy of the relevant portion of the Herbert transcript is attached hereto as **Exhibit "E."**

appeared to be stretching trade payables and predicted that they would run out of cash in the coming months. The existence of these financial problems is irrefutable and the Debtors have previously admitted to them.

66.     The Debtors' assertion that the unaudited financials could not serve as the basis for an event of default is also contradicted by the Debtors' own past actions. Indeed, based upon the same quarterly testing regime for the third quarter of 2008, the Debtors alerted Wayzata in writing and in advance that they would fail to comply with several covenants based on their third quarter numbers. In response to the Debtors' request for covenant relief, Wayzata prepared and executed a waiver of all third quarter covenant breaches. The Debtors' denial of their failure to comply with covenants in this matter contradicts the facts, the Debtors' own statements, and the Debtors' past practices. The Debtors need to admit that an actual event of default occurred. Any statement to the contrary is false.[33] At a minimum, Wayzata should be allowed to propose insertion of language that sets forth its view of the default issues.

67.     On pages 28 of the Disclosure Statements, the Debtors fail to quantify the monetary risk associated with the State of Louisiana Royalty Audit, including (a) whether the Debtors have the financial resources to pay any resulting defaults and (b) whether risks associated with such audit will materially impact their restructuring. The Disclosure Statement simply does not give creditors sufficient information regarding the State's audit or its potential effect on the Debtors' operations and plan feasibility.

68.     On page 29 of the Disclosure Statement, the Debtors blur the line between valuation of reserves and valuation of the Debtors' businesses; such valuations are not identical.

---

[33] It is notable that the Debtors failed to file a Form 8-K regarding this event. Similarly, the Debtors failed to file a Form 8-K upon the filing of its two disclosure statements in this proceeding, the publication of its serial reserve reports (which do not comply with SEC requirements for reserve reports), and several other events that Wayzata believes are material.

US 90698v.6

Nowhere in the Disclosure Statement do the Debtors disclose that, as previously stated in SEC filings, that the PV-10 reserve figure may not be an accurate valuation metric for the market value of reserves. This non-disclosure is a material omission that must also be remedied.

### (iv) *The Disclosure Statement Fails to Describe Key Events During the Bankruptcy Proceeding*

69.     The Disclosure Statements also fails to: (a) acknowledge the existence of a dispute as to the appraised value of the Debtors' proved reserves; (b) detail any of the conflicting valuations of the Debtors' reserves; and (c) describe (or even disclose) the Debtors' apparently-unsuccessful efforts during the cases to raise additional financing, whether as debt or equity. As such, the Disclosure Statement is deficient as not containing adequate information and should not be approved. *See, In re Keisler*, 2009 WL 1851413 at *5 (Bankr. E.D. Tenn. 2009) ("The court's primary concern in the adequacy stage . . . is simply whether creditors have been provided with sufficient information to make an informed decision as to whether they should accept or reject [a plan] and the Debtors have provided such information, disclosing that there is a dispute as to the value").

70.     The Debtors' failure to disclose their attempts to secure debt or equity financing is particularly troubling in light of the disclosure contained in Saratoga's Form 10-Q filed with the SEC on August 14, 2009:

> We have no commitments to provide capital or financing if needed to retire our existing indebtedness and, given the current condition of the capital and credit markets, there is no assurance that any such capital or financing will be available on acceptable terms, or at all, if needed.

71.     Finally, the Disclosure Statement fails to include a discussion of the Debtors' financial performance throughout their bankruptcy cases. Simply attaching the Debtors' financial statements and referring to the Debtors' operating reports, without any meaningful discussion whatsoever, provides an incomplete picture of the Debtors' performance.

## RESERVATION OF RIGHTS

72.     Wayzata reserves its rights to amend or supplement this Objection, to introduce evidence supporting this Objection at any hearing thereon, and to seek any alternative or incremental relief.  Wayzata also fully reserves all of its rights to make any other or further objections to the confirmation of the Plan, whether referred to in this Objection or not.

**WHEREFORE**, Wayzata respectfully request that the Court (a) sustain this Objection, (b) deny approval of the Disclosure Statement, (c) deny confirmation of the Plan, and (d) grant it such other and further relief to which it is justly entitled.

US 90698v.6

Dated: September 28, 2009

Respectfully submitted,

By: */s/ Courtney S. Lauer*
Paul E. Heath, TX Bar. No. 09355050
James J. Lee, TX Bar No. 12074550
Courtney S. Lauer, LA Bar No. 23029
VINSON & ELKINS L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas  75201-2975
Tel:  214-220-7976   Fax:  214-999-7976
Email: pheath@velaw.com; jimlee@velaw.com;
clauer@velaw.com

- and –

Joseph P. Hebert
LA Bar No. 6734; TX Bar No. 789095
LISKOW & LEWIS
P.O. Box 52008
Lafayette, LA 70505-2008
822 Harding Street
Lafayette, LA 70503
Tel:  337-232-7424
Fax:  337-267-2399
Email: jphebert@liskow.com

**ATTORNEYS FOR WAYZATA
INVESTMENT PARTNERS LLC, AS
ADMINISTRATIVE AGENT**

US 90698v.6

## <u>CERTIFICATE OF SERVICE</u>

       This is to certify that a copy of the above pleading was served on September 28, 2009, by Electronic Filing through the court's electronic filing system and/or via U.S. Mail, First Class, postage prepaid, upon those parties and in the manner set forth on the attached Service list.


                              */s/ Courtney S. Lauer*
                                      One of Counsel