# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HARVEST OIL & GAS, LLC, *et al.* | § | Case No. 09-50397 |
| | § | (Jointly Administered) |
| Debtors | § | |
| | § | |

## DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE

ROBIN B. CHEATHAM
JOHN M. DUCK
LISA M. HEDRICK
DAVID K. BOWSHER
JOHN A. LEE
JOANN J. COURCELLE
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
*Attorneys for the Debtors*


PAUL J. GOODWINE
Schully, Roberts, Slattery & Marino,
A Professional Law Corporation
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800
Facsimile: (504) 585-7890
*Special Counsel for the Debtors*

DATED: October 6, 2009

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Debtors' Second Amended Plan of Reorganization |
| Exhibit B | Summaries of the Collarini Year End 2008 Reserve Report and the Collarini Second Quarter 2009 Reserve Report |
| Exhibit C | Claims Registry |
| Exhibit D | Debtors' Financial Statements |
| Exhibit E | Financial Projections |
| Exhibit F | Liquidation Analysis |
| Exhibit G | Retained Causes of Action |
| Exhibit H | Post-Effective Date Equity Holdings |
| Exhibit I | Information About SPE and SEC Reserve Reporting |

ARTICLE I ....................................................................................................................... 1
INTRODUCTION ............................................................................................................... 1
    A.  FILING OF THE DEBTORS' BANKRUPTCY CASE ....................................................... 1
    B.  PURPOSE OF DISCLOSURE STATEMENT ................................................................. 1
    C.  HEARING ON CONFIRMATION OF THE PLAN ........................................................... 3
    D.  SOURCES OF INFORMATION .................................................................................. 3
ARTICLE II ...................................................................................................................... 4
EXPLANATION OF CHAPTER 11 .................................................................................. 4
    A.  OVERVIEW OF CHAPTER 11 ................................................................................. 4
    B.  PLAN OF REORGANIZATION ................................................................................. 4
ARTICLE III .................................................................................................................... 5
BACKGROUND OF THE DEBTORS ............................................................................. 5
    A.  DESCRIPTION OF THE DEBTORS' BUSINESSES ...................................................... 5
        1.  The Harvest Acquisitions .......................................................................... 6
        2.  Macquarie Credit Agreement .................................................................... 8
        3.  Wayzata Credit Agreement ....................................................................... 9
        4.  Overview of the Debtors' Assets and Operations ...................................... 9
        5.  Effects of Hurricanes Gustav and Ike ...................................................... 15
        6.  Macroeconomic Impact on Oil and Natural Gas Prices; Hedging Practices .... 15
        7.  Drilling and Development Activities .......................................................... 16
        8.  Cost Containment and Operating Efficiency Measures ............................ 18
        9.  Market for Saratoga's Common Stock .................................................... 20
    B.  EVENTS LEADING TO BANKRUPTCY ..................................................................... 20
ARTICLE IV .................................................................................................................... 22
EVENTS DURING THE CHAPTER 11 BANKRUPTCY CASE ................................ 22
    A.  FILING OF THE CHAPTER 11 PETITION ................................................................. 22
    B.  RETENTION OF COUNSEL BY THE DEBTORS ......................................................... 22
    C.  STATEMENTS AND SCHEDULES ............................................................................ 22
    D.  SIGNIFICANT POST-PETITION EVENTS ................................................................. 22
        1.  First Day Motions ..................................................................................... 22
        2.  First Day Orders ........................................................................................ 23
        3.  Employment of Professionals of the Debtors ........................................... 24
        4.  Cash Collateral Orders ............................................................................. 25
        5.  Appointment of the Official Committee of Unsecured Creditors ............. 27
        6.  Appointment of the Official Committee of Equity Security Holders ........ 27
        7.  Monthly Operating Reports, Schedules and Statements, Meeting of Creditors and Bar Date .... 28
        8.  State of Louisiana Royalty Audit ............................................................. 29
        9.  Extension of Exclusivity ............................................................................ 29
      10.  Valuation Hearing and Confirmation Hearing .......................................... 30
      11.  Financial Results During the Bankruptcy Case ....................................... 30
ARTICLE V ..................................................................................................................... 31
VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS ................... 31
    A.  BALLOTS AND VOTING DEADLINE ....................................................................... 31
    B.  CLASS ENTITLED TO VOTE ................................................................................. 31
    C.  BAR DATE FOR FILING PROOFS OF CLAIM ........................................................... 31
    D.  DEFINITION OF IMPAIRMENT ............................................................................... 32
    E.  VOTE REQUIRED FOR CLASS ACCEPTANCE .......................................................... 32
    F.  INFORMATION ON VOTING AND BALLOTS ............................................................ 32
    G.  EXECUTION OF BALLOTS BY REPRESENTATIVES ................................................... 33
    H.  CONFIRMATION OF PLAN ..................................................................................... 34
        1.  Solicitation of Acceptances ...................................................................... 34
        2.  Requirements for Confirmation of the Plan ............................................. 34
        3.  Acceptances Necessary to Confirm the Plan ........................................... 35
        4.  Cramdown ................................................................................................. 36
ARTICLE VI .................................................................................................................... 36
FINANCIAL STATEMENTS OF THE DEBTORS ..................................................... 36

i

ARTICLE VII ...................................................................................................... 36
DESCRIPTION OF THE PLAN OF REORGANIZATION .......................................... 36
  A.  INTRODUCTION ................................................................................................ 36
  B.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................ 37
    1.  Unclassified Claims .................................................................................. 37
      a. Allowed Administrative Expense Claims against the Debtors ................... 37
      b. Allowed Professional Fee Claims Against the Debtors ........................... 37
      c. Allowed Priority Unsecured Tax Claims ............................................ 38
      d. U.S. Trustee's Fees .................................................................... 39
      e. Disallowance of Special Taxes ...................................................... 39
      f. Plugging and Abandonment Claims ................................................. 39
    2.  Classes of Claims and Equity Interests ....................................................... 39
      a. Class 1 - Priority Unsecured Claims ............................................... 42
      b. Class 2 - Macquarie Secured Claim ................................................ 42
      c. Class 3 - Wayzata Secured Claim ................................................... 43
      d. Class 4 - Oil Well Lien Act Claims ................................................. 45
      e. Class 5 - Other Secured Claims ..................................................... 53
      f. Class 6 - General Unsecured Claims ................................................ 53
      g. Class 7 - State Lessor Audit Royalty Claims ..................................... 54
      h. Class 8 - Management Note Claims ................................................. 54
      i. Class 9 - Non-Warrant Equity Interests ........................................... 55
      j. Class 10 - Warrants .................................................................... 55
  C.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................ 55
    1.  Assumption and Rejection. ....................................................................... 55
    2.  Approval of Assumption and Rejection ...................................................... 56
    3.  Cure of Defaults .................................................................................... 56
    4.  Rejection Damage Claims. ........................................................................ 56
ARTICLE VIII. ..................................................................................................... 56
MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN ......................... 56
  A.  GENERAL MEANS OF IMPLEMENTATION ......................................................... 56
    1.  General Provision .................................................................................. 56
    2.  Directors and Officers.. ........................................................................... 56
    3.  Causes of Action ................................................................................... 57
  B.  DISTRIBUTIONS ............................................................................................. 57
    1.  Generally ............................................................................................. 57
    2.  Distributions of Cash .............................................................................. 57
    3.  Record Date for Voting on Plan ................................................................ 57
    4.  Timing of Distributions ........................................................................... 57
    5.  Minimum Distributions; No Interest. .......................................................... 58
    6.  No Fractional Distributions. ...................................................................... 58
    7.  Delivery of Distributions. ......................................................................... 58
    8.  Undeliverable Distributions. ...................................................................... 58
    9.  Withholding. ......................................................................................... 58
    10. Time Bar to Cash Payments .................................................................... 59
    11. Existing Securities and Agreements. .......................................................... 59
  C.  PROCEDURE FOR RESOLVING DISPUTED CLAIMS .............................................. 59
    1.  Right to Object to Claims ........................................................................ 59
    2.  Deadline for Objecting to Claims .............................................................. 59
    3.  Deadline for Responding to Objections ....................................................... 60
    4.  Estimation of Claims .............................................................................. 60
    5.  Payment of Disputed Claims .................................................................... 60
  D.  EFFECT OF CONFIRMATION OF PLAN. ............................................................. 60
    1.  Vesting of Assets ................................................................................... 60
    2.  Amended Organizational Documents of Reorganized Debtors ........................... 60
    3.  Amended and Restated Wayzata Credit Agreement ........................................ 60
    4.  Operation by Reorganized Debtors ............................................................ 61

ii

5. Injunction..........................................................................................................61
6. Indemnification Obligations ..............................................................................61
7. Discharge of Debtors and Claims .....................................................................61
8. No Successor Liability. ......................................................................................62
9. Exculpations. ....................................................................................................62
10. Term of Injunction or Stays ..............................................................................62
E. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE...........................62
1. Conditions .......................................................................................................62
2. Notice of Effective Date ...................................................................................63
3. Revocation of Confirmation Order or Withdrawal of Plan ................................63
F. MISCELLANEOUS PROVISIONS ..................................................................................64
1. Retention of Jurisdiction....................................................................................64
2. Defects, Omissions, Amendments, and Modifications of the Plan......................64
3. Severability.......................................................................................................64
4. Revocation or Withdrawal of the Plan...............................................................64
5. Dissolution of Committees.................................................................................65
6. Exemption from Securities Laws .......................................................................65
7. Successors and Assigns ....................................................................................65
8. Notices.............................................................................................................65
9. Payment of Statutory Fees ...............................................................................66
10. Additional Documents ......................................................................................66
11. Rules of Interpretation......................................................................................66

**ARTICLE IX**..........................................................................................................**67**
**FINANCIAL PROJECTIONS, FEASIBILITY AND RISKS** ..........................................**67**
**ARTICLE X** ............................................................................................................**67**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...............**67**
**ARTICLE XI** ..........................................................................................................**68**
**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN** .....**68**
**ARTICLE XII** .........................................................................................................**68**
**CONCLUSION AND RECOMMENDATION** .............................................................**68**

# ARTICLE I
# INTRODUCTION

Saratoga Resources, Inc. ("Saratoga"), Harvest Oil & Gas, LLC ("Harvest Oil & Gas"), The Harvest Group, LLC ("Harvest Group" and together with Harvest Oil & Gas, the "Harvest Companies"), Lobo Operating, Inc. ("Lobo Operating"), and Lobo Resources, Inc. ("Lobo Resources" and together with Lobo Operating, the "Lobo Companies"), each a debtor and debtor-in-possession (Harvest Oil & Gas, Saratoga, Harvest Group, Lobo Operating, and Lobo Resources, individually referred to herein as a "Debtor" and collectively referred to herein as the "Debtors"), respectfully submit this Second Amended Disclosure Statement, as it may be amended and/or modified (this "Disclosure Statement"), pursuant to Section 1125 of Title 11 of the United States Code in support of the Debtors' Second Amended Plan of Reorganization, as it may be amended and/or modified (the "Plan"). A copy of the Plan is attached to this Disclosure Statement as **Exhibit A**. Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan. Any term used in this Disclosure Statement that is not defined herein or in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to them in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

This Disclosure Statement sets forth certain information regarding the prepetition operations and financial history of the Debtors, events leading to the Debtors' bankruptcy, significant events that have occurred during the Bankruptcy Case (as hereinafter defined), and the means for reorganizing the Debtors' business. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process, the voting procedures and the requirements for voting on the Plan, as well as the conditions to effectiveness of the Plan.

## A. Filing of the Debtors' Bankruptcy Case

On March 31, 2009, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division (the "Bankruptcy Court"), commencing bankruptcy case nos. 09-50397, 09-50398, 09-50399, 09-50400, and 09-50401 (the "Bankruptcy Case"). On April 1, 2009, the Debtors filed a Motion for Joint Administration, requesting joint administration of the Debtors' cases for procedural purposes only, pursuant to Federal Rule of Bankruptcy Procedure 1015(b). On April 8, 2009, the Bankruptcy Court entered Orders in each of the Debtors' cases granting the Debtors' Motion for Joint Administration. The Debtors continue to operate their businesses and manage their property and assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## B. Purpose of Disclosure Statement

This Disclosure Statement is submitted in accordance with Section 1125 of the Bankruptcy Code for the purpose of soliciting acceptances of the Plan from holders of certain

1

Classes of Claims. Acceptances of the Plan are only being sought from holders of Claims that are "impaired" (as that term is defined in Section 1124 of the Bankruptcy Code) by the Plan and who are receiving or retaining property under the Plan. Holders of Claims that are not impaired are deemed to have accepted the Plan. Holders of Claims or Equity Interests that are not receiving or retaining any property under the Plan are deemed to have rejected the Plan.

The Debtors have prepared this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against the Debtors, along with a written disclosure statement containing adequate information about the Debtors of a kind, and in sufficient detail, as far as is reasonably practical, that would enable a hypothetical, reasonable investor typical of the holders of Claims to make an informed judgment in exercising their right to vote on the Plan.

This Disclosure Statement was approved by the Bankruptcy Court on _____ ___, 2009. Such approval is required by the Bankruptcy Code, and does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or the value or suitability of any consideration offered under the Plan. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of Section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Claims whose acceptance of the Plan is solicited to make an informed judgment regarding acceptance or rejection of the Plan.

**APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED SOLELY FOR THE USE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN.**

**THE DEBTORS BELIEVE THAT THE PLAN AND THE PROPOSED TREATMENT OF CLAIMS AND EQUITY INTERESTS ARE IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, AND THEREFORE URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**NEITHER THE FILING OF THE PLAN NOR ANY STATEMENT OR PROVISION CONTAINED IN THE PLAN OR IN THE DISCLOSURE STATEMENT, NOR THE TAKING BY ANY PARTY IN INTEREST OF ANY ACTION WITH RESPECT TO THE PLAN, SHALL (i) BE OR BE DEEMED TO BE AN ADMISSION AGAINST INTEREST, AND (ii) UNTIL THE EFFECTIVE DATE, BE OR BE DEEMED TO BE A WAIVER OF ANY RIGHTS ANY PARTY IN INTEREST MAY HAVE (a)**

2

**AGAINST ANY OTHER PARTY IN INTEREST OR (b) IN ANY OF THE ASSETS OF ANY OTHER PARTY IN INTEREST, AND, UNTIL THE EFFECTIVE DATE, ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED OR FAILS TO BECOME EFFECTIVE, NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT, NOR ANY STATEMENT CONTAINED IN THE PLAN OR THE DISCLOSURE STATEMENT, MAY BE USED OR RELIED ON IN ANY MANNER IN ANY SUIT, ACTION, PROCEEDING OR CONTROVERSY, WITHIN OR WITHOUT THE DEBTORS' BANKRUPTCY CASE, INVOLVING THE DEBTORS, EXCEPT WITH RESPECT TO CONFIRMATION OF THE PLAN.**

**C.      Hearing on Confirmation of the Plan**

The Bankruptcy Court has set November 9, 10, 12, 13, 2009 at __:__ **[a.m./p.m.]** Central Time as the time and date for the hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of holders of Claims and Equity Interests and whether the other requirements for confirmation of the Plan have been satisfied. Holders of Claims and Equity Interests may vote on the Plan by completing and delivering the enclosed ballot in the enclosed return envelope, or otherwise forward it to Kristen M. Reyna, Adams and Reese LLP, 4500 One Shell Square, New Orleans, Louisiana 70139, on or before 5:00 p.m. Central Time on November 4, 2009. If one or more Impaired Classes of Claims does not accept or is deemed not to accept the Plan, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Section 1129(b) of the Bankruptcy Code (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims. The procedures and requirements for voting on the Plan are described in more detail below.

**D.      Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their businesses, properties and management have been prepared from information furnished by the Debtors or from public filings made by the Debtors.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Debtors have made every effort to retain the meaning of such other documents or portions that have been summarized, they urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of the document shall govern and apply.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to the holder of a Claim under the Plan should be relied on other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Debtors, Robin B. Cheatham and John M. Duck, Adams and Reese LLP, 4500 One Shell Square, New Orleans, Louisiana 70139, (504) 581-3234.

## ARTICLE II
### EXPLANATION OF CHAPTER 11

### A.      Overview of Chapter 11

The commencement of a Chapter 11 case creates an estate comprised of all of a debtor's legal and equitable interests in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a Chapter 11 debtor may continue to operate its business and control its assets as a "debtor-in-possession."

The filing of a Chapter 11 petition also triggers the automatic stay under Section 362 of the Bankruptcy Code. The automatic stay is an injunction that halts essentially all attempts to collect prepetition claims from a debtor or to otherwise interfere with a debtor's business or its property.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor. Unless a trustee is appointed or the Court so orders, only the debtor may file a plan during the first 120 days of a Chapter 11 case or any extension of that period pursuant to an order of the Bankruptcy Court (the "Exclusive Period"). After the Exclusive Period has expired, a creditor or any other interested party may file a plan, unless the debtor files a plan within the Exclusive Period.

### B.      Plan of Reorganization

After a plan has been filed, the holders of Claims against or Equity Interests in a debtor generally are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a Claim against or Equity Interest in a debtor vote in favor of a plan in order for the plan to be confirmed. At a minimum, however, a majority in number and two-thirds in amount of those Claims actually voting from at least one class of Claims impaired under the plan must vote to accept the plan. The Bankruptcy Code also defines acceptance of a plan by a class of Equity Interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of Claims or Equity Interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and are therefore not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual

4

rights attaching to the Claims or Equity Interests of that class. Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Conversely, classes of Claims or Equity Interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if classes of Claims and Equity Interests accept a plan of reorganization, the Bankruptcy Court may nonetheless deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired, dissenting creditors and interest holders and that the plan be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to impaired, dissenting creditors and interest holders under a plan may not be less than that which those parties would receive if the debtor were liquidated under a hypothetical Chapter 7 proceeding. A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired Claims and Equity Interests accept it. The Bankruptcy Court may do so under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code. In order for a plan to be confirmed under the cramdown provisions, despite a class of impaired Claims or Equity Interests not accepting or being deemed not to accept the plan, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of Claims or Equity Interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of a particular plan meet the specific requirements of Section 1129(b) of the Bankruptcy Code with respect to any class of Claims that does not accept or is deemed not to accept the plan. If a plan's proponent seeks confirmation of the plan under the provisions of Section 1129(b) of the Bankruptcy Code, the plan must also meet all applicable requirements of Section 1129(a) of the Bankruptcy Code (except Section 1129(a)(8)). Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law; (ii) the plan be proposed in good faith; and (iii) at least one impaired class of creditors or interest holders has voted to accept the plan.

## ARTICLE III
### BACKGROUND OF THE DEBTORS

### A.    Description of the Debtors' Businesses

Saratoga is an independent oil and natural gas company engaged in the exploration, development, production, acquisition and exploitation of natural gas and crude oil properties. Saratoga operations are principally conducted through its four wholly-owned subsidiaries, Lobo Operating, Lobo Resources, Harvest Oil & Gas and Harvest Group (collectively, the Lobo Companies and the Harvest Companies are referred to as the "Subsidiaries"). Saratoga and its

5

Subsidiaries have approximately 110 wells in production, including 109 wells in Louisiana and one well in Texas.

## 1. The Harvest Acquisitions

On October 18, 2007 and October 24, 2007, respectively, following months of diligence and negotiations, Saratoga entered into Purchase and Sale Agreements (the "PSAs") with Harvest Oil & Gas, Harvest Group and the owners (the "Sellers") of Harvest Oil & Gas and Harvest Group. Pursuant to the terms of the PSAs, Saratoga agreed to purchase, and the Sellers agreed to sell to Saratoga, all of the equity interests in Harvest Oil & Gas and Harvest Group, respectively, for aggregate cash consideration of $145,000,000, subject to certain adjustments, which amount was payable $110,000,045 in cash and the balance in the form of subordinated promissory notes (the "Subordinated Notes"). The terms of the Subordinated Notes provided for (i) interest payable quarterly at eight percent (8%), (ii) payment of principal on the earlier of thirty-six (36) months from closing or receipt of funding by Saratoga from a fully-underwritten registered public offering yielding net proceeds to Saratoga of at least $70,000,000, and (iii) payment of additional interest at maturity or repayment of the Subordinated Notes such that the effective yield on the Subordinated Notes would equal twenty percent (20%) with such additional interest being payable, at Saratoga's option, in either cash or common stock of Saratoga.

Following execution of the PSAs, Saratoga undertook extensive discussions and negotiations with various investment banking firms (the "Investment Bankers"), including but not limited to Jefferies & Company, Inc. ("Jefferies"), SMH Capital, Inc. ("SMH") and Pritchard Capital Partners, LLC ("Pritchard"), with a view to securing additional debt and/or equity financing to pay the cash portion of the purchase price of the Harvest Companies. Pursuant to those efforts, on February 11, 2008, Saratoga entered into an engagement letter with Jefferies whereby Jefferies agreed to act as financial advisor and lead manager, placement agent or purchaser of debt securities in an amount sufficient to finance the acquisition of the Harvest Companies (the "Harvest Acquisitions"). Jefferies, in turn, prepared an offering circular (the "Offering Circular") whereby Jefferies, as sole book running manager and, along with SMH and Pritchard, as initial purchasers, undertook to purchase and/or place $115,000,000 in five year senior secured notes and warrants to purchase 115,000 shares of Saratoga common stock.[1] As reflected in the Offering Circular and in other investment materials prepared by the various Investment Bankers, the Harvest Acquisitions represented a favorable below market acquisition and investment opportunity with proved reserves of the Harvest Companies valued at in excess of $300,000,000 being acquired at a price well below prevailing market prices coupled with the addition of an experienced management team at Saratoga and implementation of a comprehensive strategy to exploit assets that had previously been underdeveloped by the Harvest Companies. Jefferies ultimately entered into a Purchase Agreement to acquire the securities referenced in the Offering Circular. However, despite repeated assurances from Jefferies, ultimately Jefferies failed to perform under its Purchase Agreement.

---

[1] At Saratoga's request, Wayzata sent an indicative letter of intent and term sheet to Saratoga on February 1, 2008, before Saratoga engaged Jeffries, proposing similar terms to those of the Offering Circular.

6

Following the failure of Jefferies to perform under the Purchase Agreement, Saratoga entered into discussions with other Investment Bankers and with various prospective investors, including Wayzata and other investors originally introduced in connection with the Jefferies-led offering.

Wayzata indicated a continuing interest in financing the Harvest Acquisitions, subject, however, to a maximum amount Wayzata would finance of $97,500,000 and subject to the requirement that senior revolver debt not exceed $25,000,000. In order to accommodate the cash limits imposed by Wayzata; Saratoga, Harvest Oil & Gas, Harvest Group and the Sellers entered into amendments to the PSAs, which, among other things, extended the closing of the purchase and sale transactions and modified the purchase price provisions of the PSAs. The cash portion of the purchase price would be $105,683,000, to be funded entirely by borrowings from Wayzata and Macquarie (discussed *infra* in greater detail), not by Saratoga's owners at the time. Saratoga would also issue 4,900,000 shares of common stock to the owners of the Harvest Companies.

On July 14, 2008, Saratoga completed the Harvest Acquisitions, acquiring all of the equity interests in the Harvest Companies, each an independent oil and natural gas company engaged in the exploration, development, production, acquisition and exploitation of natural gas and crude oil properties, together covering approximately 33,000 gross (30,000 net) acres across thirteen fields in the state waters of Louisiana, including Breton Sound Block 18, Breton Sound Block 31, Breton Sound Block 32, Breton Sound Block 51, Crooked Bayou, Grand Bay, Lake Fortuna, Little Bay, Main Pass Block 25, Main Pass Block 46, Main Pass Block 52, South Atchafalaya Bay and Vermilion Block 16.

As consideration for the membership interests in the Harvest Companies, including the retirement of outstanding debt of the Harvest Companies and termination of net profits interests encumbering the holdings of the Harvest Companies, both of which were conditions of closing, Saratoga paid to the former members of the Harvest Companies a combined purchase price of $105,683,000 in cash and issued 4.9 million shares of common stock in Saratoga, representing approximately 31% of the shares outstanding at closing and a significant dilution of Saratoga's pre-acquisition shareholders. Of the shares issued as consideration at closing of the Harvest Acquisitions, 3.3 million shares were issued to the holder of the net profits interests being terminated pursuant to an agreement among the former members of the Harvest Companies and the holder of the net profits interests. Based on the closing price on July 14, 2008, the 4.9 million shares of stock were worth approximately $12,500,000 when issued. When acquired, the Harvest Companies were also responsible for asset retirement obligations and unrealized losses under commodity derivative instruments of over $28,000,000. When aggregated, these amounts total in excess of $146,500,000. Wayzata disagrees with any suggestion that the purchase price for the Harvest Companies exceeded $118,183,000.

In conjunction with the Harvest Acquisitions, and partially in order to comply with requirements in the Wayzata financing transaction to retain the ongoing services of Barry Salsbury, Saratoga issued 1,040,000 shares of common stock as inducement for the continued services of various key employees of the Harvest Companies.

7

Also in conjunction with the Harvest Acquisitions and the lending requirements of Wayzata, at closing of the Harvest Acquisitions, Thomas Cooke ("Cooke") and Andy Clifford ("Clifford"), the principal officers and shareholders of Saratoga, agreed to extend amounts owed by Saratoga to Cooke and Clifford for advances and deferred salary, totaling approximately $780,000, pursuant to the issuance of Subordinated Promissory Notes payable, with interest at 10%, in monthly installments over three years (the "Management Notes"). Prior to the Harvest Acquisition, Cooke and Clifford were Saratoga's only employees, and Saratoga had minimal operations. By their terms, the Management Notes are subordinate to Saratoga's indebtedness to Wayzata under the Wayzata Credit Agreement. The outstanding principal balance of the Management Notes on the Petition Date was approximately $605,000.

## 2. Macquarie Credit Agreement

In conjunction with the acquisition of the Harvest Companies, Saratoga entered into a Credit Agreement (the "Revolving Credit Agreement") with Macquarie pursuant to which Saratoga assumed and restated the existing Macquarie credit facilities of the Harvest Companies, and Macquarie agreed to provide a revolving credit loan facility in an amount up to $25,000,000. Simultaneous with execution of the Revolving Credit Agreement, Saratoga borrowed $12,528,878 under the revolving credit facility to pay amounts due with respect to the acquisition of the Harvest Companies and related transaction costs. Additionally, letters of credit of the Harvest Companies, totaling approximately $11,500,000, remained outstanding following the Harvest Acquisitions and reduced available borrowing under the revolving credit facility.

Pursuant to the terms of the Revolving Credit Agreement, Saratoga purported to grant to Macquarie a first lien on substantially all of Saratoga's assets, and each of the Subsidiaries executed guarantee agreements purporting to guarantee all amounts owing under the Revolving Credit Agreement.

Loans made under the Revolving Credit Agreement are subject to borrowing base requirements and bear interest at varying rates based on percentage usage of the borrowing base and margins ranging from 2.25% to 2.75% over the applicable LIBOR Rate and 0.75% to 1.25% over the applicable prime rate. Interest on the revolving credit facility is due monthly with respect to prime rate based loans and at the end of each applicable interest period with respect to Eurodollar loans. Loans under the Revolving Credit Agreement mature on April 1, 2011.

Pursuant to the terms of the Revolving Credit Agreement, Saratoga is required to pay $30,000 per year in administrative fees, letter of credit fees equal to the then applicable LIBOR margin payable to the lenders plus a fronting fee of 12.5 basis points and commitment fees and expenses of 50 basis points on the unused portion of the borrowing base under the Revolving Credit Agreement.

The Revolving Credit Agreement includes extensive monetary and nonmonetary covenants and credit conditions and is subject to the terms of an Intercreditor Agreement (the "Intercreditor Agreement") with Saratoga and Wayzata.

8

### 3.    Wayzata Credit Agreement

In conjunction with the acquisition of the Harvest Companies, Saratoga entered into a Credit Agreement (the "Wayzata Credit Agreement") with Wayzata, pursuant to which Wayzata agreed to loan Saratoga $97,500,000 to partially fund Saratoga's acquisition of the Harvest Companies.

Pursuant to the terms of the Wayzata Credit Agreement, Saratoga purported to grant to Wayzata a second lien on substantially all of Saratoga's assets, and each of the Subsidiaries executed guarantee agreements purporting to guarantee all amounts owing under the Wayzata Credit Agreement.

The loans made under the Wayzata Credit Agreement bear interest at 20% per annum and are due and payable in monthly installments of interest only (totaling approximately $1,700,000 per month), with the principal being due and payable in full on July 14, 2011.

Pursuant to the terms of the Wayzata Credit Agreement, Saratoga issued to the Wayzata Lenders a warrant to purchase 805,515 shares of its common stock exercisable for a period of five years at a price of $0.01 per share. These warrants were valued at $2,054,039 at the date of issuance and impact the effective interest rate. If exercised, Wayzata would become the owner of approximately 5% of the equity interest in Saratoga.

The Wayzata Credit Agreement includes a number of covenants and credit conditions and is subject to the terms of the Intercreditor Agreement with Saratoga and Macquarie.

### 4.    Overview of the Debtors' Assets and Operations

Since completion of the Harvest Acquisitions, Saratoga and its Subsidiaries are principally focused on exploration, exploitation, and development of natural gas and crude oil properties in the state waters of Louisiana. The properties obtained in the Harvest Acquisitions provided the Debtors with a valuable reserve base, an extensive portfolio of lower-risk drilling opportunities and a proved reserve commodity mix that is presently approximately 59% natural gas and 41% oil. Current net production of approximately 3,100 barrels of oil equivalent per day has a mix of 62% oil and 38% natural gas.

The principal properties of the Harvest Companies cover approximately 37,756 gross (34,246 net) acres, substantially all of which are held by production without near-term lease expirations. The Harvest Companies own working interests in the properties ranging from 25% to 100%, with an average working interest on a net acreage leasehold basis being approximately 95%. Over 92% of the wells are operated with 100% working interest. The net revenue interests in the properties range from 18% to 82%, with an average net revenue interest on a net acreage leasehold basis being approximately 75%. In addition to the aforementioned acreage holding and wells, there are 6 production platforms and more than 85 miles of pipelines owned and operated by Saratoga and its Subsidiaries.

9

With the approval of Macquarie and Wayzata, Saratoga and its Subsidiaries began an active development program to exploit these oil and gas opportunities. Most of these properties offer multiple stacked reservoir objectives with substantial behind-pipe potential. The Debtors have identified multiple development opportunities on the acreage, as follows:

- 72 proved developed behind-pipe and proved developed shut-in opportunities in 9 fields;
- 72 proved undeveloped opportunities in 3 fields;
- 60 probable developed behind-pipe and probable developed shut-in opportunities;
- 25 probable undeveloped opportunities;
- 18 possible developed behind-pipe opportunities; and
- 63 possible undeveloped opportunities.

Saratoga and its Subsidiaries have initiated an aggressive development program to exploit these opportunities. The Debtors believe this development program will enable them to significantly grow their reserves, production and cash flow. In addition, new state leases were acquired at Main Pass 46 and Vermilion 16 during the last 10 months and an overriding royalty dispute with the former owners relating to Main Pass 47 was settled in Saratoga's favor.

The Debtors also utilize their field infrastructure assets to generate revenues for handling third party oil and gas production at Grand Bay (Clayton Williams), Main Pass 52 (Martin-Marks), Breton Sound 51 (Harvest Operating) and Vermilion 16 (McMoRan). In addition, Saratoga contract-operates the Breton Sound 31 facility and wells on behalf of Aviva. Discussions are well advanced with two other companies with respect to hosting their gas production at Breton Sound 32.

To facilitate the orderly transition of operations following the Harvest Acquisitions, and pursuit of Saratoga's development program, Saratoga undertook efforts to retain substantially all of the Harvest Companies' office-based and field-based personnel, including granting common stock to key personnel and adopting a company match in the previously existing Harvest 401(k) plan. As a result of such undertakings, Saratoga was able to retain substantially all of the key operating personnel while improving employee morale.

Additionally, since the Harvest Acquisitions, the Debtors have made investments in future development of their properties and improved operating efficiency with the addition of a Senior Development Geologist and an Engineering/Operations Technician, the licensing of additional 3D seismic data, the licensing of state-of-the-art technology software and increased management involvement and oversight of field operations. Saratoga is undertaking full field studies on all of its properties in order to (a) evaluate the development potential of each asset, and (b) better allocate resources – both financial and technical. The Debtors have combined technical experience of more than 250 years of relevant oil and gas industry experience plus more than 50 years of experience in the oil and gas industry support functions.

Collarini Associates ("Collarini"), a third party engineering company, has been hired by the Debtors to prepare various reserve reports.[2] These reports were prepared pursuant to the

---

[2] Collarini has also been engaged by the Debtors to assist with the Grand Bay field study.

standards of the Society of Petroleum Engineers ("SPE") utilizing NYMEX strip pricing.[3] The Collarini reserve report dated March 16, 2009 is based upon NYMEX strip pricing at close of business on December 31, 2008 ("Collarini Year End 2008 Reserve Report") and the Collarini reserve report dated September 1, 2009[4] is based upon NYMEX strip pricing at close of business on June 30, 2009 ("Collarini Second Quarter 2009 Reserve Report"). These reports are summarized below.[5] The Debtors expect a report reflecting reserves as of September 30, 2009, to be available in October 2009 and believe that this report will reflect continued increases in reserves as a result of the Debtors' ongoing efforts.[6] For a more detailed presentation of the Reorganized Debtors' post-Effective Date projected financial performance, see Article IX.

<u>As of December 31, 2008</u>

| Reserve Category | Net Remaining Reserves | | Future Net Income (M$) | |
|---|---|---|---|---|
| | Oil (MBO) | Gas (MMCF) | Undiscounted | Present Worth at 10% |
| **Proved** | | | | |
| Producing | 1,714 | 4,853 | 29,512 | 36,018 |
| Shut-In | 5 | 23 | 207 | 182 |
| Behind Pipe | 1,793 | 9,144 | 120,670 | 81,457 |
| Undeveloped | 1,353 | 35,937 | 239,812 | 145,639 |
| Hedge | 0 | 0 | 6,499 | 6,106 |
| **Total Proved** | **4,864** | **49,957** | **396,700** | **269,402** |
| **Probable** | | | | |
| Behind Pipe | 648 | 6,954 | 69,417 | 46,168 |
| Undeveloped | 2,107 | 41,767 | 331,685 | 152,264 |
| **Total Probable*** | **2,755** | **48,721** | **401,102** | **198,432** |
| **Total Possible*** | **3,836** | **58,479** | **528,785** | **163,792** |

---

[3] Note that, as discussed in more detail below, SPE-basis reserve reporting is different than the reserve reporting basis currently used for filings with the U.S. Securities and Exchange Commission.

[4] The Collarini reports dated July 1, 2009 and July 28, 2009 were updated based on additional opportunities identified in the continuing field study.

[5] The probable and possible reserves in the Collarini reports (and reflected in the tables) have not been discounted for the risk associated with future recovery. The reserve value provided by Collarini is net of all expenditures including capital expenditures. The net oil and net gas production forecasts are provided more fully in the Collarini Second Quarter 2009 Reserve Report.

[6] The Debtors will release these results when finalized. In a conference with the Bankruptcy Court on August 11, 2009, Wayzata requested that the Bankruptcy Court limit valuation evidence for the hearing to be conducted on October 1 and 2, 2009 to the Collarini reserve report dated July 28, 2009, which was based on NYMEX strip pricing at the close of business on June 30, 2009. The Bankruptcy Court granted that request subject, the Debtors assert, to the right of the parties to supplement that report. Wayzata disagrees with the Debtors' assertion.

11

## As of June 30, 2009

| Reserve Category | Net Remaining Reserves | | Future Net Income (M$) | |
|---|---|---|---|---|
| | Oil (MBO) | Gas (MMCF) | Undiscounted | Present Worth at 10% |
| **Proved** | | | | |
| Producing | 2,216 | 4,535 | 84,764 | 78,925 |
| Shut-In | 14 | 97 | 2,571 | 1,804 |
| Behind Pipe | 1,805 | 8,380 | 133,260 | 87,863 |
| Undeveloped | 3,854 | 56,236 | 589,933 | 341,344 |
| Hedge | 0 | 0 | 490 | 601 |
| **Total Proved** | **7,890** | **69,248** | **811,017** | **510,536** |
| | | | | |
| **Probable** | | | | |
| Behind Pipe | 757 | 5,799 | 84,680 | 54,620 |
| Undeveloped | 2,515 | 39,348 | 409,734 | 154,191 |
| **Total Probable** | **3,273** | **45,146** | **494,415** | **208,811** |
| | | | | |
| **Total Possible** | **12,416** | **103,973** | **1,386,730** | **352,871** |

More extensive summaries of the two independent, third-party reserve reports are attached hereto as **Exhibit B**. The full reports are voluminous and, consequently, have not been attached. However, the full reports are available upon written request to counsel for the Debtors. Additionally, reserve estimates depend on many assumptions that may turn out to be inaccurate and any material inaccuracies in the reserve estimates or underlying assumptions of the Debtors' properties will materially affect the quantities and present value of those reserves.[7] Moreover, note that the NYMEX strip pricing used to calculate values in the reserve reports may not in fact correspond to actual current or future oil and gas prices. For example, the NYMEX strip pricing at the close of business on June 30, 2009, included a projected price of $3.98 per MCF for

---

[7] Estimating crude oil and natural gas reserves is complex and inherently imprecise. It requires interpretation of the available technical data and making many assumptions about future conditions, including price and other economic conditions. In preparing such estimates, projection of production rates, timing of development expenditures and available geological, geophysical, production and engineering data are analyzed. The extent, quality and reliability of this data can vary. This process also requires economic assumptions about matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. If the Debtors' interpretations or assumptions used in arriving at their reserve estimates prove to be inaccurate, the amount of oil and gas that will ultimately be recovered may differ materially from the estimated quantities and net present value of reserves owned by the Debtors. Any inaccuracies in these interpretations or assumptions could also materially affect the estimated quantities of reserves shown in the reserve reports summarized herein. Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and gas reserves most likely will vary from estimates. In addition, the Debtors may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond the Debtors' control. In reviewing the information in reserve reports, the following factors should be taken into account: future costs and sales prices will probably differ from those required to be used in these calculations; actual production rates for future periods may vary significantly from the rates assumed in the calculations; a 10% discount rate may not be reasonable relative to risk inherent in realizing future net oil and gas revenue; and future net revenues may be subject to different rates of income taxation.

12

natural gas and $71.77 per Bbl for oil for September 2009. However, according to the U.S. Department of Energy's Energy Information Administration, the average of the actual spot price for September 1-29 for natural gas was $3.39 per MCF and for oil was $69.36 per Bbl.

As the Collarini Second Quarter 2009 Reserve Report demonstrates in the table above, the Debtors have proved reserves with a PV10 of $510,536,000.[8] In addition to the aforementioned proved reserves, as reflected in the Collarini Second Quarter 2009 Reserve Report, Saratoga has probable reserves of 3,273 MBO[9] plus 45,146 MMCF,[10] with PV10 of $208,811,000, and possible reserves of 12,416 MBO plus 103,973 MMCF, with PV10 of $352,871,000.

Collarini's estimates of Saratoga's proved reserves have consistently grown since late 2007. Proved reserves that were estimated by Collarini as of January 1, 2008 at 67.3 BCFE grew to 116.6 BCFE as of July 1, 2009 with PV10 values over the same period growing from approximately $340,000,000 to approximately $510,500,000, as shown in the chart below:



Crude oil and natural gas prices varied greatly during this period and the PV10 valuations for January 1, 2009 and April 1, 2009 were reduced by lower oil and gas prices.

When an analysis is done of historical reserve growth since January 1, 2006, a reduction in gross proved developed shut-in ("PDSI"), gross proved developed behind-pipe ("PDBP") and gross proved undeveloped ("PUD") reserves is seen between September 2007 and January 2008, as shown in the chart below:

---

[8] Note that the value of the Debtors' reserves is different from the value of the Debtors' businesses. Furthermore, as discussed *supra* in note 7, the PV10 reserve values may not be an accurate valuation metric for the market value of reserves.

[9] "MBO" means thousands of stock tank barrels of oil.

[10] "MMCF" means millions of standard cubic feet of natural gas.



**Saratoga's Proved Reserves Growth thru Time by Category***

* Collarini SPE proved reserve opportunities, excluding PDP category

    Saratoga and its Subsidiaries reported on an SEC basis, rather than an SPE basis, after September 2007, and as a result many former PDSI, PDBP and PUD reserves were re-classified as probables and possibles, resulting in a drop in those categories from the Collarini September 1, 2007 report to the subsequent Collarini January 1, 2008 report. By SEC criteria, if a reservoir has not produced, it cannot be called proved.[11] Those re-classified reserves were never classified back to proved by Collarini, even though the Debtors now report reserves on an SPE basis as well as an SEC basis.[12] In summary, the Debtors believe that their reserves are overly conservative because Collarini still uses SEC criteria to judge the reserves. Additionally, Saratoga's own internal reserve estimates are much higher than Collarini's and a comparison of the pre-drill and post-drill reserve estimates for the GPLD A-191 well shows that Saratoga's pre-drill estimate was substantially closer to the subsequent post-drill reserves and number of proved sands than Collarini was with their pre-drill estimates.

    Wayzata disputes Collarini's valuation of the Debtors' oil and gas reserves, discussed at length above.

    The Debtors expect that the Bankruptcy Court will rule on the issue of the value of the Debtors' oil and gas reserves shortly after this Disclosure Statement is approved, and the Debtors

---

[11] For additional information on SPE and SEC reserve reporting, see **Exhibit I**, which includes a summary description by the SPE of the current differences between SPE and SEC reserve reporting, as well as an SEC press release describing the changes in their reserve reporting requirements that will take effect at the end of this year to make the SEC reporting requirements more closely resemble those used by the SPE.

[12] For the Debtors' most recent SEC-basis reserve reporting, see their most recent Form 10-Q, which is available online at http://www.saratogaresources.net-a.googlepages.com/investorrelations. Additionally, copies of this Form 10-Q are available upon written request to counsel for the Debtors.

encourage interested parties to monitor the docket in the Bankruptcy Case for the Bankruptcy Court's decision.

### 5.     Effects of Hurricanes Gustav and Ike

In late August and September 2008, Hurricanes Gustav and Ike resulted in temporary interruptions in production from, and damage to, the Debtors' south Louisiana fields and operations. Electrical outages, road and waterway closures and similar disruption of critical third-party services resulted in a temporary decline in product sales estimated at 19.4 MBO and 113.1 MMCF during August and September 2008, resulting in a reduction in revenues estimated at $3,098,600. Additional reductions in revenue also occurred after September 2008 as more particularly described in Article III, Section A(6).

Inspections to date have revealed damage to the Debtors' facilities, with damage assessments to date in excess of $1,700,000. Saratoga and its Subsidiaries carry property damage insurance on their south Louisiana operations in the amount of $10,000,000, subject to a deductible of $1,000,000 per event. Saratoga and its Subsidiaries are in the process of preparing an insurance claim to cover the hurricane damage and repair.

### 6.     Macroeconomic Impact on Oil and Natural Gas Prices; Hedging Practices

Late in the third quarter of 2008, accelerating during the fourth quarter of 2008, and continuing into 2009, the United States and global economies suffered severe disruptions in credit and financial markets accompanied by a sharp drop in the price of oil and natural gas due to a projected decline in demand. While the Debtors, as appropriate, entered into hedging transactions to reduce their exposure to commodity price risks, the Debtors' operating performance and financial position remain subject to the adverse effects associated with declines in the price of oil and natural gas relating to unhedged production.

The Debtors' philosophy on hedging follows the general industry practice of managing volatility in the commodities market. Pre-existing hedges at the time of closing the Harvest Acquisitions covered approximately 43% of production in 2008 at $58.50-$60.00 per barrel and $7.00-$7.38 per million British Thermal Unit (MMBtu). The Debtors layered in additional hedges as of September 22, 2008, as follows:

- 213,866 barrels of crude oil and liquids Swaps through August 2011 at an average price of $106.87 per barrel; and
- 402,623 MMBtu of natural gas Swaps through December 2010 at an average price of $8.24 per MMBtu.

On July 14, 2008, the day of closing for the Harvest Acquisitions, crude oil prices closed at $145.66 per barrel, while the Henry Hub spot price for natural gas averaged $11.45 per MMBtu. Oil had remained above $100 per barrel for sixteen consecutive weeks at that time. As a result of the macroeconomic conditions and decline in commodity prices noted above, on

February 26, 2009,[13] crude oil prices (WTI Cushing Spot) closed at $38.60 per barrel,[14] while the Henry Hub spot price for natural gas averaged $4.08 per MMBtu.[15] These prices reflect a 73.5% decline in the price per barrel of oil and a 55.6% decline in the price per MMBtu since July 14, 2008. Subsequently, oil and natural gas prices began to stabilize and oil prices began to rise from the near historic lows (on an inflation adjusted basis) of the first quarter to levels more consistent with historical trends. As of September 29, 2009, crude oil prices (WTI Cushing Spot) closed at $69.56 per barrel, while the Henry Hub spot price for natural gas averaged $3.24 per MMBtu as of September 30, 2009. These prices reflect an 80.2% increase in the price per barrel of oil and a 20.6% decrease in the price per MMBtu since February 26, 2009.[16]

### 7.    Drilling and Development Activities

During the third quarter of 2008, Saratoga and its Subsidiaries began to implement a plan to further develop the assets acquired in the Harvest Acquisitions. Plans for 2008 included recompletion of three wells, workover of one well, and the drilling of one development well. Recompletion and workover activities were temporarily delayed as a result of Hurricanes Ike and Gustav, but were recommenced in late October 2008 and were completed in November 2008. This work resulted in new gross proved developed producing (PDP) reserves of 79 MBO and 1,399 MMCF. A developmental well, the GPLD A-191 Well, was commenced in late October 2008 and reached its total depth of 12,295 feet measured depth (MD)/10,670 feet true vertical depth subsea (TVDSS) in late December 2008. This well, the Debtors' first in four years or more, encountered thirty-six pay sands with an estimated 674 feet of net pay and resulted in new gross proved developed non-producing (PDNP) reserves of 326 MBO and 1,970 MMCF, plus new PUD reserves of 222 MBO and 607 MMCF. Debtors' fourth quarter 2008 development program resulted in combined additions to proved reserves of 627 MBO and 3,976 MMCF. This development program has resulted in initial increases in net production rates of 194 barrels of oil per day (BOPD) and 2,907 thousand cubic feet per day (MCFPD), or 678 barrels of oil equivalent per day (BOEPD), for a capital outlay of $11,903,900, although it was initially not expected to cost more than $3,000,000 – $4,000,000.

Part of the reason for the increased cost was that the GPLD A-191 Well encountered a gas kick while drilling through the 21 sand. This kick was unexpected and resulted in the bit/drill pipe being stuck in the well. Ultimately, it was decided to attempt a completion in the 21B sand through the drill pipe. This completion produced at average rates of 3,500 MCFPD, and rates as high as 8,000 MCFPD were encountered. The well started making sand under high pressure and it was determined that sand control was not feasible due to limitations presented by the small inside diameter of the drill pipe.

---

[13] February 26, 2009, is the date that Wayzata issued its notice of nonmonetary defaults, discussed in greater detail below.

[14] Crude oil pricing from the U.S. Department of Energy's Information Administration.

[15] Henry Hub natural gas spot prices from the State of Nebraska website.

[16] The decline in natural gas prices from February 26, 2009 to August 10, 2009, can be attributed in part or in whole to seasonal variances in natural gas prices based on increased usage of natural gas during winter months for heating purposes and accompanying higher spot prices in the winter as compared to the summer.

The GPLD A-191/191D Well in Grand Bay Field was subsequently completed as a dual completion and filed with the State of Louisiana on September 8, 2009. The long string (completed in the 13A and 13B reservoirs) was opened on August 29, 2009, and unloaded and stabilized on a 12/64" choke. The well initial production (IP) rate was recorded on August 31, 2009, at 1,899 MCFPD, 95 BOPD and 9 barrels of water per day (BWPD) with 2,000 psi flowing tubing pressure (FTP). The short string was then unloaded and put on line September 2, 2009. The IP rate on the 10B reservoir was recorded at 1,624 MCFPD, 23 BOPD and 68 BWPD with 910 psi FTP on an 18/64" choke. The combined rate for the well is 3,523 MCFPD, 118 BOPD and 77 BWPD, equivalent to 705 BOEPD.

Further development work was undertaken in the Grand Bay field in February 2009 with five recompletions resulting in additional reserves and added more than 800 BOEPD for a total outlay of $416,000 with a 23-day payout. These wells are currently producing at a stabilized rate of approximately 249 BOPD and 238 MCFPD, or 289 BOEPD. The Debtors currently have 334 barrels of oil equivalent shut-in to provide sand control.

Although the Debtors believe that their drilling and development activities will be successful, that success is subject to many factors. In addition to a failure to find oil or natural gas, drilling efforts can be affected by adverse weather conditions (such as hurricanes and tropical storms in the Gulf of Mexico), cost overruns, equipment shortages and mechanical difficulties. Therefore, the successful drilling of a gas or oil well does not ensure the Debtors will realize a profit on their investment. A variety of factors, both geological and market-related, could cause a well to become uneconomic or only marginally economic. In addition to their costs, unsuccessful wells could impede the Debtors' efforts to replace reserves.

In addition to the commencement of recompletion, workover and developmental drilling activities, Saratoga and its Subsidiaries engaged two geological and engineering firms in October 2008 to perform full field studies in the Grand Bay and Vermilion 16 fields, both owned by Harvest Oil & Gas, in order to maximize potential recoveries from those fields. The Grand Bay full field study has already contributed significant reserve additions, as reflected in the Collarini Second Quarter 20009 Reserve Report. Significant reserve additions are expected later this year from the Vermilion 16 full field study.

Saratoga and its Subsidiaries also contracted the services of a reservoir engineer, in January 2009, to undertake full field studies on the Debtors' other assets, starting with Breton Sound 32 field, supplemented by the assistance of a Senior Development Geologist, also hired in January 2009. All of these field studies are presently ongoing.

Upon closing the Harvest Acquisitions in July 2008, production from the thirteen fields operated by the Harvest Companies was 2,359 BOEPD net to Harvest. Saratoga has increased its inventory of proved development opportunities to 71 PDNP opportunities in 9 fields plus 72 PUD opportunities in 3 fields. The aforementioned development program undertaken by the Debtors since closing has resulted in an increase in production of over 27% (as of July 31, 2009), with daily production rates reaching an average of approximately 3,000 BOEPD, net to the Debtors. Completion and commencement of production from the GPLD A-191 well along with

other workover and rework candidates already identified is expected to further add to daily production volumes.

The increase in PDP is attributable to Saratoga's recent development program which involved 5 recompletions. Additionally, Saratoga has identified more than 30 similar operations that it wishes to undertake in 2009 and 2010.

Saratoga has increased the estimated PDP value of the reserves through field development activities. The PDP value has increased from $69,210,000 PV10 (SPE) or $72,877,000 PV10 (SEC) pre-closing to $78,925,000 PV10 (SPE) as of July 1, 2009, despite 18 months' worth of production from the assets. Prices used for the earlier valuation were $96.01/Bbl and $6.79/MCF compared to the most recent pricing of $71.09/Bbl and $3.84/MCF, 26% and 43% reductions in pricing respectively. The chart below shows the growth of Saratoga's PDP reserves through time since September 1, 2007 with the black bars showing the actual Collarini PDP net volumes and the white bars showing the actual net produced volumes for the period between each of the reserve reports:



Saratoga PDP Growth thru Time *

* Collarini SPE proved reserve estimates, dated 9/1/07, 1/1/08, 1/1/09, 4/1/09 & 7/1/09. Production data is from internal company reports.

Note that PDP volumes have increased in each subsequent report period and that in each and every case, PDP reserve additions have easily outstripped production.

## 8.   Cost Containment and Operating Efficiency Measures

Since completion of the Harvest Acquisitions, Saratoga and its Subsidiaries have undertaken, and continue to undertake, a series of initiatives designed to improve operating

18

efficiency and reduce operating costs. Those measures include revising the contract bid process employed by former management of the Harvest Companies, closer management oversight in the field and interaction with field personnel, execution of a Tie-In, Measurement and Allocation Agreement with Apache Corporation to optimize production in the Grand Bay Field, new technology investments and field infrastructure improvements. Insurance coverage, particularly windstorm limits, has been improved for an increase in premium of only 1% in an extremely tough insurance market where most offshore operators are either self-insuring or experiencing 30% increases in premiums. The benefits of these initiatives are expected to be realized over the balance of 2009 and beyond and, to date, have resulted in a greater than 20% decline in lease operating expenses since the closing of the Harvest Acquisitions.

In fact, actual lease operating expenses ("LOE"), as measured by monthly Lease Operating Statements ("LOS"), during the second quarter of 2009 have decreased greatly when compared with the second quarter of 2008 (the quarter immediately prior to closing the Harvest Acquisitions). The average LOE per MCFE is approximately $1.34. A chart showing a breakdown for each of the Debtors' fields is shown below:



**Saratoga Actual 2Q 2009 Operating Costs by Field \***

*\* Operating costs from Company LOS statements. Production is gross Mcfe from internal company reports.*

The Debtors maintain, and plan to continue to maintain after the Effective Date and pursuant to their contractual obligations, escrow agreements, bonds, and letters of credit to secure certain plugging and abandonment obligations assumed by the Debtors in the acquisition of certain oil and gas properties. Certain of these financial security devices include, but are not limited to, (i) a $7,000,000 letter of credit issued by The Bank of New York in favor of Chevron USA, Inc. for plugging and abandonment obligations in Grand Bay field, Plaquemines Parish, Louisiana, and (ii) escrow accounts with deposited funds dedicated to satisfying plugging and

19

abandonment obligations in Grand Bay Grand Bay field, Plaquemines Parish, Louisiana. These obligation shall not be impaired in any manner by the Plan.

Other important steps taken by the Debtors' management include offering all employees a 401K employer match and stock options to key employees, including field supervisors, layering in new oil and gas hedges in the third quarter of 2008, improving internal communications and improving decision making processes. New production handling agreements were also entered into with Martin-Marks for handling production from their Jetty well.

## 9. Market for Saratoga's Common Stock

Saratoga's common stock is traded on the OTC Bulletin Board under the symbol "SROEQ.OB." Prior to the Petition Date, Saratoga's common stock traded under the symbol "SROE.OB." The following table sets forth the range of high and low bid prices of Saratoga's common stock for each quarter for the two-year period ended June 30, 2009, as reported on Nasdaq.com.

|  |  | High | Low |
|---|---|---|---|
| Calendar Year 2009 | Second Quarter | $0.60 | $0.10 |
|  | First Quarter | 0.30 | 2.25 |
|  |  |  |  |
| Calendar Year 2008 | Fourth Quarter | $3.75 | $1.20 |
|  | Third Quarter | 4.00 | 0.50 |
|  | Second Quarter | 1.01 | 0.17 |
|  | First Quarter | 3.50 | 0.25 |
|  |  |  |  |
| Calendar Year 2007 | Fourth Quarter | $4.00 | $0.12 |
|  | Third Quarter | 0.15 | 0.12 |

At September 9, 2009, the closing price of Saratoga's common stock on the OTC Bulletin Board was $1.00.

## B. Events Leading to Bankruptcy

While the Debtors never missed a payment of principal or interest required under either the Revolving Credit Agreement or the Wayzata Credit Agreement before the Petition Date, the circumstances described above, and discussed in more detail below, led Wayzata to claim the existence of nonmonetary covenant defaults. After Hurricanes Gustav and Ike, the Debtors requested that Wayzata waive certain defaults for the period ending September 30, 2008, and Wayzata indicated a willingness to do so provided the Debtors would execute a release of claims against Wayzata as part of the waiver.[17] The Debtors agreed and the parties executed the waiver and release, although the Debtors and Wayzata now dispute the scope and effectiveness of the

---

[17] The Debtors and Macquarie reached a similar agreement.

release.[18]  Subsequently, Wayzata issued a notice of default, dated February 26, 2009, for the period ending December 31, 2008, wherein it alleged nine nonmonetary breaches of the Wayzata Credit Agreement, or events of default, primarily based on a preliminary draft financial model, which model did not yet reflect reserve additions and production increases reflected in the year-end 2008 reserve reports, and unaudited financial statements for the fourth quarter of fiscal year 2008.  Wayzata, in its notice of default, did not exercise any of its rights under the Wayzata Credit Agreement, but expressly reserved the right to do so.  The Debtors disputed (and continue to dispute) Wayzata's notice of default as premature and based on incomplete data and its failure to take into account the various developments and circumstances described above, including the force majeure effect of the two named hurricanes.

Macquarie also issued a notice of default dated February 26, 2009, which was expressly based on Wayzata's notice of default. The Macquarie notice of default was triggered by cross default provisions in Section 8.1.7(ii) of the Macquarie Credit Agreement defining an event of default as an event or condition occurring which permits the holder of any material debt to accelerate that obligation.  Macquarie stated in its notice of default that it was not initiating any action to exercise its available rights and remedies, though its right to do so was expressly reserved. As a result of the Macquarie notice of default, Macquarie denied the Debtors' requests to access additional credit available under the Revolving Credit Agreement, which restriction of credit impaired the Debtors' ability to continue their development program.  The Debtors disputed (and continue to dispute) the Macquarie notice of default.

Following receipt of Wayzata and Macquarie's notices of default, the Debtors entered into discussions with Wayzata seeking an amicable resolution and forbearance in order to cure the alleged covenant defaults and to access available credit under the Macquarie Revolving Credit Agreement to continue ongoing drilling, workover and recompletion projects.  However, despite management's efforts, and due in part to Wayzata's refusal to grant forbearance, management determined that reorganization under Chapter 11 was the best means of addressing the existing debt structure and realization of the long term benefits of the drilling, workover and recompletion process.

The Debtors filed for relief under the Bankruptcy Code in an effort to cure the nonmonetary defaults declared under the Wayzata Credit Agreement, and the nonmonetary defaults declared under the Macquarie Credit Agreement (which were caused by the premature issuance of the notice of default by Wayzata). Additionally, relief was needed to allow the Debtors the opportunity to continue with their existing capital expenditure requirements, and to initiate and continue the development programs to exploit, develop and produce the oil and gas reserves in order for the Debtors to realize the significant value of said reserves, which represent substantial assets of the Debtors, for the benefit of all constituents with an interest in the success of the Debtors' reorganization.

---

[18] For example, Wayzata believes that the release is effective against any Claims or Causes of Action (including those listed on **Exhibit G** as and to the extent asserted against Wayzata) that arose before the date of the release, November 14, 2008.  The Debtors disagree and reserve any and all rights related to the release, its effectiveness, and its scope.

## ARTICLE IV
### EVENTS DURING THE CHAPTER 11 BANKRUPTCY CASE

**A.      Filing of the Chapter 11 Petition**

The Debtors filed their petitions for relief under Chapter 11 of the Bankruptcy Code on March 31, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division. The Debtors have continued to operate their businesses and manage their properties in the normal course as debtors-in-possession. In the Statement of Financial Affairs ("Statements") and Schedules of Assets and Liabilities[19] ("Schedules") filed in the Bankruptcy Case, the Debtors identified their property and assets existing on the Petition Date. For a complete listing and explanation of the Debtors' assets as of the Petition Date, parties should refer to the Statements and Schedules as same may be amended prior to confirmation of the Plan.[20]

**B.      Retention of Counsel by the Debtors**

The Bankruptcy Court approved the employment of the law firm of Adams and Reese LLP as counsel for the Debtors pursuant to an interim order entered April 17, 2009 and by final order entered on April 30, 2009. The Bankruptcy Court approved the employment of the law firm of Schully, Roberts, Slattery & Marino, a Professional Law Corporation as special counsel for the Debtors pursuant to an interim order entered on April 17, 2009, and a final order entered on April 30, 2009.

**C.      Statements and Schedules**

On June 5, 2009, the Debtors filed their Schedules and Statements, except for Schedule G, which was filed on June 12, 2009.

**D.      Significant Post-petition Events**

**1.      First Day Motions**

On April 1, 2009, the Debtors filed the following "first day" motions and pleadings:

(a)      Debtors' Emergency Motion for Joint Administration (Docket No. 9)

(b)      Motion for Administrative Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (Docket No. 10)

---

[19] Schedule A Real Property, Schedule B Personal property, Schedule C Property Claimed as Exempt, Schedule D Creditors Holding Secured Claims, Schedule E Creditors Holding Unsecured Priority Claims, Schedule F Creditors Holding Unsecured Nonpriority Claims, Schedule G Executory Contracts and Unexpired Leases, and Schedule H Codebtors.

[20] Some of the amounts in the Statements and Schedules have changed due to authorized payments.

(c)     Debtors' Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection (Docket No. 11)

(d)     Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Suzanne Ambrose and Ambrose Consulting, LLC as Financial Advisor on an Interim Basis and Setting Final Hearing (Docket No. 12)

(e)     Debtors' Motion to Establish Notice Procedures (Docket No. 13)

(f)     Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Michael W. Sanders as Securities and Exchange Commission Counsel and General Corporate Counsel to the Debtors (Docket No. 14)

(g)     Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Robin B. Cheatham, John M. Duck and the Law Firm of Adams and Reese LLP on an Interim Basis and Setting Final Hearing (Docket No. 15)

(h)     Application of Debtors for Entry of Order Authorizing the Employment and Retention of Paul J. Goodwine and the Law Firm of Schully, Roberts, Slattery & Marino, A Professional Law Corporation as Special Counsel (Docket No. 16)

(i)     Application of Debtors to Employ and Retain Calvin Kilonzo as Accountant on an Interim Basis and Setting Final Hearing (Docket No. 17)

On April 2, 2009, the Debtors filed the following additional "first day" motions and pleadings:

(a)     Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Professional Oil and Gas Marketing, LLC (Docket No. 19)

On April 3, 2009, the Debtors filed the following additional "first day" motions and pleadings:

(a)     Debtors' Emergency Motion for an Order: (I) Granting Extension of Time for Filing Lists, Schedules and Statements of Financial Affairs; and (II) Allowing the Debtors to File a Consolidated Creditor and Equity List and List of Top 20 Unsecured Creditors (Docket No. 21)

(b)     Emergency Motion of Debtors for Authority to Pay Prepetition Amounts Due and Post Petition Retainer to Critical Professional, E.C. Otillio, Jr., Certified Public Accountant (Docket No. 23)

(c)     Ex Parte Motion for Expedited Hearing and to Shorten Notice on "First Day" Motions (Docket No. 24)

## 2.     **First Day Orders**

On April 8, 2009, the Bankruptcy Court entered the following first day orders:

(a) Order Directing Joint Administration of Cases (Docket No. 50)

(b) Order Granting Motion to Expedite Hearing and to Shorten Notice on "First Day" Motions (Docket No. 48)

(c) Order Approving Application of Debtors Authorizing the Employment and Retention of Collarini Engineering, Inc., d/b/a Collarini Associates as Independent Reserve Engineers for the Debtors (Docket No. 51)

On April 17, 2009, the Bankruptcy Court held a hearing on several "first day" motions. After the hearing, the Bankruptcy Court entered the following additional "first day" orders:

(a) Administrative Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedure for Interim Compensation and Reimbursement of Expenses for Professionals (Docket No. 95)

(b) Order Establishing Notice Procedures Pursuant to Federal Rule of Bankruptcy Procedure 2002(m) (Docket No. 97)

## 3. **Employment of Professionals of the Debtors**

On April 17, 2009, the Bankruptcy Court entered an interim order and on April 30, 2009 entered a final order approving the employment of the following professionals:

(a) Adams and Reese LLP as counsel for the Debtors (Docket No. 98, 179)

(b) Schully, Roberts, Slattery & Marino, a Professional Law Corporation as special counsel for the Debtors (Docket No. 99, 180)

(c) Suzanne Ambrose and Ambrose Consulting, LLC as Financial Advisor (Docket No. 96, 178)[21]

(d) Michael W. Sanders as Securities and Exchange Commission Counsel and General Corporate Counsel (Docket No. 93, 193)

(e) Calvin Kilonzo as Accountant (Docket No. 100, 181)[22]

(f) Professional Oil and Gas Marketing, LLC (Docket No. 102, 182)

---

[21] On August 11, 2009, the Debtors filed a Notice of Termination of Employment and Retention of Suzanne Ambrose and Ambrose Consulting, LLC as Financial Advisor to the Debtors, as the work of Ms. Ambrose and Ambrose Consulting, LLC was complete as of July 27, 2009. (Doc. No. 482)

[22] On August 11, 2009, the Debtors filed a Notice of Termination of Employment and Retention of Calvin Kilonzo as Accountant to the Debtors, as the work of Mr. Kilonzo was complete as of July 27, 2009. (Doc. No. 481)

(g)     Jay Norris and Malone and Bailey, PC as Independent Auditors (Docket No. 174)

(h)     E.C. Otillio, Jr. and E. C. Otillio, Jr., CPA, LLC as Certified Public Accountants Nunc Pro Tunc (Docket No. 173)

On May 18, 2009, the Bankruptcy Court entered a final order approving the employment of:

(a)     Christopher A. Hopkins and MH&S, PC as Tax Accountants (Docket No. 239)

On July 27, 2009, the Debtors filed their Application for Entry of Order Authorizing the Employment and Retention of Grant Thornton LLP as Their Accountants and Financial Advisors Nunc Pro Tunc to July 20, 2009. Wayzata, and certain Lien Claimants filed objections to the Debtors' employment of Grant Thornton. A hearing on the Application was held on August 25, 2009. On September 4, 2009, the Court entered an Order Authorizing the Employment and Retention of Grant Thornton LLP as Their Accountants and Financial Advisors Nunc Pro Tunc to July 20, 2009.

## 4.     Cash Collateral Orders

On April 1, 2009, the Debtors filed an Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Motion").[23] A hearing on the Cash Collateral Motion was set for April 7, 2009.

After the hearing, on April 8, 2009, the Bankruptcy Court entered an Interim Order Authorizing Debtors to Use Cash Collateral (the "Interim Order"). Pursuant to the Interim Order, the Debtors were authorized to use the Cash Collateral to pay the expenses shown on the interim budget attached to the Interim Order from the date of entry of the Interim Order through the earlier of (a) the entry of a final order on the Cash Collateral Motion after final hearing, or (b) April 12, 2009. A final hearing on the Cash Collateral Motion was set for April 24, 2009.

On April 15, 2009, the Bankruptcy Court entered an Amended Interim Order Authorizing Debtors to Use Cash Collateral wherein the Debtors were authorized to use Cash Collateral through April 24, 2009. The final hearing on the Cash Collateral Motion remained set for April 24, 2009.

On April 21, 2009, the Debtors filed a Consent Motion to Convert Hearing Regarding Use of Cash Collateral from April 24, 2009, to a Hearing Upon Request to Extend Cash Collateral Order on an Interim Basis Pending Final Hearing, which was granted by Order entered on April 23, 2009. Pursuant to the Order Granting Consent Motion, the hearing on the Cash Collateral Motion was rescheduled for April 28, 2009.

On April 29, 2009, the Bankruptcy Court entered a Minute Entry in connection with the hearing on the Cash Collateral Motion and other matters. Pursuant to the Minute Entry, the Cash

---

[23] Although the Debtors considered pursuing debtor-in-possession financing early in the Bankruptcy Case, they ultimately concluded that the best course was to fund ongoing operations with cash collateral.

Collateral Motion was granted on an interim basis, and a final hearing on the Motion was set for May 29, 2009. An Amended Interim Order Authorizing Debtors to Use Cash Collateral was entered on May 4, 2009 authorizing the Debtors to use the Cash Collateral through May 29, 2009, and setting the final hearing on the Cash Collateral Motion for May 29, 2009.

On May 5, 2009, the Debtors filed an Emergency Motion to Amend Second Amended Interim Cash Collateral Order and Schedule Expedited Hearing wherein the Debtors requested that the Court schedule an emergency hearing and enter a Third Amended Interim Order authorizing the Debtors to use cash collateral to pay an emergency capital expenditure. The Third Amended Interim Order Authorizing Debtors to Use Cash Collateral was entered by the Bankruptcy Court on May 8, 2009, authorizing the Debtors to use the Cash Collateral through May 29, 2009, and the final hearing on the Cash Collateral Motion remained set for May 29, 2009.

On May 26, 2009, the Debtors filed an Amended Consent Motion (i) to Continue Final Hearing Regarding Use of Cash Collateral from May 29, 2009, to June 29, 2009, (ii) to Convert Hearing on May 29, 2009, to a Hearing Upon Request to Extend Cash Collateral on an Interim Basis Pending final Hearing and (iii) Extend Objection Deadline to Interim Use of Cash Collateral.

On May 29, 2009, the Bankruptcy Court entered an Order Granting Amended Consent Motion (i) to Continue Final Hearing Regarding Use of Cash Collateral from May 29, 2009 to June 29, 2009, (ii) to Convert Hearing on May 29, 2009, to a Hearing Upon Request to Extend Cash Collateral on an Interim Basis Pending final Hearing and (iii) Extend Objection Deadline to Interim Use of Cash Collateral. Pursuant to the Order and the Court's Minute Entry entered May 29, 2009, the final hearing on the Motion was reset for June 29, 2009. The Fourth Interim Order Authorizing Debtors to Use Cash Collateral was entered by the Court on June 5, 2009, authorizing the Debtors to use the Cash Collateral through June 28, 2009, and the final hearing on the Cash Collateral Motion remained set for June 29, 2009.

On June 26, 2009, the Debtors filed a Consent Motion (i) to Continue Final Hearing Regarding Use of Cash Collateral From June 29, 2009, to August 4, 2009, (ii) to Convert Hearing on June 29, 2009, to a Hearing Upon Request to Extend Cash Collateral Order on an Interim Basis Pending Final Hearing and (iii) Extend Objection Deadline to Interim Use of Cash Collateral. The Order Granting Consent Motion was entered on June 29, 2009, and the final hearing on the Motion was reset for August 4, 2009. On July 1, 2009, the Court entered the Fifth Interim Order Authorizing Debtors to Use Cash Collateral authorizing the Debtors to use the Cash Collateral through August 4, 2009. The final hearing on the Cash Collateral Motion was set for August 4, 2009.

On July 30, 2009, the Debtors filed a Motion (i) to Continue the Final Hearing Concerning Cash Collateral Currently Scheduled for August 4, 2009, at 10:00 a.m. until September 1, 2009, at 10:00, (ii) to Convert the Hearing on August 4, 2009, to a Hearing upon the Debtors' Request for an Extended Interim Order Granting Debtors the Authority to Use Cash Collateral Pending Final Hearing, and (iii) Extend Objection Deadline to Interim Use of Cash Collateral.

On August 3, 2009, Wayzata filed an Objection to the Debtors' continued use of cash collateral on an interim and final basis. In lieu of a hearing, the Court conducted a conference on August 4, 2009 and Wayzata continued its Objection to September 1, 2009, pending the next hearing on the Debtors' Cash Collateral Motion and the next request by the Debtors to use cash collateral on an interim basis. Also at the conference, the Bankruptcy Court granted the Debtors authority to use cash collateral on an interim basis through September 1, 2009, and continued the final hearing until October 1 and 2, 2009. This is reflected in the Bankruptcy Court's August 12, 2009, Sixth Interim Order Authorizing Debtors to Use Cash Collateral. No creditors or parties in interest objected to the Debtors' use of cash collateral on an interim basis for the period September 2, 2009 through October 2, 2009. Therefore, there was no hearing on the Debtors' Cash Collateral Motion on September 1, 2009. On September 4, 2009, the Court entered the Seventh Interim Order Authorizing Debtors to Use Cash Collateral for the period September 2, 2009 through October 2, 2009. On September 25, 2009, Debtors' counsel circulated the proposed cash collateral budget for the period October 3, 2009 through November 13, 2009, along with the justification for capital expenditures. Debtors' counsel has received no comments or objections regarding the proposed cash collateral budget. The Debtors anticipate that an Eighth Interim Order Authorizing Debtors to Use Cash Collateral for the period October 3, 2009 through November 13, 2009 will be entered, pending the Court's decision on the valuation hearing.

### 5. Appointment of the Official Committee of Unsecured Creditors

On May 15, 2009, the United States Trustee filed a Notice of Appointment of Creditors' Committee. The members of the Official Committee of Unsecured Creditors are XLPOR Energy Operating Company, River Rental Tools, Inc., Quality Energy Services, Inc., Southern Flow Companies, Inc. and Thru Tubing Systems, Inc.

On May 26, 2009, the Official Committee of Unsecured Creditors filed an Application for Authority to Employ Michael A. Crawford and the law firm of Taylor, Porter, Brooks, Phillips, LLP as Counsel for Official Committee of Unsecured Creditors. An Interim Order Approving Application for Authority to Employ Taylor, Porter, Brooks & Phillips, LLP as Counsel for Official Committee of Unsecured Creditors was entered on May 28, 2009, with the final hearing on the Application being set for June 16, 2009. On June 19, 2009, the Bankruptcy Court entered a Final Order Approving Application for Authority to Employ Taylor, Porter, Brooks & Phillips, LLC *nunc pro tunc* effective as of May 22, 2009.

### 6. Appointment of the Official Committee of Equity Security Holders

On August 10, 2009, the United States Trustee filed a Notice of Appointment of Equity Security Holders' Committee. The members of the Equity Security Holders' Committee are Brian C. Albrecht, EJC Ventures, Ltd. and Frank C. Dudenhefer, Jr. On August 14, 2009, this Committee filed its Application for Entry of an Order Authorizing the Employment and Retention of Heller, Draper, Hayden, Patrick & Horn, L.L.C. for the Official Committee of Equity Security Holders Nunc Pro Tunc to August 11, 2009. A hearing on the Application was set for August 25, 2009. On August 19, 2009, Wayzata filed an Emergency Motion for an Order Directing the U.S. Trustee to Disband the Official Committee of Equity Security Holders. Wayzata also filed a Limited Objection to the Official Committee of Equity Security Holders'

Application for Entry of an Order Authorizing the Employment and Retention of Heller, Draper, Hayden, Patrick & Horn, L.L.C. On August 20, 2009, certain Lien Claimants filed a Limited Joinder in Wayzata's Motion to Disband the Equity Committee. On August 21, 2009, the Official Committee of Unsecured Creditors filed a Response to Wayzata's Motion to Disband the Equity Committee. Also on August 21, 2009, Macquarie filed a Response to the Official Committee of Equity Security Holders' Application for Entry of an Order Authorizing the Employment and Retention of Heller, Draper, Hayden, Patrick & Horn, L.L.C., Wayzata's Motion to Disband the Equity Committee, and Request to Continue Hearings set for August 25, 2009. By Minute Entry filed August 25, 2009, the Court continued the hearings on the Official Committee of Equity Security Holders' Application for Entry of an Order Authorizing the Employment and Retention of Heller, Draper, Hayden, Patrick & Horn, L.L.C. and Wayzata's Motion to Disband the Equity Committee until October 6, 2009.

### 7. Monthly Operating Reports, Schedules and Statements, Meeting of Creditors and Bar Date

Pursuant to the Chapter 11 Operating Guidelines and Reporting Requirements of the U.S. Trustee, Region 5, Judicial Districts of Louisiana and Mississippi, a Chapter 11 debtor must file monthly operating reports ("Operating Reports") by the 15th day of each month. On May 15, 2009, the Debtors, with the consent of the United States Trustee, filed a Consent Motion for an Order Granting Extension of Time For Filing Consolidated Monthly Operating Reports.

On May 18, 2009, the Bankruptcy Court entered an order extending the time within which the Debtors were to file the first of their Operating Reports by an additional ten (10) days, through and including May 25, 2009 and extending the deadline for filing all subsequent Operating Reports by an additional five (5) days, through and including the 20th day of each month.

On May 26, 2009, the Debtors filed their Monthly Operating Report for the period ending April 30, 2009. Since that time, the Debtors have filed their Monthly Operating Reports on a timely basis.

On June 5, 2009, the Debtors filed their Schedules and Statements, except for Schedule G, which was filed on June 12, 2009. On June 16, 2009, the initial meeting of creditors pursuant to Section 341 of the Bankruptcy Code was held in Lafayette, Louisiana.

On June 22, 2009, the Debtors filed an Ex Parte Motion to Establish Bar Date for Filing Claims seeking to establish August 15, 2009, as the deadline by which creditors must file proofs of claims. On June 23, 2009, the Debtors filed an Amended Ex Parte Motion to Establish Bar Date for Filing Claims requesting that August 14, 2009, be fixed as the claims bar date, because August 15, 2009, is a Saturday. On June 25, 2009, the Bankruptcy Court entered an Order Establishing Bar Date for Filing Claims and established Friday, August 14, 2009, as the deadline for filing claims.

28

## 8.    State of Louisiana Royalty Audit

On May 4, 2009 the State of Louisiana, through the Office of Mineral Resources, Department of Natural Resources (the "State"), filed a Motion for Relief from the Automatic Stay to conduct an audit of Harvest Oil & Gas and Harvest Group, all as allowed by LSA-R.S. 30:136. Counsel for the State described the audits as routine practice of the State for lessees in bankruptcy. The Debtors consented to the relief requested and the Bankruptcy Court entered an agreed order granting the stay relief motion on June 5, 2009. The audit has commenced and is presently on-going.

On May 22, 2009, the Debtors filed a Motion for Order Authorizing Debtors to Assume Oil and Gas Leases to ensure that they had authority to pay all of their prepetition lessor royalty obligations. The Debtors noted that assumption of their oil and gas leases was vital to their on-going business operations and that payment of prepetition royalties would constitute appropriate cure for the assumption.[24] The State and the Debtors agreed to include specific language in the order granting the motion to reserve the rights of all parties based upon the results of the royalty audit. The Bankruptcy Court entered an order granting the lease assumption motion, with the reservation of rights language, on June 23, 2009.

Once the State royalty audit is complete, the State may have additional "cure" Claims associated with the two motions noted above. Due to the unique nature of these potential Claims, the Debtors have separately classified the potential claims of the State. In addition, since the time period covered by the audit partially covers a period of time preceding Saratoga's ownership of Harvest Oil & Gas and Harvest Group, the former owners of Harvest Oil & Gas and Harvest Group have been informed that Saratoga will hold them responsible for any unpaid or underpaid royalties due the State that precede Saratoga's acquisition pursuant to their obligations under the PSAs documenting the Harvest Acquisitions. Because the audit has not yet been completed, the Debtors are unable to estimate the extent of possible liability (if any) or the possible impact (if any) on the Debtors' restructuring.

## 9.    Extension of Exclusivity

On July 21, 2009, the Debtors filed a Motion to Extend Time of Exclusive Period Within Which to File Plan of Reorganization and Disclosure Statement and of Exclusive Period to Obtain Acceptance of Plan of Reorganization and a Motion to Expedite Hearing, which was granted. The Motion to Extend Time was opposed by Macquarie, the Unsecured Creditors' Committee, certain Lien claimants, and Wayzata. After a hearing on July 28, 2009, the Bankruptcy Court granted the Motion to Extend Time and extended through August 28, 2009, the period within which exclusively the Debtors may file a plan of reorganization, with a corresponding extension through October 28, 2009, of the period within which exclusively the Debtors may obtain acceptance of their plan of reorganization. The Debtors expect that a subsequent order will be entered changing the deadline for obtaining acceptance of their plan of

---

[24] The Debtors filed this motion in an abundance of caution. Nothing in the motion, this Disclosure Statement or the Plan should be construed as an admission or as a position taken by the Debtors as to the applicability or non-applicability of 11 U.S.C. § 365 to oil and gas leases.

09-50397 - #695  File 10/06/09  Enter 10/06/09 18:31:00  Main Document    Pg 34 of 75

reorganization, subject to further reasonable extension based upon the Court's and counsel's availability for the plan Confirmation Hearing.

On August 24, 2009, Wayzata and the Official Committee of Unsecured Creditors filed a Joint Motion to Terminate the Extended Exclusivity Period under 11 U.S.C. § 1121(d) and for Leave to File Creditors' Plan of Reorganization. A hearing was set on the Joint Motion for September 15, 2009, but was continued until September 22, 2009. The Debtors opposed the Joint Motion. After a hearing, the Court declined to rule upon the Joint Motion until the Court rules upon the valuation of the Debtors' assets.

### 10. **Valuation Hearing and Confirmation Hearing**

During a conference with the Bankruptcy Court on August 4, 2009 regarding the Cash Collateral Motion, the Bankruptcy Court set October 1 and 2, 2009, as the dates for a valuation hearing for the Debtors' assets, which is for purposes of both the Cash Collateral Motion and the Plan. The valuation hearing began October 1, 2009 and continues as of the date of the filing of this Disclosure Statement. The Debtors anticipate that the valuation hearing will conclude on or before October 7, 2009.

At a telephone status conference with the Bankruptcy Court held on August 12, 2009, to discuss, among other things, the status of the Plan and the timing of the Disclosure Statement and/or Confirmation Hearing, the Court indicated that it had set aside the week of November 9, 2009, for the Confirmation Hearing, as that week is the best block of dates on the Court's calendar. Despite the Debtors' request, the Court indicated that it would not compress the timetable for approval of the Disclosure Statement and the Plan Confirmation process absent consent of the parties. Wayzata's counsel indicated that Wayzata would not support a compressed schedule at that time and have not consented to a reduced time for confirmation of the Debtor's proposed Plan since the status conference.[25]

### 11. **Financial Results During the Bankruptcy Case**

The results of the Debtors' financial operations during the Bankruptcy Case are reflected in the Monthly Operating Reports filed by the Debtors and the Debtors' Financial Statements attached as **Exhibit D**. As of June 30, 2009, the Debtors had approximately Fifteen Million Six Hundred Thousand Dollars ($15,600,000.00) cash on hand. From the Petition Date to June 30, 2009, pursuant to the Cash Collateral Order, in addition to paying their normal operating expenses, the Debtors have spent approximately Thirteen Thousand Dollars ($13,000.00) for a new boat for field operations.

The Debtors filed a Motion to Pay Obligations to Overriding Royalty Interest Owners on May 8, 2009. After a hearing, on June 25, 2009, the Bankruptcy Court entered an order authorizing the Debtors to pay the outstanding and known unpaid prepetition obligations due to

---

[25] The Bankruptcy Court, at the conference conducted on August 4, 2009, indicated that it expected the parties to be reasonable regarding further extensions of exclusivity. A conference hearing may have to be set subsequent to the currently extended exclusive period, due to the Bankruptcy Court's and one of Wayzata's counsel's scheduling conflicts.

the overriding royalty interest owners as set forth in the Motion to Pay Obligations to Overriding Royalty Interest Owners. On July 13, 2009, the Debtors paid prepetition overriding royalty obligations of approximately Eight Hundred Fifteen Thousand Dollars ($815,000.00). Additionally, on July 9, 2009, the Debtors paid prepetition governmental royalties of approximately Six Hundred Forty Thousand Dollars ($640,000.00).

## ARTICLE V
### VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

**A.    Ballots and Voting Deadline**

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement (along with a return envelope), and has been mailed to holders of Claims and Equity Interests (or their authorized representative) entitled to vote. After carefully reviewing the Disclosure Statement, including all exhibits, each holder of a Claim or Equity Interest (or its authorized representative) entitled to vote should indicate its vote on the enclosed ballot. All holders of Claims or Equity Interests (or their authorized representative) entitled to vote must:

- carefully review the ballot and corresponding instructions,

- execute the ballot, and

- return it in the enclosed return envelope, or otherwise forward it to the address indicated on the ballot, by the voting deadline indicated on the ballot (the "Voting Deadline") for the ballot to be considered.

If you believe you are a holder of a Claim or Equity Interest in an impaired Class under the Plan and entitled to vote to accept or reject the Plan, but did not receive a ballot with these materials, please contact Kristen M. Reyna, Adams and Reese LLP, 4500 One Shell Square, New Orleans, Louisiana 70139, (504) 581-3234, kristen.reyna@arlaw.com.

**B.    Classes Entitled to Vote**

Each holder of an Allowed Claim or an Allowed Equity Interest in a Class of Claims or Equity Interests against the Debtor that may be impaired and is to receive a Distribution under the Plan, including any holder of an Allowed Claim in Classes 2, 3, 4, 5, 6, 7, or 8 or an Allowed Equity Interest in Classes 9 or 10, shall be entitled to vote separately to accept or reject the Plan. Each holder of a Claim in a Class of Claims or Equity Interests that is Unimpaired under the Plan, such as Class 1, shall be deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**C.    Bar Date for Filing Proofs of Claim**

The Bankruptcy Court previously established August 14, 2009, as the deadline for filing proofs of claim and proofs of interests in the Bankruptcy Case for all creditors and interest holders, except as otherwise provided in the Plan. Attached hereto as **Exhibit C** is a copy, as of the date of filing of this Disclosure Statement, of the claims registry maintained by the Clerk of the Bankruptcy Court, reflecting claims filed in the Bankruptcy Case, the date filed, the name of the claimant and the amount claimed.

## D.  Definition of Impairment

Under Section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is impaired under a plan of reorganization unless, with respect to each Claim or Equity Interest of such class, the plan:

(1) leaves unaltered the legal, equitable, and contractual rights of the holder of such Claim or Equity Interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Equity Interest to receive accelerated payment of such Claim or Equity Interest after the occurrence of a default:

   (a) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

   (b) reinstates the maturity of such Claim or Equity Interest as it existed before the default;

   (c) compensates the holder of such Claim or Equity Interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   (d) does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the holder of such Claim or Equity Interest.

## E.  Vote Required for Class Acceptance

An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Equity Interests shall have accepted the Plan if the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan. For purposes of calculating the number of Allowed Claims in a class of Claims held by holders of Allowed Claims in such class that have voted to accept or reject the Plan under Section 1126(c) of the Bankruptcy Code, all Allowed Claims in such class held by one entity or any Affiliate shall be aggregated and treated as one Allowed Claim in such class.

## F.  Information on Voting and Ballots

Ballots are being forwarded to all holders of Claims and Equity Interests in accordance with the Bankruptcy Rules. For purposes of voting on the Plan, the amount and classification of

a Claim or Equity Interest and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(a)     If no proof of claim or interest has been timely filed, the voted amount of a Claim or Equity Interest shall be equal to the amount listed for the particular Claim or Equity Interest in the Schedules, as and if amended, to the extent such Claim or Equity Interest is not listed as contingent, unliquidated, or disputed, and the Claim or Equity Interest shall be placed in the appropriate Class, based on the Debtors' records, and consistent with the Schedules and the claims registry of the Clerk of the Bankruptcy Court (the "Clerk").

(b)     If a proof of claim or interest has been filed timely and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim or Equity Interest shall be the amount specified in the proof of claim or interest filed with the Clerk.

(c)     Subject to subparagraph (d) below, a Claim or Equity Interest that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes unless the Debtors agree to Allow it in their discretion, unless otherwise ordered by the Bankruptcy Court.

(d)     If a Claim or Equity Interest has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court.

(e)     If a holder of a Claim or Equity Interest (or its authorized representative) did not use the ballot form provided by the Debtors or the Official Ballot Form authorized under the Federal Rules of Bankruptcy Procedure such ballots may not be counted in the Debtors' discretion.

(f)     If the ballot is not received by the Debtors on or before the Voting Deadline at the place indicated on the ballot or otherwise in the Solicitation Materials, the ballot may not be counted in the Debtors' discretion.

(g)     If the ballot is not signed by the holder of the Claim or Equity Interest (or its authorized representative), the ballot may not be counted in the Debtors' discretion.

(h)     Whenever a holder of a Claim or Equity Interest (or its authorized representative) submits more than one ballot voting the same Claim(s) or Equity Interest(s) before the Voting Deadline, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such ballot shall be deemed to reflect the voter's intent and shall supersede any prior ballots unless the Debtors in their discretion otherwise determines.

## G.     Execution of Ballots by Representatives

If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of corporations, or another acting in a fiduciary or representative capacity, such Person must indicate their capacity when signing and, at the Debtors' request, must submit proper evidence of their authority to so act. The Debtors shall determine in their discretion compliance with this requirement.

33

## H. Confirmation of Plan

### 1. Solicitation of Acceptances

**The Debtors are requesting that you vote to accept the Plan.**

NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO DEBTORS' COUNSEL FOR APPROPRIATE ACTION.

THIS IS A SOLICITATION SOLELY BY THE DEBTORS, AND IS NOT A SOLICITATION BY ANY ATTORNEY, ACCOUNTANT, OR OTHER PROFESSIONAL FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTORS AND NOT OF SUCH ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by Section 1125(b) of the Bankruptcy Code. Violation of Section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

### 2. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an Order confirming the Plan. For the Plan to be confirmed, Section 1129 of the Bankruptcy Code requires that:

    (a)    The Plan and the Debtors comply with the applicable provisions of the Bankruptcy Code;

    (b)    The Debtors are proposing the Plan in good faith and not by any means forbidden by law;

    (c)    Any payment or distribution made or promised by the Debtors under the Plan for services or for costs and expense in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(d)     With respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. If Section 1111(b)(2) of the Bankruptcy Code applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtors' interest in the property that secures that claim;

(e)     Each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan or has voted to accept the Plan as otherwise approved by the Bankruptcy Court;

(f)     Except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to a different treatment of its Claim, the Plan provides that Administrative Claims and Allowed Priority Unsecured Claims shall be paid in full on the Effective Date or the date such Claim becomes an Allowed Claim;

(g)     If a Class of Claims is impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class; and

(h)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan was proposed in good faith. The Debtors believe they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3.     Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of a Claim or Equity Interest (or its authorized representative) is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim or Equity Interest vote in favor of the Plan in order for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of Section 1126(a) of the Bankruptcy Code, the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan. Generally, to be confirmed under the acceptance provisions of Section 1126(a) of the Bankruptcy Code, the Plan must be accepted by each Class of Equity Interests that is impaired under the Plan by parties holding at least two-thirds in amount of the Allowed Equity Interests in that Class actually voting in such Class. Even if all Classes of Claims and Equity Interests accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

35

4. **Cramdown**

In the event that any impaired Class of Claims or Equity Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted or has been deemed not to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Equity Interests. "Fair and equitable" has different meanings for holders of secured and unsecured Claims and Equity Interests.

With respect to a secured Claim, "fair and equitable" means either (a) the impaired secured creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the Allowed amount of its Claim with a present value as of the Effective Date of the Plan at least equal to the value of such creditor's interest in the property securing its liens; (b) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (a) and (c) hereof; or (c) the impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to an unsecured Claim, "fair and equitable" means either (a) each impaired creditor receives or retains property of a value equal to the amount of its Allowed Claim or (b) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

With respect to an Equity Interest, "fair and equitable" means either (a) each impaired Equity Interest receives or retains, on account of that Equity Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the Equity Interest, or (b) the holder of any Equity Interest that is junior to the Equity Interest of that Class will not receive or retain under the Plan, on account of that junior Equity Interest, any property.

## ARTICLE VI
### FINANCIAL STATEMENTS OF THE DEBTORS

The Debtors' Financial Statements (both income and balance sheet) reflecting the Debtors' assets and liabilities as of June 30, 2009, are attached hereto as **Exhibit D.**

## ARTICLE VII
### DESCRIPTION OF THE PLAN OF REORGANIZATION

A. **Introduction**

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Allowed Equity Interests is set forth below. The following summary is entirely qualified by the Plan. The Plan, and not the Disclosure Statement, governs the rights and obligations of the parties.

36

## B. Classification and Treatment of Claims and Equity Interests

The Debtors believe that the classification of Claims and Equity Interests provided by the Plan is consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, only holders of Allowed Claims or Allowed Equity Interests that are impaired and that receive distributions under the Plan are entitled to vote on the Plan.

### 1. Unclassified Claims

**a. Allowed Administrative Expense Claims Against the Debtors.** Subject to the bar date provisions below, the holders of Allowed Administrative Expense Claims against any of the Debtors, unless otherwise agreed to by the Debtors and the holder(s) or set forth in the Plan, are entitled to priority under Section 507(a)(1) of the Bankruptcy Code. An Entity entitled to payment pursuant to Sections 546(c) or 553 of the Bankruptcy Code, and an Entity entitled to payment of administrative expenses pursuant to Sections 503 and 507(a) of the Bankruptcy Code, shall receive from the Reorganized Debtors, on account of such Allowed Administrative Expense Claim, Cash in the amount of such Allowed Administrative Expense Claim on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Administrative Expense Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Entity; provided that an Allowed Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid by the Debtors or the Reorganized Debtors in the ordinary course of business.

Applications for allowance and payment of Administrative Expense Claims must be filed on or within thirty (30) days after the Effective Date. The Court shall not consider any applications for the allowance of an Administrative Expense Claim filed after such date, and any such Administrative Expense Claim shall be discharged and forever barred. Any Administrative Expense Claim that becomes an Allowed Administrative Expense Claim after the Confirmation Date will be treated like other Allowed Administrative Expense Claims and will be paid on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Administrative Expense Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and the holder of such Claim. Any such Claim that is Allowed, but determined not to be an Administrative Expense Claim, will be treated as a General Unsecured Claim.

**b. Allowed Professional Fee Claims Against the Debtors.** Except as otherwise provided in the Plan (including in Section 4.3, Section 4.4, Section 4.5, Section 4.6, and Section 4.7), each holder of an Allowed Professional Fee Claim shall receive from the Reorganized Debtors, on account of such Allowed Professional Fee Claim, Cash in the amount of such Allowed Professional Fee Claim on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Professional Fee Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder.

09-50397 - #695  File 10/06/09  Enter 10/06/09 18:31:00  Main Document  Pg 42 of 75

Unless otherwise provided herein or otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, all secured creditors' Professional Fee Claims shall be subject to section 506(b) of the Bankruptcy Code.

Applications for allowance and payment of Professional Fee Claims (including Professional Fee Claims that are part of a Claim for Applicable Fees and Costs) incurred on or before the Confirmation Date must be filed on or within sixty (60) days from the Effective Date. The Bankruptcy Court shall not consider any applications for the allowance of a Professional Fee Claim filed after such date, and any such Professional Fee Claim shall be discharged and forever barred.

The Debtors estimate that, from the Petition Date to the Effective Date, they will have incurred aggregate Professional Fee Claims of approximately One Million Six Hundred Thousand Dollars ($1,600,000.00) for attorneys' fees and costs of Debtors' counsel and special counsel. Additionally, the Debtors estimate that they will have Professional Fee Claims of approximately Five Hundred Fifteen Thousand Dollars ($515,000.00) for the Debtors' financial advisors.

The Debtors estimate that they will have a Professional Fee Claim of approximately Two Hundred Thousand Dollars ($200,000.00) for professionals for the Unsecured Creditors' Committee, a Professional Fee Claim of approximately One Hundred Fifty Thousand Dollars ($150,000.00) for professionals for the Equity Holders' Committee, and a Professional Fee Claim of approximately Two Hundred Forty Thousand Dollars ($240,000.00) for professionals for the Oil Well Lien Act Claimants. The Debtors further estimate that they will have a Professional Fee Claim of approximately One Million Two Hundred Thousand Dollars ($1,200,000.00) for attorneys' fees and costs of counsel for Wayzata and a Professional Fee Claim of approximately Six Hundred Thousand Dollars ($600,000.00) for attorneys' fees and costs of counsel for Macquarie. The Debtors reserve the right to contest any Professional Fee Claim.

     c.    **Allowed Priority Unsecured Tax Claims**. Each holder of an Allowed Priority Unsecured Tax Claim shall receive from the Reorganized Debtors Cash payments commencing upon the Effective Date that will, no later than the five (5) years from the Petition Date, in the aggregate equal the amount of such Allowed Priority Unsecured Tax Claim, with interest at such rate as required by section 511 of the Bankruptcy Code or otherwise required by section 1129(a)(9)(C) or (D) of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan, unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder.

Holders of Priority Unsecured Tax Claims shall not receive any payment on account of penalties, with respect to, or arising in connection with such Priority Unsecured Tax Claims to the extent permissible under applicable Law, except as expressly provided in the Plan. However, such Holders of Priority Unsecured Tax Claims will receive post-Petition Date interest. The Plan, the Confirmation Order and Section 1141(d) of the Bankruptcy Code provide for the discharge of any such Claims for penalties. Holders of Priority Unsecured Tax Claims shall not assess or attempt to collect such penalties from the Debtors, the Reorganized Debtors, the Estates, or from any property thereof.

**d.** **U.S. Trustee's Fees**. The Debtors will continue to report to the U.S. Trustee by the twentieth (20th) of each month the total disbursements of each Debtor for the previous month and shall timely pay quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Court enters a Final Decree or an order either converting the Bankruptcy Case to cases under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case. Any such fees outstanding and due as of the Effective Date shall be paid in Cash by the Reorganized Debtors on the Effective Date.

**e.** **Disallowance of Special Taxes**. The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable Law, or the making or delivery of any instrument of transfer under the Plan, shall not be subject to any Tax under any state or local law imposing a stamp Tax or similar Tax as provided in Section 1146 of the Bankruptcy Code.

**f.** **Plugging and Abandonment Claims**. Any and all Claims associated with Debtors' liabilities relating to plugging, abandonment, and/or reclaiming wells, facilities, and pipelines, whether arising under contractual indemnity or otherwise, shall be unimpaired and shall be satisfied after the Effective Date in the ordinary course of business.

**2.** **Classes of Claims and Equity Interests**.

| Class 1 – Priority Unsecured Claims | Unimpaired | All Allowed Priority Unsecured Claims |
|---|---|---|
| Class 2 – Macquarie Secured Claim | Impaired | All Allowed Secured Claims arising under the Macquarie Claim |
| Class 3 – Wayzata Secured Claim | Impaired | All Allowed Secured Claims arising under the Wayzata Claim |
| Class 4 – Oil Well Lien Act Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act |
| Class 4(a) – Grand Prairie Levee District A Lease Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect Grand Prairie Levee District A Lease (Plaquemines Parish) |
| Class 4(b) – Louisiana State Lease 195 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 195 (Plaquemines Parish) |
| Class 4(c) - Louisiana State Lease 1227 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 1227 (Plaquemines Parish) |
| Class 4(d) - Louisiana State Lease 2726 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 2726 (Plaquemines Parish) |

| | | |
|---|---|---|
| Class 4(e) - Louisiana State Lease 16664 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16664 (Plaquemines Parish) |
| Class 4(f) - Louisiana State Lease 16569 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16569 (Plaquemines Parish) |
| Class 4(g) - Louisiana State Lease 18014 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 18014 (Plaquemines Parish) |
| Class 4(h) - Louisiana State Lease 16432 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16432 (Plaquemines Parish) |
| Class 4(i) - Louisiana State Lease 11189 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 11189 (Plaquemines Parish) |
| Class 4(j) - Louisiana State Lease 5097 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 5097 (St. Mary Parish) |
| Class 4(k) - Louisiana State Lease 16818 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16818 (Plaquemines Parish) |
| Class 4(l) - Louisiana State Lease 16692 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16692 (Plaquemines Parish) |
| Class 4(m) - Louisiana State Lease 4407 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 4407 (Plaquemines Parish) |
| Class 4(n) - Louisiana State Lease 4865 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 4865 (Plaquemines Parish) |
| Class 4(o) - Louisiana State Lease 19680 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 19680 (Plaquemines Parish) |
| Class 4(p) - Louisiana State Lease 16847 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16847 (Plaquemines Parish) |

| | | |
|---|---|---|
| Class 4(q) - Louisiana State Lease 335DP Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 335DP (Plaquemines Parish) |
| Class 4(r) - Louisiana State Lease 16443 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16443 (Plaquemines Parish) |
| Class 4(s) - Louisiana State Lease 17621 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 17621 (Plaquemines Parish) |
| Class 4(t) - Louisiana State Lease 18078 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 18078 (Plaquemines Parish) |
| Class 4(u) - Plaquemines Parish Government Agency Lease Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect Plaquemines Parish Government Agency Lease (Plaquemines Parish) |
| Class 4(v) - Louisiana State Lease 1268 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 1268 (Plaquemines Parish) |
| Class 4(w) - Louisiana State Lease 15906 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 15906 (Plaquemines Parish) |
| Class 4(x) - Louisiana State Lease 16393 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16393 (Plaquemines Parish) |
| Class 4(y) - Louisiana State Lease 16392 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16392 (Plaquemines Parish) |
| Class 4(z) - Louisiana State Lease 16773 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16773 (Plaquemines Parish) |
| Class 4(aa) – Louisiana State Lease 16570 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16570 (Plaquemines Parish) |
| Class 4(bb) – Louisiana State Lease 16890 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16890 (Plaquemines Parish) |

| Class 5 – Other Secured Claims | Impaired | All Allowed Secured Claims not in Class 2, 3, or 4 |
|---|---|---|
| Class 6 – General Unsecured Claims | Impaired | All Allowed General Unsecured Claims |
| Class 7 – State Lessor Audit Royalty Claims | Impaired | All Allowed State Lessor Audit Royalty Claims |
| Class 8 – Management Note Claim | Impaired | All Allowed Claims arising under the Management Note Claim |
| Class 9 – Non-Warrant Equity Interests | Impaired | All Allowed Non-Warrant Equity Interests in Saratoga |
| Class 10 – Warrants | Impaired | All Allowed Equity Interests in Saratoga that are Warrants |

**a.** **Class 1 – Priority Unsecured Claims.**

Impairment and Voting. Claims in Class 1 are Unimpaired. Holders of Allowed Priority Unsecured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

Treatment. The Reorganized Debtors shall pay to each holder of an Allowed Priority Unsecured Claim Cash in the amount of such Allowed Priority Unsecured Claim on the later of the Effective Date and the date such Priority Unsecured Claim becomes an Allowed Priority Unsecured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder.

**b.** **Class 2 – Macquarie Secured Claim.**

Impairment and Voting. The Claim in Class 2 is Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holder of the Allowed Secured Claim in Class 2 is entitled to vote to accept or reject the Plan.

Treatment.

(i) The Allowed Secured Claim arising under the Macquarie Claim shall be paid by the Reorganized Debtors in Cash as follows: (x) on the Effective Date, the portion of such Allowed Secured Claim that, pursuant to the terms of the Macquarie Credit Agreement, became due and payable between the Petition Date and the Effective Date; and (y) after the Effective Date, in accordance with the terms of the Macquarie Credit Agreement.

(ii) The Liens under the Macquarie Credit Agreement and, except as otherwise provided in the Plan, all other terms of the Macquarie Credit Agreement shall be unaffected by the Plan, Confirmation, and Consummation, and such Liens shall maintain the same validity, priority, and extent that existed on the Petition Date. Except as otherwise provided in the Plan, the Reorganized Debtors agree to be bound by the terms of the Macquarie Credit Agreement. On the Effective Date, the Macquarie Credit Agreement (as modified in accordance with the

42

Plan) shall be binding and enforceable in accordance with its terms against Macquarie and the Reorganized Debtors.

(iii) Additional details about the treatment, terms, and conditions of the Allowed Secured Claim are set forth in **Exhibit A** to the Plan. The Debtors reserve the right at any time before the Confirmation Hearing to amend, restate, or supplement **Exhibit A.**

Cure of Defaults. On the Effective Date, all defaults under all agreements between any Debtor and Macquarie or any Affiliate (including the Macquarie Credit Agreement) shall be deemed cured.

### c. **Class 3 – Wayzata Secured Claim.**

Impairment and Voting. The Claim in Class 3 is Impaired. Subject to the terms and conditions of the Plan (including Article V, Article IX, and Section 4.3(b)), the holder of the Allowed Secured Claim in Class 3 is entitled to vote to accept or reject the Plan.

Class 3 Treatment Subject to Allowance. **Exhibit G** to this Disclosure Statement lists potential Causes of Action against, and potential defenses to the Claims of, a number of Entities (including the Wayzata Parties), which are now under investigation by the Debtors. In accordance with Section 7.3 of the Plan, and for the avoidance of doubt, Confirmation of the Plan will not impair or limit any of the Debtors' defenses or Causes of Action against any and all of the Wayzata Parties or others, all of which shall be preserved and maintained to be prosecuted by the Debtors and, after the Effective Date, the Reorganized Debtors.

Consensual Treatment. In the event that Wayzata votes to accept the Debtors' Plan, Wayzata's Allowed Secured Claim shall be treated as follows:

(i) The Allowed Secured Claim arising under the Wayzata Claim (including the portion of such Allowed Secured Claim that, pursuant to the terms of the Wayzata Credit Agreement, became due and payable between the Petition Date and the Effective Date, such as interest at the Applicable Interest Rate for the Applicable Interest Period) shall be paid by the Reorganized Debtors in Cash as follows: (x) for a period of twenty-four (24) months following the Effective Date, monthly payments of interest only at ten percent (10%) per annum, (y) from the twenty-fifth (25th) month following the Effective Date through the sixtieth (60th) month from the Effective Date, regular monthly payments of principal plus interest at ten percent (10%) per annum calculated based on a twelve (12) year amortization schedule, and (z) on the fifth (5th) anniversary of the Effective Date, a Balloon Payment of all principal, interest, and Allowed Applicable Fees and Costs then due. Notwithstanding the foregoing, the Reorganized Debtors may, in their sole discretion and without any penalty, pay any amount required or allowed to be paid under Section 4.3(c) of the Plan before it is due.

(ii) In addition to the foregoing, in respect of the Allowed Secured Claim arising under the Wayzata Claim, on the later of the Effective Date and the date the Secured Claim arising under the Wayzata Claim becomes an Allowed Secured Claim, the holder of the Allowed Secured Claim shall receive the Wayzata New Shares.

43

(iii)   The Liens under the Wayzata Credit Agreement on which the Allowed Secured Claim is based shall be unaffected by the Plan, Confirmation, and Consummation, and such Liens shall maintain the same validity, priority, and extent that existed on the Petition Date.

(iv)   Notwithstanding anything herein to the contrary, if the Debtors object to any Lender Professional Fees and Expenses Claim by Wayzata or any Affiliate, whether such Claim is asserted on its own or as part of another Claim, then no payment shall be made in respect of the Lender Professional Fees and Expenses Claim unless, until, and only to the extent that such Claim is Allowed; provided that, at the Debtors' sole discretion, the Allowed Lender Professional Fees and Expenses Claim may be converted to principal and paid in accordance with Section 4.3(c)(i) of the Plan.[26]

(v)   Additional details about the treatment, terms, and conditions of the Allowed Secured Claim are set forth in **Exhibit B** to the Plan.  The Debtors reserve the right at any time before the Confirmation Hearing to amend, restate, or supplement **Exhibit B**.

<u>Nonconsensual Treatment</u>.   In the event that Wayzata does not vote to accept the Debtors' Plan, Wayzata's Allowed Secured Claim shall be treated as follows:

(i)   The Allowed Secured Claim arising under the Wayzata Claim (including the portion of such Allowed Secured Claim that, pursuant to the terms of the Wayzata Credit Agreement, became due and payable between the Petition Date and the Effective Date, such as interest at the Applicable Interest Rate for the Applicable Interest Period) shall be paid by the Reorganized Debtors in Cash as follows: (x) for a period of twenty-four (24) months following the Effective Date, monthly payments of interest only at ten percent (10%) per annum, (y) from the twenty-fifth (25th) month following the Effective Date through the sixtieth (60th) month from the Effective Date, regular monthly payments of principal plus interest at ten percent (10%) per annum calculated based on a twelve (12) year amortization schedule, or such other rate as the Bankruptcy Court may set,[27] and (z) on the fifth (5th) anniversary of the Effective Date, a Balloon Payment of all principal, interest, and Allowed Applicable Fees and Costs then due. Notwithstanding the foregoing, the Reorganized Debtors may, in their sole discretion and without any penalty, pay any amount required or allowed to be paid under Section 4.3(d) of the Plan before it is due.

(ii)   If capital contributions to the Debtors in return for common stock, and/or securities convertible into common stock, are made by the Investor(s) in one or more transactions after Confirmation, then as of the date of each such capital contribution the interest rate specified in the preceding paragraph shall be reduced as follows to reflect the further reduction of the post-Effective Date market risk undertaken by Wayzata under this Plan: (x) if an aggregate of Twenty Million Dollars ($20,000,000.00) of such contributions is raised, then the

---

[26] The Debtors assert that, on a telephonic status conference with the Bankruptcy Court, Wayzata's counsel stated to the Bankruptcy Court and all counsel that Wayzata would bear responsibility for the cost and fees incurred by Netherland Sewell & Associates, Inc.  Wayzata disagrees with the Debtors' assertion.

[27] The Debtors reserve the right to request that the Bankruptcy Court determine an appropriate rate of interest at less than ten percent (10%) in accordance with the factors set forth in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), or to utilize the *Till* analysis to conclude that 10% is an appropriate and fair interest rate, whether market- or risk-based.

interest rate shall be reduced by one hundred (100) Basis Points; and (y) for every Ten Million Dollars ($10,000,000.00) of additional aggregate contributions after the first Twenty Million Dollars ($20,000,000.00), the interest rate shall be reduced by an additional fifty (50) Basis Points; provided that, notwithstanding the foregoing, the interest rate shall not be lower than eight percent (8%) per annum.[28]

(iii)  The Liens under the Wayzata Credit Agreement on which the Allowed Secured Claim is based shall be unaffected by the Plan, Confirmation, and Consummation, and such Liens shall maintain the same validity, priority, and extent that existed on the Petition Date.

(iv)  Notwithstanding anything herein to the contrary, if the Debtors object to any Lender Professional Fees and Expenses Claim by Wayzata or any Affiliate, whether such Claim is asserted on its own or as part of another Claim, then no payment shall be made in respect of the Lender Professional Fees and Expenses Claim unless, until, and only to the extent that such Claim is Allowed; provided that, at the Debtors' sole discretion, the Allowed Lender Professional Fees and Expenses Claim may be converted to principal and paid in accordance with Section 4.3(d)(i) of the Plan.

(v)  Additional details about the treatment, terms, and conditions of the Allowed Secured Claim are set forth in **Exhibit B** to the Plan. The Debtors reserve the right at any time before the Confirmation Hearing to amend, restate, or supplement **Exhibit B**.

Cure of Defaults.  On the Effective Date, all defaults under all agreements between any Debtor and Wayzata or any Affiliate shall be deemed cured.

**d.**  **Class 4 – Oil Well Lien Act Claims.**

(1)  Class 4(a) – Grand Prairie Levee District A Lease Claims

(a)  Impairment and Voting.  Claims in Class 4(a) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(a) are entitled to vote to accept or reject the Plan.

(b)  Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(a) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, (i) (x) ninety percent (90%) of the amount of the Allowed Secured Claim on the later of the Effective Date and the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) ten percent (10%) of the amount of the Allowed Secured Claim ninety (90) days after the Effective Date plus interest at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus the holder's Applicable Fees and Costs as provided by applicable Law that are Allowed;

---

[28] Should Wayzata not vote to accept the Plan, the Debtors will analyze whether and how best to exercise their rights under this provision of the Plan. If the Investor(s) were to make investments like the ones outlined in this provision, such investments would likely result in the dilution of the then-outstanding Equity Interests.

provided that any attorneys' fees due in respect of any Allowed Secured Claim shall not exceed the lesser of (A) the actual amount of reasonable attorneys' fees incurred and (B) ten percent (10%) of the amount of the Allowed Secured Claim (the "Oil Well Lien Act Claim 90-Day Full Pay Option"); or (ii) one hundred percent (100%) of the Allowed Secured Claim on the later of the Effective Date and the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) plus interest on the Allowed Secured Claim at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus the holder's Applicable Fees and Costs as provided by applicable Law that are Allowed; provided that any attorneys' fees due in respect of any Allowed Secured Claim shall not exceed the lesser of (A) the actual amount of reasonable attorneys' fees incurred and (B) five percent (5%) of the amount of the Allowed Secured Claim (the "Oil Well Lien Act Claim Effective Date Pay Option").

(2)     Class 4(b) – Louisiana State Lease 195 Claims

(a)     Impairment and Voting. Claims in Class 4(b) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

(b)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(b) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(3)     Class 4(c) – Louisiana State Lease 1227 Claims

(a)     Impairment and Voting. Claims in Class 4(c) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(c) are entitled to vote to accept or reject the Plan.

(b)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(c) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(4)     Class 4(d) – Louisiana State Lease 2726 Claims

(a)     Impairment and Voting. Claims in Class 4(d) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(d) are entitled to vote to accept or reject the Plan.

(b)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(d) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(5)    <u>Class 4(e) – Louisiana State Lease 16664 Claims</u>

(a)    <u>Impairment and Voting</u>. Claims in Class 4(e) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(e) are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(e) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(6)    <u>Class 4(f) – Louisiana State Lease 16569 Claims</u>

(a)    <u>Impairment and Voting</u>. Claims in Class 4(f) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(f) are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(f) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(7)    <u>Class 4(g) – Louisiana State Lease 18014 Claims</u>

(a)    <u>Impairment and Voting</u>. Claims in Class 4(g) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(g) are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(g) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(8)    <u>Class 4(h) – Louisiana State Lease 16432 Claims</u>

(a)    <u>Impairment and Voting</u>. Claims in Class 4(h) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(h) are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(h) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(9)     Class 4(i) – Louisiana State Lease 11189 Claims

(a)     *Impairment and Voting.* Claims in Class 4(i) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(i) are entitled to vote to accept or reject the Plan.

(b)     *Treatment.* Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(i) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(10)    Class 4(j) – Louisiana State Lease 5097 Claims

(a)     *Impairment and Voting.* Claims in Class 4(j) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(j) are entitled to vote to accept or reject the Plan.

(b)     *Treatment.* Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(j) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(11)    Class 4(k) – Louisiana State Lease 16818 Claims

(a)     *Impairment and Voting.* Claims in Class 4(k) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(k) are entitled to vote to accept or reject the Plan.

(b)     *Treatment.* Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(k) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(12)    Class 4(l) – Louisiana State Lease 16692 Claims

(a)     *Impairment and Voting.* Claims in Class 4(l) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(l) are entitled to vote to accept or reject the Plan.

(b)     *Treatment.* Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(l) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

48

(13)     Class 4(m) – Louisiana State Lease 4407 Claims

(a)     Impairment and Voting.  Claims in Class 4(m) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(m) are entitled to vote to accept or reject the Plan.

(b)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(m) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(14)     Class 4(n) – Louisiana State Lease 4865 Claims

(a)     Impairment and Voting.  Claims in Class 4(n) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(n) are entitled to vote to accept or reject the Plan.

(b)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(n) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(15)     Class 4(o) – Louisiana State Lease 19680 Claims

(a)     Impairment and Voting.  Claims in Class 4(o) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(o) are entitled to vote to accept or reject the Plan.

(b)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(o) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(16)     Class 4(p) – Louisiana State Lease 16847 Claims

(a)     Impairment and Voting.  Claims in Class 4(p) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(p) are entitled to vote to accept or reject the Plan.

(b)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(p) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(17)     Class 4(q) – Louisiana State Lease 335DP Claims

(a)     _Impairment and Voting_. Claims in Class 4(q) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(q) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(q) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(18)     Class 4(r) – Louisiana State Lease 16443 Claims

(a)     _Impairment and Voting_. Claims in Class 4(r) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(r) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(r) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(19)     Class 4(s) – Louisiana State Lease 17621 Claims

(a)     _Impairment and Voting_. Claims in Class 4(s) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(s) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(s) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(20)     Class 4(t) – Louisiana State Lease 18078 Claims

(a)     _Impairment and Voting_. Claims in Class 4(t) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(t) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(t) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

50

(21)   Class 4(u) – Plaquemines Parish Government Agency Lease Claims

(a)   Impairment and Voting.  Claims in Class 4(u) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(u) are entitled to vote to accept or reject the Plan.

(b)   Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(u) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(22)   Class 4(v) – Louisiana State Lease 1268 Claims

(a)   Impairment and Voting.  Claims in Class 4(v) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(v) are entitled to vote to accept or reject the Plan.

(b)   Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(v) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(23)   Class 4(w) – Louisiana State Lease 15906 Claims

(a)   Impairment and Voting.  Claims in Class 4(w) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(w) are entitled to vote to accept or reject the Plan.

(b)   Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(w) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(24)   Class 4(x) – Louisiana State Lease 16393 Claims

(a)   Impairment and Voting.  Claims in Class 4(x) are Impaired.  Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(x) are entitled to vote to accept or reject the Plan.

(b)   Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(x) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(25)     Class 4(y) – Louisiana State Lease 16392 Claims

(a)     _Impairment and Voting_. Claims in Class 4(y) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(y) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(y) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(26)     Class 4(z) – Louisiana State Lease 16773 Claims

(a)     _Impairment and Voting_. Claims in Class 4(z) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(z) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(z) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(27)     Class 4(aa) – Louisiana State Lease 16570 Claims

(a)     _Impairment and Voting_. Claims in Class 4(aa) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(aa) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(aa) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

(28)     Class 4(bb) – Louisiana State Lease 16890 Claims

(a)     _Impairment and Voting_. Claims in Class 4(bb) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 4(bb) are entitled to vote to accept or reject the Plan.

(b)     _Treatment_. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim in Class 4(bb) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, the Oil Well Lien Act Claim 90-Day Full Pay Option or the Oil Well Lien Act Claim Effective Date Pay Option.

### e.     <u>Class 5 – Other Secured Claims</u>.

<u>Impairment and Voting</u>. Claims in Class 5 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Secured Claims in Class 5 are entitled to vote to accept or reject the Plan.

<u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed Secured Claim not in Class 2, 3, or 4(a) – 4(bb) in Cash, at the written election of such holder made on or prior to the Confirmation Hearing, (i) (x) ninety percent (90%) of the amount of the Allowed Secured Claim on the later of the Effective Date and the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) ten percent (10%) of the amount of the Allowed Secured Claim ninety (90) days after the Effective Date <u>plus</u> interest at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law <u>plus</u> the holder's Applicable Fees and Costs as provided by applicable Law that are Allowed; or (ii) one hundred percent (100%) of the Allowed Secured Claim on the later of the Effective Date and the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) <u>plus</u> the holder's Applicable Fees and Costs as provided by applicable Law that are Allowed <u>plus</u> interest on the Allowed Secured Claim for the Applicable Interest Period at the Federal Interest Rate.

### f.     <u>Class 6 – General Unsecured Claims</u>.

<u>Impairment and Voting</u>. Claims in Class 6 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Claims in Class 6 are entitled to vote to accept or reject the Plan.

<u>Treatment</u>. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed General Unsecured Claim in Cash, at the written election of such holder made at or prior to the Confirmation Hearing, (i) (x) ninety percent (90%) of the amount of the Allowed General Unsecured Claim on the later of the Effective Date and the date the General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) ten percent (10%) of the amount of the Allowed General Unsecured Claim ninety (90) days after the Effective Date <u>plus</u> interest on the Allowed General Unsecured Claim at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law <u>plus</u> Applicable Fees and Costs as provided by applicable Law that are Allowed; or (ii) one hundred percent (100%) of the Allowed General Unsecured Claim on the later of the Effective Date and the date the General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) <u>plus</u> interest on the Allowed General Unsecured Claim for the Applicable Interest Period at the Federal Interest Rate.

09-50397 - #695  File 10/06/09  Enter 10/06/09 18:31:00  Main Document  Pg 58 of 75

g. **Class 7 – State Lessor Audit Royalty Claims**.

*Impairment and Voting*. Claims in Class 7 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Claims in Class 7 are entitled to vote to accept or reject the Plan.

*Treatment*. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder, the Reorganized Debtors shall pay to each holder of an Allowed State Lessor Audit Royalty Claim in Cash, at the written election of such holder made at or prior to the Confirmation Hearing, (i) (x) ninety percent (90%) of the amount of the Allowed State Lessor Audit Royalty Claim on the later of the Effective Date and the date the State Lessor Audit Royalty Claim becomes an Allowed State Lessor Audit Royalty Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) ten percent (10%) of the amount of the Allowed State Lessor Audit Royalty Claim ninety (90) days after the Effective Date plus interest on the Allowed State Lessor Audit Royalty Claim at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Applicable Fees and Costs as provided by applicable Law that are Allowed; or (ii) one hundred percent (100%) of the Allowed State Lessor Audit Royalty Claim on the later of the Effective Date and the date the State Lessor Audit Royalty Claim becomes an Allowed State Lessor Audit Royalty Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) plus interest on the Allowed State Lessor Audit Royalty Claim for the Applicable Interest Period at the Federal Interest Rate.

h. **Class 8 – Management Note Claim**.

*Impairment and Voting*. Claims in Class 8 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the holders of Allowed Claims in Class 8 are entitled to vote to accept or reject the Plan.

*Treatment*. The Reorganized Debtors shall pay to each holder of an Allowed Management Note Claim in Cash as follows: (x) for a period of twenty-four (24) months following the Effective Date, monthly payments of interest only on the Allowed Management Note Claim at the lesser of the interest rate provided for in the applicable Management Note and the interest rate provided for in Section 4.3 of the Plan, (y) from the twenty-fifth (25th) month following the Effective Date through the sixtieth (60th) month from the Effective Date, regular monthly payments of principal plus interest on the Allowed Management Note Claim based on a twelve (12) year amortization schedule with interest at the lesser of the interest rate provided for in the applicable Management Note and the interest rate provided for in Section 4.3 of the Plan, and (z) on the fifth (5th) anniversary of the Effective Date, a Balloon Payment of all principal and interest then due. Except as otherwise provided in the Plan, the Reorganized Debtors agree to be bound by the terms of the Management Notes.

54

i.    **Class 9 – Non-Warrant Equity Interests**.

_Impairment and Voting_. Non-Warrant Equity Interests in Class 9 are Impaired. Subject to the terms and conditions of the Plan, the holders of Allowed Equity Interests in Class 9 are entitled to vote to accept or reject the Plan.

_Treatment_. Holders of Allowed Non-Warrant Equity Interests in Saratoga shall retain their Allowed Equity Interests, which shall be converted to identical Equity Interests in Reorganized Saratoga on the Effective Date; _provided_ that holders of these Allowed Non-Warrant Equity Interests in Saratoga shall receive no distribution in respect of their Allowed Non-Warrant Equity Interests until all Allowed Claims are paid in full in accordance with the terms of this Plan.

j.    **Class 10 – Warrants**.

_Impairment and Voting_. Warrants in Class 10 are Impaired. Subject to the terms and conditions of the Plan, the holders of Allowed Equity Interests in Class 10 are entitled to vote to accept or reject the Plan.

_Treatment_. Holders of Allowed Warrants in Saratoga shall retain their Allowed Equity Interests, which shall be converted to identical Equity Interests in Reorganized Saratoga on the Effective Date; _provided_ that holders of these Allowed Warrants in Saratoga shall receive no distribution in respect of their Allowed Warrants or the Non-Warrant Equity Interests issuable upon the exercise of the Warrants until all Allowed Claims are paid in full in accordance with the terms of this Plan.

**C.**    **Executory Contracts and Unexpired Leases**.

1.    **Assumption and Rejection**. On the Effective Date, all executory contracts and unexpired leases that exist between any of the Debtors and any Entity shall be assumed, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date,[29] (ii) is identified as an executory contract or unexpired lease to be rejected on the Effective Date on **Exhibit C** to the Plan, as that Exhibit may be amended, restated, or supplemented prior to the commencement of the Confirmation Hearing, (iii) is separately addressed herein (including the Wayzata Credit Agreement), or (iv) has a different time period for assumption or rejection provided by order of the Bankruptcy Court or by agreement between the parties to such executory contract or unexpired lease. Specifically included within this assumption are all obligations of contractual indemnity in favor of predecessors in title created through contracts governing the transfer of oil and gas leases to the Debtors.

---

[29] The Debtors have already assumed all of their oil and gas leases pursuant to the Order Granting Motion for Order Authorizing Debtors to Assume Oil and Gas Leases entered on June 23, 2009. The Debtors have also assumed two unexpired leases of non-residential real property pursuant to the Order Granting Debtors' Motion to Assume Leases of Non-Residential Real Property entered on July 31, 2009. Nothing in this Disclosure Statement or the Plan should be construed as an admission or as a position taken by the Debtors as to the applicability or non-applicability of 11 U.S.C. § 365 to oil and gas leases.

**2.  Approval of Assumption and Rejection.** Except as otherwise provided in the Disclosure Statement or in the Plan, entry of the Confirmation Order shall constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases, as the case may be, pursuant to this Section C, and (ii) the extension of time pursuant to Section 365(d)(4) of the Bankruptcy Code within which the Debtors may assume or reject the unexpired leases specified in this Section C through the Confirmation Date.

**3.  Cure of Defaults.** All cure payments that may be required by Section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease that is assumed under the Plan shall be made by the Debtors on the Effective Date or as soon as practicable thereafter. All requests for cure payments by a party to such assumed contract or lease must be filed pursuant to Article VII, Section C(4) unless such cure payments are agreed to by the Debtors or are otherwise determined by the Bankruptcy Court upon appropriate notice and hearing. In the event of a dispute regarding the amount of any cure payment, the ability of the Debtors to provide adequate assurance of future performance or any other matter pertaining to assumption, the Debtor shall make such cure payments required by Section 365(b)(1) of the Bankruptcy Code following the later of the Effective Date (or as soon as practicable thereafter) and the date of the entry of a Final Order resolving such dispute.

**4.  Rejection Damage Claims.** Claims arising out of the rejection of an executory contact or unexpired lease pursuant to this Section C must be filed with the Bankruptcy Court no later than thirty (30) days after entry of the Confirmation Order. Any such Claims not filed within such time will be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or any of their properties or agents, successors, or assigns. Unless otherwise order by the Bankruptcy Court, all Claims arising from the rejection of an executory contact or unexpired lease shall be treated as General Unsecured Claims.

## ARTICLE VIII
### MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

**A.  General Means of Implementation**

**1.  General Provision.** Upon Confirmation, the Debtors shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan including the execution and filing of all documents required or contemplated by the Plan. In connection with the occurrence of the Effective Date, the Reorganized Debtors, and each of the officers thereof, are authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**2.  Directors and Officers.** On the Effective Date, the current officers, directors, and managers of the Debtors will continue to hold their respective positions with the Reorganized Debtors. Any required disclosure of compensation under 11 U.S.C. § 1129(a)(5) will be made by a notice filed prior to the Confirmation Hearing.

3. **Causes of Action**. The Debtors and, after the Effective Date, the Reorganized Debtors, specifically reserve and shall have the exclusive right to bring, prosecute, waive, release, compromise, and settle all Causes of Action, including those described on **Exhibit G** to this Disclosure Statement, which are specifically retained under the terms of this Plan and, notwithstanding anything herein to the contrary, shall not be impaired in any way by this Plan, Confirmation, the occurrence of the Effective Date, or otherwise. The Debtors and, after the Effective Date, the Reorganized Debtors will pursue those Causes of Action that they, in the sole exercise of their business judgment and discretion, deem financially beneficial to the Estates. The recovery from all Causes of Action shall become Assets of the Debtors and, after the Effective Date, the Reorganized Debtors in accordance with this Plan. Further, the Debtors shall be entitled to offset such amounts as may be awarded to the Debtors or Reorganized Debtors with respect to such Causes of Action against Distributions due hereunder to the holder of a Claim, whether Disputed or Allowed. Neither the allowance of a Claim against the Debtors nor the making of Distributions pursuant hereto to a holder of Claims will bar or limit the right of the Debtors or Reorganized Debtors to bring any Causes of Action held against the holder of any Claim, even if the Claim that is Allowed or on account of which Distributions are made arises from the same agreement, transactions or occurrence from which the Causes of Action arise.

4. **Distributions**. All Distributions required under the Plan to holders of Allowed Claims shall be made by the Reorganized Debtors on the Effective Date, except as otherwise provided herein, from Cash on hand and/or income generated through operations. From and after the Confirmation Date, costs and expenses shall be paid in the ordinary course of business.

**B.    Distributions**

1. **Generally**. All distributions required under the Plan to holders of Allowed Claims shall be made on or after the Effective Date, except as otherwise provided herein.

2. **Distributions of Cash**. Any Distribution of Cash made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank; provided that payment to foreign holders of Allowed Claims may be in such funds and by such means (as determined by the Debtors or, after the Effective Date, the Reorganized Debtors in their sole discretion) as are customary or necessary in a particular foreign jurisdiction.

3. **Record Date for Voting on Plan**. The transfer registers for each of the Classes of Claims and Interests as maintained by the Debtors or any third party shall be deemed closed on the date of entry of an order of the Bankruptcy Court approving the Disclosure Statement (or, with respect to any Class, any later date to which the Debtors agree in their sole discretion) for purposes of voting on the Plan, and there shall be no further changes to reflect any new record holders of any Claims or Equity Interests for purposes of voting on the Plan.

4. **Timing of Distributions**. Any Distribution to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day. If a Claim or portion thereof has not been Allowed at the time a Distribution in respect of that Claim or portion would be due under the Plan, then, subject to Article VIII, Section C(5), that Distribution shall not occur at that time and shall instead occur within ten (10) Business Days of the Claim or portion becoming Allowed; provided that, if a portion of the Claim has been Allowed at the time

a Distribution is due, then, in accordance with Article VIII, Section C(5), the Distribution in respect of the Allowed portion may be made in accordance with the terms of the Plan.

5. **Minimum Distributions; No Interest**. No Distribution of Cash less than One Hundred Dollars ($100.00) is required to be made to any holder of an Allowed Claim unless a request therefore is made in writing to the Debtors or, after the Effective Date, the Reorganized Debtors. Except as otherwise expressly provided herein, no holder of any Allowed Claim shall be entitled to any post-Petition Date interest on such Claim.

6. **No Fractional Distributions**. No Distribution of fractional dollars is required; Distributions shall be rounded up or down to the nearest whole dollar.

7. **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed by the Debtors with the Bankruptcy Court, unless superseded by the address as set forth on proofs of claim filed by such holders or other writing notifying Debtors or, after the Effective Date, the Reorganized Debtors of a change of address (or at the last known address of such a holder if no proof of claim is filed or if the Debtors and Reorganized Debtors have not been notified in writing of a change of address).

8. **Undeliverable Distributions**. If any Distribution to a holder of an Allowed Claim is returned as undeliverable, no further Distributions to such holder shall be made, unless and until the Debtors or, after the Effective Date, the Reorganized Debtors are notified of such holder's then current address, at which time all missed Distributions shall be made to such holder. Amounts in respect of the undeliverable Distributions made shall be returned to the Reorganized Debtors until such Distributions are claimed. All Claims for undeliverable Distributions shall be made on or before the later of the first (1st) anniversary of the Effective Date and the date ninety (90) days after such Claim is Allowed. After such date, all unclaimed property held for Distribution to any holder of an Allowed Claim shall be re-vested in and returned to the Debtors or, after the Effective Date, the Reorganized Debtors, and the Claim of any holder with respect to such property shall be discharged and forever barred.

9. **Withholding**. The Debtors or, after the Effective Date, the Reorganized Debtors may at any time withhold from any Distribution to any holder of an Allowed Claim (except the Internal Revenue Service) such amounts sufficient to pay any Tax or other charge that has been or may be imposed on such holder with respect to the amount distributable or to be distributed under the income Tax laws of the United States or of any other Governmental Authority by reason of any Distribution provided for in the Plan, whenever such withholding is determined by the Debtors or, after the Effective Date, the Reorganized Debtors and in their sole discretion, to be required by any Law. The Debtors or, after the Effective Date, the Reorganized Debtors in the exercise of their sole discretion may enter into agreements with taxing or other Governmental Authorities for the payment of such amounts that may be withheld in accordance with the provisions of this paragraph. Notwithstanding the foregoing but without prejudice to any rights of the Debtors or, after the Effective Date, the Reorganized Debtors, such holder of an Allowed Claim shall have the right with respect to the United States, or any other Governmental Authority, to contest the imposition of any tax or other charge by reason of any Distribution under the Plan.

**10.** **Time Bar to Cash Payments**. Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Debtors or, after the Effective Date, the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first (1st) anniversary of the Effective Date and the date ninety (90) days after such Claim is Allowed, and the failure timely to make any such claim shall result in such Claim being forever barred and discharged.

**11.** **Existing Securities and Agreements**. Each holder of a debenture, promissory note, pledge agreement, guarantee, mortgage, financing statement, share certificate, or other instrument evidencing a Claim, a Lien related thereto, or an Equity Interest receiving a Distribution under the Plan, except as otherwise provided in the Disclosure Statement or the Plan, may be required by the Debtors or, after the Effective Date, the Reorganized Debtors, in their sole discretion, to surrender such document and/or to execute such other documents as the Debtors or, after the Effective Date, the Reorganized Debtors, in their sole discretion, may require to evidence the satisfaction and discharge of the Claim, Lien, or Equity Interest. No Distribution hereunder is required to be made to or on behalf of any such holders unless and until such documents are received by the Debtors or, after the Effective Date, the Reorganized Debtors or the unavailability of such documents is established to the reasonable satisfaction of the Debtors or, after the Effective Date, the Reorganized Debtors. The Debtors or, after the Effective Date, the Reorganized Debtors may require any Entity delivering an affidavit of loss and indemnity to furnish a bond in form and substance (including with respect to amount) reasonably satisfactory to the Debtors or, after the Effective Date, the Reorganized Debtors. Any holder shall be deemed to have forfeited all rights, Claims, and Equity Interests and shall not participate in any Distribution hereunder if that holder fails, within sixty (60) days after being notified of the request to surrender, (i) to surrender or cause to be surrendered such debenture, promissory note, pledge agreement, guarantee, mortgage, financing statement, share certificate, or other instrument, (ii) to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Debtors or, after the Effective Date, the Reorganized Debtors, (iii) if requested, to furnish a bond reasonably satisfactory to the Debtor, and (iv) if requested, to execute and deliver additional documents to evidence the satisfaction and discharge of the Claim, Lien, or Equity Interest.

## C. Procedure for Resolving Disputed Claims

**1.** **Right to Object to Claims**. The Debtors and, after the Effective Date, the Reorganized Debtors shall have the exclusive right to object to the allowance, amount, or classification of Claims and such objections may be litigated to Final Order by the Debtors or Reorganized Debtors, as the case may be, or compromised and settled in accordance with their business judgment without further order of the Bankruptcy Court.

**2.** **Deadline for Objecting to Claims**. As soon as reasonably practicable, but in no event later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims. An objection shall notify the holder of the Claim of the deadline for responding to such objection.

3.    **Deadline for Responding to Objections**. Within thirty (30) days after service of an objection, any written response to the objection must be filed with the Bankruptcy Court by the holder of the objected-to Claim and must be served upon the Debtors or, after the Effective Date, the Reorganized Debtors and upon counsel to the Debtors or Reorganized Debtors, as the case may be. Failure to file a written response by that date shall constitute a waiver and release of the subject Claim, and shall cause the Bankruptcy Court to enter a default judgment against the non-responding holder of the Claim granting the relief requested in the objection.

4.    **Estimation of Claims**. The Debtors may request the Bankruptcy Court to estimate any contingent or Disputed Claim for purposes of allowance under Section 502(c) of the Bankruptcy Code.

5.    **Payment of Disputed Claims**. At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall distribute to the holder thereof the Distribution, if any, to which such holder is then entitled under the Plan. The holder of a Disputed Claim that later becomes an Allowed Claim shall receive interest at the Applicable Rate from the Effective Date (or such earlier or different date as is provided for herein) to the date of the Distribution in respect of the Allowed Claim. The Debtors or, after the Effective Date, the Reorganized Debtors may, but shall not be required to, make a Distribution with respect to the portion of a Disputed Claim that is not in dispute (if any) pending the resolution of the entire Claim.

**D.    Effect of Confirmation of Plan**.

1.    **Vesting of Assets**. On the Effective Date, except as otherwise provided herein, all Assets of the Estates, including all Causes of Action (including those identified on **Exhibit G** to this Disclosure Statement), shall be transferred to, and shall vest in, the Reorganized Debtors, free and clear of all Liens and Claims, subject to the terms and conditions set forth herein. After the Effective Date all such Causes of Action shall be retained and enforced by the Reorganized Debtors. THIS SECTION D(1), TOGETHER WITH OTHER PROVISIONS IN THIS DISCLOSURE STATEMENT AND THE PLAN, ARE INTENDED TO OPERATE TO SPECIFICALLY AND UNEQUIVOCALLY DISCLOSE AND ADVISE INTERESTED PARTIES THAT ALL CAUSES OF ACTION, INCLUDING THOSE IDENTIFIED ON **EXHIBIT G** TO THIS DISCLOSURE STATEMENT, WILL BE PRESERVED AND PROSECUTED AFTER THE EFFECTIVE DATE.

2.    **Amended Organizational Documents of Reorganized Debtors**. On the Effective Date, the Amended Organizational Documents attached to the Plan as **Exhibit E** shall become effective and, as appropriate, be filed with the appropriate Governmental Authorities. The Debtors reserve the right at any time before the Effective Date to amend, restate, or supplement **Exhibit E.**

3.    **Amended and Restated Wayzata Credit Agreement**. On the later of the Effective Date and the date the Wayzata Claim becomes an Allowed Claim, the Amended and Restated Wayzata Credit Agreement shall become effective and be enforceable in accordance with its terms. Entry of the Confirmation Order shall constitute approval of the terms of the Amended and Restated Wayzata Credit Agreement.

60

**4.** **Operation by Reorganized Debtors**. After the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of Assets free of any restrictions imposed under the Bankruptcy Code.

**5.** **Injunction**. Except as otherwise expressly provided in the Plan, upon Confirmation, all Entities who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest; (c) creating, perfecting or enforcing any Lien against the Debtors or Reorganized Debtors, or against any of their Assets, on account of any such Claim or Equity Interest; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the Assets of the Debtors or Reorganized Debtors on account of any such Claim or Interest.

**6.** **Indemnification Obligations**. The obligations of the Debtors to indemnify, reimburse or limit liability of any person who is serving or has served as one of its directors, officers, employees or agents by reason of such person's prior or current service in such capacity as provided in the applicable articles of organization, operating agreements, partnership agreements, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtors shall be recognized and honored and shall bind the Reorganized Debtors and shall not be affected by or discharged by this Plan. Nothing in this Plan shall be deemed to affect any rights of any director or officer or any other person against any insurer with respect to any directors or officers liability insurance policies.

**7.** **Discharge of Debtors and Claims**. The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of every nature, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or the Reorganized Debtors, or any of their Assets. Except as otherwise provided herein, on the Effective Date (i) all such Claims against, and Equity Interests in, the Debtors shall be satisfied, discharged, and released in full and (ii) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors to the extent the Claims are satisfied in full, their Assets, or any other or further Claims or Equity Interests based upon any act or omission, transaction, or other activity of any kind or nature, whether known or unknown, that occurred prior to the Effective Date, whether or not (a) a proof of claim or interest based upon such Claim or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) such Claim or Equity Interest is allowed under Section 502 of the Bankruptcy Code, or (c) the holder of such Claim or Equity Interest has accepted the Plan; provided that the discharge shall not apply to the Debtors' contingent liability (if any) for plugging, abandonment, and/or reclaiming wells, facilities, and pipelines, whether such liabilities are direct or arise through contractual indemnity obligations. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.

**8.** <u>No Successor Liability</u>. Except as otherwise specifically provided in the Plan or the Confirmation Order, neither the Debtors nor the Reorganized Debtors will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates relating to or arising out of the operations of or Assets of the Debtors or any of the Debtors' past or present Affiliates, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. The Reorganized Debtors shall have no successor or transferee liability of any kind or character, for any Claims; <u>provided</u> that the Reorganized Debtors shall have the obligations for the payments specifically and expressly provided, and solely in the manner stated, in the Plan.

**9.** <u>Exculpations</u>. The officers, directors, managers and professionals of the Debtors shall have no liability to any holder of a Claim or Equity Interest or other Entity for any act, event, or omission in connection with, relating to, or arising out of the Bankruptcy Case, the negotiation of the Plan, the Consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for any liability based on willful misconduct or gross negligence. In all such instances, the above-referenced parties shall be and have been entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities in connection with the Bankruptcy Case and under the Plan. Such exculpation shall not extend to any post-Petition Date act of any Entity other than in connection with that Entity's official capacity in the Bankruptcy Case.

**10.** <u>Term of Injunction or Stays</u>. Unless otherwise provided herein or otherwise ordered by the Bankruptcy Court, all injunctions or stays set forth in 11 U.S.C. §§ 105 and 362 shall remain in full force and effect until the Effective Date rather than the Confirmation Date. Nothing in this paragraph, however, shall be construed as a limitation of the permanent discharge and injunction provisions provided for in the Plan.

**E.** <u>Conditions Precedent to Confirmation and Effective Date.</u>

**1.** <u>Conditions</u>. The occurrence of the Effective Date and the substantial Consummation of the Plan are subject to satisfaction or, in the sole discretion of the Debtors, waiver of the following conditions precedent:

**a.** <u>Confirmation Order</u>. The Confirmation Order shall have become a Final Order and be in full force and effect.

**b.** <u>Amended and Restated Wayzata Credit Agreement</u>. The Wayzata Credit Agreement shall have been replaced by an Amended and Restated Credit Agreement by and among Reorganized Saratoga, Wayzata, and other appropriate Entities, and such other related agreements and documents as are necessary or appropriate to give effect to the Amended and Restated Credit Agreement, and these shall have been executed and delivered by all parties thereto. This Amended and Restated Credit Agreement and these other agreements and documents shall include the terms and conditions set forth in Section 4.3(c) or Section 4.3(d) of the Plan, as appropriate, and in **Exhibit B** to the Plan, and such other terms and conditions— consistent with the Plan, with the transactions contemplated therein, and with a non-predatory secured loan with a substantial equity cushion that most closely resembles a first-lien loan—as

the parties thereto may agree on; provided that, if there is a dispute over the terms and conditions and the parties cannot agree, then the Bankruptcy Court shall resolve the dispute, with the resulting Amended and Restated Credit Agreement and other agreements and documents being binding and enforceable in accordance with their terms against the Reorganized Debtors, Wayzata, and other appropriate Entities without execution by any of these Parties.

     **c.**    **Oil Well Lien Act Claim Releases**.  Each holder of an Oil Well Lien Act Claim shall have executed and delivered to the Debtors a release of any Lien under the Oil Well Lien Act against the Debtors, their Assets, and the Estates, which release shall by its terms be effective upon the occurrence of the last Distribution due under the Plan in respect of that Oil Well Lien Act Claim. Upon the occurrence of the last Distribution due under the Plan in respect of that Oil Well Lien Act Claim, all such Liens filed against any Debtor shall have been released, discharged, and erased and made of no force and effect against the Debtors, their Assets, and the Estates. The form of release is attached to the Plan as **Exhibit D**. The Debtors reserve the right at any time before the Effective Date to amend, restate, or supplement **Exhibit D** to the Plan.

     **d.**    **Tax Identification Number Affidavit**.  The Debtors shall have received an affidavit, in a form acceptable to them in their reasonable discretion, from each Entity that is to receive a Distribution under the Plan as to that Entity's federal tax identification number.

     **e.**    **Governmental Authorizations**.  Any authorizations, consents and regulatory approvals from a Governmental Authority required for the consummation of each of the transactions contemplated in this Plan shall have been obtained and shall have become final and nonappealable and, with respect to any court proceeding relating thereto, been approved by Final Order.

     **f.**    **Execution of Documents; Other Actions**.  All other actions and documents necessary to implement the Plan shall have been effected or executed.

     **2.**    **Notice of Effective Date**.  The occurrence of the Effective Date and the substantial Consummation of the Plan shall be evidenced by a Notice of Effective Date filed with the Bankruptcy Court by the Reorganized Debtors

     **3.**    **Revocation of Confirmation Order or Withdrawal of Plan**. The Debtors may revoke or withdraw the Plan prior to the Confirmation Date by filing a Notice of Withdrawal of Plan in the record of the Bankruptcy Case. If the Plan is withdrawn prior to the Confirmation Date, then the Plan shall be deemed withdrawn and the Confirmation Order (if any has been entered) shall be automatically revoked without the need for any action by any party in interest or the Bankruptcy Court. In such event, the Plan and the Confirmation Order shall be of no further force or effect; the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the filing of the Plan; all the Debtors' respective obligations with respect to the Claims and Equity Interests shall remain unchanged; and all of the Debtors' rights and claims against all Entities shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed to constitute an admission or statement against interest or to constitute a waiver or release of any claims by or against the Debtors or any other persons or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors or any other Entities; provided

63

that, if the Debtors have the exclusive right to file a plan on the day this Plan is filed, then revocation or withdrawal of this Plan shall extend such exclusive right for thirty (30) days after revocation or withdrawal and, if the Debtors file a plan within that thirty-day period, for an additional sixty (60) days so that the Debtors may solicit and obtain acceptance of their plan of reorganization.

## F. Miscellaneous Provisions

**1. Retention of Jurisdiction.** As more specifically provided in the Plan, after the Confirmation Date the Bankruptcy Court (to the maximum extent permitted by the Bankruptcy Code or other applicable Law) will retain jurisdiction of all matters arising out of, and related to, the Bankruptcy Case and the Plan.

## 2. Defects, Omissions, Amendments, and Modifications of the Plan.

a. The Debtors may, with the approval of the Bankruptcy Court and without notice to holders of Claims, insofar as it does not materially and adversely affect holders of Claims, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution of the Plan.

b. The Debtors may propose amendments or alterations to the Plan before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with Section 1125 of the Bankruptcy Code.

c. The Debtors may propose amendments or alterations to the Plan before or after the Confirmation Date but prior to substantial Consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect holders of Claims, so long as (i) the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code, (ii) the Debtors have complied with Section 1125 of the Bankruptcy Code, and, (iii) after notice and hearing, the Bankruptcy Court confirms such Plan, as modified, under Section 1129 of the Bankruptcy Code.

**3. Severability.** If the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable. The invalidity, voidness, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**4. Revocation or Withdrawal of the Plan.** The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn prior to the Confirmation Date, the Plan shall be deemed null and void. In such event, all of the respective obligations of the Debtors and the holders of Claims and Equity Interests shall remain unchanged and nothing contained herein or in the Disclosure Statement shall be deemed an admission or statement against interest or to constitute a waiver or release of any claims by or

against the Debtors or any other Entity or to prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving the Debtor or Entity.

5. **Dissolution of Committees**. On the Effective Date, the Unsecured Creditors' Committee and its Professionals and the Equity Holders' Committee and its Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Bankruptcy Cases, and the Unsecured Creditors' Committee and the Equity Holders' Committee shall be deemed dissolved; provided that, in the event that the Effective Date occurs prior to the entry of an order with respect to final fee applications of Professionals for the Unsecured Creditors' Committee or the Equity Holders' Committee, the Unsecured Creditors' Committee and the Equity Holders' Committee and their Professionals may seek and recover reasonable compensation in connection with the preparation, filing and prosecution of such applications.

6. **Exemption from Securities Laws**. The issuance of the Wayzata New Shares shall be exempt from registration under any federal, state or local Law pursuant to section 1145 of the Bankruptcy Code or other applicable Law. Any person who solicits or participates in the offer, issuance, sale or purchase of the Wayzata New Shares issued under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable Law governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale or purchase of securities pursuant thereto.

7. **Successors and Assigns**. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Entity.

8. **Notices**. Any notice required or permitted to be provided under the Plan shall be in writing and served by either (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, freight prepaid, addressed as follows:

The Debtors or Reorganized Debtors:
Saratoga Resources, Inc.
Attention: Debtors/Reorganized Debtors
67201 Industry Lane
Covington, Louisiana 70433

and
Saratoga Resources, Inc.
Attention: Debtors/Reorganized Debtors
7500 San Felipe
Suite 675
Houston, Texas 77063

With copies, which shall not constitute notice, to:
Adams and Reese LLP
Attention: Robin B. Cheatham and John M. Duck
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234

and to:
Schully, Roberts, Slattery & Marino,
  A Professional Law Corporation
Attention: Paul J. Goodwine
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800

**9.** **Payment of Statutory Fees**. Except as otherwise provided herein, for so long as the Bankruptcy Case shall remain open and pending before the Bankruptcy Court, all fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors, with all such fees determined by the Bankruptcy Court at the Confirmation hearing to be due on or prior to the Effective Date being paid in Cash by the Reorganized Debtors on the Effective Date.

**10.** **Additional Documents**. On or before substantial Consummation of the Plan, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to reasonably effectuate and further evidence the terms and conditions of the Plan.

**11.** **Rules of Interpretation**. Whenever appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender. Any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions. Any reference in this Disclosure Statement to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented. Unless otherwise specified, all references in this Disclosure Statement to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Disclosure Statement. Captions and headings to Sections, Articles, and Exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement. In the event of a conflict between the terms of the body of this Disclosure Statement and the terms of any Exhibit, the terms of the body of this Disclosure Statement shall control; provided that the terms of the Plan shall control over the terms of the body of this Disclosure Statement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Any reference herein to any Law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time. The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed

66

to refer to this Disclosure Statement in its entirety and not to any particular provision hereof. With respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including." The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## ARTICLE IX
### FINANCIAL PROJECTIONS, FEASIBILITY AND RISKS

The Debtors have analyzed their ability to meet their obligations under the Plan, and as part of that analysis have prepared their preliminary financial projections (the "Financial Projections"), which are attached to the Disclosure Statement as **Exhibit E**. Although the Debtors have had preliminary discussions with a number of parties regarding potential additional debt or equity financing, the Debtors do not believe that such additional financing is necessary to their successful reorganization, and **Exhibit E** does not reflect any additional financing. **Exhibit E** also includes a discussion of the assumptions underlying the Financial Projections and related risks. Certain other risks are discussed *supra* at Article III, Section A(4)-(8). A more detailed discussion of the risks associated with the Debtors' business is included in the Debtors' most recent Annual Report on Form 10-K filed with the SEC, which is available online at http://www.saratogaresources.net-a.googlepages.com/10-K12-31-08.pdf.[30] Additionally, copies of this Form 10-K are available upon written request to counsel for the Debtors. Based on the Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan. The Debtors also believe that a reorganization or liquidation of the Debtors' assets outside of the Plan would not be in the best interest of any of the creditors of the estates and that reorganization pursuant to the Plan provides the greatest possible benefit to creditors and other parties in interest. A comparison of the estimated return to creditors if the case were converted to a case under Chapter 7 compared to the return to creditors if the Plan is approved is set forth in the Liquidation Analysis attached to this Disclosure Statement as **Exhibit F**. **Exhibit F** also includes a comparison of the administrative costs if the case were converted to a case under Chapter 7 compared to those if the Plan is approved. Attached as **Exhibit H** is a chart showing the projected Effective Date Equity Interests in Reorganized Saratoga.

## ARTICLE X
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, and (ii) the preparation and presentation of an alternative plan or plans of reorganization or (iii) dismissal of the Bankruptcy Case. The Debtors reserve the right to pursue any of these courses of action should the Plan not be confirmed.

If no Chapter 11 plan can be confirmed, the Debtors' Bankruptcy Case may be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors. The Debtors believe that liquidation under Chapter 7 would result in (a) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of

---

[30] Saratoga is current in the filing of periodic reports with the SEC.

a trustee and attorneys and other professionals to assist such trustee; and (b) additional expenses and claims, which would be generated during the liquidation.

## ARTICLE XI
### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to any person or Entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local government officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

This discussion is a general summary of certain federal income tax aspects of the Plan, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest. This discussion is based upon existing provisions of the Internal Revenue Code of 1986, as amended, existing and proposed regulations thereunder, and current pertinent administrative rulings and court decisions. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this Section.

Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent. THE DEBTORS ARE NOT REQUESTING A RULING FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN, AND THE DEBTORS HAVE OBTAINED NO OPINION OF COUNSEL WITH RESPECT THERETO. ACCORDINGLY, NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. THE TAX CONSIDERATIONS APPLICABLE TO CERTAIN HOLDERS (SUCH AS PENSION OR PROFIT-SHARING TRUSTS OR FOREIGN INVESTORS) MAY BE DIFFERENT THAN THE GENERAL DISCUSSION CONTAINED HEREIN. THERE MAY ALSO BE STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS APPLICABLE TO EACH HOLDER OF A CLAIM OR INTEREST, WHICH ARE NOT ADDRESSED HEREIN. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN SHOULD CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST.

## ARTICLE XII
### CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. In addition, other alternatives would involve significant delay, uncertainty and

substantial additional administrative costs. The Debtors urge holders of impaired Claims and Equity Interests to vote in favor of the Plan.

Respectfully submitted,

**ADAMS AND REESE LLP**

By:___*/s/ John M. Duck*_____
ROBIN B. CHEATHAM [#4004]
JOHN M. DUCK [#5104]
LISA M. HEDRICK [#26421]
DAVID K. BOWSHER [AL # ASB-1703-D56B]
JOHN A. LEE [TX #12125400]
JOANN J. COURCELLE [#26941]
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Attorneys for the Debtors

PAUL J. GOODWINE [#23757]
Schully, Roberts, Slattery & Marino,
A Professional Law Corporation
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800
Facsimile: (504) 585-7890
Special Counsel for the Debtors

**SARATOGA RESOURCES, INC.**

By: _____
Chairman, Chief Executive Officer & Director

**HARVEST OIL & GAS, LLC**

By: _____
Operating Manager

**THE HARVEST GROUP, LLC**

By: _____
Operating Manager

**LOBO OPERATING, INC.**

By: _____
President

**LOBO RESOURCES, INC.**

By: _____
President

70