**SO ORDERED.**

**SIGNED April 19, 2010.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **HARVEST OIL & GAS, LLC,** *et al* | § | **CASE NO. 09-50397 and** |
| | § | **(Jointly Administered)** |
| **Debtors** | § | |

---

### ORDER CONFIRMING THIRD AMENDED PLAN OF REORGANIZATION AS JOINTLY PROPOSED BY THE DEBTORS, MACQUARIE AMERICAS CORP. AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS (AS MODIFIED AS OF MARCH 31, 2010)

This matter came before the Court on the confirmation of the Third Amended Plan of

Reorganization as Jointly Proposed by the Debtors, Macquarie Americas Corp. and the Official

Committee of Equity Security Holders (as Modified as of March 31, 2010) [Doc. #1074-1] (the

"Plan") filed by Saratoga Resources, Inc. ("Saratoga"), Harvest Oil & Gas, LLC ("Harvest Oil &

Gas"), The Harvest Group, LLC ("Harvest Group" and, together with Harvest Oil & Gas, the

"Harvest Companies"), Lobo Operating, Inc. ("Lobo Operating"), and Lobo Resources, Inc.

("Lobo Resources" and, together with Lobo Operating, the "Lobo Companies"), each a debtor

and debtor-in-possession (Saratoga, Harvest Oil & Gas, Harvest Group, Lobo Operating, and Lobo Resources, individually referred to herein as a "Debtor" and collectively referred to herein as the "Debtors"), Macquarie Americas Corp., in its capacity as Holder of Equity Interests in Saratoga, and the Equity Holders' Committee.

The Court having considered (a) the Plan, (b) all other documents and notices related to the Plan that are part of the record of these cases, (c) the record of the entire above-captioned cases, (d) the objections filed with respect to the confirmation of the Plan, and (e) the evidence presented and the argument of counsel at the Confirmation Hearing[1]; and the Court having determined, for oral reasons assigned in open court, that just cause has been established for the relief requested by the Debtors and that all requirements for the confirmation of the Plan have been satisfied, **IT IS HEREBY ORDERED THAT:**

1.  Confirmation of the Plan. The Plan, attached hereto as **Exhibit A**, is hereby confirmed.

2.  Injunction. As and to the extent not inconsistent with sections 524 and 1141 of the Bankruptcy Code, and except as otherwise expressly provided in the Plan (including in Section 4.2 and Section 4.3), all Entities who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors or Reorganized Debtors with respect to any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by any of the Debtors or Reorganized Debtors on or

---

[1] All provisions of the Plan, including all definitions therein and all exhibits attached thereto, and all Plan Documents, are adopted as part of this Confirmation Order as if set forth in this Order *in extenso*. The failure specifically to include or reference any particular provisions of the Plan (including, without limitation, the exhibits) or any Plan Document in this Confirmation Order shall not diminish or impair the efficacy of such provisions.

prior to the Effective Date; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Debtors or the Reorganized Debtors on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date; (c) creating, perfecting or enforcing any Lien against any of the Debtors or Reorganized Debtors, or against any of their Assets, on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by any of the Debtors or Reorganized Debtors on or prior to the Effective Date; and (d) asserting any right of setoff, subrogation or recoupment of any kind (except under section 362(b)(26) of the Bankruptcy Code as provided in section 553 of the Bankruptcy Code) against any obligation due from any of the Debtors or Reorganized Debtors or against the Assets of any of the Debtors or Reorganized Debtors on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date.

3.  Discharge of Debtors and Claims. Except as otherwise provided in the Plan (including in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)), the rights afforded in the Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of every nature, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or the Reorganized Debtors, or any of their Assets. As and to the extent not inconsistent with sections 524 and 1141 of the Bankruptcy Code, and except as otherwise provided in the Plan (including in Section 4.2,

3

Section 4.3, Section 7.3(b), and Section 7.3(c)), subject to the occurrence of and as of the Effective Date (i) all such Claims against the Debtors shall be satisfied, discharged, and released in full and (ii) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors to the extent the Claims are satisfied in full, or Equity Interests are retained hereunder, their Assets, or any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature, whether known or unknown, that occurred on or prior to the Effective Date, or that could have been commenced by the Holder of an Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date, whether or not (a) a proof of claim or interest based upon such Claim or Equity Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim or Equity Interest is allowed under section 502 of the Bankruptcy Code, or (c) the Holder of such Claim or Equity Interest has accepted the Plan; provided that the discharge shall not apply to the Reorganized Debtors' obligations under the Plan or any Plan Document or to the Debtors' contingent liability (if any) for plugging, abandonment, and/or reclaiming wells, facilities, and pipelines, whether such liabilities are direct or arise through contractual indemnity obligations; provided, further, that the discharge shall not apply to the Equity Interests in the Harvest Companies or the Lobo Companies. Except as provided herein and in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. Nothing in the Plan, this Order or the application of sections 524 and 1141 of the Bankruptcy Code shall impair or alter in any manner whatsoever the obligations of any of the Debtors (i) to plug and abandon any of the wells owned or previously owned or (ii) to remediate the surface lands affected by the mineral interests owned or previously owned by the Debtors; this non-impairment includes the rights of any party under any

4

applicable law, operating agreement or other contractual relationship with the Debtors including but not limited to (i) any right to assert any claim against the Debtors within the time periods established under non-bankruptcy law or contractual provisions, (ii) any right to set off and/or recoup claims in the future under applicable non-bankruptcy law, (iii) assert and perfect security interests or liens under applicable non-bankruptcy law or contractual provisions or (iv) serve to release, discharge or enjoin the enforcement of any of the Debtors' obligations for the plugging, abandonment and remediation related to all mineral interests owned or previously owned by any of the Debtors.

4.     Exculpations. As and to the extent not inconsistent with section 524(e) of the Bankruptcy Code or 26 U.S.C. § 6672, the officers, directors, managers, members, and professionals of the Debtors, the Macquarie Parties, the Wayzata Parties, the Unsecured Creditors' Committee, and the Equity Holders' Committee shall have no liability to any Holder of a Claim or Equity Interest or other Entity (including the foregoing Entities) for any act, event, or omission in connection with, relating to, or arising out of the Bankruptcy Cases, the negotiation of the Plan, the Consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for any liability based on willful misconduct or gross negligence. In all such instances, the above-referenced parties shall be and have been entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities in connection with the Bankruptcy Cases and under the Plan. Such exculpation shall not extend to any post-Petition Date act of any Entity other than in connection with that Entity's official capacity in the Bankruptcy Cases.

5.     Plan Documents. The Plan Documents (including, without limitation, the Macquarie Amended and Restated Credit Agreement, the Wayzata Amended and Restated Credit

5

Agreement, and the Amended Organizational Documents, together with all exhibits and schedules thereto and documents referred to therein or contemplated thereby), and any amendments, modifications, and supplements thereto, as applicable, are duly authorized and approved when executed and delivered. On the Effective Date, the adoption of the Amended Organizational Documents, the issuance of the Wayzata New Warrant and the shares of Reorganized Saratoga upon the exercise thereof, and the issuance of the Creditors' Shares shall be duly authorized and approved in all respects, in each case without further action under applicable Law (including, without limitation, any action by the stockholders or directors of any of the Debtors or the Reorganized Debtors), and all matters provided for under the Plan that would otherwise require the approval of the stockholders or directors of any of the Debtors or the Reorganized Debtors shall be deemed to have occurred on the Effective Date pursuant to applicable Law.

6. <u>Authorization to Consummate Plan</u>. Bankruptcy Rules 3020(e) and 6006(d) shall not be applicable to this Confirmation Order, and the Debtors are authorized to consummate the Plan immediately upon the satisfaction or waiver, as applicable and in accordance with the provisions of the Plan, of the conditions precedent set forth in section 11.1 of the Plan.

###

This order was prepared and submitted by:
Robin B. Cheatham (#4004)
John M. Duck (#5104)
**ADAMS AND REESE LLP**
4500 One Shell Square
New Orleans, LA 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **HARVEST OIL & GAS, LLC,** *et al.* | § | **Case No. 09-50397** |
| | § | **(Jointly Administered)** |
| **Debtors** | § | |

## THIRD AMENDED PLAN OF REORGANIZATION AS JOINTLY PROPOSED BY THE DEBTORS, MACQUARIE AMERICAS CORP. AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS (AS MODIFIED AS OF MARCH 31, 2010)

ROBIN B. CHEATHAM
JOHN M. DUCK
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
*Attorneys for the Debtors*

PAUL J. GOODWINE
Slattery, Marino & Roberts,
A Professional Law Corporation
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800
Facsimile: (504) 585-7890
*Special Counsel for the Debtors*

LOUIS M. PHILLIPS
Gordon, Arata, McCollam, Duplantis &
  Eagan, L.L.P.
One American Place
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
*Counsel for Macquarie Americas Corp.*

DOUGLAS S. DRAPER
WILLIAM H. PATRICK III
Heller, Draper, Hayden, Patrick &
  Horn, LLC
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
*Counsel for the Official Committee of
  Equity Security Holders*

DATED: March 31, 2010



EXHIBIT
tables
A

# INTRODUCTION

Pursuant to chapter 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Saratoga Resources, Inc. ("Saratoga"), Harvest Oil & Gas, LLC ("Harvest Oil & Gas"), The Harvest Group, LLC ("Harvest Group" and together with Harvest Oil & Gas, the "Harvest Companies"), Lobo Operating, Inc. ("Lobo Operating"), and Lobo Resources, Inc. ("Lobo Resources" and together with Lobo Operating, the "Lobo Companies"), each a debtor and debtor-in-possession (Harvest Oil & Gas, Saratoga, Harvest Group, Lobo Operating, and Lobo Resources, individually referred to herein as a "Debtor" and collectively referred to herein as the "Debtors"), Macquarie Americas Corp., in its capacity as Holder of Equity Interests in Saratoga, and the Equity Holders' Committee respectfully propose the following Third Amended Plan of Reorganization (as it may be amended or supplemented from time to time, and including all Exhibits and Schedules, the "Plan"):

## ARTICLE I
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, DEFINED TERMS

Section 1.1    **Rules of Interpretation**.  Whenever appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender.  Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified, all references in the Plan to Sections, Articles, Exhibits, and Schedules are references to Sections, Articles, Exhibits, and Schedules of or to the Plan.  Captions and headings to Sections, Articles, Exhibits, and Schedules are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  Except as otherwise provided herein, in the event of a conflict between the terms of the body of this Plan and the terms of any Exhibit or Schedule, the terms of the body of this Plan shall control.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Any reference herein to any Law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.  The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Plan in its entirety and not to any particular provision hereof.  With respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including."  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.  Any term used in the Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to them in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Section 1.2    **Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply as though the Plan is an order of the Bankruptcy Court.

Section 1.3 **Governing Law**. Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed in accordance with, the Laws of the State of Louisiana, without giving effect to the principles of conflicts of laws thereof.

Section 1.4 **Defined Terms**. The following terms, as used herein, have the following meanings:

"Administrative Expense Claim" means any Claim constituting a cost or expense of the administration of the Bankruptcy Cases asserted under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the administration and implementation of the Plan, the administration, prosecution or defense of Claims by or against the Debtors and for distributions under the Plan, any Claims for compensation and reimbursement of expenses arising during the period from and after the Petition Date and to the Effective Date or otherwise in accordance with the provisions of the Plan, and any fees or charges assessed against the Debtors' estates pursuant to 28 U.S.C. § 1930; provided that Professional Fee Claims shall not constitute Administrative Expense Claims.

"Affiliate" means, as to any Entity, any Subsidiary of such Entity, or any other Entity which, directly or indirectly, controls, is controlled by, or is under common control with, such Entity. For the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities or partnership interests, or by contract or otherwise.

"Allowed" means, with reference to any Claim or Equity Interest, (a) any Claim against or Equity Interest in any of the Debtors which has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and as and to the extent that no contrary proof of claim or interest has been filed, (b) any Claim or Equity Interest allowed hereunder, (c) any Claim or Equity Interest which is not Disputed, or (d) any Claim or Equity Interest which, if Disputed, (i) as to which, pursuant to the Plan or a Final Order of the Bankruptcy Court, the liability of the Debtors and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court, or (ii) has been allowed hereunder or by Final Order; provided, however, that any Claims or Equity Interests allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" Claims or "Allowed" Equity Interests hereunder. Unless otherwise specified herein, in section 511 of the Bankruptcy Code, or by order of the Bankruptcy Court, "Allowed" Administrative Expense Claims, "Allowed" Claims, or "Allowed" Equity Interests shall not, for purposes of computation of distributions under the Plan, include interest on such Administrative Expense Claim, Claim or Equity Interest from and after the Petition Date.

"Amended Organizational Documents" means the Amended and Restated Certificate of Incorporation, the Amended and Restated Bylaws, and any other similar documents of the Reorganized Debtors required to implement the Plan, all of which shall comply with the requirements of 11 U.S.C. §§ 1123(a)(6)-(7).

"Applicable Fees and Costs" means, if and to the extent not included in an Allowed Claim, the Allowed fees, costs, and expenses (including Professional Fee Claims) due to the Holder of an Allowed Claim (if any) under the written agreement with the Debtor(s) giving rise to the Allowed Claim or, if there is no such an agreement or applicable Law dictates that such an agreement does not control, under applicable Law.

"Applicable Interest Period" means the period of time from the Petition Date to the date an Allowed Claim is paid in full, or such other period of time (if any) for which interest on an Allowed Claim, or portion thereof, would be due under the Bankruptcy Code (including sections 506(b) and 726(a)).

"Applicable Interest Rate" means the interest rate accruing on the amount of an Allowed Claim (or portion thereof) that is (i) specified in the written agreement with the Debtor(s) giving rise to the Allowed Claim (or portion thereof), (ii), if there is no such an agreement or applicable Law dictates that such an agreement does not control, the interest rate specified by applicable Law, or (iii) as determined by order of the Bankruptcy Court.

"Assets" means all assets of any nature whatsoever, including the property of the Estates pursuant to section 541 of the Bankruptcy Code, Causes of Action, Cash, Cash equivalents, claims of right, interests and property, real and personal, tangible and intangible.

"Balloon Payment" means, with respect to a Claim, loan, debt, or other right to payment, the payment of all outstanding principal and all accrued but unpaid interest.

"Bankruptcy Cases" means the bankruptcy cases filed by the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which are being jointly administered under Case No. 09-50397.

"Bankruptcy Code" has the meaning set forth in the initial paragraph hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Louisiana or such other court having jurisdiction over the Bankruptcy Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Bankruptcy Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court.

"Basis Point" means one hundredth of one percent (0.01%).

"Business Day" means a day other than a Saturday, a Sunday or any other day on which commercial banks in Lafayette, Louisiana are required or authorized to close by law or executive order.

"Cash" means the lawful currency of the United States of America.

"Causes of Action" means any and all rights, claims, causes and rights of action, whether unliquidated or contingent, of any of the Debtors and/or their respective Estates existing as of the Effective Date, including, without limitation, any such rights, claims, causes of action, suits, and proceedings (i) arising under applicable non-bankruptcy Law, which the Debtors may have as debtors and debtors in possession (exercising the rights and powers of a trustee pursuant to section 1107(a) of the Bankruptcy Code), under section 541 of the Bankruptcy Code, including possible claims and causes of action relating to (a) the Purchase Agreement dated March 20, 2008, to which the Debtors (or some of them) were parties and (b) the Wayzata Credit Agreement, (ii) which the Debtors may have as debtor and debtor in possession (exercising the rights and powers of a trustee pursuant to section 1107(a) of the Bankruptcy Code), under sections 544 through 553 (inclusive) of the Bankruptcy Code, (iii) under section 510(c) of the Bankruptcy Code, and (iv) as may be asserted defensively in connection with any objection to a Disputed Claim. As of the Effective Date "Causes of Action" **shall not include** any Cause of Action under Section 547 of the Bankruptcy Code against any Holder of a Claim in Classes 4, 5, or 6, and the occurrence of Effective Date shall, without further action of any Entity or the Bankruptcy Court constitute a waiver and relinquishment of any such section 547 Cause of Action in accordance with the Plan against such Class 4, 5, and 6 Claim Holders.

"Claim" means any right to payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Class" means a category of Holders of Claims or Equity Interests, as more fully described in Article III of the Plan.

"Class 2 Additional Interest" has the meaning set forth in Section 4.2(b).

"Class 2 Allowed Secured Claim" has the meaning set forth in Section 4.2(b).

"Class 3 Additional Interest" has the meaning set forth in Section 4.3(b).

"Class 3 Allowed Secured Claim" has the meaning set forth in Section 4.3(b).

"Clerk" means the clerk of the Bankruptcy Court.

"Collateral" means any property or interest in property of the Debtors' Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code, or other applicable Law.

"Confirmation" means the entry of the Confirmation Order.

"Confirmation Date" means the date upon which the Clerk enters the Confirmation Order on the docket in the Bankruptcy Cases.

"Confirmation Hearing" means the hearing to consider Confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as the same may be adjourned from time to time.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

"Consummation" means the occurrence of the Effective Date.

"Debtor" has the meaning set forth in the initial paragraph hereof.

"Debtors" has the meaning set forth in the initial paragraph hereof.

"Disclosure Statement" means the Third Amended Disclosure Statement Pursuant to Section 1125 of the United States Bankruptcy Code in support of the Third Amended Plan of Reorganization as Jointly Proposed by the Debtors, Macquarie Americas Corp., and the Official Committee of Equity Security Holders filed by the Debtors on February 11, 2010, as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions hereof relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Disputed Claim" means any Claim against any of the Debtors, to the extent the allowance of which is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been resolved in the Plan or withdrawn or determined by a Final Order.

"Distribution" means a distribution of Cash or other non-Cash consideration made by the Debtors or, after the Effective Date, the Reorganized Debtors pursuant to the Plan.

"Effective Date" means the time on the first Business Day (a) which is on or after the date of the entry of the Confirmation Order and (b) on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions to the effectiveness of the Plan have been satisfied or waived as provided in Section 11.1.

"Entity" means a person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a Governmental Authority or any subdivision of any of the foregoing or any other entity.

"Equity Holders' Committee" means the official committee (including any interim committee) for the Holders of Equity Interests in the Debtors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102, as it may be constituted from time to time.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 12 of 183

"Equity Interest" has the meaning assigned to the term "Equity Security" in section 101(16) of the Bankruptcy Code. Except as otherwise indicated, references to Equity Interests in this Plan shall be deemed to refer to Equity Interests in the Debtors.

"Estates" means the estates created upon the commencement of the Bankruptcy Cases by section 541 of the Bankruptcy Code.

"Federal Interest Rate" means the interest rate calculated in accordance with 28 U.S.C. § 1961 for the Applicable Interest Period.

"Fee Application" means an application of a Professional under section 330, 331, 503, 506, or 1129(a)(4) of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Bankruptcy Cases.

"File" or "Filed" means file or filed with the Bankruptcy Court in the Bankruptcy Cases.

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022 as applied to these Bankruptcy Cases.

"Final Order" or "Final Judgment" means an order or judgment of a court of competent jurisdiction that has been entered and not reversed, stayed, modified, or amended.

"General Unsecured Claim" means a Claim that is not a/an (a) Administrative Expense Claim, (b) Professional Fee Claim, (c) Priority Unsecured Tax Claim, (d) Priority Unsecured Claim, (e) Secured Claim, or (f) Equity Interest. General Unsecured Claims includes all other Claims not separately classified under the Plan or provided for in Article II.

"Governmental Authority" means any court, tribunal, or governmental department, commission, board, bureau, agency or instrumentality of any nation or of any province, state, commonwealth, nation, territory, possession, county, parish, municipality, or other subdivision thereof, whether now or hereafter constituted or existing.

"Harvest Companies" has the meaning set forth in the initial paragraph hereof.

"Harvest Group" has the meaning set forth in the initial paragraph hereof.

"Harvest Oil & Gas" has the meaning set forth in the initial paragraph hereof.

"Holder" and collectively, "Holders" mean a Person or Entity holding an Equity Interest or Claim, and with respect to a vote on the Plan, means the beneficial Holder as of the Distribution record date or any authorized signatory who has completed and executed a Ballot in accordance with the Voting Instructions.

"Impaired" or "Impairment" has the meaning set forth in section 1124 of the Bankruptcy Code.

"Interest" means the rights of a stockholder that owns shares, warrants or options in any of the Debtors arising from his or her status as Holder of an Equity Interest.

7

"Investor" means an Entity that makes capital contributions after Confirmation to the Debtors in return for common stock and/or securities convertible into common stock.

"Laws" means all applicable statutes, laws, ordinances, regulations, orders, writs, injunctions or decrees of any state, commonwealth, nation, territory, possession, county, township, parish, municipality or Governmental Authority.

"Lender Professional Fees and Expenses Claim" means a Claim or portion thereof by Macquarie, Wayzata or any Affiliate thereof in respect of fees and expenses of lawyers, accountants, consultants, advisors, or other professionals.

"Lien" means a lien, security interest, or other interest or encumbrance as defined in section 101(37) of the Bankruptcy Code asserted against any property of the Estate. "Lien" includes "privileges" under the Laws of the State of Louisiana (including the Oil Well Lien Act).

"Litigation Oversight Committee" shall have the meaning ascribed to it in Section 7.3(a).

"Lobo Companies" has the meaning set forth in the initial paragraph hereof.

"Lobo Operating" has the meaning set forth in the initial paragraph hereof.

"Lobo Resources" has the meaning set forth in the initial paragraph hereof.

"Macquarie" means Macquarie Bank Limited, as Administrative Agent and Lender.

"Macquarie Amended and Restated Credit Agreement" means the Macquarie Credit Agreement, as amended by the First Amendment, by and among Reorganized Saratoga, the Wayzata Lenders, and other appropriate Entities, the form of which is attached hereto as **Exhibit A**, together with such other related agreements, documents and schedules as are necessary or appropriate to give effect to the Macquarie Amended and Restated Credit Agreement.

"Macquarie Claim" means all Claims based upon any of the Macquarie Credit Agreement and all related agreements, guarantees, financing statements, mortgages, pledges, and other documents.

"Macquarie Credit Agreement" means the Amended and Restated Credit Agreement by and among Macquarie, Saratoga, and certain of their Affiliates dated on or about July 14, 2008.

"Macquarie Parties" means Macquarie and Macquarie Americas Corp.

"Management Note Claim" means all Claims of Thomas F. Cooke and Andrew Clifford based upon the Management Notes.

"Management Notes" means the Subordinated Promissory Note by and between Saratoga and Thomas F. Cooke dated on or about July 14, 2008, and the Subordinated Promissory Note by and between Saratoga and Andrew Clifford also dated on or about July 14, 2008.

"Non-Warrant Equity Interests" means all Equity Interests other than Warrants.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 14 of 183

"Oil Well Lien Act" means the Louisiana Oil, Gas, and Water Oil Well Lien Act, LSA-R.S. 9:4861, *et seq*.

"Oil Well Lien Act Claim Treatment" has the meaning set forth in Section 4.4(b)(ii).

"Oil Well Lien Act Claims" means all Claims based upon the Oil Well Lien Act.

"Person" means a person as defined in section 101(41) of the Bankruptcy Code.

"Petition Date" means the date (March 31, 2009) and time at which the Debtors commenced the Bankruptcy Cases.

"Plan" has the meaning set forth in the initial paragraph hereof.

"Plan Documents" means all of the agreements, instruments and documents necessary or appropriate to effectuate the terms and conditions of or transactions contemplated by the Plan.

"Priority Unsecured Claims" means any Claim against the Debtors entitled to priority in right of payment under sections 507(a)(3)-(7) of the Bankruptcy Code.

"Priority Unsecured Tax Claim" means any Claim against the Debtor entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent entitled to such priority.

"Professional" means an Entity (a) employed in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) to whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4), 506, or 1129(a)(4) of the Bankruptcy Code.

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to sections 330, 331, 503, 506, and/or 1129(a)(4) of the Bankruptcy Code (including Lender Professional Fees and Expenses Claims), and unpaid as of the Confirmation Date.

"Pro Rata" means a proportionate share, so that (a) the ratio of (x) the consideration distributed on account an Allowed Claim to (y) the amount of such Allowed Claim is the same as (b) the ratio of (x) the amount of the consideration distributed on account of all Allowed Claims receiving such consideration to (y) the amount of such Allowed Claims receiving such consideration.

"Proven Producing Preserves" means those reserves of crude oil, condensate, natural gas, and natural gas liquids that, based on geologic and engineering data, are reasonably certain to be commercially recovered from existing completion intervals open at the time of the estimate and producing in existing wells.

"Reorganized Debtors" means the Debtors following the Effective Date.

"Reorganized Saratoga" means Saratoga following the Effective Date.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 15 of 183

"Saratoga" has the meaning set forth in the initial paragraph hereof.

"Schedules" means the respective schedules of assets and liabilities, the list of Interests, and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statement have been or may be supplemented or amended.

"Secured Claim" means a Claim against any of the Debtors that is secured by a validly perfected Lien on collateral or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code.

"State Lessor Audit Royalty Claim" means a Claim against any of the Debtors that is (a) based upon under- or non-payment of royalties due under an applicable lease of property of the State of Louisiana including amounts due for cure of defaults under assumed leases and pecuniary losses resulting from defaults under such leases, and (b) not a Priority Unsecured Tax Claim.

"Subsidiary" means, for any Entity, any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Entities performing similar functions (including that of a general partner) are at the time directly or indirectly owned, collectively, by such Entity and any Subsidiaries of such Entity. The term Subsidiary shall include Subsidiaries of Subsidiaries (and so on).

"Taxes" means all taxes, assessments, filing or other fees, levies, imposts, duties, deductions, withholdings, stamp taxes, interest equalization taxes, capital transaction taxes, severance taxes, foreign exchange taxes or other charges, or other charges of any nature whatsoever, from time to time or at any time imposed by Law or any federal, state or local governmental agency, and "Tax" means any one of the foregoing.

"Unimpaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

"Unsecured Creditors' Committee" means the official committee for the Holders of General Unsecured Claims against the Debtors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102, as it may be constituted from time to time.

"Warrant" has the meaning set forth in section 101(16)(C) of the Bankruptcy Code.

"Wayzata" means Wayzata Investment Partners LLC.

"Wayzata Amended and Restated Credit Agreement" means the Amended and Restated Credit Agreement by and among Reorganized Saratoga, as borrower, the other Reorganized Debtors as guarantors, Wayzata, individually and as administrative agent and the Wayzata Lenders that will amend and restate the Wayzata Credit Agreement as of the Effective Date, the form of which is attached hereto as **Exhibit B**, together with such other related agreements, documents and schedules as are necessary or appropriate to give effect to that Amended and Restated Credit Agreement.

"Wayzata Claim" means all Claims based upon any of the Wayzata Credit Agreement and all related agreements, guarantees, financing statements, mortgages, pledges, and other documents.

"Wayzata Credit Agreement" means the Credit Agreement dated as of July 14, 2008, by and among Saratoga, as borrower, the other Debtors, as guarantors, Wayzata, individually and as administrative agent and the Wayzata Lenders.

"Wayzata Lenders" means Wayzata Opportunities Fund, LLC, and Wayzata Opportunity Fund II, L.P.

"Wayzata New Warrant" has the meaning ascribed to it in Section 4.3(c)(ii)

"Wayzata Parties" means Wayzata and the Wayzata Lenders.

"Wayzata Warrant" means that certain warrant dated as of July 14, 2008 issued to Wayzata immediately prior to the closing of the acquisition of the Harvest Companies for five percent (5%) of the issued and outstanding shares of common stock of Saratoga at that time.

## ARTICLE II
## NON-CLASSIFIED CLAIMS AND CERTAIN FEES AND TAXES

Section 2.1 **Administrative Expense Claims**.

(a) Allowed Administrative Expense Claims Against the Debtors. Subject to the bar date provisions of Section 2.1(b), the Holders of Allowed Administrative Expense Claims against any of the Debtors, unless otherwise agreed to by the Debtors and the Holder(s) or as otherwise set forth in this Plan, are entitled to priority under section 507(a)(2) of the Bankruptcy Code. An Entity entitled to payment pursuant to sections 546(c) or 553 of the Bankruptcy Code, and an Entity entitled to payment of administrative expenses pursuant to sections 503 and 507(a) of the Bankruptcy Code, shall receive from the Reorganized Debtors, on account of such Allowed Administrative Expense Claim, Cash in the amount of such Allowed Administrative Expense Claim on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Administrative Expense Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Entity; provided that an Allowed Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors shall be paid by the Debtors or the Reorganized Debtors in the ordinary course of business and **shall not** be required to File a request for payment as otherwise required herein.

(b) Bar Date for Filing Applications for Allowance and Payment of Administrative Expense Claims. Except as otherwise provided in section 503(b)(1)(D) of the Bankruptcy Code, applications for allowance and payment of Administrative Expense Claims must be filed on or within thirty (30) days after the Effective Date. The Court shall not consider any applications for the allowance of an Administrative Expense Claim filed after such date, and any such Administrative Expense Claim shall be discharged and forever barred. Any Administrative Expense Claim that becomes an Allowed Administrative Expense Claim after the

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 17 of 183

Confirmation Date will be treated like other Allowed Administrative Expense Claims and will be paid on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Administrative Expense Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and the Holder of such Claim. Any such Claim that is Allowed, but determined not to be an Administrative Expense Claim, will be treated as a General Unsecured Claim.

Section 2.2    **Professional Fee Claims**.

(a)    Allowed Professional Fee Claims Against the Debtors.    Except as otherwise provided herein (including in Section 4.2, Section 4.3, Section 4.4, Section 4.5, Section 4.6, and Section 4.7), each Holder of an Allowed Professional Fee Claim shall receive from the Reorganized Debtors, on account of such Allowed Professional Fee Claim, Cash in the amount of such Allowed Professional Fee Claim on or before the later of the Effective Date or thirty (30) days after becoming an Allowed Professional Fee Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder. Except as otherwise provided herein (including in Section 4.2 and Section 4.3) or otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, all secured creditors' Professional Fee Claims shall be subject to section 506(b) of the Bankruptcy Code.

(b)    Bar Date for Filing Applications for Allowance and Payment of Professional Fee Claims Against the Debtors. Except as otherwise provided herein (including in Section 4.2 and Section 4.3), applications for allowance and payment of Professional Fee Claims (including Professional Fee Claims that are part of a Claim for Applicable Fees and Costs) incurred on or before the Confirmation Date must be filed on or within sixty (60) days after the Effective Date. The Bankruptcy Court shall not consider any applications for the allowance of a Professional Fee Claim filed after such date, and any such Professional Fee Claim shall be discharged and forever barred.

Section 2.3    **Priority Unsecured Tax Claims**.

(a)    Allowed Priority Unsecured Tax Claims.    Each Holder of an Allowed Priority Unsecured Tax Claim shall receive from the Reorganized Debtors Cash payments in regular monthly installments commencing on the later of the following dates, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates): (i) thirty (30) days after becoming an Allowed Priority Unsecured Tax Claim and (ii) the sooner of (x) the Effective Date and (y) thirty (30) days after the Confirmation Date; which payments will, no later than the five (5) years from the Petition Date, in the aggregate equal the amount of such Allowed Priority Unsecured Tax Claim, with interest at such rate as required by section 511 of the Bankruptcy Code or otherwise required by section 1129(a)(9)(C) or (D) of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan, unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 18 of 183

(b)     Certain Interest and Penalties on Allowed Priority Unsecured Tax Claims. Holders of Priority Unsecured Tax Claims shall not receive any payment on account of penalties, with respect to, or arising in connection with such Priority Unsecured Tax Claims to the extent permissible under applicable Law, except as expressly provided in this Plan. However, such Holders of Priority Unsecured Tax Claims will receive post-Petition Date interest, and any interest due under Section 5.5 shall be measured from the date that payments under Section 2.3(a) begin. The Plan, the Confirmation Order and section 1141(d) of the Bankruptcy Code provide for the discharge of any such Claims for penalties. Holders of Priority Unsecured Tax Claims shall not assess or attempt to collect such penalties from the Debtors, the Reorganized Debtors, the Estates, or from any property thereof, except as General Unsecured Claims pursuant to Section 4.6.

Section 2.4     **Certain Fees and Taxes**.

(a)     U.S. Trustee's Fees.     The Debtors will continue to report to the U.S. Trustee by the twentieth (20th) of each month the total disbursements of each Debtor for the previous month and shall timely pay quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Court enters a Final Decree or an order either converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Cases. Any such fees outstanding and due as of the Effective Date shall be paid in Cash by the Reorganized Debtors on the Effective Date.

(b)     Disallowance of Special Taxes.     The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable Law, or the making or delivery of any instrument of transfer under this Plan, shall not be subject to any Tax under any state or local law imposing a stamp Tax or similar Tax as provided in section 1146 of the Bankruptcy Code.

Section 2.5     **Plugging and Abandonment Claims**.     Any and all Claims associated with Debtors' liabilities relating to plugging, abandonment, and/or reclaiming wells, facilities, and pipelines, whether arising under contractual indemnity or otherwise, shall be unimpaired and shall be satisfied after the Effective Date in the ordinary course of business.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; BAR DATE

Section 3.1     **Classification**.     Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class, and (ii) the Claim or Equity Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims specified in section 507(a)(2) of the Bankruptcy Code, and Priority Unsecured Tax Claims are not classified under the Plan.

Section 3.2 **Identification of Classes**. The following are the designations for the Classes of Claims against the Estate and Interests in the Debtor:

| Class 1 – Priority Unsecured Claims | Unimpaired | All Allowed Priority Unsecured Claims |
|---|---|---|
| Class 2 – Macquarie Allowed Secured Claim | Impaired | All Allowed Secured Claims arising under the Macquarie Claim |
| Class 3 – Wayzata Allowed Secured Claim | Impaired | All Allowed Secured Claims arising under the Wayzata Claim |
| Class 4 – Oil Well Lien Act Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act |
| Class 4(a) – Grand Prairie Levee District A Lease Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect Grand Prairie Levee District A Lease (Plaquemines Parish) |
| Class 4(b) – Louisiana State Lease 195 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 195 (Plaquemines Parish) |
| Class 4(c) - Louisiana State Lease 1227 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 1227 (Plaquemines Parish) |
| Class 4(d) - Louisiana State Lease 2726 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 2726 (Plaquemines Parish) |
| Class 4(e) - Louisiana State Lease 16664 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16664 (Plaquemines Parish) |
| Class 4(f) - Louisiana State Lease 16569 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16569 (Plaquemines Parish) |
| Class 4(g) - Louisiana State Lease 18014 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 18014 (Plaquemines Parish) |
| Class 4(h) - Louisiana State Lease 16432 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16432 (Plaquemines Parish) |
| Class 4(i) - Louisiana State Lease 11189 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 11189 (Plaquemines Parish) |

| | | |
|---|---|---|
| Class 4(j) - Louisiana State Lease 5097 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 5097 (St. Mary Parish) |
| Class 4(k) - Louisiana State Lease 16818 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16818 (Plaquemines Parish) |
| Class 4(l) - Louisiana State Lease 16692 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16692 (Plaquemines Parish) |
| Class 4(m) - Louisiana State Lease 4407 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 4407 (Plaquemines Parish) |
| Class 4(n) - Louisiana State Lease 4865 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 4865 (Plaquemines Parish) |
| Class 4(o) - Louisiana State Lease 19680 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 19680 (Plaquemines Parish) |
| Class 4(p) - Louisiana State Lease 16847 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16847 (Plaquemines Parish) |
| Class 4(q) - Louisiana State Lease 335DP Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 335DP (Plaquemines Parish) |
| Class 4(r) - Louisiana State Lease 16443 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16443 (Plaquemines Parish) |
| Class 4(s) - Louisiana State Lease 17621 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 17621 (Plaquemines Parish) |
| Class 4(t) - Louisiana State Lease 18078 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 18078 (Plaquemines Parish) |
| Class 4(u) - Plaquemines Parish Government Agency Lease Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect Plaquemines Parish Government Agency Lease (Plaquemines Parish) |

15

| | | |
|---|---|---|
| Class 4(v) - Louisiana State Lease 1268 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 1268 (Plaquemines Parish) |
| Class 4(w) - Louisiana State Lease 15906 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 15906 (Plaquemines Parish) |
| Class 4(x) - Louisiana State Lease 16393 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16393 (Plaquemines Parish) |
| Class 4(y) - Louisiana State Lease 16392 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16392 (Plaquemines Parish) |
| Class 4(z) - Louisiana State Lease 16773 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16773 (Plaquemines Parish) |
| Class 4(aa) – Louisiana State Lease 16570 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16570 (Plaquemines Parish) |
| Class 4(bb) – Louisiana State Lease 16890 Claims | Impaired | All Allowed Secured Claims arising under the Oil Well Lien Act that affect State Lease 16890 (Plaquemines Parish) |
| Class 5 – Other Secured Claims | Impaired | All Allowed Secured Claims not in Class 2, 3, or 4 |
| Class 6 – General Unsecured Claims | Impaired | All Allowed General Unsecured Claims |
| Class 7 – State Lessor Audit Royalty Claims | Impaired | All Allowed State Lessor Audit Royalty Claims |
| Class 8 – Management Note Claim | Impaired | All Allowed Claims arising under the Management Note Claim |
| Class 9 – Non-Warrant Equity Interests | Impaired | All Allowed Non-Warrant Equity Interests in Saratoga |
| Class 10 – Warrants | Impaired | All Allowed Equity Interests in Saratoga that are Warrants |

Section 3.3 **Claims Bar Date**. Except as otherwise provided herein, in the Bankruptcy Code, in the Bankruptcy Rules, or by order of the Bankruptcy Court, all Claims must be filed with the Bankruptcy Court on or before August 14, 2009; provided that, in accordance with Section 2.2(b), Claims for Applicable Fees and Costs (including Professional Fee Claims) must be filed within sixty (60) days after the Effective Date except as otherwise provided herein.

The Bankruptcy Court shall not consider any Claim filed after such dates, and any such Claim shall be discharged and forever barred.

## ARTICLE IV
## IMPAIRMENT AND VOTING OF CLASSES; TREATMENT OF CLASSES

Section 4.1    **Class 1 – Priority Unsecured Claims**.

(a)    Impairment and Voting. Claims in Class 1 are Unimpaired. Holders of Allowed Priority Unsecured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Treatment. The Reorganized Debtors shall pay to each holder of an Allowed Priority Unsecured Claim Cash in the amount of such Allowed Priority Unsecured Claim on the later of the Effective Date and the date such Priority Unsecured Claim becomes an Allowed Priority Unsecured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates), unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such holder.

Section 4.2    **Class 2 – Macquarie Allowed Secured Claim**.

(a)    Impairment and Voting. The Claim in Class 2 is Impaired. Subject to the terms and conditions of this Plan, the Holders of the Allowed Secured Claim in Class 2 are entitled to vote to accept or reject the Plan. The Wayzata Lenders are the Holders of the Allowed Secured Claim in Class 2.

(b)    Allowance. On the Effective Date, the Macquarie Claim in Class 2 (including the portion of such Claim that, pursuant to the terms of the Macquarie Credit Agreement, became due and payable between the Petition Date and the Effective Date, such as interest at the Applicable Interest Rate for the Applicable Interest Period, and any Applicable Fees and Costs (including Lender Professional Fees and Expenses Claim by Macquarie, the Wayzata Lenders or any Affiliate)), shall be an Allowed Secured Claim hereunder in the amount of $23,500,000 (such Allowed Secured Claim together with any Claim for Class 2 Additional Interest is herein called the "Class 2 Allowed Secured Claim"); provided, however, that if the Effective Date of the Plan does not occur prior to May 15, 2010, interest at the non-default rate as provided under the Macquarie Credit Agreement ("Class 2 Additional Interest") shall also be Allowed hereunder and continue to accrue from May 15, 2010 and until the date of the actual occurrence of the Effective Date and the amount of such accrued Class 2 Additional Interest shall (at the election of the Debtors) be added to the principal balance of the Class 2 Allowed Secured Claim or may be paid by the Debtors to the Wayzata Lenders in Cash on the Effective Date. The Class 2 Allowed Secured Claim is not, nor shall it be, subject to any objection, discharge, avoidance, counterclaim, abatement, adverse claim, reduction, setoff, recoupment or subordination of any kind by any party, including by the Debtors, the Reorganized Debtors, the Unsecured Creditors' Committee, the Equity Holders' Committee or Macquarie. The Class 2 Allowed Secured Claim is Allowed under this Plan and none of the Wayzata Parties shall be required to File any further applications with the Bankruptcy Court with respect to the same.

(c)    Treatment. The Class 2 Allowed Secured Claim shall be treated and paid as follows: (x) on the Effective Date a Cash payment of $5,500,000 shall be made to the

Wayzata Lenders and (y) the remaining balance of the Class 2 Allowed Secured Claim shall be paid as provided in the Macquarie Amended and Restated Credit Agreement. The Macquarie Amended and Restated Credit Agreement shall provide, *inter alia*, that the Class 2 Allowed Secured Claim shall be payable (a) in monthly payments in an amount equal to interest upon the Class 2 Allowed Secured Claim at the Alternate Base Rate (as defined in the Macquarie Amended and Restated Credit Agreement) plus 2.00 %, and (b) on April 30, 2012, a Balloon Payment, plus any fees, costs, and expenses that have accrued under the Macquarie Amended and Restated Credit Agreement and that have not been paid, shall be due and payable in Cash, in full. The Reorganized Debtors may, in their sole discretion and without any premium or penalty, pay any amount required or allowed to be paid under this Section 4.2(c) before it is due.

(d)     Conflict Between Plan and Credit Documents. To the extent that any provision of the Plan conflicts with the Macquarie Amended and Restated Credit Agreement, the provisions of the Macquarie Amended and Restated Credit Agreement control and supersede the terms of the Plan. On the Effective Date and upon execution by the parties thereto, the Macquarie Amended and Restated Credit Agreement shall be binding and enforceable in accordance with its terms upon the Wayzata Parties and the Reorganized Debtors.

(e)     Liens. The Liens under the Macquarie Credit Agreement and Loan Documents (as defined therein) (x) shall be unaffected and shall not be discharged, released, enjoined, avoided or impaired by the Plan, Confirmation, the Confirmation Order, and Consummation, (y) shall maintain the same validity, priority, and extent that existed on the Petition Date, and (z) shall secure payment and performance of any and all Obligations under the Macquarie Amended and Restated Credit Agreement.

(f)     Cure of Defaults. On the Effective Date, all defaults that could have arisen before the Effective Date under the Macquarie Credit Agreement shall be deemed cured. This provision shall not apply to representations and warranties made within the Macquarie Amended and Restated Credit Agreement by the Debtors or Reorganized Debtors.

Section 4.3     **Class 3 – Wayzata Allowed Secured Claim**.

(a)     Impairment and Voting. The Claim in Class 3 is Impaired. Subject to the terms and conditions of this Plan, the Holders of the Allowed Secured Claim in Class 3 are entitled to vote to accept or reject the Plan. The Wayzata Lenders are the Holders of the Allowed Secured Claim in Class 3.

(b)     Allowance. On the Effective Date, the Wayzata Claim in Class 3 (including the portion of such Claim that, pursuant to the terms of the Wayzata Credit Agreement, became due and payable between the Petition Date and the Effective Date, such as interest at the Applicable Interest Rate for the Applicable Interest Period, and any Applicable Fees and Costs (including Lender Professional Fees and Expenses Claim by Wayzata or any Affiliate)), shall be an Allowed Secured Claim hereunder in the amount of $127,500,000 (such Allowed Secured Claim together with any Claim for Class 3 Additional Interest is herein called the "Class 3 Allowed Secured Claim"); provided, however, that if the Effective Date of the Plan does not occur prior to May 15, 2010, interest at the non-default rate (i.e., 20% per annum) as provided under the Wayzata Credit Agreement ("Class 3 Additional Interest") shall also be

Allowed hereunder and continue to accrue from May 15, 2010 until the date of the actual occurrence of the Effective Date and the amount of such accrued Class 3 Additional Interest shall (at the election of the Debtors) be added to the principal balance of the Class 3 Allowed Secured Claim or may be paid by the Debtors to Wayzata in Cash on the Effective Date. The Class 3 Allowed Secured Claim is not, nor shall it be, subject to any objection, discharge, avoidance, counterclaim, abatement, adverse claim, reduction, setoff, recoupment or subordination of any kind by any party, including by the Debtors, the Reorganized Debtors, the Unsecured Creditors' Committee, the Equity Holders' Committee or Macquarie. The Class 3 Allowed Secured Claim is Allowed under this Plan and none of the Wayzata Parties shall be required to File any further applications with the Bankruptcy Court with respect to the same.

        (c)     Treatment.

        (i)     The Wayzata Allowed Secured Claim shall be treated and paid as provided in the Wayzata Amended and Restated Credit Agreement. The Wayzata Amended and Restated Credit Agreement shall provide, *inter alia*, that the Class 3 Allowed Secured Claim shall be payable (a) in monthly payments in an amount equal to interest upon the Wayzata Allowed Secured Claim at the fixed interest rate of 11.25% per annum, and (b) on April 30, 2012, a Balloon Payment, plus any fees, costs, and expenses that have accrued under the Wayzata Amended and Restated Credit Agreement and that have not been paid, shall be due and payable in Cash, in full. The Reorganized Debtors may, in their sole discretion and without any premium or penalty, pay any amount required or allowed to be paid under this Section 4.3(c)(i) before it is due.

        (ii)     On the Effective Date, Wayzata shall also receive a warrant ("Wayzata New Warrant") for up to 2,000,000 shares of common stock in Reorganized Saratoga, at a purchase price per common share equal to $0.01, which Wayzata New Warrant shall have the same terms and conditions as the Wayzata Warrant; provided, however, that shares issuable under the Wayzata New Warrant will vest in accordance with the following schedule: (a) on the Effective Date, 111,111 shares shall vest in (and thereafter be exercisable by) Wayzata; and (b) on the last day of each of the succeeding seventeen (17) calendar months after the month in which the Effective Date occurs, 111,111 shares shall vest in (and thereafter be exercisable by) Wayzata; provided further that if the Class 3 Allowed Secured Claim is paid in full in Cash (including all accrued but unpaid interest), then any remaining shares that would have vested following the date of such payment, shall revert to Reorganized Saratoga.

        (d)     Conflict Between Plan and Credit Documents. To the extent that any provision of the Plan conflicts with the Wayzata Amended and Restated Credit Agreement, the provisions of the Wayzata Amended and Restated Credit Agreement control and supersede the terms of the Plan. To the extent any provision of the Plan conflicts with either the Wayzata Warrant or Wayzata New Warrant, the provisions of the Wayzata Warrant and Wayzata New Warrant control and supersede the terms of the Plan. On the Effective Date, the Wayzata Warrant, and upon execution by the parties thereto, the Wayzata Amended and Restated Credit Agreement, and the Wayzata New Warrant, shall be binding and enforceable in accordance with their respective terms upon the Wayzata Parties and the Reorganized Debtors.

(e)     Liens.     The Liens under the Wayzata Credit Agreement and Loan Documents (as defined therein) (x) shall be unaffected and shall not be discharged, released, enjoined, avoided or impaired by the Plan, Confirmation, the Confirmation Order, and Consummation, (y) shall maintain the same validity, priority, and extent that existed on the Petition Date, and (z) shall secure payment and performance of any and all Obligations under the Wayzata Amended and Restated Credit Agreement.

(f)     Guarantees.     The Obligations of Reorganized Saratoga under the Wayzata Amended and Restated Credit Agreement shall continue to be unconditionally guaranteed by all other Reorganized Debtors.

(g)     Cure of Defaults.     On the Effective Date, all defaults that could have arisen before the Effective Date under Wayzata Credit Agreement shall be deemed cured. This provision shall not apply to the representations and warranties made within the Wayzata Amended and Restated Credit Agreement.

Section 4.4     **Class 4 – Oil Well Lien Act Claims.**

(a)     General Statements Regarding Treatment of Classes 4, 5, and 6.

(i)     As partial consideration for the Claims of Holders in Classes 4, 5, and 6, each Holder of an Allowed Secured Claim in this Class shall also receive its Pro Rata share of 483,310 shares of common stock of Reorganized Saratoga to be issued to the Holders of the Allowed Claims in Classes 4, 5, and 6 ("Creditors' Shares"). Prior to the Confirmation Hearing the Plan may be amended to provide for a Stock Agent to hold the Creditors' Shares and/or to provide the method for the matching or combining of fractional shares for ease of administration. Any such amendment shall be undertaken only with advice of and consultation with known counsel for the Holders of Claims in Classes 4, 5, and 6.

(ii)     As of the Effective Date any Causes of Action against the Holders of Class 4, 5, and 6 Claims under Section 547 of the Bankruptcy Code shall be released, waived and extinguished.

(iii)     The Liens securing all Class 4 Claims shall be maintained, in the same rank and to the same extent as such Liens, if any, existed prior to the Petition Date, until the Allowed Claims in Class 4 are paid in full.

(b)     Class 4(a) – Grand Prairie Levee District A Lease Claims

(i)     Impairment and Voting.     Claims in Class 4(a) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(a) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.     Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(a) in Cash (i) (x) eighty

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document     Pg 26 of 183

percent (80%) of the amount of the Allowed Secured Claim (including Allowed interest thereon at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Allowed Applicable Fees and Costs as provided by applicable Law) on the later of the Effective Date and the date the those amounts are Allowed, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) the remaining twenty percent (20%) of the amount of the Allowed Secured Claim (including Allowed interest thereon at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Allowed Applicable Fees and Costs as provided by applicable Law) within twelve (12) months of the Effective Date in four (4) equal quarterly installments; provided that, if, prior to the first (1st) anniversary of the Effective Date, the Debtors refinance the Class 3 Allowed Secured Claim and the Class 2 Allowed Secured Claim or raise equity and achieve sufficient liquidity as a result thereof, as determined by the Reorganized Debtor in its reasonable discretion, each Holder of an Allowed Secured Claim in this Class shall be paid in full its Allowed Secured Claim as soon as is practicable ("Oil Well Lien Act Claim Treatment").

(c)     Class 4(b) – Louisiana State Lease 195 Claims

(i)     Impairment and Voting.  Claims in Class 4(b) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(b) in Cash the Oil Well Lien Act Claim Treatment.

(d)     Class 4(c) – Louisiana State Lease 1227 Claims

(i)     Impairment and Voting.  Claims in Class 4(c) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(c) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(c) in Cash the Oil Well Lien Act Claim Treatment.

(e)     Class 4(d) – Louisiana State Lease 2726 Claims

(i)     Impairment and Voting.  Claims in Class 4(d) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(d) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 27 of 183

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(d) in Cash the Oil Well Lien Act Claim Treatment.

(f)     Class 4(e) – Louisiana State Lease 16664 Claims

(i)     Impairment and Voting.  Claims in Class 4(e) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(e) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(e) in Cash the Oil Well Lien Act Claim Treatment.

(g)     Class 4(f) – Louisiana State Lease 16569 Claims

(i)     Impairment and Voting.  Claims in Class 4(f) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(f) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(f) in Cash the Oil Well Lien Act Claim Treatment.

(h)     Class 4(g) – Louisiana State Lease 18014 Claims

(i)     Impairment and Voting.  Claims in Class 4(g) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(g) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(g) in Cash the Oil Well Lien Act Claim Treatment.

(i)     Class 4(h) – Louisiana State Lease 16432 Claims

(i)     Impairment and Voting.  Claims in Class 4(h) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(h) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document   Pg 28 of 183

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(h) in Cash the Oil Well Lien Act Claim Treatment.

(j)     Class 4(i) – Louisiana State Lease 11189 Claims

(i)     Impairment and Voting.  Claims in Class 4(i) are Impaired. Subject to the terms and conditions of this Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(i) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(i) in Cash the Oil Well Lien Act Claim Treatment.

(k)     Class 4(j) – Louisiana State Lease 5097 Claims

(i)     Impairment and Voting.  Claims in Class 4(j) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(j) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(j) in Cash the Oil Well Lien Act Claim Treatment.

(l)     Class 4(k) – Louisiana State Lease 16818 Claims

(i)     Impairment and Voting.  Claims in Class 4(k) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(k) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(k) in Cash the Oil Well Lien Act Claim Treatment.

(m)     Class 4(l) – Louisiana State Lease 16692 Claims

(i)     Impairment and Voting.  Claims in Class 4(l) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(l) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(l) in Cash the Oil Well Lien Act Claim Treatment.

(n)     Class 4(m) – Louisiana State Lease 4407 Claims

(i)     Impairment and Voting.  Claims in Class 4(m) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(m) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(m) in Cash the Oil Well Lien Act Claim Treatment.

(o)     Class 4(n) – Louisiana State Lease 4865 Claims

(i)     Impairment and Voting.  Claims in Class 4(n) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(n) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(n) in Cash the Oil Well Lien Act Claim Treatment.

(p)     Class 4(o) – Louisiana State Lease 19680 Claims

(i)     Impairment and Voting.  Claims in Class 4(o) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(o) are entitled to vote to accept or reject the Plan.

(ii)     Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(o) in Cash the Oil Well Lien Act Claim Treatment.

(q)     Class 4(p) – Louisiana State Lease 16847 Claims

(i)     Impairment and Voting.  Claims in Class 4(p) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(p) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document     Pg 30 of 183

(ii)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(p) in Cash the Oil Well Lien Act Claim Treatment.

(r)    Class 4(q) – Louisiana State Lease 335DP Claims

(i)    Impairment and Voting. Claims in Class 4(q) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(q) are entitled to vote to accept or reject the Plan.

(ii)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(q) in Cash the Oil Well Lien Act Claim Treatment.

(s)    Class 4(r) – Louisiana State Lease 16443 Claims

(i)    Impairment and Voting. Claims in Class 4(r) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(r) are entitled to vote to accept or reject the Plan.

(ii)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(r) in Cash the Oil Well Lien Act Claim Treatment.

(t)    Class 4(s) – Louisiana State Lease 17621 Claims

(i)    Impairment and Voting. Claims in Class 4(s) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(s) are entitled to vote to accept or reject the Plan.

(ii)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(s) in Cash the Oil Well Lien Act Claim Treatment.

(u)    Class 4(t) – Louisiana State Lease 18078 Claims

(i)    Impairment and Voting. Claims in Class 4(t) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(t) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 31 of 183

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(t) in Cash the Oil Well Lien Act Claim Treatment.

(v)     Class 4(u) – Plaquemines Parish Government Agency Lease Claims

(i)     Impairment and Voting.  Claims in Class 4(u) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(u) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(u) in Cash the Oil Well Lien Act Claim Treatment.

(w)     Class 4(v) – Louisiana State Lease 1268 Claims

(i)     Impairment and Voting.  Claims in Class 4(v) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(v) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(v) in Cash the Oil Well Lien Act Claim Treatment.

(x)     Class 4(w) – Louisiana State Lease 15906 Claims

(i)     Impairment and Voting.  Claims in Class 4(w) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(w) are entitled to vote to accept or reject the Plan.

(ii)     Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(w) in Cash the Oil Well Lien Act Claim Treatment.

(y)     Class 4(x) – Louisiana State Lease 16393 Claims

(i)     Impairment and Voting.  Claims in Class 4(x) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(x) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 32 of 183

(ii)    Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(x) in Cash the Oil Well Lien Act Claim Treatment.

(z)    Class 4(y) – Louisiana State Lease 16392 Claims

(i)    Impairment and Voting.  Claims in Class 4(y) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(y) are entitled to vote to accept or reject the Plan.

(ii)    Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(y) in Cash the Oil Well Lien Act Claim Treatment.

(aa)    Class 4(z) – Louisiana State Lease 16773 Claims

(i)    Impairment and Voting.  Claims in Class 4(z) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(z) are entitled to vote to accept or reject the Plan.

(ii)    Treatment.  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(z) in Cash the Oil Well Lien Act Claim Treatment.

(bb)    Class 4(aa) – Louisiana State Lease 16570 Claims

(i)    Impairment and Voting.  Claims in Class 4(aa) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(aa) are entitled to vote to accept or reject the Plan.

(ii)    Treatment  Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(aa) in Cash the Oil Well Lien Act Claim Treatment.

(cc)    Class 4(bb) – Louisiana State Lease 16890 Claims

(i)    Impairment and Voting.  Claims in Class 4(bb) are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 4(bb) are entitled to vote to accept or reject the Plan.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 33 of 183

(ii)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim in Class 4(bb) in Cash the Oil Well Lien Act Claim Treatment.

Section 4.5    **Class 5 – Other Secured Claims**.

(a)    General Statements Regarding Treatment of Classes 4, 5, and 6.

(i)    As partial consideration for the Claims of Holders in Classes 4, 5, and 6, each Holder of an Allowed Secured Claim in this Class shall also receive its Pro Rata share of the Creditors' Shares. Prior to the Confirmation Hearing the Plan may be amended to provide for a Stock Agent to hold the Creditors' Shares and/or to provide the method for the matching or combining of fractional shares for ease of administration. Any such amendment shall be undertaken only with advice of and consultation with known counsel for the Holders of Claims in Classes 4, 5, and 6.

(ii)    As of the Effective Date any Causes of Action against the Holders of Class 4, 5, and 6 Claims under Section 547 of the Bankruptcy Code shall be released, waived and extinguished.

(iii)    The Liens securing all Class 5 Claims shall be maintained, in the same rank and to the same extent as such Liens, if any, existed prior to the Petition Date, until the Allowed Claims in Class 5 are paid in full.

(b)    Impairment and Voting. Claims in Class 5 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Secured Claims in Class 5 are entitled to vote to accept or reject the Plan.

(c)    Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed Secured Claim not in Class 2, 3, or 4(a) – 4(bb) in Cash (i) (x) eighty percent (80%) of the amount of the Allowed Secured Claim (including Allowed interest thereon at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Allowed Applicable Fees and Costs as provided by applicable Law) on the later of the Effective Date and the date the those amounts are Allowed, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) the remaining twenty percent (20%) of the amount of the Allowed Secured Claim (including Allowed interest thereon at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Allowed Applicable Fees and Costs as provided by applicable Law) within twelve (12) months of the Effective Date in four (4) equal quarterly installments; provided that, if, prior to the first (1st) anniversary of the Effective Date, the Debtors refinance the Class 3 Allowed Secured Claim and the Class 2 Allowed Secured Claim or raise equity and achieve sufficient liquidity as a result thereof, as determined by the Reorganized Debtor in its reasonable discretion, each Holder of an Allowed Secured Claim in this Class shall be paid in full its Allowed Secured Claim as soon as is practicable.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 34 of 183

Section 4.6 **Class 6 – General Unsecured Claims**.

(a) General Statements Regarding Treatment of Classes 4, 5, and 6.

(i) As partial consideration for the Claims of Holders in Classes 4, 5, and 6, each Holder of an Allowed General Unsecured Claim in this Class shall also receive its Pro Rata share of the Creditors' Shares. Prior to the Confirmation Hearing the Plan may be amended to provide for a Stock Agent to hold the Creditors' Shares and/or to provide the method for the matching or combining of fractional shares for ease of administration. Any such amendment shall be undertaken only with advice of and consultation with known counsel for the Holders of Claims in Classes 4, 5, and 6.

(ii) As of the Effective Date any Causes of Action against the Holders of Class 4, 5, and 6 Claims under Section 547 of the Bankruptcy Code shall be released, waived and extinguished.

(b) Impairment and Voting. Claims in Class 6 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Claims in Class 6 are entitled to vote to accept or reject the Plan.

(c) Treatment. Unless otherwise agreed to by the Debtors or, after the Effective Date, the Reorganized Debtors and such Holder, the Reorganized Debtors shall pay to each Holder of an Allowed General Unsecured Claim in Cash (i) (x) seventy-five percent (75%) of the amount of the Allowed General Unsecured Claim on the later of the Effective Date and the date the General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is practicable (but in no event after the tenth (10th) Business Day after the later of those two dates) and (y) the remaining twenty-five percent (25%) of the amount of the Allowed General Unsecured Claim plus interest at the Applicable Interest Rate for the Applicable Interest Period as provided by applicable Law plus Applicable Fees and Costs as provided by applicable Law that are Allowed within twelve (12) months of the Effective Date in four (4) equal quarterly installments; provided that, if, prior to the first (1st) anniversary of the Effective Date, the Debtors refinance the Class 3 Allowed Secured Claim and the Class 2 Allowed Secured Claim or raise equity and achieve sufficient liquidity as a result thereof, as determined by the Reorganized Debtors in their reasonable discretion, each Holder of an Allowed General Unsecured Claim in this Class shall be paid in full its Allowed General Unsecured Claim as soon as is practicable.

Section 4.7 **Class 7 – State Lessor Audit Royalty Claims**.

(a) Impairment and Voting. Claims in Class 7 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Claims in Class 7 are entitled to vote to accept or reject the Plan.

(b) Treatment. The Allowed State Lessor Audit Royalty Claims shall be Allowed in the amount of $1,709,656.23. The Allowed State Lessor Audit Royalty Claims shall be paid by the Reorganized Debtors in Cash in twenty-four (24) monthly installments of $71,235.68 and as otherwise set forth in the Audit Committee Resolutions.

Section 4.8    **Class 8 – Management Note Claim**.

(a)    <u>Impairment and Voting</u>. Claims in Class 8 are Impaired. Subject to the terms and conditions of the Plan (including Article V and Article IX), the Holders of Allowed Claims in Class 8 are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. The Reorganized Debtors shall pay to each Holder of an Allowed Management Note Claim as follows: for a period of forty (40) months following the Effective Date, monthly payments of interest only on the Allowed Management Note Claim at the rate provided in the applicable Management Note, which payments shall be made in kind, with such interest to be compounded (or capitalized) annually, with the Allowed Management Note Claims to be payable in full in Cash, including all interest accrued thereupon, on the last Business Day of the 40th full month following the Effective Date; <u>provided</u> that the Allowed Claims of any and all other Classes of Claims herein shall have been paid in full as a precondition to payment of the Allowed Management Note Claims. Except as otherwise provided herein, the Reorganized Debtors agree to be bound by the terms of the Management Notes. For the avoidance of doubt, the Reorganized Debtors shall not make any Cash payments on account of the Management Notes until all Allowed Claims are paid in full.

Section 4.9    **Class 9 – Non-Warrant Equity Interests**.

(a)    <u>Impairment and Voting</u>. Non-Warrant Equity Interests in Class 9 are Impaired. If the Bankruptcy Court determines that their earlier votes do not continue to be effective, then, subject to the terms and conditions of the Plan, the Holders of Allowed Equity Interests in Class 9 are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Holders of Allowed Non-Warrant Equity Interests in Saratoga shall retain their Allowed Equity Interests, which shall be retained and shall automatically constitute identical Equity Interests in Reorganized Saratoga on the Effective Date; <u>provided</u> that Holders of these Allowed Non-Warrant Equity Interests in Saratoga shall receive no dividend or distribution in respect of their Allowed Non-Warrant Equity Interests until all Allowed Claims are paid in full in accordance with the terms of this Plan. Moreover, no Equity Interests of the Reorganized Debtors, including any new Equity Interests issued after the Effective Date, shall receive any distribution or dividend of any kind unless and until the Allowed Claims are paid in full in accordance with the terms of this Plan.

Section 4.10    **Class 10 – Warrants**.

(a)    <u>Impairment and Voting</u>. Warrants in Class 10 are Impaired. If the Bankruptcy Court determines that their earlier votes do not continue to be effective, then, subject to the terms and conditions of the Plan, the Holders of Allowed Equity Interests in Class 10 are entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>. Holders of Allowed Warrants in Saratoga shall retain their Allowed Equity Interests, which shall be retained and shall automatically constitute identical Equity Interests in Reorganized Saratoga on the Effective Date; <u>provided</u> that Holders of these Allowed Warrants in Saratoga shall receive no distribution in respect of their Allowed Warrants or the Non-Warrant Equity Interests issuable upon the exercise of the Warrants until all Allowed

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 36 of 183

Claims are paid in full in accordance with the terms of this Plan. For the avoidance of doubt, Wayzata shall retain the Wayzata Warrant and its terms shall remain in full force and effect.

## ARTICLE V
## DISPUTED CLAIMS

Section 5.1    **Right to Object to Claims**.  Except to the extent a Claim is Allowed hereunder, the Debtors and, after the Effective Date, the Reorganized Debtors shall have the exclusive right to object to the allowance, amount, or classification of Claims and such objections may be litigated (including to Final Order) by the Debtors or Reorganized Debtors, as the case may be, or compromised and settled in accordance with their business judgment without further order of the Bankruptcy Court.

Section 5.2    **Deadline for Objecting to Claims**.  As soon as reasonably practicable, but in no event later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court (which may be ordered upon *ex parte* motion of the Reorganized Debtors), all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims.  An objection shall notify the Holder of the Claim of the deadline for responding to such objection.

Section 5.3    **Deadline for Responding to Objections**.  Within thirty (30) days after service of an objection, any written response to the objection must be filed with the Bankruptcy Court by the Holder of the objected-to Claim and must be served upon the Debtors or, after the Effective Date, the Reorganized Debtors and upon counsel to the Debtors or Reorganized Debtors, as the case may be.  Failure to file a written response by that date shall constitute a waiver and release of the subject Claim, and shall cause the Bankruptcy Court to enter a default judgment against the non-responding Holder of the Claim granting the relief requested in the objection.

Section 5.4    **Estimation of Claims**.  The Debtors may request the Bankruptcy Court to estimate any contingent or Disputed Claim for purposes of allowance under section 502(c) of the Bankruptcy Code.

Section 5.5    **Payment of Disputed Claims**.  At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall distribute to the Holder thereof the Distribution, if any, to which such Holder is then entitled under the Plan.  The Holder of a Disputed Claim that later becomes an Allowed Claim shall receive interest at the Applicable Rate from the Effective Date (or such earlier or different date as is provided for herein) to the date of the Distribution in respect of the Allowed Claim.  The Debtors or, after the Effective Date, the Reorganized Debtors may, but shall not be required to, make a Distribution with respect to the portion of a Disputed Claim that is not in dispute (if any) pending the resolution of the entire Claim.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 6.1    **Assumption and Rejection**.  On the Effective Date, all executory contracts and unexpired leases that exist between any of the Debtors and any Entity shall be

assumed, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date[1], (ii) is identified as an executory contract or unexpired lease to be rejected on the Effective Date on **Exhibit C**, as that Exhibit may be amended, restated, or supplemented prior to the commencement of the Confirmation Hearing, (iii) is separately addressed herein (including the Wayzata Credit Agreement), or (iv) has a different time period for assumption or rejection provided by order of the Bankruptcy Court or by agreement between the parties to such executory contract or unexpired lease. Specifically included within this assumption are all obligations of contractual indemnity in favor of predecessors in title created through contracts governing the transfer of oil and gas leases to the Debtors.

Section 6.2    **Approval of Assumption and Rejection**.  Except as otherwise provided in the Disclosure Statement or in the Plan, entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases, as the case may be, pursuant to this Article VI, and (ii) the extension of time pursuant to section 365(d)(4) of the Bankruptcy Code within which the Debtors may assume or reject the unexpired leases specified in this Article VI through the Confirmation Date.

Section 6.3    **Cure of Defaults**.  All cure payments that may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease that is assumed under this Plan must be made by the Debtors on the Effective Date or as soon as practicable thereafter.  All requests for cure payments by a party to such assumed contract or lease must be filed pursuant to Section 2.1, unless such cure payments are agreed to by the Debtors or are otherwise determined by the Bankruptcy Court upon appropriate notice and hearing.  In the event of a dispute regarding the amount of any cure payment, the ability of the Debtors to provide adequate assurance of future performance or any other matter pertaining to assumption, the Debtor shall make such cure payments required by section 365(b)(1) of the Bankruptcy Code following the later of the Effective Date (or as soon as practicable thereafter) and the date of the entry of a Final Order resolving such dispute.

Section 6.4    **Rejection Damage Claims**.  Claims arising out of the rejection of an executory contact or unexpired lease pursuant to this Article VI must be filed with the Bankruptcy Court no later than thirty (30) days after entry of the Confirmation Order.  Any such Claims not filed within such time will be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or any of their properties or agents, successors, or assigns. Unless otherwise order by the Bankruptcy Court, all Claims arising from the rejection of an executory contact or unexpired lease shall be treated as General Unsecured Claims.

---

[1] The Debtors have already assumed all of their oil and gas leases pursuant to the Order Granting Motion for Order Authorizing Debtors to Assume Oil and Gas Leases entered on June 23, 2009.  The Debtors have also assumed two unexpired leases of non-residential real property pursuant to the Order Granting Debtors' Motion to Assume Leases of Non-Residential Real Property entered on July 31, 2009. Nothing in this Disclosure Statement or the Plan should be construed as an admission or as a position taken by the Debtors as to the applicability or non-applicability of 11 U.S.C. § 365 to oil and gas leases.

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 38 of 183

## ARTICLE VII
## MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN

Section 7.1 **Generally**. Upon Confirmation, the Debtors shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of this Plan including the execution and filing of all documents required or contemplated by this Plan. In connection with the occurrence of the Effective Date, the Reorganized Debtors, and each of the officers thereof, are authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Section 7.2 **Directors and Officers**. On the Effective Date, the current officers, directors, and managers of the Debtors will continue to hold their respective positions with the Reorganized Debtors. Their compensation will continue at current levels unless and until the Compensation Committee (made up of independent directors) of Reorganized Saratoga's Board of Directors, acting in the ordinary course of business, changes those levels.

Section 7.3 **Causes of Action**.

(a) Except for the Causes of Action released pursuant to the releases set forth in Sections 4.4(a)(ii), 4.5(a)(ii), 4.6(a)(ii), 7.3(b) and 7.3(c), the Debtors and, after the Effective Date, the Reorganized Debtors, specifically reserve and shall have the exclusive right to bring, prosecute, waive, release, compromise, and settle as representatives of the Estates all Causes of Action, which are specifically retained under the terms of this Plan and/or set forth on **Exhibit C** to the Disclosure Statement. All retained Causes of Action shall be subject to the liens and security interests in favor of the Wayzata Parties as provided for herein. The recovery from all Causes of Action shall become Assets of the Debtors and, after the Effective Date, the Reorganized Debtors in accordance with this Plan. Further, subject to Sections 4.2 and 4.3 and the releases set forth in Section 7.3(b) and Section 7.3(c), the Debtors shall be entitled to offset such amounts as may be awarded to the Debtors or Reorganized Debtors with respect to such Causes of Action against Distributions due hereunder to the Holder of a Claim, whether Disputed or Allowed; provided that no such offset shall occur, and no Distribution shall be delayed, unless, until, and only to the extent that the Cause of Action is reduced to judgment by appropriate Governmental Authority or as agreed by the parties. Subject to Sections 4.2 and 4.3 and the releases set forth in Section 7.3(b) and Section 7.3(c), neither the allowance of a Claim against the Debtors nor the making of Distributions pursuant hereto to a Holder of Claims will bar or limit the right of the Debtors or Reorganized Debtors to bring any Causes of Action held against the Holder of any Claim, even if the Claim that is Allowed or on account of which Distributions are made arises from the same agreement, transactions or occurrence from which the Causes of Action arise. For purposes of Plan implementation, the Reorganized Debtors shall constitute representatives of their respective Estates, fully authorized to prosecute all Causes of Action to final judgment pursuant to section 1123(b)(3)(B) of the Bankruptcy Code; provided that, if each of Classes 4 and 6 have accepted the Plan pursuant to section 1126 of the Bankruptcy Code, then there shall be established a committee (the "Litigation Oversight Committee") which shall have oversight over and shall direct the Reorganized Debtors regarding the prosecution of any Cause of Action that accrued or was in existence (whether or not filed) as of the Petition Date and which has a claimed value to the Debtors or Reorganized Debtors of $250,000 or more, and

which shall have authority to make decisions binding upon the Debtors and Reorganized Debtors concerning commencement, prosecution, settlement and/or litigation to judgment of such Causes of Action, except that, unless the Litigation Oversight Committee determines otherwise, any attorney retention agreement regarding the commencement, continuation or prosecution of such Causes of Action shall be a contingency fee agreement conforming to applicable non-bankruptcy Law. If it is established, then the Litigation Oversight Committee (i) shall be entitled as a committee to retain counsel to represent it in the discharge of its duties, with the costs of such counsel to be paid by the Debtors and Reorganized Debtors, (ii) shall, along with its members, have a fiduciary duty to act in the best interests of the Debtors and the Reorganized Debtors and be covered by the attorney client privilege of the Debtors and Reorganized Debtors with respect to all matters covered by or related to its responsibility, and (iii) shall be comprised of the following or a designee of the following: (a) one member of the board of directors who is not also an officer; (b) one member of the Unsecured Creditors Committee or its designee; (c) one Holder of an Oil Well Lien Act Claim; (d) one Holder of an Equity Interest amounting to at least 8% of the outstanding Equity Interests of the Debtor who is not an officer of the Debtors; and (e) Andy Clifford or his designee as officer of the Debtors. If it is established, then the Litigation Oversight Committee shall be chosen as of the Effective Date by (i) counsel for the Equity Holders' Committee, (ii) counsel for the Unsecured Creditors' Committee, and (iii) Ben Kadden, in consultation with other counsel for Holders of Oil Well Lien Act Claims. If the Litigation Oversight Committee is established, notice of the selection of the Litigation Oversight Committee Members, together with a copy of the bylaws governing the Litigation Oversight Committee, shall be filed with the Bankruptcy Court as of the Effective Date. For the avoidance of doubt, if each of Classes 4 and 6 have not accepted the Plan pursuant to section 1126 of the Bankruptcy Code, then no Litigation Oversight Committee shall be established.

(b)     Notwithstanding anything herein to the contrary, subject to the occurrence of and as of the Effective Date, the Debtors and the Reorganized Debtors shall retain *no* Claims or Causes of Action against the Macquarie Parties or their respective former and current officers, directors, managers, members, employees, agents, attorneys, financial advisors and professionals (collectively, the "Released Macquarie Agents"), and upon the Effective Date any and all potential liabilities of or rights, Claims or Causes of Action against the Macquarie Parties or the Released Macquarie Agents that may exist as of the Effective Date, whether or not asserted, known or unknown, shall, without any further action by the Macquarie Parties, the Released Macquarie Agents, the Debtors, or any other Entity, be fully, finally and forever waived, released and extinguished, with prejudice. For the avoidance of doubt, the foregoing release includes, without limitation, any right of the Debtors or the Reorganized Debtors to recover through any third party's claims for contribution, indemnity or similar third party Causes of Action.

(c)     Notwithstanding anything herein to the contrary, subject to the occurrence of and as of the Effective Date, the Debtors and, the Reorganized Debtors shall retain *no* Claims or Causes of Action against Wayzata, the Wayzata Lenders or their respective former and current officers, directors, managers, members, employees, agents, attorneys, financial advisors and professionals (collectively, the "Released Wayzata Agents"), and upon the Effective Date any and all potential liabilities of or rights, Claims or Causes of Action against Wayzata, the Wayzata Lenders, or the Released Wayzata Agents, that may exist as of the Effective Date, whether or not asserted, known or unknown, foreseen or unforeseen, shall, without any further action by Wayzata, the Wayzata Lenders, the Released Wayzata Agents, the Debtors, the Reorganized

Debtors or any other Entity, be fully, finally and forever waived, released and extinguished, with prejudice. For the avoidance of doubt, the foregoing release includes, without limitation, any right of the Debtors or the Reorganized Debtors to recover through any third party's claims for contribution, indemnity or similar third party Causes of Action.

Section 7.4     **Distributions**. All Cash Distributions required under the Plan to Holders of Allowed Claims shall be made by the Reorganized Debtors on the Effective Date, except as otherwise provided herein, from Cash on hand and/or income generated through operations. From and after the Confirmation Date, costs and expenses shall be paid in the ordinary course of business.

Section 7.5     **Governmental Authority Defaults**. If the Reorganized Debtors should substantially default on the payments to the Louisiana Department of Revenue or payments of a Tax due the United States, acting through the Internal Revenue Service, pursuant to the terms of the Plan, then that shall constitute a default. The Louisiana Department of Revenue or the United States, acting through the Internal Revenue Service, as the case may be, shall give the Reorganized Debtors written notice thereof pursuant to the terms hereof, and the Reorganized Debtors may cure such default within twenty (20) days from the receipt of such notice. If the Reorganized Debtors fail to cure a default within twenty (20) days after receipt of written notice of default, then the Louisiana Department Revenue or the United States, acting through the Internal Revenue Service, as the case may be, may (a) enforce the entire amount of its Allowed Claim; (b) exercise any and all rights and remedies allowed under applicable Law; and/or (c) seek such relief as may be appropriate in the Bankruptcy Court.

## ARTICLE VIII
## DISTRIBUTIONS

Section 8.1     **Distributions of Cash**. Any Distribution of Cash made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank; provided that payment to foreign Holders of Allowed Claims may be in such funds and by such means (as determined by the Debtors or, after the Effective Date, the Reorganized Debtors in their sole discretion) as are customary or necessary in a particular foreign jurisdiction.

Section 8.2     **Timing of Distributions**. Any Distribution to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day. If a Claim or portion thereof has not been Allowed at the time a Distribution in respect of that Claim or portion would be due under the Plan, then, subject to Section 5.5, that Distribution shall not occur at that time and shall instead occur within ten (10) Business Days of the Claim or portion becoming Allowed; provided that, if a portion of the Claim has been Allowed at the time a Distribution is due, then, in accordance with Section 5.5, the Distribution in respect of the Allowed portion may be made in accordance with the terms of the Plan.

Section 8.3     **Record Date for Voting on Plan**. The transfer registers for each of the Classes of Claims and Interests as maintained by the Debtors or any third party shall be deemed closed on the date of entry of an order of the Bankruptcy Court approving the Disclosure Statement (or, with respect to any Class, any later date to which the Debtors agree in their sole

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 41 of 183

discretion) for purposes of voting on the Plan, and there shall be no further changes to reflect any new record Holders of any Claims or Equity Interests for purposes of voting on the Plan.

Section 8.4 **Minimum Distributions; No Fractional Distributions; No Interest**. No Distribution of Cash less than twenty-five Dollars ($25.00) is required to be made to any Holder of an Allowed Claim unless a request therefore is made in writing to the Debtors or, after the Effective Date, the Reorganized Debtors. No Distribution of fractional dollars or fractional shares of common stock of Reorganized Saratoga is required; Distributions shall be rounded up or down to the nearest whole dollar or whole number of shares, as the case may be.

Section 8.5 **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed by the Debtors with the Bankruptcy Court, unless superseded by the address as set forth on proofs of claim filed by such Holders or other writing notifying Debtors or, after the Effective Date, the Reorganized Debtors of a change of address (or at the last known address of such a Holder if no proof of claim is filed or if the Debtors and Reorganized Debtors have not been notified in writing of a change of address).

Section 8.6 **Undeliverable Distributions**. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, no further Distributions to such Holder shall be made, unless and until the Debtors or, after the Effective Date, the Reorganized Debtors are notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder. All Claims for undeliverable Distributions shall be made on or before the later of the first (1st) anniversary of the Effective Date and the date ninety (90) days after such Claim is Allowed. After such date, all property held for Distribution to any Holder of an Allowed Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become vested in the Reorganized Debtors, and the Claim of any Holder with respect to such property shall be discharged and forever barred.

Section 8.7 **Withholding**. The Debtors or, after the Effective Date, the Reorganized Debtors may at any time withhold from any Distribution to any Holder of an Allowed Claim (except the Internal Revenue Service) such amounts sufficient to pay any Tax or other charge that has been or may be imposed on such Holder with respect to the amount distributable or to be distributed under the income Tax laws of the United States or of any other Governmental Authority by reason of any Distribution provided for in the Plan, whenever such withholding is determined by the Debtors or, after the Effective Date, the Reorganized Debtors and in their sole discretion, to be required by any Law. The Debtors or, after the Effective Date, the Reorganized Debtors in the exercise of their sole discretion may enter into agreements with taxing or other Governmental Authorities for the payment of such amounts that may be withheld in accordance with the provisions of this Section 8.7. Notwithstanding the foregoing but without prejudice to any rights of the Debtors or, after the Effective Date, the Reorganized Debtors, such Holder of an Allowed Claim shall have the right with respect to the United States, or any other Governmental Authority, to contest the imposition of any tax or other charge by reason of any Distribution under the Plan.

Section 8.8 **Time Bar to Cash Payments**. Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance

thereof. Requests for reissuance of any check shall be made directly to the Debtors or, after the Effective Date, the Reorganized Debtors by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first (1st) anniversary of the Effective Date and the date ninety (90) days after such Claim is Allowed, and the failure timely to make any such claim shall result in such Claim being forever barred and discharged.

Section 8.9    **Existing Securities and Agreements**. Upon the Effective Date, the Reorganized Debtors shall determine whether it is necessary for any Holder of any debenture, promissory note, pledge agreement, guarantee, mortgage, financing statement, share certificate, or other instrument evidencing a Claim, or a Lien related thereto, receiving a Distribution under the Plan, except as otherwise provided in the Disclosure Statement or Plan (including Section 4.2 and Section 4.3), to surrender such document and/or to execute such other documents to evidence the satisfaction and discharge of the Claim or Lien, as provided for in the Plan. The Reorganized Debtors shall provide prompt notice of the determination that surrender is necessary with respect to a Claim or Lien, and no Distribution on account thereof shall be made unless the surrender occurs, unless otherwise ordered by the Bankruptcy Court.

Section 8.10    **Oil Well Lien Act Claim Releases**. Prior to the occurrence of the first Distribution under this Plan in respect of an Oil Well Lien Act Claim, the Holder of that Oil Well Lien Act Claim shall execute and deliver to the Debtors a release of any Lien under the Oil Well Lien Act against the Debtors, their Assets, and the Estates, which release shall by its terms be effective upon the occurrence of the last Distribution due under this Plan in respect of that Oil Well Lien Act Claim. Upon the occurrence of the last Distribution due under this Plan in respect of any Oil Well Lien Act Claim, all such Liens filed against any Debtor by such claimant shall have been released, discharged, and erased and made of no force and effect against the Debtors, their Assets, and the Estates, and the form of release may be recorded as necessary under applicable non-bankruptcy Law to provide release of any such Lien in the applicable public records. The form of release is attached hereto as **Exhibit D**. The Debtors reserve the right at any time before the Effective Date to submit to the Bankruptcy Court and to the Holders of Class 4 Claims an amended, restated, or supplemented form of **Exhibit D.**

Section 8.11    **Tax Identification Number Affidavit**. Upon request, the Debtors shall be entitled to obtain the appropriate form and/or affidavit, in a form acceptable to them in their reasonable discretion, from each Entity that is to receive a Distribution under this Plan as to that Entity's federal tax identification number, as a pre condition to issuance of any Distribution.

## ARTICLE IX
## ACCEPTANCE OR REJECTION OF THE PLAN

Section 9.1    **Classes Entitled to Vote**. Each Holder of an Allowed Claim or an Allowed Equity Interest in a Class of Claims or Equity Interests against the Debtor that may be Impaired and is to receive a Distribution under the Plan, including any Holder of an Allowed Claim in Classes 2, 3, 4, 5, 6, 7, or 8 or  an Allowed Equity Interest in Classes 9 or 10, shall be entitled to vote separately to accept or reject the Plan; provided that the Bankruptcy Court may determine that the earlier votes of Holders of Allowed Equity Interests in Classes 9 and 10 continue to be effective. Each Holder of a Claim in a Class of Claims or Equity Interests that is

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document      Pg 43 of 183

Unimpaired under the Plan, such as Class 1, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Section 9.2 **Class Acceptance Requirement**. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan. For purposes of calculating the number of Allowed Claims in a class of Claims held by Holders of Allowed Claims in such class that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such class held by one entity or any Affiliate shall be aggregated and treated as one Allowed Claim in such Class.

Section 9.3 **Cramdown**. In the event that any impaired Class of Claims shall not accept the Plan or be deemed not to have accepted the Plan, the proponents of the Plan reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan to provide treatment sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Class(es) not accepting the Plan or being deemed not to have accepted the Plan, and, in particular, the treatment necessary to meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code with respect to the rejecting Class(es) and any other Class(es) affected by such modifications.

### ARTICLE X
### EFFECT OF CONFIRMATION OF PLAN

Section 10.1 **Vesting of Assets**. On the Effective Date, except as otherwise provided herein (including without limitation in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)), all Assets of the Estates, including all Causes of Action, shall be transferred to, and shall vest in, the Reorganized Debtors, free and clear of all Liens and Claims, subject to the terms and conditions set forth herein.

Section 10.2 **Amended Organizational Documents of Reorganized Debtors**. On the Effective Date, the Amended Organizational Documents attached hereto as **Exhibit E** shall become effective and, as appropriate, be filed with the appropriate Governmental Authorities.

Section 10.3 **Amended and Restated Wayzata Credit Agreement**. On the Effective Date, the Wayzata Amended and Restated Credit Agreement shall become effective and be enforceable in accordance with its terms (including being enforceable against any agent and all lenders). Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the terms of the Wayzata Amended and Restated Credit Agreement.

38

Section 10.4 **Amendment to Macquarie Credit Agreement**. On the Effective Date, the Macquarie Amended and Restated Credit Agreement shall become effective and be enforceable in accordance with its terms (including being enforceable against any agent and all lenders). Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the terms of the Macquarie Amended and Restated Credit Agreement.

Section 10.5 **Operation by Reorganized Debtors**. After the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of Assets free of any restrictions imposed under the Bankruptcy Code, subject to the terms of the Plan.

Section 10.6 **Injunction**. As and to the extent not inconsistent with sections 524 and 1141 of the Bankruptcy Code, and except as otherwise expressly provided in the Plan (including in Section 4.2 and Section 4.3), all Entities who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors or Reorganized Debtors with respect to any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by any of the Debtors or Reorganized Debtors on or prior to the Effective Date; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Debtors or the Reorganized Debtors on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date; (c) creating, perfecting or enforcing any Lien against any of the Debtors or Reorganized Debtors, or against any of their Assets, on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by any of the Debtors or Reorganized Debtors on or prior to the Effective Date; and (d) asserting any right of setoff, subrogation or recoupment of any kind (except under section 362(b)(26) of the Bankruptcy Code as provided in section 553 of the Bankruptcy Code) against any obligation due from any of the Debtors or Reorganized Debtors or against the Assets of any of the Debtors or Reorganized Debtors on account of any such Claim or that could have been commenced by the Holder of such Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date.

Section 10.7 **Indemnification Obligations**. The obligations of the Debtors to indemnify, reimburse or limit liability of any person who is serving or has served as one of its directors, officers, employees or agents by reason of such person's prior or current service in such capacity as provided in the applicable articles of organization, operating agreements, partnership agreements, or bylaws, by statutory law or by written agreement, policies or procedures of or with the Debtors shall be recognized and honored and shall bind the Reorganized Debtors and shall not be affected by or discharged by this Plan. Nothing in this Plan shall be deemed to affect any rights of any director or officer or any other person against any insurer with respect to any directors or officers liability insurance policies.

Section 10.8 **Discharge of Debtors and Claims**. Except as otherwise provided in the Plan (including in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)), the rights afforded

herein and the treatment of all Claims herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of every nature, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or the Reorganized Debtors, or any of their Assets. As and to the extent not inconsistent with sections 524 and 1141 of the Bankruptcy Code, and except as otherwise provided herein (including in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)), subject to the occurrence of and as of the Effective Date (i) all such Claims against the Debtors shall be satisfied, discharged, and released in full and (ii) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors to the extent the Claims are satisfied in full, or Equity Interests are retained hereunder, their Assets, or any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature, whether known or unknown, that occurred on or prior to the Effective Date, or that could have been commenced by the Holder of an Equity Interest against any of the Debtors or Reorganized Debtors on the basis of conduct by the Debtors or Reorganized Debtors on or prior to the Effective Date, whether or not (a) a proof of claim or interest based upon such Claim or Equity Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim or Equity Interest is allowed under section 502 of the Bankruptcy Code, or (c) the Holder of such Claim or Equity Interest has accepted the Plan; provided that the discharge shall not apply to the Reorganized Debtors' obligations under this Plan or any Plan Document or to the Debtors' contingent liability (if any) for plugging, abandonment, and/or reclaiming wells, facilities, and pipelines, whether such liabilities are direct or arise through contractual indemnity obligations; provided, further, that the discharge shall not apply to the Equity Interests in the Harvest Companies or the Lobo Companies. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.

Section 10.9  **No Successor Liability**. Except as otherwise specifically provided in this Plan (including in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)) or the Confirmation Order, neither the Debtors nor the Reorganized Debtors will have any responsibilities, pursuant to this Plan or otherwise, for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates relating to or arising out of the operations of or Assets of the Debtors or any of the Debtors' past or present Affiliates, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. Except as otherwise specifically provided in this Plan (including in Section 4.2, Section 4.3, Section 7.3(b), and Section 7.3(c)), the Reorganized Debtors shall have no successor or transferee liability of any kind or character, for any Claims; provided that the Reorganized Debtors shall have the obligations for the payments specifically and expressly provided, and solely in the manner stated, in this Plan and the Plan Documents.

Section 10.10  **Exculpations**. As and to the extent not inconsistent with section 524(e) of the Bankruptcy Code or 26 U.S.C. § 6672, the officers, directors, managers, members, and professionals of the Debtors, the Macquarie Parties, the Wayzata Parties, the Unsecured Creditors' Committee, and the Equity Holders' Committee shall have no liability to any Holder of a Claim or Equity Interest or other Entity (including the foregoing Entities) for any act, event, or omission in connection with, relating to, or arising out of the Bankruptcy Cases, the negotiation of the Plan, the Consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for any liability based on willful misconduct or gross negligence. In all such instances, the above-referenced parties shall be and have been entitled to reasonably rely on the advice of counsel with respect to their duties and

responsibilities in connection with the Bankruptcy Cases and under the Plan. Such exculpation shall not extend to any post-Petition Date act of any Entity other than in connection with that Entity's official capacity in the Bankruptcy Cases.

Section 10.11 **Term of Injunction or Stays**. Unless otherwise provided herein or otherwise ordered by the Bankruptcy Court, all injunctions or stays set forth in 11 U.S.C. §§ 105 and 362 shall remain in full force and effect until the Effective Date rather than the Confirmation Date; provided that the Internal Revenue Service shall be permitted to commence and prosecute administrative collection actions for post-Confirmation Date debts beginning on the date that payments to the Internal Revenue Service under Section 2.3(a) begin. Nothing in this Section 10.11, however, shall be construed as a limitation of the permanent discharge and injunction provisions provided for in this Plan.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

Section 11.1 **Conditions**. The occurrence of the Effective Date and the substantial Consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)   Confirmation Order. The Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay.

(b)   Macquarie Amended and Restated Credit Agreement. The Macquarie Amended and Restated Credit Agreement (including such other related agreements, documents and schedules as are necessary or appropriate to give effect to the Macquarie Amended and Restated Credit Agreement) shall have been executed and delivered by the Debtors and the Wayzata Parties.

(c)   Wayzata Amended and Restated Credit Agreement. The Wayzata Amended and Restated Credit Agreement (including such other related agreements, documents and schedules as are necessary or appropriate to give effect to the Wayzata Amended and Restated Credit Agreement) shall have been executed and delivered by the Debtors and the Wayzata Parties.

(d)   Governmental Authorizations. Any authorizations, consents and regulatory approvals from a Governmental Authority required for the consummation of each of the transactions contemplated in this Plan shall have been obtained and shall have become final and nonappealable and, with respect to any court proceeding relating thereto, been approved by Final Order.

(e)   Execution of Documents; Other Actions. All other actions and documents necessary to implement the Plan shall have been effected or executed.

The proponents of the Plan, may, in their sole discretion, waive the conditions in Section 11.1(d) and 11.1(e).

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document   Pg 47 of 183

Section 11.2    **Notice of Effective Date**.  The occurrence of the Effective Date and the date thereof shall be evidenced by a Notice of Effective Date Filed with the Bankruptcy Court by the Reorganized Debtors within two (2) Business Days of the occurrence thereof.

Section 11.3    **Revocation of Confirmation Order or Withdrawal of Plan**.  The proponents of the Plan may revoke or withdraw this Plan prior to the Confirmation Date by filing a Notice of Withdrawal of Plan in the record of the Bankruptcy Cases.  If this Plan is withdrawn prior to the Confirmation Date, then the Plan shall be deemed withdrawn and the Confirmation Order (if any has been issued but not entered on the docket) shall be automatically revoked without the need for any action by any party in interest or the Bankruptcy Court.  In such event, the Plan and the Confirmation Order shall be of no further force or effect; the Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the filing of this Plan; all the Debtors' respective obligations with respect to the Claims and Equity Interests shall remain unchanged; and all of the Debtors' rights and claims against all Entities shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed to constitute an admission or statement against interest or to constitute a waiver or release of any claims by or against the Debtors or any other persons or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors or any other Entities.

### ARTICLE XII
### RETENTION OF JURISDICTION

Section 12.1    **Retention of Jurisdiction**.  To the maximum extent permitted by the Bankruptcy Code or other applicable Law, the Bankruptcy Court shall have jurisdiction of all matters arising out of, and related to, the Bankruptcy Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following nonexclusive purposes:

(a)    To construe and to take any action to enforce this Plan and to issue such orders as may be necessary for the implementation, execution and confirmation of this Plan;

(b)    To determine the allowance or classification of Claims or Equity Interests (including the Applicable Interest Rate, the Applicable Interest Period, and Applicable Fees and Costs) and to determine any objections thereto;

(c)    To determine rights to Distribution pursuant to this Plan;

(d)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(e)    To determine any and all applications, motions, adversary proceedings, contested matters and other litigated matters that may be pending in the Bankruptcy Court on or initiated after the Effective Date;

(f)    To hear and determine any objection to Administrative Expense Claims or Claims;

(g) To hear and determine any Causes of Action brought or continued by the Debtors to the maximum extent permitted under applicable Law;

(h) To hear and determine motions of the Reorganized Debtors seeking the examination of any Entity pursuant to Bankruptcy Rule 2004, for purposes including investigations of potential Causes of Action, to the same extent the Debtors were entitled to seek such examinations prior to the Effective Date;

(i) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(j) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k) To hear and determine matters concerning any release, exculpation, or discharge and to enforce the injunctions set forth in the Plan;

(l) To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(m) To hear and determine all Fee Applications;

(n) To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or any transactions, documents, or agreements contemplated by the Plan (including the Plan Documents);

(o) To hear and determine all questions and disputes regarding title to, and any action to recover any of, the Assets or property of the Debtors or their Estates, wherever located;

(p) To hear and determine matters concerning state, local, and Federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q) To consider and act on the compromise and settlement of any claim against the Debtors or their Estates;

(r) To hear any other matter not inconsistent with the Bankruptcy Code; provided that, with respect to consideration issued to parties in interest under the Plan, the Bankruptcy Court shall have no further jurisdiction; and

(s) To enter a Final Decree closing the Bankruptcy Cases.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1 **Defects, Omissions, Amendments, and Modifications of the Plan.**

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 49 of 183

(a)     The Debtors may, with the approval of the Bankruptcy Court and without notice to Holders of Claims, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution of the Plan.

(b)     The Debtors (with the prior written consent of Wayzata) may propose amendments or alterations to the Plan before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.

(c)     The Debtors (with the prior written consent of Wayzata) may propose amendments or alterations to the Plan before or after the Confirmation Date but prior to substantial Consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect Holders of Claims, so long as (i) the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, (ii) the Debtors have complied with section 1125 of the Bankruptcy Code, and, (iii) after notice and hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

Section 13.2     **Severability**.     If the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable and, notwithstanding the invalidity, voidness, or unenforceability of such provision, the Debtors may proceed to seek confirmation of the Plan without such invalid, void, or unenforceable provision; provided, that the Debtors first obtain the prior written consent of Wayzata, in which case, the invalidity, voidness, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

Section 13.3     **Dissolution of Committees**.     On the Effective Date, the Unsecured Creditors' Committee and its Professionals and the Equity Holders' Committee and its Professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Bankruptcy Cases, and the Unsecured Creditors' Committee and the Equity Holders' Committee shall be deemed dissolved; provided that, in the event that the Effective Date occurs prior to the entry of an order with respect to final fee applications of Professionals for the Unsecured Creditors' Committee or the Equity Holders' Committee, the Unsecured Creditors' Committee and the Equity Holders' Committee and their Professionals may seek and recover reasonable compensation in connection with the preparation, filing and prosecution of such applications; provided, further, that if a motion for rehearing or appeal of the Confirmation Order is pending on the Effective Date, then the Unsecured Creditors' Committee and the Equity Holders' Committee shall not be dissolved until that motion or appeal is resolved.

Section 13.4     **Exemption from Securities Laws**.     The issuance of the Wayzata New Warrant to Wayzata, the issuance of shares of common stock in Reorganized Saratoga as a result of the exercise thereof, the issuance of shares of common stock in Reorganized Saratoga to

Holders of Allowed Claims in Classes 4 and 6, and the retention of Allowed Non-Warrant Equity Interests and Allowed Warrant Equity Interests in Saratoga and their constitution of identical Equity Interests in Reorganized Saratoga shall be exempt from registration under any federal, state or local Law pursuant to section 1145 of the Bankruptcy Code or other applicable Law. Any Entity who solicits or participates in the offer, issuance, sale or purchase of shares of common stock in Reorganized Saratoga as a result of the exercise of the Wayzata New Warrant, shares of common stock in Reorganized Saratoga to Holders of Allowed Claims in Classes 4, 5, and 6, or Equity Interests in Reorganized Saratoga converted under this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable Law governing solicitation of acceptance or rejection of this Plan or the offer, issuance, sale or purchase of securities pursuant thereto.

Section 13.5 **Successors and Assigns**. The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Entity.

Section 13.6 **Notices**. Any notice required or permitted to be provided under the Plan shall be in writing and served by either (i) certified mail, return receipt requested (or, for the United States, first class mail), postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, freight prepaid, addressed as follows:

If to the Debtors or Reorganized Debtors:
Saratoga Resources, Inc.
Attention: Debtors/Reorganized Debtors
67201 Industry Lane
Covington, Louisiana 70433

and
Saratoga Resources, Inc.
Attention: Debtors/Reorganized Debtors
7500 San Felipe
Suite 675
Houston, Texas 77063

With copies, which shall not constitute notice, to:
Adams and Reese LLP
Attention: Robin B. Cheatham and John M. Duck
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234

and to:
Slattery, Marino & Roberts,
 A Professional Law Corporation
Attention: Paul J. Goodwine
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800


If to the Unsecured Creditors' Committee:
Taylor, Porter, Brooks & Phillips, LLP
Attention: Michael A. Crawford
451 Florida Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, Louisiana 70821
Telephone: (225) 387-3221


If to the Equity Holders' Committee:
Heller, Draper, Hayden, Patrick & Horn, LLC
Attention: Douglas S. Draper
605 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300


Section 13.7 **Payment of Statutory Fees**. Except as otherwise provided herein, for so long as the Bankruptcy Cases shall remain open and pending before the Bankruptcy Court, all fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors, with all such fees determined by the Bankruptcy Court at the Confirmation Hearing to be due on or prior to the Effective Date being paid in Cash by the Reorganized Debtors on the Effective Date.

Section 13.8 **Additional Documents**. On or before substantial Consummation of the Plan, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to reasonably effectuate and further evidence the terms and conditions of the Plan.

DATED: March 31, 2010

Respectfully submitted:

**ADAMS AND REESE, LLP**

By:___/s/ John M. Duck_____
ROBIN B. CHEATHAM [#4004]
JOHN M. DUCK [#5104]
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Attorneys for the Debtors

PAUL J. GOODWINE [#23757]
Slattery, Marino & Roberts,
A Professional Law Corporation
1100 Poydras Street, Suite 1800
New Orleans, Louisiana 70163
Telephone: (504) 585-7800
Facsimile: (504) 585-7890
Special Counsel for the Debtors

LOUIS M. PHILLIPS [#10505]
Gordon, Arata, McCollam, Duplantis &
  Eagan, L.L.P.
One American Place
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Counsel for Macquarie Americas Corp.

DOUGLAS S. DRAPER [#5073]
WILLIAM H. PATRICK III [#10359]
Heller, Draper, Hayden, Patrick & Horn, LLC
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
Counsel for the Official Committee of Equity
  Security Holders

# EXHIBIT A

## MACQUARIE AMENDED AND RESTATED CREDIT AGREEMENT

A-1
US 294577v.3

# FIRST AMENDMENT TO
## AMENDED AND RESTATED CREDIT AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (this "Amendment") dated as of _____ ___, 2010, is among Saratoga Resources, Inc., a Texas corporation ("Saratoga"), Harvest Oil & Gas, LLC, a Louisiana limited liability company, ("HOG"), The Harvest Group LLC, a Louisiana limited liability company, ("THG"), Lobo Operating, Inc., a Texas corporation, ("Lobo"), and Lobo Resources, Inc., a Texas corporation, ("LRI"), (Saratoga, HOG, THG, Lobo and LRI are collectively referred to as, "Borrowers"), Wayzata Investment Partners LLC, a Delaware limited liability company in its capacity as successor administrative agent ("Administrative Agent"), and the Lenders signatory hereto (collectively, the "Lenders").

## RECITALS

WHEREAS, Borrowers and Macquarie Bank Limited ("Original Lender") entered into that certain Amended and Restated Credit Agreement dated as of July 14, 2008 (as amended, supplemented or modified from time to time, including as amended by this Amendment, the "Credit Agreement").

WHEREAS, Borrowers filed voluntary petitions for relief under Chapter 11, Title 11, United States Code, on March 31, 2009, in the United States Bankruptcy Court for the Western District of Louisiana (the "Bankruptcy Court"), which cases are being jointly administered under Case No. 09-50397 (the "Chapter 11 Case").

WHEREAS, on February 11, 2010, Original Lender (i) assigned all of its right, title and interest in and to the Obligations and the Loan Documents to Wayzata Opportunities Fund, LLC and Wayzata Opportunities Fund II, L.P. (collectively, the "Wayzata Lenders"), and (ii) resigned as administrative agent under the Loan Documents.

WHEREAS, the Wayzata Lenders desire to appoint Wayzata Investment Partners LLC as the successor administrative agent under the Loan Documents.

WHEREAS, in connection with Borrowers' consummation of the plan of reorganization in the Chapter 11 Case entitled "Third Amended Plan of Reorganization as Jointly Proposed by the Debtors, Macquarie Americas Corp., and the Official Committee of Equity Security Holders (as Modified as of March 31, 2010)," as such plan may be modified or amended from time to time, Borrowers desire to amend, restate, modify and ratify certain provisions of the Credit Agreement, and the parties have agreed to enter into this Amendment for such purpose.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Amendment. Effective as of the Effective Date (defined below), the Credit Agreement is hereby amended as follows:

a.    The definition of "Acceptable Commodity Hedging Agreements" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Acceptable Commodity Hedging Agreements**" means Commodity Hedging Agreements meeting all of the following criteria:

(i)    The notional quantity of Crude Oil and Natural Gas subject to Commodity Hedging Agreements by the Borrower and its Subsidiaries, at the time of entering into such Commodity Hedging Agreements, shall not be, without the prior written approval of the Required Lenders, greater than 60% of the projected monthly production of Crude Oil or greater than 60% of the projected monthly production of Natural Gas (as applicable) for a period not exceeding the Final Maturity Date from the Proved Developed Producing Oil and Gas Properties of the Borrower and its Subsidiaries as determined by the Administrative Agent based on the most recent Reserve Report;

(ii)    Any counterparty must be an Approved Counterparty;

(iii)    the Commodity Hedging Agreement shall not contain any anti-assignment provisions restricting the Borrower or its Subsidiaries or if such Commodity Hedging Agreement contains anti-assignment provisions which cannot be removed, such provisions shall be modified to read substantially as follows: "The interest and obligations arising from this agreement are non-transferable and non-assignable, except that [name of Person] may assign and grant a security interest in its rights and interests hereunder to a contractual collateral agent for itself and certain other lenders (collectively, "Lenders") as security for present and future obligations of [name of Person] to the Lenders. Until hedge provider is notified in writing by such collateral agent, to pay to such collateral agent, amounts due [name of Person] hereunder, hedge provider may continue to make such payments to [name of Person].";

(iv)    The Administrative Agent shall have received for the benefit of the Lenders first and prior perfected security interests pursuant to security agreements in form and substance reasonably satisfactory to the Administrative Agent in the right, title and interest of such Person in and to the Commodity Hedging Agreements of such Person;

(v)    The Borrower or its Subsidiaries will not sell any calls other than calls corresponding to an existing permitted collar already executed or being executed in conjunction with such purchased call; and

(vi)    The Commodity Hedging Agreement is entered into in the ordinary course of business for the purpose of protecting against fluctuations in commodity prices or commodity basis risk and not for purposes of speculation.

2

b.    The definition of "Administrative Agent" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Administrative Agent**" means Wayzata Investment Partners LLC, in its capacity as contractual representative of the Lenders pursuant to <u>Article XI</u>, and any successor Administrative Agent appointed pursuant to <u>Article XI</u>.

c.    The definition of "Annualized EBITDA" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Annualized EBITDA**" means (i) for the quarter ending June 30, 2010, the product of 4 times the Borrower's EBITDA for the three months ending June 30, 2010, (ii) for the quarter ending September 30, 2010, the product of 2 times the Borrower's EBITDA for the six months ending September 30, 2010, (iii) for the quarter ending December 31, 2010, the product of 4/3 times the Borrower's EBITDA for the nine months ending December 31, 2010, and (iv) for any quarter ending thereafter, the Borrower's EBITDA for the twelve month period ending on the last day of such quarter.

d.    The definition of "Applicable Margin" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Applicable Margin**" means 2.00%.

e.    The definition of "Approved Counterparties" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Approved Counterparties**" means (a) any of JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., Goldman Sachs & Co. and any of their respective Affiliates, provided, that, at the time of entering into any Hedging Agreement such person has a credit rating of "A3" or higher from Moody's or "A-" or higher from S&P, or (b) a Lender or an Affiliate of a Lender.

f.    The definition of "Base Rate" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Base Rate**" means, at any time, the per annum variable rate of interest equal to the prime rate of interest as published by *The Wall Street Journal* (or its successor publication).

g.    Section 1.1 of the Credit Agreement is amended by adding the following definition of "Cash Secured Letters of Credit":

"**Cash Secured Letters of Credit**" means the following letters of credit previously issued under the Credit Agreement and fully cash collateralized pursuant to Loans with respect thereto: (i) letter of credit number S00052005 issued by The Bank of New York (guaranteed by Macquarie Bank Limited) to the Louisiana Office of Conservation in a stated amount of $1,925,360.00; (ii)

3

letter of credit number 278/08/05 issued by Macquarie Bank Limited to Chevron USA Inc. in a stated amount of $7,000,000.00; and (iii) letter of credit number 295/05/06 issued by Macquarie Bank Limited to the Estate of William G. Helis in a stated amount of $750,000.00.

h. Section 1.1 of the Credit Agreement is amended by adding the following definition of "Chapter 11 Case":

"**Chapter 11 Case**" means the proceedings for relief under Chapter 11, Title 11, United States Code, filed by Borrower and the Designated Borrowers on March 31, 2009, in the United States Bankruptcy Court for the Western District of Louisiana, which cases are being jointly administered under Case No. 09-50397.

i. The definition of "Current Assets" in Section 1.1 of the Credit Agreement is hereby amended and restated as follows:

"**Current Assets**" of any Person means, at any date, the current assets of the Borrower and its Consolidated Subsidiaries. For the avoidance of doubt, Current Assets shall exclude any non-cash amounts (and deferred taxes relating thereto) arising from marked to market adjustments under Hedging Agreements as a result of the application of GAAP.

j. The definition of "Current Liabilities" in Section 1.1 of the Credit Agreement is hereby amended and restated as follows:

"**Current Liabilities**" of any Person means, at any date, the current liabilities of the Borrower and its Consolidated Subsidiaries, excluding (a) the current portion of the Loans and Letters of Credit outstanding hereunder, the loans under the Term Loan Facility, and Plan of Reorganization Debt, and (b) for the fiscal quarters beginning April 1, 2010 and June 1, 2010, liabilities for restructuring expenses not to exceed $4,000,000 in the aggregate associated with the Chapter 11 Case. For the avoidance of doubt, Current Liabilities shall exclude any non-cash amounts (and deferred taxes relating thereto) arising from marked to market adjustments under Hedging Agreements as a result of the application of GAAP.

k. The definition of "Deposit Account Control Agreement" in Section 1.1 of the Credit Agreement is amended by adding "in its reasonable discretion" immediately after "acceptable to Administrative Agent".

l. The definition of "EBITDA" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**EBITDA**" means, for any applicable period and with the respect to the Borrower and its Consolidated Subsidiaries, the sum of (a) Net Income, plus (b) to the extent deducted in determining Net Income, the sum of (i) amounts attributable to amortization, depletion and depreciation of assets, (ii) income

4

tax expense, and (iii) Interest Expense for such period; <u>provided</u>, that for the quarters ending June 30, 2010 and September 30, 2010 only, an add back for restructuring expenses associated with the Chapter 11 Case not to exceed $4,000,000 in the aggregate will be permitted.

m.  The definitions of "Final Maturity Date" and "Final Maturity" in Section 1.1 of the Credit Agreement are amended and restated as follows:

"**Final Maturity Date**" or "**Final Maturity**" means April 30, 2012, or such earlier date as the maturity of the Obligations is accelerated in accordance with <u>Section 8.1</u>.

n.  The definition of "Issuer" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Issuer**" means any Lender or any other Person approved by the Administrative Agent that issues or guarantees Letters of Credit pursuant to the terms of this Agreement.

o.  The definition of "Letter of Credit" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Letter of Credit**" means (a) any letter of credit issued pursuant to this Agreement after the effective date of the Plan of Reorganization, and (b) any guarantee given by a Lender or an Affiliate thereof to an issuer providing such letter of credit for the account of the Borrower or any Designated Borrower. The term Letter of Credit excludes the Cash Secured Letters of Credit.

p.  The definition of "Letter of Credit Commitment Amount" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Letter of Credit Commitment Amount**" means, on any date, a maximum amount of $10,159,128, as such amount may be permanently reduced from time to time pursuant to <u>Section 2.9.3</u>; provided, that the Letter of Credit Commitment Amount (a) may only be utilized for the replacement of Cash Secured Letters of Credit with Letters of Credit and (b) shall be automatically reduced by the stated amount of each Cash Secured Letter of Credit that is either cancelled without replacement or is replaced by a letter of credit issued outside of the Credit Agreement.

q.  The definition of "Material Adverse Effect" in Section 1.1 of the Credit Agreement and Section 8.1.4 of the Credit Agreement are both amended by adding "with the exception of the Chapter 11 Case," immediately after "the Borrower and its Subsidiaries" in the definition of "Material Adverse Effect" and immediately before "the Borrower" in Section 8.1.4.

r.  The definition of "Net Income" in Section 1.1 of the Credit Agreement is amended and restated as follows:

5

"**Net Income**" means, for any period, the aggregate of all amounts that would be included as net income (or loss) on the consolidated financial statements of the Borrower and its Subsidiaries for such period, but shall exclude effects on net income attributable to any current non-cash income or expense (including in respect of Hedging Agreements) described in or calculated pursuant to the requirements of applicable Statements of Financial Accounting Standards, as amended (provided that, for the avoidance of doubt, the calculation of Net Income shall include any income or expense in respect of the termination of any Hedging Agreement).

s.   Clause (c) of the definition of "Obligations" in Section 1.1 of the Credit Agreement is amended and restated as follows:

(c) all other obligations and liabilities of the Borrower and any of its Subsidiaries to any Approved Counterparty relating to Acceptable Commodity Hedging Agreements (in the case of a Lender, whether or not such Person is a Lender at the time of entering into the Hedging Agreements or remains a Lender hereunder), and

t.   The definitions of "Permitted Debt" and "Term Loan Facility" in Section 1.1 of the Credit Agreement are amended by replacing "$97,500,000" with "$127,500,000."

u.   The definition of "Permitted Debt" in Section 1.1 of the Credit Agreement is amended by adding the following in subsection (g) of the definition immediately after "Intercreditor Agreement": ", and Plan of Reorganization Debt not to exceed $6,000,000 at any time".

v.   Clause (n) of the definition of "Permitted Liens" in Section 1.1 of the Credit Agreement is amended and restated as follows:

(n) Liens securing the Debt permitted pursuant to clause (g) of the definition of "Permitted Debt" (other than Debt owing to holders of Allowed Claims in Classes 6 and 7 and Allowed Priority Unsecured Tax Claims of Plan of Reorganization Debt ).

w.   Section 1.1 of the Credit Agreement is amended by adding the following definition of "Plan of Reorganization":

"**Plan of Reorganization**" means the plan of reorganization entitled "Third Amended Plan of Reorganization as Jointly Proposed by the Debtors, Macquarie Americas Corp., and the Official Committee of Equity Security Holders (as Modified as of March 31, 2010)," as such plan may be modified or amended from time to time, filed by the Borrower and its Subsidiaries, as approved by the U.S. Bankruptcy Court for the Western District of Louisiana in the Chapter 11 Case.

6

x.    Section 1.1 of the Credit Agreement is amended by adding the following definition of "Plan of Reorganization Debt":

"**Plan of Reorganization Debt**" means Debt to holders of Allowed Claims in Classes 4, 5, 6, and 7 and Allowed Priority Unsecured Tax Claims (as those terms are defined in the Plan of Reorganization) pursuant to the terms of the Plan of Reorganization.

y.    The definition of "PV10 Value" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**PV10 Value**" means, as of any date of determination, as to any Person the present value, discounted at a rate of 10%, of the future net revenues expected to accrue to such Person's interests in its Oil and Gas Properties during the remaining expected economic lives of such properties as reasonably determined by the Administrative Agent in connection with the most recently completed Borrowing Base. Each calculation of such expected future net revenues shall be made in accordance with the then existing standards of the Society of Petroleum Engineers and (a) with appropriate adjustments made for (i) severance and ad valorem taxes, (ii) operating, gathering, transportation and marketing costs required for the production and sale of such reserves and (iii) risk associated with such future net revenues as determined in the reasonable discretion of the Administrative Agent and (b) assuming for the purpose of this definition that future produced volumes of oil and gas will be sold (i) in the case of unhedged volumes, at the 24 month NYMEX strip (i.e., the average of the prices quoted on the New York Mercantile Exchange for WTI crude oil or Henry Hub natural gas for the upcoming 24 contract months following the time of calculation of PV10 Value), (ii) in the case of volumes subject to a swap or other fixed priced hedge, at the applicable fixed price and (iii) in the case of volumes subject to a floor or ceiling hedge (including a collar), at the price set out in the preceding clause (b)(i), but not to exceed such ceiling or to be less than such floor.

z.    The definition of "Reserve Report" in Section 1.1 of the Credit Agreement is amended by replacing "SEC" with "Society of Petroleum Engineers".

aa.    The definition of "Required Lenders" in Section 1.1 of the Credit Agreement is amended and restated as follows:

"**Required Lenders**" means Lenders in the aggregate having at least 66-2/3% of the Aggregate Commitment or, if the Aggregate Commitment has been terminated, Lenders in the aggregate holding at least 66-2/3% of the Total Exposure Amount.

bb.    The definition of "Total Debt" in Section 1.1 of the Credit Agreement is amended by replacing "Statement of Financial Accounting Standards 133,

7

137, 138 and 143, in each case" with "applicable Statements of Financial Accounting Standards,".

cc.     Section 2.7.2 of the Credit Agreement is amended and restated as follows:

2.7.2     Administration Fee.   The Borrower agrees to pay to the Lenders pro rata an annual administration fee in the amount of $30,000. Such fee shall be payable annually in advance (a) on the date hereof and (b) on each anniversary thereof until the date on which the Commitments are terminated and the facility hereunder is terminated in full.

dd.     Section 2.7.3 of the Credit Agreement is amended and restated as follows:

2.7.3     Letter of Credit Fee.   The Borrower agrees to pay to the Administrative Agent, for the pro rata account of each Lender, a Letter of Credit fee in a per annum amount equal to (a) 2.75% or, if applicable, such higher rate as is specified in Section 3.4, multiplied by (b) the Stated Amount of each such Letter of Credit, such fees being payable quarterly in arrears on each Quarterly Payment Date and on the Final Maturity Date.   For the avoidance of doubt, no fees shall be due under this Section in respect of the Cash Secured Letters of Credit.

ee.     (i) Sections 2.8.2, 2.8.3 and 7.2.2(e) of the Credit Agreement are each amended by adding "in its reasonable discretion" immediately after each "in form and substance satisfactory to the Administrative Agent"; and (ii) Section 4.1.6 of the Credit Agreement is amended by adding "in their reasonable discretion" immediately after "in form and substance satisfactory to the Administrative Agent and its counsel".

ff.     Sections 2.8.4 and 2.8.5 of the Credit Agreement are amended and restated as follows: "[Reserved]".

gg.     The second sentence of Section 4.1.5 of the Credit Agreement is amended by adding "(and any successor thereto acceptable to the Administrative Agent in its reasonable discretion)" immediately after "POGM".

hh.     The introductory sentence of Article VI of the Credit Agreement is amended and restated as follows:

Each of the Borrower and each Designated Borrower hereby represents and warrants to the Administrative Agent, any other Agent, each Lender and the Issuer, except as set forth in the Schedules dated as of _____ ___, 2010, as follows:

ii.     The last sentence of Section 6.10.1 of the Credit Agreement is amended and restated as follows:

8

All factual information contained in the most recently delivered Reserve Report was true and correct in all material respects as of the date thereof, and all projections and estimates in such Reserve Report were prepared in good faith based on assumptions believed to be reasonable at the time.

jj.     Section 6.15.2 of the Credit Agreement is amended by adding the following immediately before the final period:

and except for balancing obligations that are settled within 45 days of the production month

kk.     Section 6.17 of the Credit Agreement is amended and restated as follows:

Section 6.17 *No Default*.  After giving effect to the waiver and cure of defaults contained in the Plan of Reorganization, no Default has occurred which is continuing.

ll.     The first sentence of Section 7.2.2(d) is amended by adding immediately after "periods covered in such report" the following:

; provided that to the extent such reports contain projections and estimates, the Officer's Certificate may contain a qualification that such projections and estimates were prepared in good faith based on assumptions believed to be reasonable at the time

mm.     Section 7.6.3 of the Credit Agreement is amended by replacing "more than 30 days after the Effective Date" with "for longer than as permitted under the Plan of Reorganization."

nn.     Section 7.10.2 of the Credit Agreement is amended and restated as follows:

The location of the Borrower's principal place of business and executive office shall remain at 7500 San Felipe, Suite 675, Houston, Texas 77063, unless at least 10 days prior to any change in such address the Borrower provides the Administrative Agent with written notice of such pending change.

oo.     Section 7.15 of the Credit Agreement is amended and restated as follows:

Section 7.15 *Certain Financial Covenants*.

7.15.1 *Quarterly EBITDA to Interest Expense*.  Borrower will not permit the ratio of EBITDA to Interest Expense to be less than (a) 1.80 to 1.00, determined as of the end of the calendar quarter ending on June 30, 2010; (b) 1.65 to 1.00, determined as of the end of the calendar quarter ending on September 30, 2010; (c) 1.75 to 1.00, determined as of the end of the calendar quarter ending on December 31, 2010; (d) 2.00 to 1.00, determined at the end of the calendar quarter ending on March 31, 2011; and (e) 2.25 to 1.00,

9

determined as of the end of the calendar quarters ending on or after June 30, 2011.

7.15.2 *Current Ratio.* Commencing with the quarter that begins April 1, 2010, Borrower will not permit at any time its ratio of Current Assets to Current Liabilities to be less than 1.00 to 1.00.

7.15.3 *Total Debt to Annualized EBITDA.* Borrower will not permit the ratio of Total Debt to Annualized EBITDA to be greater than the values indicated below for the fiscal quarters indicated below:

| Calendar Quarter ending: | Total Debt to Annualized EBITDA |
|---|---|
| June 30, 2010 | 6.25 |
| September 30, 2010 | 6.00 |
| December 31, 2010 | 5.5 |
| March 31, 2011 | 5.25 |
| June 30, 2011 | 4.75 |
| September 30, 2011 | 4.5 |
| December 31, 2011 | 4.5 |
| March 31, 2012 | 4.25 |

7.15.4 *Minimum EBITDA.* Borrower will not permit its EBITDA as of the last day of each calendar quarter to be less than the amounts specified below for the respective calendar quarter:

| Calendar Quarter ending: | Minimum EBITDA |
|---|---|
| June 30, 2010 | $6,000,000 |
| September 30, 2010 | $6,300,000 |
| December 31, 2010 | $7,000,000 |
| March 31, 2011 | $7,200,000 |
| June 30, 2011 | $7,200,000 |
| September 30, 2011 | $7,500,000 |
| December 31, 2011 | $7,750,000 |
| March 31, 2012 | $7,750,000 |

pp. Section 7.19.3 of the Credit Agreement is amended by adding "(or other agreement restricting disclosure of information)" immediately after "confidentiality agreement".

qq. The first sentence of Section 10.14 of the Credit Agreement is amended and restated as follows:

10

The benefit of the Security Documents and of the provisions of this Agreement relating to the Collateral shall also extend to and be available to Approved Counterparties to Acceptable Commodity Hedging Agreements on a pro rata basis in respect of any Hedging Agreement Obligations of Borrower or any of its Subsidiaries; provided that it is the intention of the parties that receipt of payment in respect of Hedging Agreement Obligations of Borrower and its Subsidiaries under any Acceptable Commodity Hedging Agreement from realization of any Collateral shall be subject to the terms of the Intercreditor Agreement and the Security Documents.

rr.    The first sentence of Section 10.15 of the Credit Agreement is amended and restated as follows:

Each Lender and each Approved Counterparty to an Acceptable Commodity Hedging Agreement acknowledges and agrees that the Administrative Agent has entered into the Intercreditor Agreement and the Security Documents on behalf of itself, any other Agents, if any, Lenders and such Approved Counterparties, and each of them (by their signature hereto or acceptance of the benefits of the Security Documents) hereby agrees to be bound by the terms of the Intercreditor Agreement and such Security Documents, acknowledges receipt of copies of the Intercreditor Agreement and such Security Documents and consents to the rights, powers, remedies, indemnities and exculpations given to the Administrative Agent thereunder.

ss.    The first two sentences in Section 11.1 of the Credit Agreement are amended and restated as follows:

Each of the Lenders irrevocably authorizes the Administrative Agent to act as administrative agent hereunder for such Lender. The Administrative Agent or any other Agent agree to act as such upon the express conditions contained in this Article XI.

tt.    Section 11.11 of the Credit Agreement is amended to (i) delete the sixth sentence thereof in its entirety and (ii) delete the reference to "Article X" therein and replace such reference with "Article XI".

uu.    Exhibit B to the Credit Agreement is amended and restated in the form of Exhibit B attached to this Amendment.

2.    No Additional Credit Extensions; Borrowing Base; Letters of Credit; Interest Rate. Notwithstanding anything in the Credit Agreement to the contrary:

a.    The Borrowers shall not be entitled to request any further Credit Extensions and the Lenders shall not be obligated to make any additional Advances (including, without limitation, any Loans to satisfy Reimbursement Obligations in respect of Letters of Credit). Any amounts repaid or prepaid may not be reborrowed.

11

b.      The Borrowers acknowledge that, as of the Effective Date and after giving effect to the payment required under Section 3(b) hereof, the total outstanding principal amount of the Loans is $[18,000,000 plus interest accrued after 5/15] (the "Effective Date Loan Amount"). The Effective Date Loan Amount includes $10,159,128.00 in Loans disbursed in respect of Reimbursement Obligations for the Cash Secured Letters of Credit.

c.      Following the Effective Date, the Borrowing Base shall equal (i) for the period from the Effective Date to and including the date that the Administrative Agent receives the first Reserve Report following the Effective Date, the Effective Date Loan Amount, and (ii) at all times thereafter, the lesser of (1) 50% of the PV10 Value of Proved Developed Producing Reserves based on the most recent Reserve Report and (2) the Effective Date Loan Amount. Each Reserve Report delivered following the Effective Date shall include all oil and gas reserves attributable to the Oil and Gas Properties owned by Borrower and its Subsidiaries regardless of whether or not Borrower wishes to include such properties in the Borrowing Base.

d.      The Borrowers shall not be entitled to request any Letters of Credit; however, (i) an Issuer (acting with the approval of the Administrative Agent) and the Borrower may replace one or more Cash Secured Letters of Credit with Letters of Credit issued under and subject to the terms and conditions of the Credit Agreement, and (ii) the current issuers of the Cash Secured Letters of Credit and the Borrower may renew Cash Secured Letters of Credit for a period not to exceed the Letter of Credit Commitment Termination Date. To the extent that a Cash Secured Letter of Credit is cancelled or replaced with a Letter of Credit, the Loans shall be deemed repaid in an amount equal to the amount of cash collateral returned to the Administrative Agent and the Lenders by Macquarie Bank Limited in exchange for the cancellation or replacement of such Cash Secured Letter of Credit.

e.      The principal amount of all Loans (including, without limitation, Loans disbursed in respect of Cash Secured Letters of Credit) shall bear interest at a rate per annum equal to the lesser of (i) the sum of the Alternate Base Rate from time to time in effect plus the Applicable Margin or, if applicable, such higher rate as is specified in Section 3.4 of the Credit Agreement, or (ii) the Highest Lawful Rate. For the avoidance of doubt, the Borrowers shall not be entitled to make any Eurodollar elections under Section 2.3 of the Credit Agreement.

f.      The address of the Administrative Agent and the Lenders for purposes of notice under the Loan Documents is as follows:

701 East Lake Street, Suite 300
Wayzata, Minnesota 55391
Attn: Ray Wallander

12

g.  Other than with respect to fees owing to an Issuer pursuant to Section 2.7.4 of the Credit Agreement and indemnification obligations owing to any Indemnified Party (which shall be paid directly to such Persons), all payments due under the Loan Documents shall be made to the Lenders pro rata by wire transfer pursuant to the instructions set forth below:

JPMorgan Chase Bank
New York, New York
ABA #021000021
Account Name: Wayzata Opportunities Fund, LLC
Account Number: 304639710
Reference: Saratoga Resources, Inc.

JPMorgan Chase Bank
New York, New York
ABA #021000021
Account Name: Wayzata Opportunities Fund II, L.P.
Account Number: 304990833
Reference: Saratoga Resources, Inc.

3.  Conditions Precedent. The effectiveness of the amendments contained herein is subject to the satisfaction of each of the following conditions precedent (the date on which all such conditions are satisfied is referred to herein as the "Effective Date"):

a.  the Bankruptcy Court shall have entered a final order confirming the Plan of Reorganization, and all conditions to the effectiveness of the Plan of Reorganization shall have been waived or satisfied in accordance with the Plan of Reorganization and the "Effective Date" as defined thereunder shall have occurred;

b.  the Administrative Agent shall have received $5,500,000 from the Borrowers by wire transfer of immediately available funds to be applied to the outstanding Obligations;

c.  the Borrowers shall have executed and delivered to the Administrative Agent the Loan Documents (including any amendments to the Security Documents) and the other documents, instruments and any deliveries described in the closing checklist delivered to the Borrowers' counsel on March 25, 2010, and such other documents, instruments and agreements as are deemed necessary by the Administrative Agent in its reasonable discretion;

d.  the Borrowers shall have delivered to the Administrative Agent opinions of counsel to the Borrowers, in form and substance reasonably satisfactory to the Administrative Agent and its counsel, regarding existence, authority, due authorization and due execution;

e.  the Borrowers shall have caused Macquarie Bank Limited and/or Macquarie Americas Corp. to deliver to the Administrative Agent the original stock

13

certificates (duly endorsed in blank) of Lobo Operating, Inc. and Lobo Resources, Inc.; and

f. after giving effect to the amendments herein, all representations and warranties contained in Article VI of the Credit Agreement shall be true and correct as of the Effective Date as if made on such date (except for any representation or warranty made as of a specific date which shall be true and correct as of such date), and a Responsible Representative of the Borrowers shall have delivered an officer's certificate to the Administrative Agent with respect thereto.

4.  Ratification of Loan Documents. The Borrowers and the Lenders hereby ratify, adopt and confirm the Credit Agreement and each other Loan Document in each and every respect, and except as amended, restated, modified, or waived by this Amendment, all the terms and conditions of the Loan Documents shall remain in full force and effect. The Borrowers represent and warrant that, as of the Effective Date, the Effective Date Loan Amount is owing pursuant to the Credit Agreement and is not subject to any counterclaim, reduction or setoff. All Liens securing the Obligations under the Credit Agreement and the other Loan Documents are hereby ratified, affirmed and continued.

5.  Defined Terms. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

6.  Appointment of Successor Administrative Agent. Pursuant to Section 11.11 of the Credit Agreement, each Lender hereby appoints Wayzata Investment Partners LLC, a Delaware limited liability company, as the successor Administrative Agent under the Loan Documents to Macquarie Bank Limited. Wayzata Investment Partners LLC hereby accepts such appointment and shall be deemed a "Secured Party" and/or "Mortgagee" as applicable under each Security Document.

7.  Successors and Assigns. The terms and provisions of this Amendment shall be binding upon and inure to the benefit of Borrowers, the Administrative Agent and the Lenders and their respective successors and assigns.

8.  Governing Law. This Amendment (including, but not limited to, the validity and enforceability hereof) shall be governed by, and construed in accordance with, the laws of the State of Texas (without regard to any principles of law that would require the application of the laws of another state).

9.  Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Any signature page of a counterpart may be detached therefrom without impairing the legal effect of the signatures thereon and attached to another counterpart identical in form thereto but having attached to it one or more additional signature pages signed by other parties.

10.  ENTIRE AGREEMENT. **THIS AMENDMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY**

14

EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**Signatures appear on the following page.**

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment effective as of the date first above written.

**BORROWERS:**

**SARATOGA RESOURCES, INC.,**
a Texas corporation

By: _____
Name: _____
Title: _____

**HARVEST OIL & GAS, LLC,**
a Louisiana limited liability company

By: _____
Name: _____
Title: _____

**THE HARVEST GROUP LLC,**
a Louisiana limited liability company

By: _____
Name: _____
Title: _____

**LOBO OPERATING, INC.,**
a Texas corporation

By: _____
Name: _____
Title: _____

**LOBO RESOURCES, INC.,**
a Texas corporation

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO FIRST AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment effective as of the date first above written.

**Administrative Agent:**

**WAYZATA INVESTMENT PARTNERS LLC,**
as Administrative Agent

By: _____
Name: _____
Title: _____


**Lenders:**

**WAYZATA OPPORTUNITIES FUND, LLC,**
as a Lender

By: _____
Name: _____
Title: _____


**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as a Lender

By: _____
Name: _____
Title: _____

## EXHIBIT B

### [Form of]

## COMPLIANCE CERTIFICATE

_____, 20[\_\_]

Wayzata Investment Partners LLC, as Administrative Agent
701 East Lake Street, Suite 300
Wayzata, Minnesota 55391
Attention : Raphael Wallander
Telephone: (952) 345-0727
Telecopy: (952) 345-8901
E-mail: rwallander@wayzpartners.com

and

Attention: Mike Strain
Telephone: (713) 594-5916
Telecopy: (952) 345-8901
E-mail: mstrain@wayzpartners.com

Re:     Amended and Restated Credit Agreement, dated as of July 14, 2008, by and among
Saratoga Resources, Inc. (the "Borrower"), the Designated Borrowers, Wayzata
Investment Partners LLC, as successor Administrative Agent and the Lenders signatory
thereto (the "Lenders") and certain other Persons party thereto (as amended, restated, or
supplemented from time to time, the "Credit Agreement")

Ladies and Gentlemen:

Pursuant to applicable requirements of the Credit Agreement, the undersigned, as a
Responsible Representative of the Borrower, hereby certifies to you the following information as
true and correct as of the date hereof or for the period indicated, as the case may be:

[1.     To the best of the knowledge of the undersigned, no Default exists as of the date hereof.]

[1.     To the best of the knowledge of the undersigned, the following Defaults exist as of the
date hereof and the actions set forth below are being taken to remedy such circumstances:]

2.     The compliance of the Borrower with certain financial covenants of the Credit
Agreement, as of the close of business on _____, is evidenced by the following:

(a) Section 7.15.1: Quarterly EBITDA to Cash Interest Expense Ratio.

Required                                                    Actual

Not less than [   ] [level specified in Section 7.15.1 for   _____ to 1.0
calendar quarter] to 1.0

(b) Section 7.15.2: Current Ratio.

Required                                                    Actual

Not less than 1.0 to 1.0                                     _____ to 1.0

(c) Section 7.15.3: Total Debt to Annualized EBITDA.

Required                                                    Actual

Not greater than [   ] [level specified in Section 7.15.3 for  _____ to 1.0
calendar quarter] to 1.0

(d) Section 7.15.4: Minimum EBITDA

Required                                                    Actual

Not less than [$_____] [amount specified in      $_____
Section 7.15.4 for calendar quarter]

3.     The financial statements being delivered to the Administrative Agent concurrently herewith pursuant to the Credit Agreement present fairly in all material respects, the financial position of the Borrower and its Consolidated Subsidiaries on a consolidated and consolidating basis as of the date thereof and the results of the operations and cash flows of the Borrower and its Consolidated Subsidiaries on a consolidated and consolidating basis during the periods set forth therein, in accordance with GAAP[, subject to year-end adjustments and the omission of footnotes,] and the undersigned has reviewed the terms of the Credit Agreement and the other Loan Documents, and has made, or caused to be made under my supervision, a review of the transactions and financial condition of the Borrower during the fiscal period covered by such financial statements.

Each capitalized term used but not defined herein shall have the meaning assigned to such term in the Credit Agreement.

Very truly yours,

_____

Name:
Title:

# EXHIBIT B

## WAYZATA AMENDED AND RESTATED CREDIT AGREEMENT

B-2
US 294577v.3

# AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

_____ __, 2010

among

## SARATOGA RESOURCES, INC.,
as Borrower,

the Guarantors,

and

## WAYZATA INVESTMENT PARTNERS LLC,
individually and as Administrative Agent,

and

## THE LENDERS FROM TIME TO TIME PARTY HERETO

## WAYZATA INVESTMENT PARTNERS LLC,
as Lead Arranger and Sole Book Runner

269884
#4672668v8_NO_ - Second Lien Credit Agreement - Se DOC

# TABLE OF CONTENTS

**ARTICLE I**     **DEFINITIONS** .......................................................................................... 1

    1.1     Definitions ...................................................................................... 1

    1.2     Accounting Terms and Determinations; Changes in Accounting ...................... 24

    1.3     References ...................................................................................... 24

**ARTICLE II**     **TERMS OF FACILITIES** ........................................................................... 25

    2.1     Continuation of Loans ...................................................................... 25

    2.2     [Reserved] ...................................................................................... 25

    2.3     [Reserved] ...................................................................................... 25

    2.4     Repayment of Loans; Evidence of Debt ................................................. 25

    2.5     Interest Rate ................................................................................... 26

    2.6     [Reserved] ...................................................................................... 26

    2.7     [Reserved] ...................................................................................... 26

    2.8     Maturity of Loans ............................................................................ 26

**ARTICLE III**     **GENERAL PROVISIONS** ......................................................................... 27

    3.1     General Provisions as to Payments and Loans ........................................ 27

    3.2     Computation of Interest .................................................................... 27

    3.3     Default Interest ............................................................................... 27

    3.4     Repayments and Prepayments; Application ............................................ 27

    3.5     Limitation Period ............................................................................. 28

    3.6     Telephonic Notices .......................................................................... 29

**ARTICLE IV**     **COLLATERAL** ....................................................................................... 29

    4.1     Security .......................................................................................... 30

    4.2     Financing Statements ....................................................................... 31

    4.3     Covenants Relating to Certain Collateral .............................................. 31

**ARTICLE V**     **CONDITIONS PRECEDENT** ..................................................................... 32

    5.1     Conditions Precedent ....................................................................... 32

**ARTICLE VI**     **REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES** ............................................................................................. 33

    6.1     Existence and Power ........................................................................ 34

    6.2     Corporate and Governmental Authorization; Contravention ...................... 34

    6.3     Binding Effect ................................................................................. 34

    6.4     Subsidiaries .................................................................................... 34

i

| | | |
|---|---|---|
| 6.5 | Disclosure | 34 |
| 6.6 | Financial Information | 35 |
| 6.7 | Litigation | 35 |
| 6.8 | ERISA Plans | 35 |
| 6.9 | Taxes and Filing of Tax Returns | 35 |
| 6.10 | Title to Properties; Liens; Environmental Liability. | 36 |
| 6.11 | Business; Compliance | 37 |
| 6.12 | Licenses, Permits, Etc | 37 |
| 6.13 | Compliance with Law | 37 |
| 6.14 | Investment Company Act | 37 |
| 6.15 | Refunds; Certain Contracts. | 37 |
| 6.16 | Deposit Accounts; Securities Accounts | 38 |
| 6.17 | No Default | 38 |
| 6.18 | Mortgaged Property | 38 |
| 6.19 | [Reserved]. | 38 |
| 6.20 | Call on Production | 39 |
| 6.21 | Payment of Royalties | 39 |
| 6.22 | Wells | 39 |
| 6.23 | Leases | 39 |
| 6.24 | Accounts Payable | 39 |
| 6.25 | Farm-out Agreements | 39 |
| **ARTICLE VII** | **COVENANTS** | **39** |
| 7.1 | Use of Proceeds | 39 |
| 7.2 | Financial Statements; Reserve Reports; Compliance Certificates; Certain Notice; Additional Information | 39 |
| 7.3 | Inspection of Properties and Books | 44 |
| 7.4 | Maintenance of Security; Insurance; Operating Accounts; Transfer Orders | 44 |
| 7.5 | Payment of Taxes and Claims | 46 |
| 7.6 | Payment of Debt; Additional Debt; Payment of Accounts. | 46 |
| 7.7 | Negative Pledge | 47 |
| 7.8 | Loans and Advances to Others; Investments; Restricted Payments. | 47 |

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document   Pg 78 of 183

| 7.9 | Consolidation, Merger, Maintenance, Change of Control; Disposition of Property; Restrictive Agreements; Hedging Agreements; Modification of Organizational Documents.................................................................................. 47 |
|---|---|
| 7.10 | Primary Business; Location of Borrower's Office; Ownership of Assets........... 49 |
| 7.11 | Operation of Properties and Equipment; Compliance with and Maintenance of Contracts; Duties as Non-Operator. .......................................... 49 |
| 7.12 | Transactions with Affiliates.................................................................................. 50 |
| 7.13 | Plans...................................................................................................................... 50 |
| 7.14 | Compliance with Laws and Documents ................................................................ 50 |
| 7.15 | Certain Financial Covenants. ............................................................................... 50 |
| 7.16 | Tax Shelter........................................................................................................... 52 |
| 7.17 | Additional Documents; Quantity of Documents; Title Data; Additional Information. .......................................................................................................... 52 |
| 7.18 | Subsidiaries.......................................................................................................... 53 |
| 7.19 | Mortgaged Property. ............................................................................................ 54 |
| 7.20 | Farm-Out Agreements ......................................................................................... 55 |
| 7.21 | Exceptions to Covenants...................................................................................... 55 |
| **ARTICLE VIII** | **DEFAULTS; REMEDIES**.......................................................................... **55** |
| 8.1 | Events of Default; Acceleration of Maturity ....................................................... 55 |
| 8.2 | Suits for Enforcement .......................................................................................... 57 |
| 8.3 | Remedies Cumulative ........................................................................................... 58 |
| 8.4 | Remedies Not Waived .......................................................................................... 58 |
| **ARTICLE IX** | **GUARANTEE**............................................................................................ **58** |
| 9.1 | Guarantee. ............................................................................................................ 58 |
| 9.2 | No Subrogation .................................................................................................... 59 |
| 9.3 | Amendments, etc. with respect to the Obligations ............................................. 59 |
| 9.4 | Guarantees Absolute and Unconditional .............................................................. 59 |
| 9.5 | Reinstatement....................................................................................................... 60 |
| 9.6 | Additional Guarantors.......................................................................................... 60 |
| **ARTICLE X** | **MISCELLANEOUS** ................................................................................. **61** |
| 10.1 | Amendments and Waivers .................................................................................... 61 |
| 10.2 | Compliance with Laws ......................................................................................... 61 |
| 10.3 | INDEMNITY......................................................................................................... 62 |
| 10.4 | Expenses. .............................................................................................................. 63 |

iii

| | | |
|---|---|---|
| 10.5 | Survival | 64 |
| 10.6 | Applicable Law; Venue; Waiver of Jury Trial. | 64 |
| 10.7 | Invalid Provisions, Severability | 65 |
| 10.8 | ENVIRONMENTAL INDEMNIFICATION | 65 |
| 10.9 | Communications Via Internet | 66 |
| 10.10 | USA Patriot Act Notice Public Material | 67 |
| 10.11 | EXCULPATION PROVISIONS | 67 |
| 10.12 | Increased Cost and Reduced Return. | 68 |
| 10.13 | Taxes. | 69 |
| 10.14 | Collateral Matters; Hedging Agreements | 71 |
| 10.15 | Intercreditor Agreement; Loan Documents | 71 |
| 10.16 | Arranger and other Agents | 72 |
| 10.17 | Ratification of Loan Documents | 72 |

**ARTICLE XI AGENTS** .......................................................... **72**

| | | |
|---|---|---|
| 11.1 | Appointment | 72 |
| 11.2 | Powers of the Agents | 72 |
| 11.3 | General Immunity | 72 |
| 11.4 | No Responsibility for Loans, Recitals, etc. | 73 |
| 11.5 | Action on Instructions of Lenders | 73 |
| 11.6 | Employment of Agents and Counsel | 73 |
| 11.7 | Reliance on Documents, Counsel | 73 |
| 11.8 | Reimbursement and Indemnification of Agents | 73 |
| 11.9 | Rights as a Lender | 74 |
| 11.10 | Lender Credit Decision | 74 |
| 11.11 | Successor Agent | 74 |
| 11.12 | Applicable Parties | 75 |

**ARTICLE XII SET-OFF; RATABLE TREATMENTS** ................................ **75**

| | | |
|---|---|---|
| 12.1 | Set-off | 75 |
| 12.2 | Ratable Treatments; Adjustments. | 75 |

**ARTICLE XIII BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS** ...................................................... **76**

| | | |
|---|---|---|
| 13.1 | Successors and Assigns | 76 |
| 13.2 | Participations; Voting Rights; Set-offs by Participants. | 77 |

iv

| | 13.3 | Assignments. | 77 |
|---|---|---|---|
| | 13.4 | Dissemination of Information | 78 |
| | 13.5 | Tax Treatment | 78 |
| | 13.6 | Disclosure of Information | 78 |
| **ARTICLE XIV** | | **NOTICES** | **79** |
| | 14.1 | Notices | 79 |
| | 14.2 | Change of Address | 79 |
| **ARTICLE XV** | | **COUNTERPARTS** | **79** |
| | 15.1 | Counterparts | 79 |
| | 15.2 | ENTIRE AGREEMENT | 79 |

## ANNEXES; SCHEDULES; EXHIBITS

| | | |
|---|---|---|
| Schedule 1 | - | Loans; Percentage Share |
| Schedule 1.1 | - | Existing Hedges |
| Schedule 1.3 | - | Hydrocarbon Purchasers |
| Schedule 5.1.18 | - | Exceptions to Representations and Warranties |
| Schedule 6.4 | - | Subsidiaries |
| Schedule 6.7 | - | Litigation |
| Schedule 6.9 | - | Outstanding Taxes |
| Schedule 6.10 | - | Oil and Gas Properties |
| Schedule 6.16 | - | Deposit Accounts; Securities Accounts |
| Schedule 6.18 | - | Royalties and Severance Taxes |
| Schedule 6.22 | - | Wells |
| Schedule 6.23 | - | Leases |
| Schedule 6.24 | - | Accounts Payable |
| Schedule 6.26 | - | Farm-out Agreements |
| Schedule 7.4 | - | Insurance |
| | | |
| Exhibit A | - | Form of Assignment and Assumption |
| Exhibit B | - | Form of Compliance Certificate |
| Exhibit C | - | Form of New Warrant |
| Exhibit D | - | **[RESERVED]** |
| Exhibit E | - | Form of Assumption Agreement |
| Exhibit F | - | Form of Note |
| Exhibit G | - | Form of Mortgage |
| Exhibit H | - | Form of Pledge Agreement |
| Exhibit I | - | Form of Security Agreement |
| Exhibit J | - | **[RESERVED]** |
| Exhibit K | - | **[RESERVED]** |
| Exhibit L | - | Form of Deposit Account Control Agreement |
| Exhibit M | - | Form of Amendment to Mortgage |

# AMENDED AND RESTATED CREDIT AGREEMENT

**THIS AMENDED AND RESTATED CREDIT AGREEMENT** is entered into as of
_____ \_\_, 2010, by and among **SARATOGA RESOURCES, INC.**, a Texas corporation,
as the Borrower, the Guarantors (as herein defined), the Lenders from time to time party hereto,
and **WAYZATA INVESTMENT PARTNERS LLC**, a Delaware limited liability company, as
Administrative Agent.  Certain terms used herein are defined in <u>Section 1.1</u>

## RECITALS:

WHEREAS, the Borrower, the Guarantors, the Lenders and the Administrative Agent
entered into that certain Credit Agreement dated as of July 14, 2008 (the "<u>Existing Credit
Agreement</u>"), pursuant to which the Lenders made term loans to the Borrower in the original
principal amount of $97,500,000.  As of the Effective Date, the total amount owing from the
Borrower to the Administrative Agent and the Lenders, inclusive of interest and expenses, under
the Existing Credit Agreement is $127,500,000 (the "<u>Existing Debt</u>").

WHEREAS, the Borrower and the Guarantors filed voluntary petitions for relief under
Chapter 11, Title 11, United States Code, on March 31, 2009, in the United States Bankruptcy
Court for the Western District of Louisiana, which cases are being jointly administered under
Case No. 09-50397 (the "<u>Chapter 11 Case</u>").

WHEREAS, the Borrower and the Guarantors have filed the Third Amended Plan of
Reorganization as Jointly Proposed by the Debtors, Macquarie Americas Corp., and the Official
Committee of Equity Security Holders (as Modified as of March 31, 2010) (as such plan may be
modified or amended from time to time, the "<u>Plan of Reorganization</u>") in the Chapter 11 Case
pursuant to which, among other things, the Existing Debt will be ratified, modified and
continued as the Loans under this Agreement.

WHEREAS, the parties desire to amend and restate the Existing Credit Agreement in its
entirety in order to reflect the foregoing arrangements.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for
other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the
parties agree to amend and restate the Existing Credit Agreement in its entirety as follows:

## ARTICLE I

## DEFINITIONS

1.1     *Definitions*.  The following terms, as used herein, have the following meanings:

"**Acceptable Commodity Hedging Agreements**" means Commodity Hedging
Agreements meeting all the following criteria:

(i)     The notional quantity of Crude Oil and Natural Gas subject to Commodity
Hedging Agreements by the Borrower and its Subsidiaries, at the time of entering into such
Commodity Hedging Agreements, shall not be, without the prior written approval of the

- 1 -

Required Lenders, greater than 60% of the projected monthly production of Crude Oil or greater than 60% of the projected monthly production of Natural Gas (as applicable) for a period not exceeding the Final Maturity Date from the Proved Developed Producing Oil and Gas Properties of the Borrower and its Subsidiaries as determined by the Administrative Agent based on the most recent Reserve Report;

        (ii)     Any counterparty must be an Approved Counterparty;

        (iii)    The Commodity Hedging Agreement shall not contain any anti-assignment provisions restricting the Borrower or its Subsidiaries or if such Commodity Hedging Agreement contains anti-assignment provisions which cannot be removed, such provisions shall be modified to read substantially as follows: "The interest and obligations arising from this agreement are non-transferable and non-assignable, *except that* [name of Person] may assign and grant a security interest in its rights and interests hereunder to a contractual collateral agent for itself and certain other lenders (collectively, "Lenders") as security for present and future obligations of [name of Person] to the Lenders. Until hedge provider is notified in writing by such collateral agent, to pay to such collateral agent, amounts due [name of Person] hereunder, hedge provider may continue to make such payments to [name of Person].";

        (iv)    The Administrative Agent shall have received for the benefit of the Lenders first and prior perfected security interests (subject only to Liens securing the Debt under the Revolving Credit Facility) pursuant to security agreements in form and substance reasonably satisfactory to the Administrative Agent in the right, title and interest of such Person in and to the Commodity Hedging Agreements of such Person;

        (v)    Neither the Borrower nor any of its Subsidiaries will sell any calls other than calls corresponding to an existing permitted collar already executed or being executed in conjunction with such purchased call;

        (vi)    The Commodity Hedging Agreement is entered into in the ordinary course of business for the purpose of protecting against fluctuations in commodity prices or commodity basis risk and not for purposes of speculation; and

        (vii)   The Commodity Hedging Agreement shall be unsecured (except to the extent permitted under clause (n)(i) of the definition of "Permitted Liens").

"**Accounts**" means, with respect to any Person, all of such Person's accounts, as such term is defined in the UCC.

"**Act**" is defined in Section 10.10.

"**Administrative Agent**" means Wayzata Investment Partners LLC, in its capacity as contractual representative of the Lenders pursuant to Article XI, and not in its individual capacity as a Lender, and any successor Administrative Agent appointed pursuant to Article XI.

"**Administrative Questionnaire**" means, with respect to each Lender, an administrative detail reply form, if any, prepared by the Administrative Agent and completed and submitted by such Lender to the Administrative Agent.

- 2 -

"**Affiliate**" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. Without limiting the previous sentence, the term "Affiliate" also includes any Affiliate as defined under the Revolving Credit Agreement.

"**Agents**" means the Administrative Agent and any other "agent" appointed under the Loan Documents.

"**Agreement**" or "**Credit Agreement**" means this Amended and Restated Credit Agreement, as the same may hereafter be amended, restated, amended and restated, supplemented or modified from time to time.

"**Annualized EBITDA**" means (a) for the quarter ending June 30, 2010, the product of 4 times the Borrower's EBITDA for the three months ending June 30, 2010, (b) for the quarter ending September 30, 2010, the product of 2 times the Borrower's EBITDA for the six months ending September 30, 2010, (c) for the quarter ending December 31, 2010, the product of 4/3 times the Borrower's EBITDA for the nine months ending December 31, 2010, and (d) for any quarter ending thereafter, the Borrower's EBITDA for the twelve month period ending on the last day of such quarter.

"**Applicable Rate**" means 11.25% per annum.

"**Approved Counterparties**" means (a) any of JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., Goldman Sachs & Co. and any of their respective Affiliates, provided, that, at the time of entering into any Hedging Agreement such person has a credit rating of "A3" or higher from Moody's or "A-" or higher from S&P, or (b) a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender.

"**Approved Engineer**" means Collarini & Associates, or any other independent petroleum engineer mutually satisfactory to the Administrative Agent and the Borrower.

"**Approved Fund**" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 13.3), and accepted by the Administrative Agent, in substantially the form attached hereto as Exhibit A or any other form approved by the Administrative Agent.

"**Assumption Agreement**" means an Assumption Agreement, substantially in the form attached hereto as Exhibit E, executed by a Responsible Representative of the newly formed Subsidiary and furnished to the Administrative Agent from time to time in accordance with Section 7.18.2.

- 3 -

"**Authorized Officer**" means a Responsible Representative and any other Person designated and properly authorized to request Loans.

"**Benefited Lender**" is defined in Section 12.2.3.

"**Borrower**" means Saratoga Resources, Inc., a Texas corporation.

"**Borrower Materials**" is defined in Section 10.10.

"**Budget**" means for any period (a) a cash flow statement for the Borrower and its Subsidiaries describing the projected cash flow for such period on a month-by-month basis, including all line item categories, line item and cumulative amounts, details and a statement of underlying assumptions and estimates comparable in scope to that contained in the cash flow projections delivered to the Administrative Agent under the Existing Credit Agreement and (b) a development plan for such period identifying the projected capital expenditures on a project-by-project basis.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York, are authorized or required by law to remain closed.

"**Capital Expenditures**" means, as of any date for the applicable period then ended, all capital expenditures of any Person for such period, as determined in accordance with GAAP.

"**Capitalized Lease Liabilities**" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"**Change of Control Event**" means the occurrence of one or more of the following events:

(a)     Any direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one transaction or a series of related transactions, of all or substantially all of the properties or assets of the Borrower (determined on a consolidated basis for the Borrower and its Subsidiaries) to any Person or group of related Persons for purposes of Section 13(d) of the Securities Exchange Act of 1934, as amended (a "Group");

(b)     The Borrower consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, the Borrower, in any such event pursuant to a transaction in which any outstanding Equity Interests of the Borrower or such other Person are converted into or exchanged for cash, securities or other property, other than any such transaction where the Equity Interests of the Borrower outstanding immediately prior to such transaction constitute, or are converted into or exchanged for, Equity Interests of the surviving or transferee Person that represent a majority of the total voting power of the outstanding Equity

- 4 -

Interests of such surviving or transferee Person (immediately after giving effect to such transaction);

(c)     the approval of the holders of Equity Interests of the Borrower of any plan or proposal for the liquidation, winding up or dissolution of the Borrower;

(d)     the consummation of any transaction (including any merger or consolidation) the result of which is that any Person or Group, other than any Permitted Holder, is or becomes the beneficial owner, directly or indirectly, in the aggregate of more than 40% of the total voting power of the Equity Interests of the Borrower; or

(e)     individuals who on the date hereof constituted the board of directors of the Borrower (together with any new directors whose election by such board of directors or whose nomination for election by the stockholders of the Borrower was approved pursuant to a vote of a majority of the directors then still in office who were either directors on the date hereof or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the board of directors then in office.

"**Claims**" is defined in Section 10.8.

"**Collateral**" means the Property pledged to the Administrative Agent or to the Administrative Agent for the benefit of the Administrative Agent and the Lenders (or to the Lenders directly) as security for the Loans and the other Obligations.

"**Collateral Value**" means, with respect to any Oil and Gas Property, the positive dollar amount which such Oil and Gas Property contributed to the most recently determined Borrowing Base (as defined in the Revolving Credit Agreement).

"**Commodity Hedging Agreements**" means any swap agreement, cap, floor, collar, exchange transaction, forward agreement, or other exchange or protection agreement relating to Hydrocarbons or any option with respect to any such transaction, including any derivative financial instruments.

"**Compliance Certificate**" means a certificate, substantially in the form attached hereto as Exhibit B, executed by a Responsible Representative of the Borrower and furnished to the Administrative Agent for the benefit of the Lenders from time to time in accordance with Section 7.2.

"**Confirmation Order**" has the meaning given to such term in Section 5.1.1.

"**Consolidated Subsidiaries**" means as to the Borrower at any date, each Guarantor and any other Subsidiary of the Borrower, the accounts of which would be consolidated with those of the Borrower in its consolidated financial statements if such statements were prepared as of such date.

"**Contingent Liability**" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or

otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Debt of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Equity Interests of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"**Control**," "**Controlling**" and "**Controlled by**" mean the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by contract or otherwise.

"**Controlled Group**" means all members of a controlled group of Persons and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower or any of its Subsidiaries, are treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended.

"**Covered Properties**" is defined in Section 7.2.2(e).

"**Crude Oil**" means all crude oil, condensate and other liquid hydrocarbon substances.

"**Current Assets**" of any Person means, at any date, the current assets of the Borrower and its Consolidated Subsidiaries. For the avoidance of doubt, Current Assets shall exclude any non-cash amounts (and deferred taxes relating thereto) arising from marked to market adjustments under Hedging Agreements as a result of the application of GAAP.

"**Current Liabilities**" of any Person means, at any date, the current liabilities of the Borrower and its Consolidated Subsidiaries, excluding (a) the current portion of the loans and letters of credit outstanding under the Revolving Credit Agreement, the Loans hereunder, and Plan of Reorganization Debt, and (b) for the fiscal quarters beginning April 1, 2010 and July 1, 2010, liabilities for restructuring expenses not to exceed $4,000,000 in the aggregate associated with the Chapter 11 Case. For the avoidance of doubt, Current Liabilities shall exclude any non-cash amounts (and deferred taxes relating thereto) arising from marked to market adjustments under Hedging Agreements as a result of the application of GAAP.

"**Debt**" of any Person means at any date, without duplication:

(a)     all obligations of such Person for borrowed money, including, without limitation, (i) the obligations of such Person for money borrowed by a partnership of which such Person is a general partner, (ii) obligations, whether or not assumed, which are secured in whole or in part by the Property of such Person or payable out of the proceeds or production from Property of such Person, and (iii) any obligations of such Person in respect of letters of credit and repurchase agreements;

(b)     all obligations of such Person evidenced by notes, debentures, bonds or similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of Property or services (except trade accounts arising in the ordinary course of business if interest is not paid or

- 6 -

accrued thereon by such Person) including obligations to pay for goods and services whether or not received or utilized, provided that the obligation of such Person to pay under property earn-in agreements shall not constitute Debt except to the extent such property is so earned;

     (d)     all Capitalized Lease Liabilities;

     (e)     all liabilities which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet and are payable more than one year from the date of creation or incurrence thereof;

     (f)     all net obligations of such Person under Hedging Agreements;

     (g)     all Guarantees by such Person of obligations of another Person;

     (h)     obligations of such Person arising under Synthetic Leases;

     (i)     all Contingent Liabilities of such Person; and

     (j)     all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

"**Default**" means the occurrence of an Event of Default or any event which with notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Default Rate**" is defined in Section 3.3.

"**Deposit Account**" has the meaning ascribed to it in the UCC.

"**Deposit Account Control Agreement**" means a Deposit Account Control Agreement, dated as of or prior to the Effective Date or otherwise delivered pursuant to the Loan Documents, between the Administrative Agent, the Revolving Credit Agent, the Borrower and each Guarantor, as applicable, and the applicable depository bank, substantially in the form of Exhibit L or such other form as the depository bank may require and acceptable to Administrative Agent in its reasonable discretion, and covering the Deposit Accounts (other than the Site Specific Trust Accounts) and Securities Accounts described on Schedule 6.16, as amended, restated, restated and amended, supplemented or otherwise modified from time to time in accordance with the Loan Documents. The term "Deposit Account Control Agreements" shall include each and every Deposit Account Control Agreement executed and delivered pursuant to the Loan Documents.

"**Development Program Expenditures**" of any Person means, as of any date of determination during the applicable fiscal year, expenditures for the development of the Loan Parties' and their respective Subsidiaries' Leases and Wells of the nature requiring an authorization for such expenditure, including all Capital Expenditures and all other development expenses made by such Person during such fiscal year.

"**Dollars**" and "**$**" mean dollars in lawful currency of the United States of America.

"**EBITDA**" means, for any applicable period and with the respect to the Borrower and its Consolidated Subsidiaries, the sum of (a) Net Income, plus (b) to the extent deducted in determining Net Income, the sum of (i) amounts attributable to amortization, depletion and depreciation of assets, (ii) income tax expense, and (iii) Interest Expense for such period; provided, that for the quarters ending June 30, 2010 and September 30, 2010 only, an add back for restructuring expenses associated with the Chapter 11 Case not to exceed $4,000,000 in the aggregate will be permitted.

"**Effective Date**" means the date on which the conditions specified in Section 5.1 are satisfied (or waived in accordance with Section 10.1).

"**Eligible Assignee**" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) a Person which is consented to as an Eligible Assignee by Administrative Agent.

"**Environmental Laws**" means (a) the following federal laws as they may be cited, referenced, and amended from time to time: the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Endangered Species Act, the Resource Conservation and Recovery Act, the Hazardous Materials Transportation Act, the Superfund Amendments and Reauthorization Act, the Occupational Safety and Health Act, and the Toxic Substances Control Act; (b) any and all equivalent environmental statutes of any state in which Property of the Borrower or any of its Subsidiaries is situated, as they may be cited, referenced, and amended from time to time; (c) any rules or regulations promulgated under or adopted pursuant to the above federal and state laws; and (d) any other equivalent federal, state, or local statute or any requirement, rule, regulation, code, ordinance, or order adopted pursuant thereto, including, without limitation, those relating to the generation, transportation, treatment, storage, recycling, disposal, handling, or release of Hazardous Substances.

"**Environmental Liability**" means any claim, demand, obligation, cause of action, accusation, allegation, order, violation, damage, injury, judgment, liability, responsibility, suit, loss, penalty or fine, cost of enforcement, cost of remedial action or any other cost or expense whatsoever, including reasonable attorneys' fees and disbursements, resulting from the violation or alleged violation of any Environmental Law or the imposition of any Environmental Lien.

"**Environmental Lien**" means a Lien in favor of a Governmental Authority or other Person (a) for any liability under an Environmental Law or (b) for damages arising from or costs incurred by such Governmental Authority or other Person in response to a release or threatened release of hazardous or toxic waste, substance or constituent into the environment.

"**Equity Interests**" means, with respect to any Person, ownership and other equity interests in such Person and rights to convert into ownership or other equity interests in such Person or to otherwise acquire ownership or other equity interests in such Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, together with all presently effective and future regulations issued pursuant thereto.

- 8 -

"**ERISA Affiliate**" means the Borrower, the Guarantors, any other Subsidiaries of the Borrower, and any other member of the Controlled Group.

"**Event of Default**" has the meaning stated in <u>Section 8.1</u> hereof.

"**Excess Cash Flow**" means, for the Borrower and its Subsidiaries determined on a consolidated basis for any fiscal year beginning with the year in which the Plan of Reorganization Debt (other than Debt to holders of Allowed Claims in Class 7 (as those terms are defined in the Plan of Reorganization) pursuant to the terms of the Plan of Reorganization) is paid in full, (a) EBITDA for such fiscal year minus (b) the sum of (i) Interest Expense for such fiscal year, (ii) prepayments or repayments made in such fiscal year of Loans, Plan of Reorganization Debt, and, to the extent of a permanent reduction of the commitments in respect thereof, loans under the Revolving Credit Agreement, (iii) Taxes paid in cash during such fiscal year and (iv) Development Program Expenditures made during such fiscal year in accordance with <u>Section 7.15.5</u>.

"**Existing Credit Agreement**" has the meaning given to such term in the Recitals.

"**Federal Funds Effective Rate**" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Final Maturity Date**" or "**Final Maturity**" means April 30, 2012, or such earlier date on which the maturity of the Loans is accelerated.

"**Financial Forecast**" means a cash flow sources and uses forecast for the then calendar year, and the immediately succeeding calendar year, substantially in the form of the forecast prepared by the Borrower and delivered to the Administrative Agent on or about the date hereof.

"**GAAP**" means those generally accepted accounting principles and practices which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board or by the Financial Accounting Standards Board or through other appropriate boards or committees thereof. Any accounting principle or practice required to be changed by the Accounting Principles Board or Financial Accounting Standards Board (or other appropriate board or committee of such Boards) in order to continue as a generally accepted accounting principle or practice may be so changed. In the event of a change in GAAP, the Loan Documents shall continue to be construed in accordance with GAAP as in existence on the date hereof.

"**General Intangibles**" means, with respect to any Person, all of such Person's general intangibles, as such term is defined in the UCC.

"**Governmental Authority**" means any nation, country, commonwealth, territory, government, state, county, parish, municipality, or other political subdivision and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"**Guarantee**" or "**guaranty**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing or in effect guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, to make reimbursement in connection with any letter of credit or to maintain financial statement conditions, by "comfort letter" or other similar undertaking of support or otherwise) or (b) entered into for the purpose of assuring in any other manner the payment of such Debt or other obligation or to protect the obligee against loss in respect thereof (in whole or in part). The term "Guarantee" or "guaranty" includes the pledging or other encumbrance of assets by a Person to secure the obligations of another Person and restrictions or limitations on a Person or its assets agreed to in connection with the obligations of another Person, but does not include endorsements for collection or deposit in the ordinary course of business; and "Guaranteed" or "guarantied" by a Person means the act or condition of providing a Guarantee by such Person or permitting a Guarantee of such Person to exist.

"**Guarantors**" means each of: HOG, THG, Lobo Operating and Lobo Resources or any other Subsidiary of the Borrower which complies with the requirements of <u>Section 7.18.2</u>.

"**Hazardous Substances**" means (a) any "hazardous substance," as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("<u>CERCLA</u>"); (b) any "hazardous waste," as defined by the Resource Conservation and Recovery Act, as amended; (c) any petroleum or petroleum product (including Hydrocarbons); or (d) any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any applicable Environmental Law, including any applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended or hereafter amended.

"**Hedge Termination Value**" means, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in <u>clause (a)</u> preceding, the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined by the counterparties to such Hedging Agreements in accordance therewith.

"**Hedging Agreement**" means a Commodity Hedging Agreement or an agreement for a Rate Management Transaction.

"**Highest Lawful Rate**" means, as to any Lender, the maximum non-usurious interest rate, if any (or, if the context so requires, an amount calculated at such rate), that at any time or

- 10 -

from time to time may be contracted for, taken, reserved, charged, or received by such Lender under applicable laws with respect to an obligation, as such laws are presently in effect or, to the extent allowed by applicable law, as such laws may hereafter be in effect and which allow a higher maximum non-usurious interest rate than such laws now allow.

"**HOG**" means Harvest Oil & Gas, LLC, a Louisiana limited liability company.

"**Hydrocarbons**" means all Crude Oil and Natural Gas.

"**Hydrocarbon Purchasers**" means all Persons, including those Persons listed on Schedule 1.3 or otherwise approved in writing by the Administrative Agent, who purchase Hydrocarbons attributable or allocable to the Mortgaged Properties.

"**Indemnified Parties**" has the meaning given such term in Section 10.8.

"**Initial Reserve Report**" means the Society of Petroleum Engineers-case reserve report concerning Oil and Gas Properties of the Loan Parties prepared by the Approved Engineer as of January 1, 2010.

"**Insolvency Proceeding**" of any Person means application (whether voluntary or instituted by another Person) for or the consent to the appointment of a receiver, trustee, conservator, custodian, or liquidator of such Person or of all or a substantial part of the Property of such Person, or the filing of a petition (whether voluntary or instituted by another Person) commencing a case under Title 11 of the United States Code, seeking liquidation, reorganization, or rearrangement or taking advantage of any bankruptcy, insolvency, debtor's relief, or other similar law of the United States, the State of New York, or any other jurisdiction.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of July 14, 2008, by and among the Borrower, each Guarantor, the Administrative Agent on behalf of the Lenders and Revolving Credit Agent on behalf of the Revolving Credit Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time by the parties thereto.

"**Interest Expense**" means, for any applicable period, the aggregate cash interest expense accrued (net of interest income accrued during such period of the Borrower and its Subsidiaries) of the Borrower and its Subsidiaries for such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense.

"**Interest Payment Date**" means the last day of each calendar month; provided that interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Final Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

"**Inventory**" means, with respect to any Person, all of such Person's inventory, as such term is defined in the UCC, in all of its forms, and wherever located, together with all accessions or additions thereto and products thereof.

- 11 -

"**Investment**" means, as to any Person, the acquisition or holding of any stock, bond, note, or other evidence of Debt, partnership interest or any other Security (other than current trade and customer accounts) of another Person. For the avoidance of doubt, automatic investments by a depository bank in overnight investment accounts shall not be deemed to be an "Investment" for purposes of this Agreement.

"**Lease**" or "**Leases**" means, whether one or more, (a) those certain oil and gas leases described or referred to in Schedule 6.10 hereto, and any other interests in such or any other oil and gas leases, whether now owned or hereafter acquired by Borrower, any Guarantor or any of their Subsidiaries, and any extension, renewals, corrections, modifications, elections or amendments (such as those relating to unitization) of any such lease or leases, or (b) other oil, gas and/or mineral leases or other interests pertaining to the Oil and Gas Properties of the Borrower or any of its Subsidiaries, whether now owned or later acquired, which may now and hereafter be made subject to the lien of any of the Security Documents and any extension, renewals, corrections, modifications, elections or amendments (such as those relating to unitization) of any such lease or leases.

"**Lenders**" means the financial institutions listed on the signature pages of this Agreement and their respective successors and permitted assigns.

"**Lending Installation**" means, with respect to a Lender or the Administrative Agent, the office, branch, subsidiary or affiliate of such Lender or the Administrative Agent listed on the signature pages hereof or on a Schedule or otherwise selected by such Lender or the Administrative Agent pursuant to the provisions hereof.

"**Lien**" means, as to any Property of any Person, (a) any mortgage, deed of trust, lien, pledge, hypothecation, or security interest in, on or of such Property, or any other charge or encumbrance on any such asset to secure Debt or liabilities, but excluding any right to netting or set-off, (b) the interest of a vendor under any conditional sale agreement or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Property, (c) any lien deemed to be associated with Capitalized Lease Liabilities, and (d) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Limitation Period**" means, with respect to any Lender, any period while any amount remains owing on any Obligation payable to such Lender when interest on such amount, calculated at the applicable interest rate plus any fees or other sums payable to such Lender under any Loan Document and deemed to be interest under applicable law, would exceed the amount of interest which would accrue at the Highest Lawful Rate.

"**Loan**" means, with respect to a Lender, that portion of the Existing Debt which is owing by the Borrower to such Lender and is being ratified, modified and continued hereunder, and "**Loans**" means the Existing Debt owing by the Borrower to all Lenders and being ratified, modified and continued hereunder.

"**Loan Documents**" means, collectively, this Agreement, any Notes, the Intercreditor Agreement, each Security Document, and each other agreement, certificate, document or

- 12 -

instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"**Loan Parties**" means the Borrower and the Guarantors.

"**Lobo Operating**" means Lobo Operating, Inc., a Texas corporation.

"**Lobo Resources**" means Lobo Resources, Inc., a Texas corporation.

"**Margin Regulations**" means Regulations T, U and X of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Material Adverse Effect**" means for the Borrower and its Subsidiaries, with the exception of the Chapter 11 Case, any material adverse effect on (a) the business, operations, properties, results of operations, condition (financial or otherwise), or prospects of the Borrower, the Guarantors and their Subsidiaries, taken as a whole, (b) the Borrower's, or any Guarantor's ability to pay any of the Obligations as and when due, (c) the Collateral or the priority or enforceability of the Liens securing the Obligations hereunder, (d) the ability of the Borrower, any Guarantor or any of their Subsidiaries to perform any of its obligations under any Loan Documents, or (e) the rights and remedies of or benefits available under any Loan Document.

"**Material Agreement**" means, with respect to any Person, any written or oral agreement, contract, commitment, or understanding to which such Person is a party, by which such Person is directly or indirectly bound, or to which any Property of such Person may be subject, which is material to the business or operations of such Person and is not cancelable by such Person upon notice of 90 days or less without (a) liability for further payment in excess of $500,000 or (b) forfeiture of Property having an aggregate value in excess of $500,000.

"**Material Debt**" means, as to any Person, Debt (other than the Obligations hereunder) of such Person aggregating in excess of $500,000. For purposes of determining Material Debt, the "principal amount" of the obligations of the Borrower and its Subsidiaries in respect of any Hedging Agreement at any time shall be the Hedge Termination Value.

"**Mortgaged Property**" and "**Mortgaged Properties**" mean any Oil and Gas Property with respect to which a Lien is granted pursuant to a Mortgage in favor of the Lenders (or in favor of the Administrative Agent for the benefit of the Lenders).

"**Mortgages**" means (a) any Act of Mortgage, Assignment of Production and As-Extracted Collateral, Security Agreement and Financing Statement (i) dated as of July 14, 2008 or (ii) otherwise delivered pursuant to the Loan Documents, in substantially the form of Exhibit G, executed and delivered by Borrower, any Subsidiary or any other appropriate Person, pursuant to which the Administrative Agent is granted a Lien on the collateral for the benefit of the Lenders, or (b) any Deed of Trust, Mortgage, Assignment of Production, Security Agreement and Financing Statement (i) dated as of July 14, 2008 or (ii) otherwise delivered pursuant to the Loan Documents, in substantially the form of Exhibit G, (appropriately modified for the state in which the deed of trust properties are located), executed and delivered by Borrower, any Subsidiary or any other appropriate Person, pursuant to which the Administrative Agent is granted a Lien on the collateral for the benefit of the Lenders, as amended, restated, amended

- 13 -

and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement and the other Loan Documents. The term "Mortgage" shall include each mortgage supplement after execution and delivery of such mortgage supplement. The term "Mortgages" shall include each and every Mortgage executed and delivered by each of Borrower, any Guarantor and any of their Subsidiaries.

"**Multiemployer Plan**" means a Plan maintained pursuant to a collective bargaining agreement or any other arrangement to which more than one employer is obligated to make contributions and which is subject to Title IV of ERISA.

"**Natural Gas**" means all natural gas, and any natural gas liquids and all products recovered in the processing of natural gas (other than condensate) including, without limitation, natural gasoline, casinghead gas, iso butane, normal butane, propane and ethane (including such methane allowable in commercial ethane) produced from or attributable to Oil and Gas Properties.

"**Net Income**" means, for any period, the aggregate of all amounts that would be included as net income (or loss) on the consolidated financial statements of the Borrower and its Subsidiaries for such period, but shall exclude effects on net income attributable to any current non-cash income or expense (including in respect of Hedging Agreements) described in or calculated pursuant to the requirements of applicable Statements of Financial Accounting Standards, as amended (provided that, for the avoidance of doubt, the calculation of Net Income shall include any income or expense in respect of the termination of any Hedging Agreement).

"**Net Revenue Interest**" means, with respect to any Oil and Gas Property, the decimal or percentage share of Hydrocarbons produced and saved from or allocable to such Oil and Gas Property, after deduction of royalty interests and other burdens on or paid out of such production.

"**New Warrant**" means that certain Warrant to Purchase Common Shares of Saratoga Resources, Inc. dated as of the date hereof in favor of Wayzata Investment Partners LLC, the form of which is attached hereto as Exhibit C.

"**Note**" means a promissory note issued pursuant hereto in substantially the form attached hereto as Exhibit F, duly executed by the Borrower and payable to the order of a Lender, including any amendment, modification, renewal or replacement of such promissory note.

"**Notes**" means each Note issued pursuant to this Agreement.

"**Obligations**" means, without duplication, (a) all Debt evidenced hereunder, (b) the obligation of the Borrower and any of its Subsidiaries for the payment of the fees payable hereunder or under the other Loan Documents, (c) all other obligations and liabilities of the Borrower and any of its Subsidiaries to any Lender or Affiliate of a Lender relating to Hedging Agreements whether or not such Person is a Lender at the time of entering into the Hedging Agreements or remains a Lender hereunder, and (d) all other obligations and liabilities (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and any of its Subsidiaries to the Administrative Agent and the Lenders arising out of or in connection with any Loan Document, and to the extent that any of the foregoing includes or refers to the payment of amounts deemed or constituting interest, only so much thereof as shall have accrued, been

- 14 -

earned and which remains unpaid at each relevant time of determination (including interest accruing (or which would have accrued) during the pendency of any proceeding of the type described in Sections 8.1.4 or 8.1.5 whether or not allowed in such proceeding).

"**Officer's Certificate**" means a certificate signed by a Responsible Representative.

"**Oil and Gas Properties**" means fee, leasehold, or other interests in or under mineral estates or oil, gas, and other liquid or gaseous hydrocarbon leases with respect to Properties situated in the United States or offshore from any State of the United States, including, without limitation, overriding royalty and royalty interests, leasehold estate interests, net profits interests, production payment interests, and mineral fee interests, together with contracts executed in connection therewith and all tenements, hereditaments, appurtenances and Properties appertaining, belonging, affixed, or incidental thereto.

"**Participants**" has the meaning given such term in Section 13.2.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"**Percentage Share**" means, relative to any Lender, the percentage set forth opposite its name on Schedule 1 hereto under the "Percentage Share" column or set forth in a Assignment and Assumption Agreement under the "Percentage Share" column, as such percentage may be adjusted from time to time pursuant to Assignment and Assumption Agreements executed by such Lender and its Assignee Lender and delivered pursuant to Section 13.3.

"**Permitted Debt**" means

(a)     the Obligations;

(b)     (i) accounts payable described on Schedule 6.24, provided that the same are paid in accordance with Section 7.6.3 of this Agreement, (ii) accounts payable incurred in the ordinary course of business, which are outstanding and unpaid less than 60 days beyond the invoice date therefor or (iii) accounts payable incurred in the ordinary course of business which are being contested in good faith and as to which such reserve as is required by GAAP has been made and on which interest charges are not paid or accrued by any Loan Party or any of their respective Subsidiaries, in the case of clauses (b)(i) through (b)(iii), subject to no Liens except those described in clauses (c) and (d) of the definition of "Permitted Liens";

(c)     Debt arising under Acceptable Commodity Hedging Agreements;

(d)     income and other taxes payable that are not overdue or are being contested in good faith and as to which reserves have been made in accordance with GAAP;

(e)     accrued abandonment and remediation liabilities;

(f)     Debt in the form of royalties, overriding royalties, working interest expenses and other liabilities, each in the ordinary course of the oil and gas business that are due to non-

- 15 -

Affiliates of the Borrower and, which, in the case of royalties and overriding royalties, are in existence as of the Effective Date or as otherwise approved by the Required Lenders;

(g)     Debt related to the Revolving Credit Facility in an aggregate principal amount not to exceed at any one time $20,000,000 and Plan of Reorganization Debt not to exceed $6,000,000 at any time;

(h)     Debt (i) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided that such Debt is incurred within 60 days of the acquisition of such property) and (ii) in respect of Capitalized Lease Liabilities; provided that the aggregate amount of all Debt outstanding pursuant to this clause (h) shall not at any time exceed $500,000;

(i)     Debt of any Person that becomes a Subsidiary after the Effective Date; provided that (i) such Debt exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary and (ii) the aggregate principal amount of such Debt permitted by this clause (i) shall not exceed $500,000 at any time outstanding;

(j)     letters of credit, performance bonds, or other financial assurance required to be obtained by the Borrower or any of its Subsidiaries in the normal course of its business to assure the proper plugging and abandonment of oil or gas drilling or production locations or bonds required by any Governmental Authority in the normal course of the Borrower's or any of its Subsidiary's business;

(k)     unsecured Debt among the Borrower and the Guarantors arising in the ordinary course of business;

(l)     Debt of the Borrower or any Subsidiary owing in connection with deferred payments of property insurance premiums, provided that all such Debt of the Borrower and its Subsidiaries shall not exceed an aggregate of $3,000,000 in any fiscal year; and

(m)     unsecured Debt of the Borrower to Thomas F. Cooke and Andrew C. Clifford pursuant to the Subordinated Notes in an aggregate principal amount not to exceed $482,932 and $122,500, respectively, and interest paid in kind thereon, in each case subordinated to the Debt under this Agreement.

"**Permitted Holder**" means Thomas F. Cooke, A.C. Clifford and their respective Affiliates, estates, heirs and devisees.

"**Permitted Investments**" means Investments in (a) Debt, evidenced by notes maturing not more than 180 days after the date of issue, issued or guaranteed by the government of the United States of America, (b) certificates of deposit maturing not more than 180 days after the date of issue, issued by any Lender or by commercial banking institutions each of which is a member of the Federal Reserve System and which has combined capital and surplus and undivided profits of not less than $500,000,000, (c) such other instruments, evidences of

- 16 -

indebtedness or investment securities as the Administrative Agent may approve, or (d) wholly-owned Subsidiaries that are or become Guarantors hereunder.

"**Permitted Liens**" means, with respect to any Property:

(a)     Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(b)     Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(c)     landlord's, operators', royalty owners', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law or contract which do not secure any Total Debt or any Debt described in clause (g) of the definition thereof, in each case only to the extent arising in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of Permitted Debt of the type described in clause (b) of the definition thereof;

(d)     Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements permitted hereunder, division orders, contracts for sale, purchase, transportation or exchange of oil or natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, royalty and overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(e)     Liens arising solely by virtue of any contractual, statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with such creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by bank regulators and no such deposit account serves as collateral to any Person other than the Administrative Agent and the Revolving Credit Agent;

(f)     easements, rights of way, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any of its Subsidiaries that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or such Subsidiary or materially impair the value of such Property subject thereto;

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document    Pg 99 of 183

(g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business (excluding, in each case, obligations constituting Debt);

(h) judgment Liens in respect of judgments that do not constitute an Event of Default;

(i) Liens securing the payment of any Obligations;

(j) rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate any Oil and Gas Property in any manner whatsoever and all laws of such Governmental Authorities, so long as the Borrower and its Subsidiaries is in compliance with all such laws, except for any non-compliance that would not result in a Material Adverse Effect;

(k) consents to assignment and similar contractual provisions affecting an Oil and Gas Property to the extent and only to the extent, such consents are not affected by or required for the execution, delivery, performance and enforcement of any Loan Document or, if affected or required, have been obtained;

(l) preferential rights to purchase and similar contractual provisions affecting an Oil and Gas Property to the extent and only to the extent, such consents are not affected by delivery of any Loan Document or, if affected, have been waived;

(m) all defects and irregularities affecting title to an Oil and Gas Property that could not operate to reduce the net revenue interest of the Borrower and its Subsidiaries for such Oil and Gas Property (if any), increase the working interest of the Borrower and its Subsidiaries for such Oil and Gas Property (if any) without a corresponding increase in the corresponding net revenue interest, or otherwise interfere materially with the operation, value or use of such Oil and Gas Property or cause a Material Adverse Effect;

(n) Liens (i) securing Debt permitted pursuant to clause (c) of the definition of "Permitted Debt", provided that the Liens in respect thereof are held by the Revolving Credit Agent for the benefit of Approved Counterparties, and (ii) securing Debt permitted pursuant to clause (g) of the definition of "Permitted Debt" (other than Debt owing to holders of Allowed Claims in Classes 6 and 7 and Allowed Priority Unsecured Tax Claims of Plan of Reorganization Debt);

(o) Liens securing the Debt permitted pursuant to clause (h) of the definition of "Permitted Debt;" provided, however, that (i) no such Lien shall extend to or cover any other Property of the Borrower or any of its Subsidiaries, and (ii) the principal amount of the Debt secured by any such Lien shall not exceed the lesser of 80% of the fair market value or the cost of the Property so held or acquired;

(p) Liens securing the Debt permitted pursuant to clause (i) of the definition of "Permitted Debt;" provided that such Liens exist at the time such Person becomes a Subsidiary and are not created in contemplation of or in connection with such Person becoming a Subsidiary; and

- 18 -

(q)     Liens securing the Debt permitted pursuant to clause (j) of the definition of "Permitted Debt;"

provided that Liens described in clauses (a) through (e) and (o) above shall not constitute Permitted Liens upon the initiation of any foreclosure proceedings with regard to the Property encumbered by such Liens and; provided, further, no intention to subordinate the first priority Lien granted in favor of the Administrative Agent for the benefit of the Lenders is hereby implied or expressed or is to be inferred by the permitted existence of such Permitted Liens.

"**Person**" means a corporation, an association, a joint venture, a limited liability company, a partnership, an organization, a business, an individual or a government or political subdivision thereof or any Governmental Authority.

"**Plan**" means any employee benefit plan which is covered by Title IV of ERISA.

"**Plan of Reorganization**" has the meaning given to such term in the Recitals.

"**Plan of Reorganization Debt**" means Debt to holders of Allowed Claims in Classes 4, 5, 6, and 7 and Allowed Priority Unsecured Tax Claims (as those terms are defined in the Plan of Reorganization) pursuant to the terms of the Plan of Reorganization.

"**Platform**" is defined in Section 10.10.

"**Pledge Agreement**" means a Pledge Agreement, (a) dated as of July 14, 2008, or (b) otherwise delivered pursuant to the Loan Documents, between the Administrative Agent and Borrower or a Subsidiary of the Borrower, substantially in the form of Exhibit H, as amended, supplemented, restated or otherwise modified from time to time in accordance with the Loan Documents. The term "Pledge Agreements" shall include each and every Pledge Agreement executed and delivered pursuant to the Loan Documents.

"**POGM**" means Professional Oil & Gas Marketing, LLC.

"**Possible Reserves**" means Possible Reserves as defined in the Reserve Definitions.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"**Probable Reserves**" means Probable Reserves as defined in the Reserve Definitions.

"**Proved Developed Nonproducing Reserves**" means Proved Reserves which are categorized as both "Developed" and "Nonproducing" in the Reserve Definitions.

"**Proved Developed Producing Reserves**" means Proved Reserves which are categorized as both "Developed" and "Producing" in the Reserve Definitions.

"**Proved Reserves**" means "Proved Reserves" as defined in the Reserve Definitions.

"**Proved Undeveloped Reserves**" means Proved Reserves which are categorized as "Undeveloped" in the Reserve Definitions.

"**Public Lender**" is defined in Section 10.10.

"**Purchasers**" has the meaning given such term in Section 13.3.

"**PV10 Value**" means, as of any date of determination, as to any Person the present value, discounted at a rate of 10%, of the future net revenues expected to accrue to such Person's interests in its Oil and Gas Properties during the remaining expected economic lives of such properties as reasonably determined by the Administrative Agent in connection with the most recently completed Reserve Report. Each calculation of such expected future net revenues shall be made in accordance with the then existing standards of the Society of Petroleum Engineers and (a) with appropriate adjustments made for (i) severance and ad valorem taxes, (ii) operating, gathering, transportation and marketing costs required for the production and sale of such reserves and (iii) risk associated with such future net revenues as determined in the reasonable discretion of the Administrative Agent and (b) assuming that future produced volumes of oil and gas will be sold (i) in the case of unhedged volumes, at the 24 month NYMEX strip (i.e., the average of the prices quoted on the New York Mercantile Exchange for WTI crude oil or Henry Hub natural gas for the upcoming 24 contract months following the time of calculation of PV10 Value), (ii) in the case of volumes subject to a swap or other fixed priced hedge, at the applicable fixed price and (iii) in the case of volumes subject to a floor or ceiling hedge (including a collar), at the price set out in the preceding clause (b)(i), but not to exceed such ceiling or to be less than such floor.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered into by the Borrower or any of its Subsidiaries which is a rate swap, basis swap, forward rate transaction, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, equity prices or other financial measures.

"**Register**" is defined in Section 13.1.

"**Regulation D**" means Regulation D of the Federal Reserve Board of Governors, as the same may be amended, supplemented or replaced from time to time.

"**Related Rights**" means all chattel papers, electronic chattel papers, payment intangibles, promissory notes, letter of credit rights, supporting obligations, documents and instruments relating to the Accounts or the General Intangibles and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to any Accounts or General Intangibles or any such chattel papers, electronic chattel papers, payment intangibles, promissory notes, letter of credit rights, documents and instruments.

"**Release of Hazardous Substances**" means any emission, spill, leak, release, disposal, or discharge, except in accordance with a valid permit, license, certificate, or approval of the

- 20 -

relevant Governmental Authority, of any Hazardous Substance into or upon (a) the air, (b) soils or any improvements located thereon, (c) surface water or groundwater, or (d) the sewer or septic system, or the waste treatment, storage, or disposal system servicing any Property of the Borrower or any of its Subsidiaries.

"**Required Lenders**" means Lenders (one of whom must be the Administrative Agent) in the aggregate holding at least 66-2/3% of the Loans.

"**Requirement of Law**" means, as to any Person, any applicable law, treaty, ordinance, order, judgment, rule, decree, regulation, or determination of an arbitrator, court, or other Governmental Authority, including, without limitation, rules, regulations, orders, and requirements for permits, licenses, registrations, approvals, or authorizations, in each case as such now exist or may be hereafter amended and are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Reserve Definitions**" means the definitions promulgated by the Society of Petroleum Engineers and the World Petroleum Council as in effect at the time in question.

"**Reserve Report**" means the Initial Reserve Report and each other report (in hard copy and electronic format) setting forth, as of each January 1st or July 1st (or such other date as required pursuant to Section 7.2.2(c) and the other provisions of this Agreement), the oil and gas reserves attributable to the Oil and Gas Properties owned directly by the Borrower and its Subsidiaries, together with a projection of the rate of production and future net income, severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date, consistent with Society of Petroleum Engineers reporting requirements at the time, provided that each such report hereafter delivered will (a) be prepared in accordance with the assumptions set forth in Section 7.2.2(c), and (b) include copies of all electronic data and/or files used or produced in connection with the calculations.

"**Responsible Representative**" means as to any Person, its chief executive officer, its president, its chief financial officer and its chief accounting officer.

"**Restricted Payment**" means:

(a)     the declaration or payment of any dividend on, or the incurrence of any liability to make any other payment or distribution in respect of, any shares of or other ownership interests in the Borrower, other than dividends or distributions payable in capital stock, or options, warrants or other rights to purchase the capital stock, of the Borrower;

(b)     any payment or distribution on account of the purchase, redemption or other retirement of any Equity Interests in the Borrower, or of any warrant, option or other right to acquire such Securities or such other ownership interests, or any other payment or distribution made in respect thereof, other than by means of capital stock of the Borrower, either directly or indirectly;

(c)     the issuance of any Equity Interests by any Subsidiary of the Borrower (other than by any Subsidiary to the Borrower or a Guarantor); or

- 21 -

(d)　the repayment by the Borrower of any subordinated Debt or Debt owed to an Affiliate (other than Debt owed to a Subsidiary), except as specifically permitted in the Loan Documents.

"**Revolving Credit Agent**" means Wayzata Investment Partners LLC, as successor agent to Macquarie Bank Limited, and its successors and assigns.

"**Revolving Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of July 14, 2008, among the Borrower, the other borrowers named therein, the Revolving Credit Agent and the Revolving Credit Lenders, as amended, restated, amended and restated, supplemented or modified from time to time in accordance with the terms of this Agreement

"**Revolving Credit Facility**" means the revolving facility with Revolving Credit Agent and the Revolving Credit Lenders in an aggregate principal amount not exceeding $20,000,000, the proceeds of which shall be used by the Borrower for working capital and general corporate purposes, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Revolving Credit Lenders**" means the lenders from time to time party to the Revolving Credit Agreement.

"**Securities Account**" has the meaning ascribed to it in the UCC.

"**Security**" means any stock, share, voting trust certificate, limited or general partnership interest, member interest, bond, debenture, note, or other evidence of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instrument commonly known as a "security" or any certificate of interest, share or participation in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means any Security Agreement, (a) dated as of July 14, 2008 or (b) otherwise delivered pursuant to the Loan Documents, between the Administrative Agent and Borrower, a Guarantor or a Subsidiary of the Borrower, substantially in the form of Exhibit I, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms of this Agreement and the other Loan Documents. The term "Security Agreements" shall include each and every Security Agreement executed and delivered by Borrower, a Guarantor or a Subsidiary of the Borrower.

"**Security Documents**" or "**Security Instruments**" means the security instruments executed and delivered in satisfaction of the condition set forth in Article IV and Section 5.1.4, including, without limitation, any Mortgage, any Pledge Agreement, any Security Agreement or any Deposit Account Control Agreement, and all other documents, instruments and guaranties, including, without limitation, any Mortgage, any Pledge Agreement, any Security Agreement or any Deposit Account Control Agreement, at any time executed as security for all or any portion of the Obligations, as such instruments may be amended, restated, amended and restated or supplemented or modified from time to time.

- 22 -

"**Site Specific Trust Account**" means a trust account maintained for the benefit of one or more Persons other than Borrower and its Subsidiaries in connection with a particular Oil and Gas Property, as described on Schedule 6.16.

"**Subject Leases**" is defined in Section 7.19.1.

"**Subordinated Notes**" means (a) that certain Subordinated Promissory Note (Cooke), dated as of July 14, 2008, executed by the Borrower in favor of Thomas F. Cooke in the original principal amount of $620,912, as modified by the Plan of Reorganization, and (b) that certain Subordinated Promissory Note (Clifford Deferred Compensation), dated as of July 14, 2008, executed by the Borrower in favor of Andrew C. Clifford in the original principal amount of $157,500, as modified by the Plan of Reorganization.

"**Subsidiary**" means for any Person, any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned, collectively, by such Person and any Subsidiaries of such Person. The term Subsidiary shall include Subsidiaries of Subsidiaries (and so on).

"**Synthetic Lease**" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"**Taxes**" means all taxes, assessments, filing or other fees, levies, imposts, duties, deductions, withholdings, stamp taxes, interest equalization taxes, capital transaction taxes, foreign exchange taxes or charges, or other charges of any nature whatsoever from time to time or at any time imposed by any law or Governmental Authority.

"**THG**" means The Harvest Group LLC, a Louisiana limited liability company.

"**Total Debt**" of any Person means, at any date, Debt of the Borrower and its Consolidated Subsidiaries as of such day described in clauses (a), (b), (c), (f) (but excluding any current non-cash asset or liability (including in respect of Hedging Agreements) described in or calculated pursuant to the requirements of applicable Statements of Financial Accounting Standards, as amended (provided that, for the avoidance of doubt, the calculation of Total Debt shall include any current assets or liabilities in respect of the termination of any Hedging Agreement)) or (h) of the definition of Debt (including amounts under this Agreement and letter of credit exposure).

"**Total Proved PV10 Value**" means at any time the PV10 Value of the Borrower's and the Guarantors' Proved Reserves as calculated by the Administrative Agent using the most recent Reserve Report.

"**Transactions**" means the execution and delivery by the Borrower, the Guarantors and the other Subsidiaries of the Borrower of this Agreement and the other Loan Documents, the restructuring of the Existing Debt and the repayment of Loans.

- 23 -

"**Transferee**" shall have the meaning given such term in Section 13.4.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Wells**" means, with respect to the Leases, the oil and/or gas wells located thereon.

"**Withholding Form**" is defined in Section 10.13.4.

"**Working Interest**" means the property interest which entitles the owner thereof to explore and develop certain land for oil and gas production purposes, whether under an oil and gas lease or unit, a compulsory pooling order or otherwise.

1.2     *Accounting Terms and Determinations; Changes in Accounting.*

1.2.1     Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP, applied on a basis consistent (except for changes concurred in by the independent public accountants and with respect to which the Borrower shall have promptly notified the Administrative Agent on becoming aware thereof) with the most recent financial statements of the Borrower and its Subsidiaries delivered to the Administrative Agent, provided that in the event of a change in GAAP that would affect calculation of any of the financial covenants in Section 7.15, such change shall be disregarded in making such calculation unless the Borrower and the Required Lenders shall agree on an amendment to such covenant that takes such change in GAAP into account.

1.2.2     The Borrower and its Subsidiaries will not change their method of accounting, other than immaterial changes in methods, changes permitted by GAAP in which the Borrower's independent public accountants concur and changes required by a change in GAAP, without the prior written consent of the Administrative Agent and the Required Lenders, which consent shall not be unreasonably withheld or delayed by the Administrative Agent or any Lender.

1.2.3     During such times that the Borrower is required to deliver financial information to the Lenders in accordance with GAAP, neither Current Assets nor Current Liabilities shall include the amount of or any liabilities respecting any non-cash items (including with respect to Hedging Agreements) as a result of the application of Financial Accounting Standards Board Statement Nos. 133, 137, 138 and 143 and any subsequent amendments thereto (provided that, for the avoidance of doubt, the calculation of consolidated current assets shall include any current assets in respect of the termination of any Hedging Agreement).

1.3     *References.*  References in this Agreement to Exhibits, Schedules, Annexes, Appendixes, Attachments, Articles, Sections or clauses shall be to exhibits, schedules, annexes, appendixes, attachments, articles, sections or clauses of this Agreement, unless expressly stated to the contrary.    References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this

- 24 -

Agreement in its entirety and not only to the particular Exhibit, Schedule, Annex, Appendix, Attachment, Article, or Section in which such reference appears. This Agreement, for convenience only, has been divided into Articles and Sections, and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections. Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and likewise, the plural shall be understood to include the singular. Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated. Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; specific enumeration shall not exclude the general but shall be construed as cumulative; the word "or" is not exclusive; the word "including" (in its various forms) shall mean "including, without limitation," in the computation of periods of time, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding," and all references to money refer to the legal currency of the United States of America. The Exhibits, Schedules, Annexes, Appendixes and Attachments attached to this Agreement and items referenced as being attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for all purposes.

## ARTICLE II

## TERMS OF FACILITIES

2.1     *Continuation of Loans.* On the Effective Date, each Lender agrees to modify and continue its Loan on the terms and subject to the conditions of this Agreement.

On the terms and subject to the conditions hereof, the Borrower may from time to time prepay or repay Loans. Amounts repaid or prepaid may not be reborrowed.

2.2     *[Reserved]*.

2.3     *[Reserved]*.

2.4     *Repayment of Loans; Evidence of Debt.*

2.4.1     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Final Maturity Date.

2.4.2     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Debt of the Borrower to such Lender resulting from its Loan, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

2.4.3     The Administrative Agent shall maintain accounts in which it shall record (a) the amount of each Loan outstanding hereunder, (b) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender

- 25 -

hereunder and (c) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

2.4.4    The entries made in the accounts maintained pursuant to Sections 2.4.2 and 2.4.3 shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

2.4.5    Any Lender may request its Loan be evidenced by a Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns). Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.3) be represented by one or more Notes in such form payable to the order of the payee named therein (or, if such Note is a registered note, to such payee and its registered assigns).

2.5    *Interest Rate.*

2.5.1    Each Loan and each other monetary Obligation shall bear interest on the outstanding principal amount thereof, for each day from and including the Effective Date (or such later date that such Obligation is incurred) to but excluding the date it is paid at a rate per annum equal to the lesser of (a) the Applicable Rate or, if applicable, such higher rate as is specified in Section 3.3 or (b) the Highest Lawful Rate.

2.5.2    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Final Maturity Date; provided that interest accrued pursuant to Section 3.3 shall be payable on demand.

2.5.3    Each change in the rate of interest charged hereunder shall become effective automatically and without notice to the Borrower upon the effective date of any change in the Highest Lawful Rate.

2.6    *[Reserved].*

2.7    *[Reserved].*

2.8    *Maturity of Loans.* The Loans shall mature no later than the Final Maturity Date and any unpaid principal of the Loans and accrued, unpaid interest thereon shall be due and payable on the Final Maturity Date.

- 26 -

# ARTICLE III

## GENERAL PROVISIONS

3.1     *General Provisions as to Payments and Loans.*

     3.1.1     All payments of principal and interest on the Loans and of fees hereunder shall be made, without set-off, deduction or counterclaim, by 12:00 noon, Central time, on the date such payments are due in federal or other funds immediately available to an account of the Administrative Agent in New York, New York designated by the Administrative Agent in writing. Each payment delivered to the Administrative Agent for the account of any Lender shall be delivered promptly by the Administrative Agent to such Lender in the same type of funds that the Administrative Agent received at such Lender's address specified pursuant to Article XIV. Except as otherwise provided herein, whenever any payment of principal or interest on the Loans or fees hereunder shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day. If the date for any payment is extended by operation of law or otherwise, interest thereon shall be payable for such extended time.

     3.1.2     All payments made by the Borrower or any Guarantor on the Loans, and the other Obligations shall be made free and clear of, and without reduction by reason of, any "Taxes" as defined in Section 10.13.

     3.1.3     [Reserved].

     3.1.4     [Reserved].

     3.1.5     All payments shall be denominated in United States of America dollars.

3.2     *Computation of Interest.* Each determination hereunder of interest on the Loans and fees hereunder based on per annum calculations shall be computed on the basis of a year of 365/366, as applicable, days and paid for the actual number of days elapsed (including the first day but excluding the last day), subject to the limitations of the Highest Lawful Rate. The Federal Funds Effective Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

3.3     *Default Interest.* After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the rate of interest that otherwise would be applicable to such Loan *plus* 4% per annum shall apply as provided in Section 2.5 but only to the extent permitted by law (the "Default Rate").

3.4     *Repayments and Prepayments; Application.* The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

     3.4.1     Repayments and Prepayments. The Borrower shall repay in full the unpaid principal amount of each Loan upon the Final Maturity Date. Prior thereto, payments and prepayments of the Loans shall or may be made only as set forth below.

- 27 -

(a) From time to time on any Business Day, subject to the provisions of Section 3.4.2, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans without penalty or premium; provided that, (i) all such voluntary prepayments shall require at least one (1) Business Day's prior notice (such notice to be delivered before 12:00 noon (Central time) on such day) and in any case not more than five (5) Business Days' prior irrevocable notice to the Administrative Agent; and (ii) all such voluntary partial prepayments shall be in an aggregate minimum amount of $1,000,000 and an integral multiple of $1,000,000. Each notice of prepayment sent pursuant to this clause (a) shall specify the prepayment date and the principal amount of the Loan to be prepaid. Each such notice shall be irrevocable and shall commit the Borrower to prepay such Loan by the amount stated therein on the date stated therein.

(b) [Reserved]

(c) The Borrower shall, on the earlier of (i) ninety (90) days after the end of each fiscal year of the Borrower and (ii) the date of the delivery of the financial information required under Section 7.2.1 with respect to each fiscal year, prepay the Loans in an amount equal to twenty-five percent (25%) of Excess Cash Flow for such fiscal year; provided however, that the amount of any prepayment required under this Section 3.4.1(c) shall be reduced on a dollar-for-dollar basis if such Excess Cash Flow proceeds are used to make a prepayment of the loans under the Revolving Credit Agreement on such date. Notwithstanding anything herein to the contrary, any Lender may elect, by notice to the Administrative Agent within at least two (2) Business Days of the applicable prepayment date, to decline (in whole but not in part) any prepayment of its Loans pursuant to this Section 3.4.1(c), in which case the aggregate amount of the prepayment that would have been applied to prepay the Loans of such declining Lender shall be re-offered to those Lenders under this Agreement (if any) who have initially accepted such prepayment (such re-offer to be made to each such Lender based on the percentage which such Lender's Loans represents of the aggregate Loans of all Lenders who initially accepted such prepayment). In the event of such re-offer, the relevant Lenders may elect, by notice to the Administrative Agent within one (1) Business Day of receiving notification of such re-offer, to decline (in whole but not in part) the amount of such prepayment that is re-offered to them. The aggregate amount of the prepayment that would have been applied to prepay accepting Lenders but was so declined shall be retained by the Borrower.

(d) Immediately upon any acceleration of the Final Maturity Date of any Loans pursuant to Section 8.1, the Borrower shall repay all the Loans.

(e) Each prepayment of any Loans made pursuant to this Section shall be accompanied by all interest then accrued and unpaid on the principal so prepaid.

3.4.2 [Reserved]

3.5 *Limitation Period*. Notwithstanding anything herein to the contrary, during any Limitation Period with respect to any Lender, the interest rate to be charged on amounts in respect of Obligations owing to such Lender shall be the Highest Lawful Rate, and the obligation, if any, of the Borrower for the payment of fees or other charges deemed to be interest under applicable law shall be suspended. During any period or periods of time following a

- 28 -

Limitation Period, to the extent permitted by applicable laws, the interest rate to be charged hereunder by such Lender shall remain at the Highest Lawful Rate until such time as there has been paid to such Lender (a) the amount of interest in excess of that accruing at the Highest Lawful Rate that such Lender would have received during the Limitation Period had the interest rate remained at the otherwise applicable rate, and (b) the amount of all other interest and fees otherwise payable to such Lender but for the effect of such Limitation Period.

3.6     *Telephonic Notices.*

3.6.1     If permitted by this Agreement, the Borrower hereby authorizes the Administrative Agent to act based on telephonic, e-mail or other electronic notices made by any Person which the Administrative Agent or any Lender in good faith believes to be acting on behalf of the Borrower. The Borrower agrees to deliver promptly to the Administrative Agent a written confirmation of each telephonic, e-mail or other electronic notice, signed by an Authorized Officer. If the written confirmation differs in any material respect from the action taken by the Administrative Agent and the Lenders, the records of the Administrative Agent and the Lenders shall be *prima facie*, but not conclusive, evidence of the matter notwithstanding anything to the contrary in such confirmation.

3.6.2     [Reserved].

3.6.3     Each Lender may book its Loans at any Lending Installation selected by such Lender and may change its Lending Installation from time to time by notice in writing to the Administrative Agent. All terms of this Agreement shall apply to any such Lending Installation, and the Note, if any, payable to such Lender shall be deemed held by each Lender for the benefit of its Lending Installation. Each Lender may, by written or facsimile notice to the Administrative Agent and the Borrower, designate, or change any previous designation of, the Lending Installation through which Loans are held by it and for whose account Loan payments are to be made.

3.6.4     Unless the Borrower notifies the Administrative Agent prior to the date on which it is scheduled to make payment to the Administrative Agent that it does not intend to make such payment, the Administrative Agent may assume that such payment has been made. The Administrative Agent may, but shall not be obligated to, make the amount of such payment available to the Lenders in reliance upon such assumption. If the Borrower has not in fact made such payment to the Administrative Agent, each Lender shall, on demand by the Administrative Agent, repay to the Administrative Agent the amount so made available to such Lender together with interest thereon in respect of each day during the period commencing on the date such amount was so made available by the Administrative Agent until the date the Administrative Agent recovers such amount at a rate per annum equal to the Federal Funds Effective Rate for such day.

**ARTICLE IV**

**COLLATERAL**

- 29 -

4.1     *Security*.  To secure full and complete payment and performance of the Obligations of the Borrower and the Guarantors to the Lenders, each of the Borrower and the Guarantors will cause the appropriate Person to execute and deliver to the Administrative Agent the following documents and instruments (to the extent not already executed and delivered prior to the Effective Date):

4.1.1     *Mortgages*.     Mortgages executed by the Borrower or any Subsidiary, if any, granting to the Administrative Agent for the benefit of the Administrative Agent and the Lenders a first and prior Lien, subject to Permitted Liens, covering (a) no less than 90% of the Total Proved PV10 Value of the Oil and Gas Properties of the Borrower and its Subsidiaries included in the most recent Reserve Report and (b) all related equipment, contracts, accounts, licenses and other property, both real and personal.  Upon and during the continuance of an Event of Default, the Administrative Agent may revoke any Mortgagee's license under any Mortgage to receive the proceeds of production and notify the purchasers of production from Mortgaged Properties to make such payments directly to the Administrative Agent as provided in the Mortgage.

4.1.2     *Pledge Agreements; UCC Filings*.     (a) Pledge Agreements executed by the Borrower, any Guarantor and any other Subsidiary, granting to the Administrative Agent for the benefit of the Administrative Agent and the Lenders a first and prior Lien, subject to Permitted Liens, on covering the Equity Interests of the Subsidiaries of such Person, (b) stock certificates or other instruments representing all the Equity Interest of such Subsidiary and stock powers and instruments of transfer, endorsed in blank, with respect to such stock certificates or other instruments, or, if any Equity Interests pledged pursuant to such Pledge Agreement are uncertificated securities, confirmation and evidence satisfactory to the Administrative Agent that the security interest in such uncertificated securities has been transferred to and perfected by the Administrative Agent in accordance with the UCC, and (c) authorization for the Administrative Agent to file Uniform Commercial Code Financing Statements (Form UCC 1), naming Borrower or such Subsidiary as the debtor and the Administrative Agent as the secured party, or other similar instruments or documents, filed or to be under the Uniform Commercial Code of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interest of the Administrative Agent pursuant to such Pledge Agreement.

4.1.3     *Security Agreements; UCC Filings*.     (a) Security Agreements executed by the Borrower, any Guarantor and any other Subsidiary (collectively, the "Debtor"), granting to the Administrative Agent for the benefit of the Administrative Agent and the Lenders a first and prior Lien, subject to Permitted Liens, on personal property of the Borrower or such Subsidiary, respectively, and (b) authorization for the Administrative Agent to file Uniform Commercial Code Financing Statements (Form UCC 1), naming Borrower or such Subsidiary as the debtor and the Administrative Agent as the secured party, or other similar instruments or documents, filed or to be under the Uniform Commercial Code of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interest of the Administrative Agent pursuant to such Security Agreement.

4.1.4     *Deposit Account Control Agreement*. (a) Deposit Account Control Agreements executed by the Borrower, any Guarantor and any other Subsidiary, granting to

- 30 -

the Administrative Agent for the benefit of the Administrative Agent and the Lenders a first and prior Lien, subject to Permitted Liens, on and covering the Deposit Accounts (other than the Site Specific Trust Accounts) and Securities Accounts of the Borrower or such Subsidiary, respectively, including those described on Schedule 6.16.

           4.1.5      *Notice of Payment Instructions*. All account debtors (including any operator and Hydrocarbon Purchasers) relating to Mortgaged Property will receive notification from the relevant Loan Party, in form and substance satisfactory to the Administrative Agent, that all proceeds from sales of all production or transmission of Hydrocarbons from or allocable to such Mortgaged Properties are to be paid into a deposit account or accounts applicable to the relevant Loan Party, or other Subsidiary which is (i) covered by a Deposit Account Control Agreement or (ii) maintained by the Revolving Credit Agent or the Administrative Agent. Each of the Borrower and each Guarantor shall use its best efforts to cause all Hydrocarbon Purchasers and POGM (and any successor thereto acceptable to the Administrative Agent in its reasonable discretion) to execute the payment notifications to confirm their agreement to remit all proceeds from sales of all production from or allocable to the Mortgaged Properties into the applicable deposit account within thirty (30) days after the Effective Date. Subject to applicable contractual restrictions, without the written consent of the Administrative Agent, none of Borrower, any Guarantor or any Subsidiary shall be permitted to sell any Hydrocarbons from or allocable to the Mortgaged Properties to any Hydrocarbon Purchaser who refuses to timely acknowledge and abide by the payment instructions set forth in any notice under this Section.

           4.1.6      *Form*. All Security Documents delivered or to be delivered under this Agreement shall be in form and substance satisfactory to the Administrative Agent and its counsel in their reasonable discretion and shall be supported by such legal opinions substantially similar to the legal opinion delivered pursuant to Section 5.1.6 of the Existing Credit Agreement.

           4.1.7      *Priority of Liens*. All Liens to be created by delivery of the documents referred to in this Section shall be first and prior perfected Liens in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders, subject only to Permitted Liens.

     4.2     *Financing Statements*. The Administrative Agent is authorized to complete and file financing statements in any state or other jurisdiction to perfect the security interests granted by the Loan Documents and as otherwise contemplated in Section 4.1.

     4.3     *Covenants Relating to Certain Collateral*.

           4.3.1      Each Account hereafter arising will represent, in all material respects, and to the best knowledge of Debtor, each Account now existing represents, in all material respects, the valid and legally enforceable obligations of a bona fide account debtor and is not and will not be subject to contra accounts, set-offs, defenses or counterclaims by or available to account debtors obligated on the Accounts except for those that have arisen in the ordinary course of Debtor's business, are not otherwise prohibited under any other Loan Document, and for which adequate reserves have been taken in substantially the same amount

- 31 -

as are shown in all material respects in the most recently delivered financial statements to the Administrative Agent ("Set-offs"); and the amount shown as to each Account on Debtor's books will be the true and undisputed amount owing and unpaid thereon, subject to (a) any applicable Set-offs and (b) any discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have arisen in Debtor's ordinary course of business or which have otherwise been disclosed to Administrative Agent in writing.

4.3.2    All Related Rights are, and those hereafter arising will be, valid and genuine in all material respects.

4.3.3    None of the Inventory is, and at the time the security interest in favor of Administrative Agent attaches, none of the Inventory hereafter acquired will be, covered by any document (as defined in the UCC), other than Inventory being transported in the ordinary course of business.

4.3.4    Debtor will transmit promptly to Administrative Agent all information that Debtor may have or receive with respect to (a) the Collateral or (b) account debtors or obligors in respect of the Accounts, the General Intangibles and the Related Rights, in each case which could reasonably be expected to materially and adversely affect the aggregate value of the Collateral or Administrative Agent's rights or remedies with respect thereto.

4.3.5    Debtor will not adjust, settle or compromise any of the Accounts, the General Intangibles or the Related Rights without the prior written consent of Administrative Agent, other than in the ordinary course of business.

4.3.6    Debtor will duly perform or cause to be performed, in accordance with the terms thereof, all material obligations of Debtor under every material contract, agreement, or other arrangement (oral or written) to which Debtor is a party or by which it or any of its Collateral is bound.

4.3.7    If any of the Collateral is in the possession of a third-party, Debtor will, at the request of Administrative Agent upon the occurrence and during the continuance of an Event of Default, join with Administrative Agent in notifying the third-party of Administrative Agent's security interest and obtaining an acknowledgment in form and substance satisfactory to Administrative Agent from such third-party that it is holding the Collateral for the benefit of the Administrative Agent. Debtor will fully cooperate with Administrative Agent in obtaining a control agreement in form and substance reasonably satisfactory to Administrative Agent with respect to any Collateral consisting of deposit accounts, securities accounts, investment property, electronic chattel paper or letter of credit rights.

## ARTICLE V

## CONDITIONS PRECEDENT

5.1    *Conditions Precedent.*  The restructuring of the Loans as contemplated by this Agreement is subject to the satisfaction of each of the following conditions:

- 32 -

5.1.1 The Bankruptcy Court for the Western District of Louisiana shall have entered a final order confirming the Plan of Reorganization (such order, the "Confirmation Order"), and all conditions to the effectiveness of the Plan of Reorganization shall have been waived or satisfied in accordance with the Plan of Reorganization and the "Effective Date" as defined thereunder shall have occurred;

5.1.2 Receipt by the Administrative Agent of a Financial Forecast for calendar years 2010 and 2011 and a Budget for the period from April 1, 2010, to December 31, 2010;

5.1.3 Receipt by the Administrative Agent of the New Warrant duly executed and delivered by the Borrower;

5.1.4 receipt by the Administrative Agent of (a) the Loan Documents (including any amendments to the Security Documents executed prior to the Effective Date and amendments to the existing Mortgages in the form attached hereto as Exhibit M) and the other documents, instruments and any deliveries described in the closing checklist delivered to Borrower's counsel on March 25, 2010, and (b) such other documents, instruments and agreements as are deemed necessary by the Administrative Agent in its reasonable discretion, each duly executed and delivered by the appropriate Person;

5.1.5 receipt by the Administrative Agent of the opinions of counsel to the Borrower and each Guarantor, in form and substance reasonably satisfactory to the Administrative Agent and its counsel, regarding existence, authority, due authorization and due execution;

5.1.6 receipt by the Administrative Agent of certificates or binders of insurance from the Borrower's insurance broker for the Borrower and each Subsidiary as of the Effective Date meeting the standards of Section 7.4; and

5.1.7 receipt by the Administrative Agent of a pro forma balance sheet of the Borrower and its Subsidiaries effective as of the Effective Date, certified as being true and correct by the Borrower's president or chief financial officer as accurately showing the financial position of the Borrower and its Subsidiaries as of that date.

Upon satisfaction of all the conditions specified in Section 5.1, the Existing Credit Agreement will be amended and restated by this Agreement (with the Existing Debt being renewed and continued as the Loans under this Agreement) and all Liens securing obligations under the Existing Credit Agreement shall be automatically affirmed and continued to secure the payment and performance of the Obligations under this Agreement and the other Loan Documents. The Loan Parties hereby agree that each reference to the "Credit Agreement" in each other Loan Document shall be a reference to this Agreement.

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES**

Each Loan Party hereby represents and warrants to the Administrative Agent, any other Agent and each Lender as follows:

- 33 -

6.1    *Existence and Power*. Each Loan Party and each of its respective Subsidiaries:

6.1.1    is a Person, duly organized, validly existing and in good standing under the laws of the state of its organization;

6.1.2    has all organizational powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted and to undertake the Transactions;

6.1.3    is duly qualified to transact business as a foreign entity in each jurisdiction where the nature of its business requires the same; and

6.1.4    owns all of its assets reflected in its financial statements most recently delivered to the Lenders, except for assets disposed of since the date thereof in accordance with this Agreement.

6.2    *Corporate and Governmental Authorization; Contravention*. The Transactions and the execution, delivery and performance by each Loan Party and each of its Subsidiaries of this Agreement and the other Loan Documents are within such Loan Party's or such Subsidiary's organizational power, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any Governmental Authority (except that the perfection of Liens created by certain of the Security Documents may require the filing of financing statements, mortgages or similar instruments in the appropriate recordation offices), and do not contravene, or constitute a default under, any material provision of applicable law or regulation (including, without limitation, the Margin Regulations) or any provision of any agreement creating or governing such Loan Party or such Subsidiary or any agreement, judgment, injunction, order, decree or other instrument binding upon such Loan Party or such Subsidiary or result in the creation or imposition of any Lien on any Property of such Loan Party or such Subsidiary, except Liens securing the Obligations.

6.3    *Binding Effect*. This Agreement and each other Loan Document to which it is a party, including, without limitation, any and all Security Documents when executed and delivered in accordance with this Agreement, is a valid and binding agreement of each Loan Party thereto, enforceable against such Loan Party, in accordance with its terms except as (i) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally and (ii) rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability.

6.4    *Subsidiaries*. Schedule 6.4 sets forth the name, the identity or corporate structure and the ownership interest of each direct or indirect Subsidiary of the Borrower as of the Effective Date. As of the Effective Date, no Loan Party has any Subsidiaries other than the Subsidiaries described on Schedule 6.4.

6.5    *Disclosure*. Taken as a whole, the documents, certificates and statements delivered to the Administrative Agent by or on behalf of the any Loan Party or any of their respective Subsidiaries in connection with the transactions contemplated hereby do not contain any untrue statement of a material fact as of the date of such delivery. All information heretofore furnished by or on behalf of any Loan Party or any of their respective Subsidiaries to the

- 34 -

Administrative Agent or any Lender for purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all such information hereafter furnished by or on behalf of any Loan Party or any of their respective Subsidiaries to the Administrative Agent or any Lender will be, as of the date of delivery thereof, true and accurate in every material respect or based on reasonable estimates on the date as of which such information is stated or certified. The Borrower has disclosed to the Administrative Agent and each Lender in writing any and all facts known to the Borrower's management (except facts of general public knowledge) which materially and adversely affect or may affect (to the extent the Borrower can now reasonably foresee) the business, operations, prospects or condition, financial or otherwise, of the Loan Parties and their respective Subsidiaries or the ability of the Borrower and its Subsidiaries to perform their obligations under this Agreement and the other Loan Documents.

6.6     *Financial Information.*

6.6.1     The financial information of the Borrower and its Subsidiaries delivered to the Administrative Agent and each Lender under this Agreement fairly present in all material respects, in conformity with GAAP, the financial position of the Borrower and its Subsidiaries, provided that certain information and note disclosures normally included with annual financial statements may be condensed or omitted, provided that the disclosures made are adequate to make the information presented not misleading and, provided, further that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based on assumptions believed to be reasonable at the time.

6.6.2     [Reserved].

6.6.3     Except as disclosed in writing by the Borrower to the Administrative Agent prior to the execution and delivery of this Agreement, since September 30, 2009 there has been no Material Adverse Effect.

6.7     *Litigation.* Except as set forth on Schedule 6.7 hereto, there is no action, suit or proceeding pending against, or to the knowledge of the Borrower threatened against or affecting any Loan Party or any of their respective Subsidiaries before any Governmental Authority or arbitrator which could reasonably be expected to result in a material liability or which reasonably could in any material manner draw into question the validity of this Agreement, any other Loan Documents or the Transactions.

6.8     *ERISA Plans.* No Loan Party nor any ERISA Affiliate of any Loan Party currently sponsors, maintains or contributes to or has at any time sponsored, maintained or contributed to any Plan or any Multiemployer Plan.

6.9     *Taxes and Filing of Tax Returns.*

6.9.1     Each Loan Party and its respective Subsidiaries have filed or properly extended all returns required to have been filed or extended with respect to Taxes and, except as described on Schedules 6.9 and 6.18, has paid all Taxes shown to be due and payable by it on such returns, including interest and penalties, and all other Taxes which are payable by it, to the extent the same have become due and payable (unless, with respect to

- 35 -

such other Taxes, the criteria set forth in Section 7.5 are being met). No Loan Party knows of any proposed assessment of Taxes of a material amount against it or any of its Subsidiaries and all liabilities for Taxes of the Loan Parties and their respective Subsidiaries are adequately provided for.

6.9.2    The Borrower does not intend to treat the Loans as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).

6.10    *Title to Properties; Liens; Environmental Liability.*

6.10.1    The Loan Parties and their respective Subsidiaries have good and defensible title to all Property evaluated in the most recent Reserve Report, including, with respect to the Effective Date, the Initial Reserve Report, except for Permitted Liens and as set forth on Schedule 6.10. All Property of the Loan Parties and their respective Subsidiaries is free and clear of all Liens other than Permitted Liens. The interests and properties described on Schedule 6.10 constitute substantially all of the fee, leasehold, or other interests in or under mineral estates or oil, gas, and other liquid or gaseous hydrocarbon leases with respect to Properties situated in the United States or offshore from any State of the United States, including, without limitation, overriding royalty and royalty interests, leasehold estate interests, net profits interests, production payment interests, and mineral fee interests, owned by the Loan Parties and their respective Subsidiaries as of the date of this Agreement. The Liens covering the Collateral are valid, enforceable, first and prior, perfected Liens in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders, subject only to Permitted Liens. Except as set forth in Schedule 6.10, after giving full effect to the Permitted Liens, the Loan Parties and their respective Subsidiaries own the net interests in production attributable to the Oil and Gas Properties reflected in the most recently delivered Reserve Report and the ownership of such Properties shall not obligate any Loan Party or any of their respective Subsidiaries to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report without a corresponding (or greater) increase in its net revenue interest. All factual information contained in the most recently delivered Reserve Report was true and correct in all material respects as of the date thereof, and all projections and estimates in such Reserve Report were prepared in good faith based on assumptions believed to be reasonable at the time.

6.10.2    No Loan Party nor any of their respective Subsidiaries has (a) received notice or otherwise learned of any Environmental Liability which could individually or in the aggregate reasonably be expected to have a Material Adverse Effect arising in connection with (i) any non-compliance with or violation of the requirements of any Environmental Law or (ii) the release or threatened release of any Hazardous Substance or constituent, or other substance into the environment in violation of Environmental Law, or (b) received written notice or otherwise learned of any federal or state investigation evaluating whether any remedial action is needed to respond to a release or threatened release of any Hazardous Substance or constituent into the environment for which any Loan Party or any of their respective Subsidiaries is or may be liable which could individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

- 36 -

6.10.3    Except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate, or approval of the relevant Governmental Authority, no Release of Hazardous Substances by any Loan Party or any of their respective Subsidiaries from, affecting, or related to any Property of any Loan Party or any of their respective Subsidiaries or adjacent to any Property of any Loan Party or any of their respective Subsidiaries has occurred which could individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

6.10.4    The rights, Mortgaged Properties and other assets currently owned, leased or licensed by the Loan Parties and any of their respective Subsidiaries, including, without limitation, all easements and rights of way, include all rights, Oil and Gas Properties and Properties necessary to permit the Loan Parties and any of their respective Subsidiaries to conduct their business in all material respects in the same manner as their business has been conducted prior to the Effective Date.

6.11    *Business; Compliance.*  Except as set forth on <u>Schedule 6.18</u>, each Loan Party and each of its respective Subsidiaries has performed and abided by all obligations required to be performed by it under any license, permit, order, authorization, grant, contract, agreement, or regulation to which it is a party or by which it or any of its Property is bound, in each case, in all material respects.

6.12    *Licenses, Permits, Etc.*  Each Loan Party and each of its respective Subsidiaries possesses all material valid franchises, certificates of convenience and necessity, operating rights, licenses, permits, consents, authorizations, exemptions and orders of Governmental Authorities as are necessary to carry on its business as now being conducted, to own its Properties and to consummate the Transactions.

6.13    *Compliance with Law.*  The business and operations of each Loan Party and each of its respective Subsidiaries have been and are being conducted in accordance in all material respects with all applicable laws, rules and regulations of all Governmental Authorities.

6.14    *Investment Company Act.*  No Loan Party nor any of its respective Subsidiaries is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

6.15    *Refunds; Certain Contracts.*

6.15.1    No orders of, proceedings pending before, or other requirements of, the Federal Energy Regulatory Commission or any other Governmental Authority exist which could result in any Loan Party or any of its respective Subsidiaries being required to refund any material portion of the proceeds received or to be received from the sale of hydrocarbons constituting part of the Collateral.

6.15.2    No Loan Party nor any of its respective Subsidiaries (a) is obligated in any material respect by virtue of any prepayment made under any contract containing a "take-or-pay" or "prepayment" provision or under any similar agreement to deliver Hydrocarbons produced from or allocated to any of the Collateral at some future date without receiving full payment therefor within 90 days of delivery, and (b) has produced

- 37 -

Natural Gas, in any material amount, subject to, and no Loan Party nor any of the Collateral is subject to, balancing rights of underproduced third parties except (i) as disclosed from time to time in connection with a Reserve Report, (ii) for current balancing obligations as of the date of the most recent Reserve Report, and (iii) for balancing obligations that are settled within 45 days of the production month.

6.16    *Deposit Accounts; Securities Accounts.*  Except as set forth on Schedule 6.16 or disclosed from time to time to the Administrative Agent, none of the Loan Parties nor any of their respective Subsidiaries maintains any Deposit Accounts or Securities Accounts or has any rights, including signature rights, with respect to any other Deposit Accounts or Securities Accounts.

6.17    *No Default.*  After giving effect to the waiver and cure of defaults contained in the Plan of Reorganization, no Default has occurred which is continuing.

6.18    *Mortgaged Property.*  Except in each case as set forth on Schedule 6.10, with respect to each Mortgage, each Loan Party and each of their respective Subsidiaries, as applicable, is the lawful owner of the Mortgaged Property described therein and has good right and authority to grant, bargain, sell, transfer, assign and mortgage the same; with respect to each Mortgaged Property described in Exhibit A to each Mortgage, its interests in each such Mortgaged Property is no less than that Net Revenue Interest and no greater than the Working Interest set forth in Exhibit A to such Mortgage for such Mortgaged Property; all oil, gas and/or mineral lease and leasehold estates, gas purchase and sales contracts, pipeline easements and rights-of-way, processing contracts, franchises, licenses and other agreements comprising or relating to such Mortgaged Property or any portion thereof are valid and subsisting and are in full force and effect and, except as described on Schedule 6.18, no default now exists under such estates, contracts, easements, rights-of-way, franchises, licenses or other agreements and none of Borrower, any other Loan Party or their respective Subsidiaries has (a) received any notice of default or claimed default thereunder and (b) any knowledge of any event or circumstance which with notice or passage of time or both could constitute a default thereunder; such leases are subject to no overriding royalties or other burdens or charges, except as reflected herein or in the Exhibit A to such Mortgage and, except as described on Schedule 6.18, all material rents, royalties and other payments due and payable by any Loan Party or any of their respective Subsidiaries, as applicable, under such Mortgaged Property have been properly and timely paid and all ad valorem, property, oil and gas production, excise and severance taxes payable by any Loan Party or any of their respective Subsidiaries, as applicable, have been duly paid; such Mortgaged Property is free and clear from all Liens except the Permitted Liens, and except as shown in Exhibit A for such Mortgage; all producing wells located on such Mortgaged Property or properties unitized therewith have been legally drilled in all material respects and are not deviated in any material respect from the vertical more than the maximum permitted by applicable laws, rules and regulations, and such wells are in fact bottomed under and are producing from lands and, if applicable, depths described in said Exhibit A or lands unitized therewith.

6.19    *Use of Proceeds.*  The proceeds of the Loans were used by the Loan Parties in accordance with Section 7.1 of the Existing Credit Agreement.

- 38 -

6.20    *Call on Production*.  There are no calls on production affecting the Leases, Wells, Units or other interests included within the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries.

6.21    *Payment of Royalties*.  Except for those royalties as set forth on <u>Schedule 6.18</u>, all royalties have been, and are being, paid timely, unless such royalties are being disputed in good faith by the Loan Parties and their respective Subsidiaries and adequate reserves have been established therefor in accordance with GAAP.

6.22    *Wells*.  To the best of the knowledge of the Loan Parties and their respective Subsidiaries, all Wells on the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries have been drilled and completed within the limits permitted by all applicable Leases, contracts, pooling or unit agreements and by legal requirements.  To the best of the knowledge of the Loan Parties and their respective Subsidiaries, no Well existing prior to the Effective Date on the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries is, or after the Effective Date will be, subject to penalties on allowables because of any overproduction or any other violation of legal requirements.  Except as set forth on <u>Schedule 6.22</u>, there are no Wells, platforms or other equipment located on the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries that (a) any Loan Party or any Subsidiary is currently obligated by any legal requirement or contract to currently plug and abandon, (b) are subject to exceptions to a requirement to plug and abandon issued by a Governmental Authority or (c) have been plugged and abandoned in a manner that does not comply in all material respects with legal requirements.

6.23    *Leases*.  Except as identified on <u>Schedule 6.23</u>, all leasehold and other mineral interests included within the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries are presently being maintained, developed and operated pursuant to the terms of each individual Lease, and there are no outstanding demands for a release pending by any lessor.

6.24    *Accounts Payable*.  Set forth on <u>Schedule 6.24</u> is a true, correct and complete list of accounts payable of the Loan Parties and their Subsidiaries as of _____, 2009.

6.25    *Farm-out Agreements*.  Set forth on <u>Schedule 6.25</u> is a true, correct and complete list of all farm-out agreements to which any of the Loan Parties or any of their respective Subsidiaries is a party as of the Effective Date.

## ARTICLE VII

## COVENANTS

So long as any Obligations remain outstanding, each Loan Party will duly perform and observe or cause each of its Subsidiaries to perform and observe each and all of the covenants and agreements hereinafter set forth:

7.1    *[Reserved]*.

7.2    *Financial Statements; Reserve Reports; Compliance Certificates; Certain Notice; Additional Information*.  The Borrower will furnish to the Administrative Agent:

- 39 -

7.2.1     (a)     As soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of the Borrower, beginning with the fiscal year ending December 31, 2009, copies of the consolidated and consolidating balance sheets of the Borrower and its Consolidated Subsidiaries as of the end of such fiscal year, and copies of the related statements of operations and comprehensive income, changes in stockholders' capital and cash flow for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP; which consolidated financial statements shall be audited by Malone & Bailey or other firm of independent certified public accountants selected by the Borrower and reasonably acceptable to the Administrative Agent and accompanied by the unqualified opinion of such accountants.

    (b)     As soon as available and in any event within fifty (50) days after the last day of each fiscal quarter of the Borrower, a copy of (a) the unaudited consolidated and consolidating balance sheets of the Borrower and its Consolidated Subsidiaries as at the close of such quarter and (b) the related statements of operations and comprehensive income, changes in stockholders' capital and cash flows for the quarter just ended and for that portion of the year ending on such last day, all in reasonable detail and prepared on a basis consistent with the financial statements previously delivered by the Borrower under this <u>Section 7.2.1</u>.

    (c)     simultaneously with the delivery of each set of financial statements pursuant to the preceding clauses of this Section, a Compliance Certificate of the Borrower and an unaudited statement of contingent liabilities of the Borrower and its Consolidated Subsidiaries.

    (d)     within thirty (30) days after each filing thereof by the Borrower and each of its Consolidated Subsidiaries with any Governmental Authority, complete copies of the federal and state income tax returns so filed.

    (e)     simultaneously with the delivery of audited financial statements pursuant to <u>clause (a)</u> of this <u>Section 7.2.1</u>, a Financial Forecast.

    (f)     (i) on or before the date that is 30 days before the end of each fiscal year of the Borrower, a draft Budget for the next succeeding fiscal year and (ii) on or before the date that is the last day of such fiscal year of the Borrower, a final Budget for such next succeeding fiscal year.

    (g)     within thirty (30) days after the end of each month, a monthly management report and a comparison of the Budget and actual expenditures for such month and a comparison on a cumulative basis for that portion of the year ending on the last day of such month.

7.2.2     (a)     within thirty (30) days following the last day of each month end, production reports and lease operating statements for the previous one or six month time period, as applicable, as of such last day in form and substance satisfactory to the Administrative Agent in its reasonable judgment, prepared by the Borrower containing data concerning production volumes, revenues and lease operating expenses for the Oil and Gas

- 40 -

Properties of the Loan Parties and their Subsidiaries and such other information with respect thereto as the Administrative Agent may reasonably request.

(b)     within fifteen (15) days following each request therefor by the Administrative Agent (but no more frequently than once every month), a report setting forth all accounts receivable and accounts payable of the Loan Parties and their respective Subsidiaries as of the date specified by the Administrative Agent, such report to show the age of such accounts and such other information as the Administrative Agent shall reasonably request.

(c)

(i)  promptly after January 1 of each calendar year and in any event prior to April 1 of each calendar year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report in form and substance satisfactory to the Administrative Agent in its reasonable discretion, prepared by an Approved Engineer, which Reserve Report shall be dated as of January 1 of such calendar year, together with additional data concerning pricing, hedging, quantities and purchasers of production, and other information and engineering and geological data as the Administrative Agent may request.

(ii)  Within ninety (90) days after each July 1, commencing July 1, 2008, the Borrower will make available for review by the Administrative Agent a Reserve Report in form and substance satisfactory to the Administrative Agent in its reasonable discretion prepared by the Borrower's petroleum engineers (or, if Borrower elects, an Approved Engineer), which report shall be dated as of July 1 of such calendar year, together with additional data concerning pricing, hedging, quantities and purchasers of production, and other information and engineering and geological data as the Administrative Agent may request.  If the semi-annual Reserve Report pursuant to this Section 7.2.2(c) is not prepared by an Approved Engineer, the assumptions and methodology use for, among other things, classifying the reserves as Proved Developed Producing; Proved Developed Non-producing and Proved Undeveloped shall be consistent with the assumptions used by the Approved Engineer in its most recent report.

(iii) In addition to the foregoing scheduled annual and semi-annual deliveries of the Reserve Report, in the event the Revolving Credit Lenders shall elect to make a discretionary redetermination of the Borrowing Base (as defined in the Revolving Credit Agreement) the Borrower shall as quickly as practical, and in any event contemporaneously with delivery thereof to the Revolving Credit Agent, deliver to the Administrative Agent a copy of the Reserve Report prepared in connection with such redetermination.

(iv) In addition to the foregoing, the Borrower will furnish to the Administrative Agent copies of any other Reserve Reports delivered in connection with the Revolving Credit Agreement concurrently with delivery thereof to the Revolving Credit Agent or the lenders thereunder.

- 41 -

(d)     concurrently with the delivery of financial statements under Section 7.2.1(b), the Borrower will deliver a report setting forth the Leases with expiration dates within 90 days of the end of such fiscal quarter.

(e)     simultaneously with the delivery of any reports under above clauses of Section 7.2.2, the Borrower will deliver an Officer's Certificate from the Borrower certifying that such reports are true, accurate and complete in all material respects for the periods covered in such report; provided that to the extent such reports contain projections and estimates, the Officer's Certificate may contain a qualification that such projections and estimates were prepared in good faith based on assumptions believed to be reasonable at the time. In addition, with the delivery of the Reserve Reports pursuant to Section 7.2.2(c), the Officer's Certificate shall certify that with respect to (i) the Oil and Gas Properties evaluated in such Reserve Report (in this Section, collectively called the "Covered Properties"), except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments with respect to the Covered Properties (other than those permitted by the Security Documents) that would require any Loan Party or any Subsidiary to deliver hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (ii) none of the Covered Properties has been sold since the date of such Reserve Report except as set forth on an exhibit to the certificate, which certificate shall list all of such properties sold and in such detail as reasonably required by the Administrative Agent, (iii) set forth on a schedule attached to such Officer's Certificate is the present discounted value of all Covered Properties (delineated by classification: Proved Developed Producing Reserves, Proved Developed Non Producing Reserves, Proved Undeveloped Reserves) that are part of the Mortgaged Properties, and (iv) that Borrower is in compliance with Section 7.4.1(b).

(f)     no later than the thirtieth (30th) day after the renewal or purchase of the policies reflected thereon, the Borrower will deliver a certificate of insurance coverage from each insurer with respect to the insurance required by Section 7.4, in form and substance satisfactory to the Administrative Agent in its reasonable discretion, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

7.2.3     (a)     within five (5) days after any Responsible Representative of the Borrower becomes aware of the occurrence of any condition or event which constitutes a Default, an Officer's Certificate of the Borrower specifying the nature of such condition or event, the period of existence thereof, what action the Borrower and its Subsidiaries has taken or is taking and proposes to take with respect thereto and the date, if any, on which it is estimated the same will be remedied.

(b)     if and when any Loan Party (i) gives or is required to give notice to the PBGC of any "reportable event" (as defined in Section 4043 of ERISA) with respect to any Plan which might constitute grounds for a termination of such Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given or is required to give notice of any such reportable event, a copy of the notice of such reportable event given or required to be given to the PBGC; (ii) receives notice of complete or partial withdrawal liability under Title IV of ERISA, which liability could reasonably be expected to result in a liability in excess of $250,000 or a Material Adverse Effect, a copy of such notice; or (iii) receives notice from the PBGC under

Title IV of ERISA of an intent to terminate or appoint a trustee to administer any Plan, a copy of such notice.

        (c)     within ten (10) days following a Responsible Representative learning that Borrower or one of its Subsidiaries has received notice or otherwise learned of any claim, demand, action, event, condition, report or investigation indicating any potential or actual liability arising in connection with (i) the non-compliance with or violation of the requirements of any Environmental Law, (ii) the release by any Loan Party or any of its respective Subsidiaries or from any Property of any Loan Party or any of its respective Subsidiaries or threatened release of any Hazardous Substance into the environment, or (iii) the existence of any Environmental Lien on any Properties of any Loan Party or any of its respective Subsidiaries, notice thereof.

        (d)     within ten (10) days of a Responsible Representative learning of any of the following, notice of (i) the filing or commencement of (in excess of $250,000), any action, suit, investigation, inquiry, arbitration or proceeding by or before any arbitrator or Governmental Authority against or affecting any Loan Party, any Subsidiary thereof or any of their Properties; (ii) any material adverse development in any such action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders); or (iii) any demand or lawsuit (in excess of $250,000 or which could reasonably be expected to have a Material Adverse Effect) by any landowner or other third party threatened in writing against any Loan Party, any Subsidiary thereof or any of their Properties in connection with any Environmental Laws.

        (e)     within five (5) days after the occurrence thereof, notice of any Change of Control Event.

        (f)     prompt written notice (and in any event within thirty (30) days prior thereto) of any change (i) in any Loan Party's corporate name or in the ownership of any Mortgaged Property, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or corporate structure, (iv) in any Loan Party's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in any Loan Party's federal taxpayer identification number;

        (g)     (i) concurrently with any delivery of financial statements under Sections 7.2.1(a) and 7.2.1(b), a certificate of an Authorized Officer of the Borrower, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of such fiscal year or fiscal quarter, a true and complete list of all Hedging Agreements (including, without limitation, trade confirmations) of each Loan Party and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on Schedule 1.1, any margin required or supplied under any credit support document, and the counterparty to each such agreement and (ii) within five (5) Business Days after any execution of any new Hedging Agreements or any assignment, termination or unwinding of any existing Hedging Agreements, notice thereof to the Administrative Agent, which notice shall be in form and substance and with details reasonably acceptable to the Administrative Agent;

- 43 -

(h)     promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other organic document of any Loan Party or any Subsidiary; and

(i)     concurrently with delivery to the Revolving Credit Agent, copies of any other certificate, instrument, agreement or other documents delivered to Revolving Credit Agent pursuant to the terms of, or in connection with, the Revolving Credit Facility.

7.2.4     with reasonable promptness, such other information relating directly or indirectly to the financial condition, business or Properties of any Loan Party or any of their respective Subsidiaries as from time to time may reasonably be requested by the Administrative Agent.

7.3     *Inspection of Properties and Books*.  Each Loan Party and each Subsidiary will keep accurate books and records in accordance with GAAP in which full, true and correct entries shall be promptly made, permit any officer, employee or agent of the Administrative Agent to visit and inspect any of its Properties, to examine its books of account (and to make copies thereof and take extracts therefrom (a) at the expense of the Borrower (the amount of such expenses to be reasonable) for the first two such visits in any calendar year and thereafter, so long as no Default has occurred and is continuing at the expense of the Administrative Agent or (b) at the expense of the Borrower (the amount of such expenses to be reasonable), if a Default has occurred and is continuing on the date of such visit, inspection or examination) and to discuss its affairs, finances and accounts (including transactions, agreements and other relations with any shareholders) with, and to be advised as to the same by, its officers and independent public accountants, all upon reasonable notice and at such reasonable times and intervals as the Administrative Agent may desire.

7.4     *Maintenance of Security; Insurance; Operating Accounts; Transfer Orders*.

7.4.1     (a) Each Loan Party shall execute and deliver, or cause the appropriate Person to execute and deliver, to the Administrative Agent for the benefit of the Administrative Agent and the Lenders all Mortgages, Pledge Agreements, Security Agreements, and Deposit Account Control Agreements and such other documents and instruments (including division and transfer orders), and supplements and amendments thereto, and take such other actions as the Administrative Agent reasonably deems necessary or desirable in order to (i) maintain as valid, enforceable, first-priority, perfected Liens (subject only to the Permitted Liens), all Liens granted to secure the Obligations or (ii) monitor or control the proceeds therefrom.  Each Loan Party authorizes the Administrative Agent to complete and file, from time to time, financing statements naming any Loan Party or any of their respective Subsidiaries as debtor to perfect Liens granted by the Loan Parties or any of their respective Subsidiaries to the Administrative Agent.  Each Loan Party shall at all times have the proceeds of production from the Mortgaged Properties paid into one of the accounts set forth on Schedule 6.16 (other than a Site Specific Trust Account) or other account approved by the Administrative Agent for which a Deposit Account Control Agreement has been executed and delivered to the Administrative Agent.

- 44 -

(b)     Each Loan Party and each of their respective Subsidiaries shall maintain, or cause to be in effect at all times, first and prior Liens, subject only to Permitted Liens, in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders by instruments properly recorded in the applicable jurisdictions covering no less than 90% of the Total Proved PV10 Value of the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries included in the most recent Reserve Report, and all related equipment, contracts, accounts, licenses and other property, both real and personal whether now owned or hereafter acquired. The Borrower shall use the values in the Reserve Report to determine whether it is in compliance with this covenant.

(c)     Each Loan Party and each of their respective Subsidiaries will at all times maintain or cause to be maintained with financially sound and reputable insurance companies insurance covering such risks as are customarily carried by businesses similarly situated, including, without limitation, risks of loss or damage by fire and against other hazards customarily insured against, but in no event shall maintain insurance coverage which is materially less beneficial to such Loan Party or such Subsidiary than the insurance described on Schedule 7.4 hereto. The Administrative Agent, on behalf of itself and the Lenders, will be named as loss payee and additional insured, as appropriate, with respect to such insurance. Subject to the terms of the Intercreditor Agreement and the Revolving Credit Agreement, all proceeds of such insurance shall be paid to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, to be retained by the Administrative Agent at its option, for application to the payment of such portion of the Obligations as the Administrative Agent may determine in its reasonable discretion or shall be applied to repair, restore or replace any such insurable loss or damage, provided that, so long as no Event of Default shall have occurred and be continuing, at the request of Borrower, such proceeds shall be disbursed to Borrower upon such terms and conditions as the Administrative Agent may reasonably deem appropriate for its protection to pay the cost of repairing, replacing or restoring Collateral or purchasing replacement Collateral; provided, further, that the proceeds of any control of well insurance or similar insurance shall be used to pay for the costs remediating the problem insured against. Borrower will furnish to the Administrative Agent, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

7.4.2     Each Loan Party shall and shall cause its respective Subsidiaries, upon request of the Administrative Agent, to execute such transfer orders, letters-in-lieu of transfer orders or division orders as the Administrative Agent reasonably may from time to time request in respect of the Collateral and to deliver such documents to the purchaser of production from the Mortgaged Properties.

7.4.3     Each Loan Party shall give the Administrative Agent at least thirty (30) days prior written notice if a Person not listed on Schedule 1.3 intends to become a Hydrocarbon Purchaser. The notice will contain the Person's name and address (including contact person) and specify the Oil and Gas Properties to which the purchases relate.

7.4.4     No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, open any new Deposit Account or Securities Account without first (a) giving prior written notice to the Administrative Agent and (b) except for any Site Specific Trust

- 45 -

Account, delivering to the Administrative Agent a fully executed Deposit Account Control Agreement with respect thereto.

7.5    *Payment of Taxes and Claims.* Each Loan Party will and will cause its respective Subsidiaries to pay (a) all Taxes imposed upon it or any of its assets or with respect to any of its franchises, business, income or profits before any material penalty or interest accrues thereon and (b) all material claims (including, without limitation, claims for labor, services, materials and supplies and under any operating agreements) for sums which have become due and payable and which have or might become a Lien (other than a Permitted Lien) on any of its assets; provided, however, that no payment of such Taxes or claims shall be required if (i) the amount, applicability or validity thereof is currently being contested in good faith by appropriate action promptly initiated and diligently conducted, (ii) the Borrower shall have set aside on its books reserves (segregated to the extent required by GAAP) reasonably deemed by it to be adequate with respect thereto, and (iii) if material, the Borrower has notified the Administrative Agent of such circumstances, in detail reasonably satisfactory to the Administrative Agent.

7.6    *Payment of Debt; Additional Debt; Payment of Accounts.*

7.6.1    Each Loan Party and each Subsidiary will (a) pay, renew or extend or cause to be paid, renewed or extended the principal of, and the prepayment charge, if any, and interest on all Material Debt heretofore or hereafter incurred or assumed by it when and as the same shall become due and payable unless such payment is prohibited by the Loan Documents or would cause a Default hereunder; (b) faithfully perform, observe and discharge all unwaived covenants, conditions and obligations imposed on it by any instrument evidencing such Debt or by any indenture or other agreement securing such Debt or pursuant to which such Debt is issued unless such performance, observance or discharge would cause a Default hereunder; and (c) not permit the occurrence of any act or omission which would constitute a material default under any such instrument, indenture or agreement, in each case prior to the time that the holders of such Debt (or any agent or trustee for such holders) would be entitled to declare such Debt due and payable in full.

7.6.2    No Loan Party nor any Subsidiary will create, incur or suffer to exist any Debt, except without duplication (a) Debt to the Lenders under this Agreement and (b) Permitted Debt.

7.6.3    Each Loan Party and each Subsidiary shall pay all of its trade and other accounts payable within 60 days after the invoice date therefor, unless such payables are being contested in good faith by appropriate proceedings and as to which such reserve as is required by GAAP has been made; provided that, the accounts payable set forth on Schedule 6.24 shall not be permitted to remain unpaid for longer than as permitted under the Plan of Reorganization.

7.6.4    No Loan Party nor any Subsidiary will permit or allow the terms and provisions of the Revolving Credit Facility to be amended without the consent of the Administrative Agent and the Required Lenders, except as permitted under the terms of the Intercreditor Agreement.

- 46 -

7.7     *Negative Pledge*. No Loan Party nor any Subsidiary will create, suffer to exist or otherwise allow any Liens to be on or otherwise to affect any of its Property whether now owned or hereafter acquired, except Permitted Liens.

7.8     *Loans and Advances to Others; Investments; Restricted Payments.*

7.8.1     No Loan Party nor any of their respective Subsidiaries will make or suffer to exist any loan, advance or extension of credit to any Person except (a) trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and which are payable in accordance with customary trade terms, (b) Permitted Investments, (c) advances to employees of such Loan Party or such Subsidiary for payment of expenses in the ordinary course of business and (d) other extensions of credit customary in the oil and gas business, including payments as operator for operating expenses to be reimbursed by non-operators.

7.8.2     No Loan Party nor any of their respective Subsidiaries will make any capital contribution to or to acquire any Investment in, or to purchase or agree to purchase any interest in or Debt of, any Person; provided that the foregoing restriction will not prohibit (a) any transaction permitted by clauses (a) and (b) of Section 7.8.1, (b) the purchase or acquisition of producing Oil and Gas Properties, or (c) Investments received by any Loan Party or any of its respective Subsidiaries in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners or other industry partners in the ordinary course of business in an aggregate amount not to exceed $2,000,000 at any one time outstanding.

7.8.3     No Loan Party will, directly or indirectly, make any Restricted Payment; provided, however, that payments in kind (but not in cash) may be made to each of Thomas F. Cooke and Andrew C. Clifford in accordance with the terms of the Subordinated Notes described in clauses (a) and (b), respectively, of the definition thereof.

7.9     *Consolidation, Merger, Maintenance, Change of Control; Disposition of Property; Restrictive Agreements; Hedging Agreements; Modification of Organizational Documents.*

7.9.1     No Loan Party nor any of their respective Subsidiaries will (a) consolidate or merge with or into any other Person (other than the merger of any Subsidiary of the Borrower into the Borrower where the Borrower is the surviving Person or into a Guarantor where a Guarantor is the surviving Person or the surviving person becomes a Guarantor), (b) sell, lease or otherwise transfer all or substantially all of its Property to any other Person, (c) terminate, or fail to maintain, its existence as a corporation in its state of incorporation or (d) terminate, or fail to maintain, its good standing and qualification to transact business in all jurisdictions where the nature of its business requires the same.

7.9.2     No Loan Party nor any of their respective Subsidiaries will sell or otherwise transfer, remove or destroy all or any portion of the Collateral or, any Property having Collateral Value without the prior written consent of the Required Lenders, which consent, with respect to Property not having Collateral Value, shall not be unreasonably

- 47 -

withheld, conditioned or delayed by any Lender or the Administrative Agent, except for (a) sales of Hydrocarbons after severance in the ordinary course of business, provided that no contract for the sale of Hydrocarbons shall obligate the Borrower or any of its Subsidiaries to deliver Hydrocarbons produced from any of the Collateral at some future date without receiving full payment therefor within 90 days of delivery, (b) the sale or other disposition of its personal Property destroyed, worn out, damaged, or having only salvage value or no longer used or useful in the business of the Borrower or any Subsidiary, (c) dispositions of claims against customers, working interests owners, other industry partners or any other Person in connection with workouts or bankruptcy, insolvency or other similar proceedings with respect of such Person thereto not affecting Collateral, (d) the assignment or participation to a non-Affiliate of any working interest in Oil and Gas Properties not constituting Collateral that have no Proved Reserves, in the ordinary course of business, on customary terms and in arms' length transactions, or (e) the abandonment of Oil and Gas Properties that are not capable of producing Hydrocarbons in paying quantities after expiration of their primary terms. In the event of any disposition of Property permitted under this Section 7.9.2, the Administrative Agent is authorized on behalf of the Lenders to release and shall promptly release any Liens in favor of the Administrative Agent for the benefit of the Lenders or any other Persons covering such Property upon the written request from an authorized representative of the Borrower which specifically identifies the subject Property and certifies that such disposition complies with the terms of this Section.

7.9.3      No Loan Party nor any of their respective Subsidiaries will be or become party to or bound by any agreement (including, without limitation, any undertaking in connection with the incurrence of Debt or issuance of securities) which imposes any limitation on the disposition of the Collateral which in any way would be contravened by the Loan Parties' or any of their respective Subsidiaries' performance of its obligations hereunder or under the other Loan Documents or which contains any prohibition on pledging all or any portion of the Loan Parties' or any Subsidiary's Property to the Administrative Agent for the benefit of the Lenders.

7.9.4      (a) No Loan Party will enter into any Hedging Agreement, other than Acceptable Commodity Hedging Agreements. No Subsidiary (other than Guarantors) shall enter into any Hedging Agreements.

(b)      No Loan Party will cause or permit any Commodity Hedging Agreement now existing or hereafter entered into by such Loan Party to be amended or modified in any material respect or terminated prior to its stated expiration date or liquidated without the prior written consent of the Administrative Agent, which consent will not be unreasonably withheld, or as required to remain in compliance with clause (a) preceding.

7.9.5      The Borrower will not (a) prepay or otherwise satisfy prior to the schedule maturity thereof in any manner any of the Subordinated Notes, (b) make any payment in violation of any subordination terms applicable thereto or (c) amend, restate, supplement or otherwise modify the Subordinated Notes, in each case, without the prior written consent of the Administrative Agent.

- 48 -

7.9.6    The Loan Parties will promptly, and in any event within ten (10) days after the occurrence, deliver notice to the Administrative Agent of any amendment or other modification to the certificate of incorporation, bylaws or other organizational documents of any Loan Party or any of their respective Subsidiaries in any material or in any respect which could be adverse to the interests of the Administrative Agent or the Lenders.

7.10    *Primary Business; Location of Borrower's Office; Ownership of Assets.*

7.10.1    The primary business of the Loan Parties and each of their Subsidiaries shall be and remain the oil and gas exploration, development, production, transportation and gathering business and the operation of oil and gas properties.

7.10.2    The location of the principal place of business and executive office of (a) each Loan Party (other than THG and HOG) shall remain at 7500 San Felipe, Suite 675, Houston, Texas 77063 and (b) each of THG and HOG shall remain at 67201 Industry Lane, Covington, Louisiana 70433, in each case, unless at least thirty (30) days prior to any change in such address such Loan Party provides the Administrative Agent with written notice of such pending change, provided, however, that each Loan Party's principal place of business and executive office shall remain in the United States of America.

7.10.3    Except as a result of sales, transfers or other dispositions permitted hereunder, the Borrower and its Consolidated Subsidiaries will at all times own, both beneficially and of record, all real property comprising Oil and Gas Properties reflected in its financial statements delivered to the Administrative Agent from time to time, subject only to Permitted Liens.

7.11    *Operation of Properties and Equipment; Compliance with and Maintenance of Contracts; Duties as Non-Operator.*

7.11.1    (a) Each Loan Party and each of its respective Subsidiaries shall maintain, develop and operate its Oil and Gas Properties in a good and workmanlike manner and will observe and comply in all material respects with all of the terms and provisions, express or implied, of all oil and gas leases relating to such Properties in order to keep such leases in effect for so long as such Crude Oil and Natural Gas Leases are capable of producing Hydrocarbons in commercial quantities.

(b)    Except to the extent replaced by another Loan Party, no Loan Party nor any of its Subsidiaries shall resign as the named operator for each well in which it now or hereafter owns an interest if it is the operator thereof on the date hereof or becomes the operator thereof subsequent hereto.

(c)    Each Loan Party and each of its respective Subsidiaries shall at all times, maintain, preserve and keep all operating equipment used or useful with respect to the Oil and Gas Properties of the Loan Parties or the Subsidiaries in proper repair, working order and condition, ordinary wear and tear excepted, and make all necessary or appropriate repairs, renewals, replacements, additions and improvements thereto so that the efficiency of such operating equipment shall at all times be properly preserved and maintained, ordinary wear and tear excepted, provided that no item of operating equipment need be so repaired, renewed,

- 49 -

replaced, added to or improved, if the Borrower shall in good faith determine that such action is not necessary or desirable for the continued efficient and profitable operation of the business of the Loan Parties and their respective Subsidiaries.

7.11.2    Each Loan Party and each of its respective Subsidiaries shall comply in all material respects with all agreements, easements, licenses, franchises, permits and contracts (both existing and future) applicable to or relating to its Oil and Gas Properties or the production and sale of Hydrocarbons therefrom and all applicable proration and conservation laws of the jurisdictions in which such Properties are located.

7.11.3    With respect to the Oil and Gas Properties referred to in this Section which are operated by operators other than the Loan Parties or one of their respective Subsidiaries, no Loan Party nor any of their respective Subsidiaries shall be obligated itself to perform any undertakings contemplated by the covenants and agreements contained in this Section which are performable only by such operators and are beyond the control of such Loan Party or such Subsidiary, but such Loan Party or such Subsidiary shall use reasonable efforts to cause such operators to perform such undertakings.

7.11.4    No Loan Party nor any of their respective Subsidiaries will amend, alter or change in any respect adverse to the interests of the Loan Parties and their Subsidiaries, taken as a whole, or the Administrative Agent and the Lenders any agreements relating to the operations or business arrangements of the Loan Parties or any of their Subsidiaries, including, without limitation, any agreements relating to the compression, gathering, sale or transportation of Crude Oil and Natural Gas.

7.12    *Transactions with Affiliates.*    No Loan Party nor any of their respective Subsidiaries will engage in any transaction with an Affiliate (other than a Loan Party) unless such transaction is at least as favorable to such Loan Party or such Subsidiary as could be obtained in an arm's length transaction with an unaffiliated third party.

7.13    *Plans.*    No Loan Party nor any of their respective Subsidiaries will assume or otherwise become subject to an obligation to contribute to or maintain any Plan or Multiemployer Plan or acquire any Person which has at any time had an obligation to contribute to or maintain any Plan or Multiemployer Plan.

7.14    *Compliance with Laws and Documents.*    No Loan Party nor any of their respective Subsidiaries will, directly or indirectly, violate in any material respect the provisions of any laws or any of its Material Agreements or violate its certificate of incorporation or bylaws.

7.15    *Certain Financial Covenants.*

7.15.1    *Quarterly EBITDA to Cash Interest Expense.*    The Borrower will not permit the ratio of EBITDA to Interest Expense to be less than (a) 1.80 to 1.00, determined as of the end of the calendar quarter ending on June 30, 2010; (b) 1.65 to 1.00, determined as of the end of the calendar quarter ending on September 30, 2010; (c) 1.75 to 1.00, determined as of the end of the calendar quarter ending on December 31, 2010; (d) 2.00 to 1.00,

- 50 -

determined as of the end of the calendar quarter ending on March 31, 2011; and (e) 2.25 to 1.00, determined as of the end of the calendar quarters ending on or after June 30, 2011.

7.15.2    *Current Ratio.* Commencing with the fiscal quarter that begins on April 1, 2010 and at the end of each fiscal quarter thereafter, the Borrower will not permit at any time the ratio of its Current Assets to its Current Liabilities to be less than 1.00 to 1.00.

7.15.3    *Total Debt to Annualized EBITDA.* The Borrower will not permit the ratio of Total Debt to Annualized EBITDA to be greater than the values indicated below for the fiscal quarters indicated below:

| Calendar Quarter ending: | Total Debt to Annualized EBITDA |
|---|---|
| June 30, 2010 | 6.25 |
| September 30, 2010 | 6.00 |
| December 31, 2010 | 5.5 |
| March 31, 2011 | 5.25 |
| June 30, 2011 | 4.75 |
| September 30, 2011 | 4.5 |
| December 31, 2011 | 4.5 |
| March 31, 2012 | 4.25 |

7.15.4    *Minimum EBITDA.* The Borrower will not permit its EBITDA as of the last day of each calendar quarter to be less than the amounts specified below for the respective calendar quarter:

| Calendar Quarter ending: | Minimum EBITDA |
|---|---|
| June 30, 2010 | $6,000,000 |
| September 30, 2010 | $6,300,000 |
| December 31, 2010 | $7,000,000 |
| March 31, 2011 | $7,200,000 |
| June 30, 2011 | $7,200,000 |
| September 30, 2011 | $7,500,000 |
| December 31, 2011 | $7,750,000 |
| March 31, 2012 | $7,750,000 |

7.15.5    *Development Program Expenditures.* The Borrower will not make any unreasonable Development Program Expenditures.

7.15.6    *Total Proved PV10 Value to Net Total Debt.* The Borrower will not permit the ratio of Total Proved PV10 Value to Total Debt (net of unrestricted cash and cash equivalents) in each case, on a consolidated basis as of the last day of each fiscal quarter to be less than 1.25 to 1.00.

- 51 -

7.15.7    *Minimum Net Production.*  As of the last day of each fiscal quarter, the Borrower shall cause the Hydrocarbon production of the Borrower and its Subsidiaries, net of royalties and production due other parties, to be no less than the number of barrels of oil equivalents per day on average during such fiscal quarter set forth below, based on a conversion rate of 6 mcf of Natural Gas per barrel of Crude Oil and exclusive of any shut-ins resulting from a named tropical storm or hurricane and incidents or accidents that cause pipelines not to be operating for reasons outside the Borrower's reasonable control:

| Calendar Quarter ending: | Minimum Net Production BOE Per Day |
|---|---|
| June 30, 2010 | 1,900 |
| September 30, 2010 | 2,100 |
| December 31, 2010 | 2,300 |
| March 31, 2011 | 2,200 |
| June 30, 2011 | 2,200 |
| September 30, 2011 | 2,300 |
| December 31, 2011 | 2,400 |
| March 31, 2012 | 2,300 |

7.16    *Tax Shelter.*  In the event the Borrower determines to take any action inconsistent with the representation in <u>Section 6.9.2</u>, it will promptly notify the Administrative Agent thereof. Accordingly, if the Borrower so notifies the Administrative Agent, the Borrower acknowledges that the Administrative Agent and the Lenders may treat the Loans as part of a transaction that is subject to Treasury Regulation Section 301.6112-1, and the Administrative Agent and the Lenders will maintain the lists and other records required by such Treasury Regulation.

7.17    *Additional Documents; Quantity of Documents; Title Data; Additional Information.*

7.17.1    Each Loan Party promptly shall execute and deliver or cause to be executed and delivered such other and further instruments or documents as in the reasonable judgment of the Administrative Agent may be required to cure any defects in the Loan Documents, to further evidence and more fully describe the Collateral, to correct omissions in the Loan Documents or to perfect, protect or preserve any Liens created pursuant to the Loan Documents.

7.17.2    Each Loan Party will deliver all instruments, certificates, opinions, reports and documents required hereunder in such number of counterparts as the Administrative Agent may reasonably request.

7.17.3    Upon the request of the Administrative Agent following either (i) the acquisition of any Oil and Gas Properties by any Loan Party or any of their respective Subsidiaries or (ii) the recharacterization of any Oil and Gas Property as a "Proved Reserve," the Borrower and/or the Guarantors shall cause to be delivered to the Administrative Agent any additional or supplemental title opinions, in form and substance and from attorneys

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 134 of 183

reasonably acceptable to the Administrative Agent, or other confirmation of title acceptable to the Administrative Agent, which when considered in connection with all title opinions or materials previously delivered to the Administrative Agent, cover no less than 90% of the Total Proved PV10 Value of the Oil and Gas Properties of the Loan Parties and their respective Subsidiaries included in the most recent Reserve Report, as adjusted for any such acquisitions, and promptly, but in any event within thirty (30) days following notice from the Administrative Agent of any defect, material in the opinion of the Administrative Agent, in the title of the mortgagor under any Mortgage to any Oil and Gas Property covered thereby, clear such title defect, and in the event any such title defects are not cured in a timely manner, pay all related costs and fees incurred by the Administrative Agent and the Lenders in attempting to do so.

7.17.4    Each Loan Party shall furnish to the Administrative Agent, promptly upon the request of the Administrative Agent, such additional financial or other information concerning the assets, liabilities, operations, and transactions of the Borrower and its Subsidiaries as the Administrative Agent may from time to time reasonably request.

7.18    *Subsidiaries.*

7.18.1    No Loan Party nor any of their respective Subsidiaries shall form or acquire any Subsidiaries without the prior written consent of the Administrative Agent and the Required Lenders, other than the formation or acquisition by the Borrower of wholly-owned Subsidiaries after compliance with Section 7.18.2.

7.18.2    Concurrently with the acquisition or formation of any subsidiary which is to be a Subsidiary and prior to the Borrower's advancing or contributing any amounts to or into such Subsidiary, the Borrower shall cause to be delivered to the Administrative Agent for the benefit of the Lenders, (a) the Assumption Agreement executed by such Subsidiary, (b) a Pledge Agreement duly executed by the Borrower or a Subsidiary of the Borrower, as applicable, covering the Equity Interests of such Subsidiary, (c) stock certificates or other instruments representing all the Equity Interest of such Subsidiary and stock powers and instruments of transfer, endorsed in blank, with respect to such stock certificates or other instruments, or, if any Equity Interests pledged pursuant to such Pledge Agreement are uncertificated securities, confirmation and evidence satisfactory to the Administrative Agent that the security interest in such uncertificated securities has been transferred to and perfected by the Administrative Agent in accordance with the UCC, (d) a Security Agreement duly executed by such Subsidiary covering all personal property of such Subsidiary, (e) all documents and instruments, including Uniform Commercial Code Financing Statements (Form UCC-1), or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under each Pledge Agreement and Security Agreement, (f) UCC Searches, all dated reasonably close to the date of the Pledge Agreement and Security Agreement and in form and substance satisfactory to the Administrative Agent, and evidence reasonably satisfactory to the Administrative Agent that any Liens indicated in such UCC Searches are Permitted Liens or have been released, (g) a Deposit Account Control Agreement duly executed by such Subsidiary of the Borrower and the Administrative Agent regarding the Deposit Account applicable to such Subsidiary, (h) notices of payment instructions addressed to all purchasers of Hydrocarbons produced from

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 135 of 183

the Oil and Gas Properties of such Subsidiary, (i) letter-in-lieu of transfer order with respect to the Oil and Gas Properties of such Subsidiary and (j) if required by the Administrative Agent, title opinion or other title information relating to such Oil and Gas Properties.

### 7.19 *Mortgaged Property.*

7.19.1    Each Loan Party will observe and comply with all of the terms and provisions, express or implied, of the Crude Oil, Natural Gas or Crude Oil and Natural Gas (or Crude Oil, Natural Gas and mineral) leases included in or relating to the Mortgaged Property (herein called "Subject Leases") and assignments constituting a part of the Mortgaged Property in order to keep the same in full force and effect. Each Loan Party will also, and will cause its respective Subsidiaries to, protect all Oil and Gas Properties included in the Mortgaged Property against drainage of Hydrocarbons thereunder by reason of production on other properties.

7.19.2    Promptly upon receipt of any written request from the Administrative Agent, the Loan Parties and their respective Subsidiaries will furnish and deliver, pursuant to such request, all title materials in the possession of such Loan Party and its respective Subsidiaries or to which such Loan Party and its respective Subsidiaries has access, including all title opinions and abstracts of title prepared by competent abstractors and covering title to the real property hereby mortgaged. Should any Loan Party or any Subsidiary fail to furnish such title opinions and abstracts upon such request, the Administrative Agent may proceed to obtain such title materials, and any and all costs so incurred shall be added to and included in the indebtedness secured hereby and shall be payable by such Loan Party and its respective Subsidiaries upon demand, the obligation for such payment being secured by all liens and remedies granted in any Mortgage. Any abstracts furnished by any Loan Party or any Subsidiary or so acquired by the Administrative Agent shall be and constitute a part of the Mortgaged Property, as above defined.

7.19.3    The Loan Parties and their respective Subsidiaries will, if requested by the Administrative Agent, furnish the Administrative Agent any information or data possessed by such Loan Party and its respective Subsidiaries with respect to the Mortgaged Property, and in the case of Crude Oil and Natural Gas Leases full information, including independent engineering reports and seismic data and interpretation, shall be furnished with regard to the wells drilled or reworked or drilling or reworking operations being conducted thereon, including, without limitation, electrical logs, core analyses, well pressure reports and copies of any electronic data and/or files used or produced in connection with reserve calculations; provided that the Loan Parties and their respective Subsidiaries shall not be obligated to disclose information subject to a valid and binding confidentiality agreement (or other agreement restricting disclosure of information) with a third party without first obtaining the consent of such third party, and each Loan Party and its respective Subsidiaries, to the extent requested by the Administrative Agent, will use its reasonable efforts to obtain such consent.

7.19.4    The Loan Parties and their respective Subsidiaries shall make available to the Administrative Agent, or its engineers, attorneys or representatives, at any time requested, its complete files and contracts on the Mortgaged Properties and the wells,

- 54 -

pipelines and other property located thereon, or regarding the operations of (or the production from) the Mortgaged Property, and in the event the Administrative Agent should take possession of the Mortgaged Property pursuant to a Mortgage or applicable law, or a keeper appointed pursuant to a Mortgage or applicable law should take possession of the Mortgaged Property, the Administrative Agent shall be entitled to possess as Collateral of all such files and contracts including seismic data and interpretation. Should any Mortgage be foreclosed (howsoever such foreclosure may be affected), the purchaser at the foreclosure sale shall be entitled to all such files as provided pursuant to the terms of such foreclosure and such Mortgage.

7.20   *Farm-Out Agreements.*  Neither the Borrower nor any of its Subsidiaries will, after the Effective Date, enter into any farm-out agreements.

7.21   *Exceptions to Covenants.*  No Loan Party nor any of its respective Subsidiaries shall be permitted to take any action which is permitted by any of the covenants contained in this Agreement if such action is in breach of any other covenant contained in this Agreement.

## ARTICLE VIII

### DEFAULTS; REMEDIES

8.1   *Events of Default; Acceleration of Maturity.*  If any one or more of the following events (each an "Event of Default") shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or Governmental Authority or otherwise):

8.1.1   (a) any Loan Party shall fail to pay, when due, any principal portion of any Obligation; or

(b)   any Loan Party shall fail to pay when due, any interest on any Loan, if such failure shall continue unremedied for a period of three (3) days; or

(c)   any Loan Party shall fail to pay when due, any fees or other amounts payable hereunder and not covered by clauses (a) or (b) above, if such failure shall continue unremedied for a period of ten (10) days; or

8.1.2   any Loan Party or any Subsidiary shall fail to observe or perform any covenant or agreement contained in Sections 7.2.3, 7.4.4, 7.6.2, 7.7, 7.8, 7.9, 7.15, or 7.17.3, or

8.1.3   any Loan Party or any Subsidiary shall fail to observe or perform any covenant or agreement contained in this Agreement or the other Loan Documents (other than those covered by Sections 8.1.1 or 8.1.2), for a period of thirty (30) days from the earlier of (a) the date on which such failure shall first become known to any Loan Party or any of its Subsidiaries and (b) written notice thereof is given to the Borrower by the Administrative Agent; or

- 55 -

8.1.4        except for the Chapter 11 Case, any Loan Party or any of its respective Subsidiaries shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate or other action to authorize any of the foregoing; or

8.1.5        an involuntary case or other proceeding shall be commenced against any Loan Party or any of its respective Subsidiaries seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of 60 days; or an order for relief shall be entered against any Loan Party or any of its respective Subsidiaries under the federal bankruptcy laws as now or hereafter in effect; or

8.1.6        any Loan Party shall fail to observe the covenant contained in Section 7.13 and such failure could reasonably be expected to have a Material Adverse Effect; or

8.1.7        (i) any Loan Party or any of its respective Subsidiaries shall default in the payment of any of any Material Debt (other than the Loans), including, without limitation, the Revolving Credit Facility, and such default shall continue beyond any applicable cure period or (ii) any other event or condition occurs which results in the acceleration of a Material Debt or which permits the holder thereof to accelerate a Material Debt of the Borrower or any of its Subsidiaries; or

8.1.8        one or more judgments or orders for the payment of money aggregating in excess of $500,000 shall be rendered against any Loan Party or any of its respective Subsidiaries which is not covered by insurance as to which the insurer has acknowledged full coverage therefor (subject to customary deductibles) and coverage of which such insurer is not disputing and such judgment or order (a) shall continue unsatisfied or unstayed (unless bonded with a *supersedeas* bond at least equal to such judgment or order) for a period of thirty (30) days, or (b) is not fully paid and satisfied to the date on which any of its Property may be lawfully sold to satisfy such judgment or order; or

8.1.9        any representation, warranty, certification or statement made or deemed to have been made by or on behalf of any Loan Party or any other Person in this Agreement or by any Loan Party or any other Person in any certificate, financial statement or other document delivered pursuant to this Agreement shall prove to have been incorrect in any material respect when made; or

- 56 -

8.1.10     any material license, franchise, permit, or authorization issued to the Borrower or any of its Subsidiaries by any Governmental Authority, the loss of which could reasonably be expected to result in a Material Adverse Effect, is forfeited, revoked, or not renewed; or any proceeding with respect to such forfeiture or revocation is instituted and is not resolved or dismissed within ninety (90) days of the date of the publication of the order instituting such proceeding; or a default shall occur under any Material Agreement, other than this Agreement, to which the Borrower or any of its Subsidiaries is a party or by which any of its Property is bound which could reasonably be expected to have a Material Adverse Effect;

8.1.11     a Change of Control Event shall occur, except as a result of the issuance of Equity Interests by the Borrower, the net proceeds of which are used to prepay the Obligations in full; or

8.1.12     (a) this Agreement, any Security Document or any other Loan Document ceases to be in full force and effect (except in accordance with its terms) or is declared null and void or the validity or enforceability is contested or challenged by any Loan Party, any Affiliate of any Loan Party or any of their respective members, partners or shareholders; (b) any Loan Party denies that it has any liability or obligation under this Agreement, any of the Security Documents or any other Loan Document; or (c) any of the Liens and security interests granted to the Administrative Agent under the Security Documents cease to be valid or perfected or cease to have the priority required hereby or under the Security Documents;

then, and in every such event, the Administrative Agent shall if requested by the Required Lenders, declare the outstanding principal balance of and accrued interest on the Loans and the other Obligations to be, and the same shall thereupon forthwith become, due and payable without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; provided that in the case of any of the Events of Default specified in Sections 8.1.4 and 8.1.5 with respect to the Borrower or any Guarantor, without any notice to the Borrower or any other act by the Administrative Agent or the Lenders, the Loans and the other Obligations (together with accrued interest thereon) shall become immediately due and payable without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each of the Borrower and each Guarantor.  The Administrative Agent agrees to give prompt written notice to the Borrower of any remedial actions taken pursuant to Section 8.1.

8.2     *Suits for Enforcement.*  In case any one or more of the Events of Default specified in Section 8.1 shall have occurred and be continuing, the Administrative Agent may proceed to protect and enforce its rights and the rights of the Lenders either by suit in equity or by action of law, or both, whether for the specific performance of any covenant or agreement contained in this Agreement or the other Loan Documents or in aid of the exercise of any power granted in this Agreement or the other Loan Documents.  Upon the occurrence and during the continuation of an Event of Default, Lender may (i) enter the premises of the Borrower or any Guarantor at any time, and (ii) until it completes the enforcement of its rights in the Collateral subject to its security interest or lien under the Security Documents and the sale or other disposition of any Property subject to those documents, take possession of those premises without charge, rent or

- 57 -

payment, or place custodians in control of any of the premises, remain on and use the premises and any of Collateral for the purpose of completing any work in progress, preparing any Collateral for disposition or collecting any Collateral.

8.3     *Remedies Cumulative.*  No remedy herein conferred upon the Administrative Agent or the Lenders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

8.4     *Remedies Not Waived.*  No course of dealing and no delay in exercising any rights under this Agreement or under the other Loan Documents shall operate as a waiver of any rights hereunder or thereunder of the Administrative Agent or the Lenders.

## ARTICLE IX

## GUARANTEE

9.1     *Guarantee.*

9.1.1     The Borrower and each of the Guarantors hereby unconditionally and irrevocably guarantees to the Administrative Agent, for the ratable benefit of the Administrative Agent and the Lenders and each of their respective permitted successors, endorsees, transferees and assigns, the prompt and complete payment by the Borrower and the Guarantors when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations, provided, however, that each of the Guarantors shall be jointly and severally liable under this Article for the maximum amount of such liability that can be hereby incurred without rendering this Guarantee, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount. This is a guarantee of payment and not collection and the liability of the Borrower and each Guarantor is primary and not secondary.

9.1.2     The guarantee contained in this Article shall remain in full force and effect at all times when Loans are outstanding.

9.1.3     No payment made by the Borrower, any Guarantor or any other Person, or received or collected by any Agent or any Lender from the Borrower, any Guarantor or any other Person, by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall, except to the extent of such payment, be deemed to modify, reduce, release or otherwise affect the liability of the Borrower or such Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by the Borrower or such Guarantor in respect of the Obligations or any payment received or collected from the Borrower or such Guarantor in respect of the Obligations), remain liable for the Obligations (except to the extent of such payment).

9.1.4     The Borrower and each Guarantor hereby unconditionally and irrevocably agree that in the event any payment shall be required to be made to any Agent or any Lender hereunder or under any other guaranty, the Borrower or such Guarantor will

- 58 -

contribute, to the maximum extent permitted by law, such amounts to each other Guarantor or Borrower so as to maximize the aggregate amount paid to such Agent or Lender under or in respect of the Loan Documents.

9.2    *No Subrogation.*  Notwithstanding any payment made by the Borrower or any Guarantor under this Article, under any Loan Document or any set-off or application of funds of the Borrower or any Guarantor by any Agent or any Lender, the Borrower or the applicable Guarantor shall not be entitled to be subrogated to any of the rights of any Agent or any Lender against the Borrower or any Guarantor or any collateral security or guarantee or right of offset held by any Agent or any Lender for the payment of the Obligations, nor shall the Borrower or such Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any Guarantor in respect of payments made by the Borrower or such Guarantor hereunder. If any amount shall be paid to the Borrower or such Guarantor on account of such subrogation rights, such amount shall be held by the Borrower or such Guarantor in trust for the Agents and the Lenders, segregated from other funds of the Borrower or such Guarantor, and shall, forthwith upon receipt by the Borrower or such Guarantor, be turned over to the Administrative Agent in the exact form received by the Borrower or such Guarantor (duly indorsed by the Borrower or such Guarantor to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured), in such order as the Administrative Agent may determine but subject in any event to the terms and provisions of this Agreement.

9.3    *Amendments, etc. with respect to the Obligations.*  The Borrower and each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Borrower or such Guarantor and without notice to or further assent by the Borrower or such Guarantor, any demand for payment of any of the Obligations made by any Agent or any Lender may be rescinded by such Agent or such Lender and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Agent or any Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Agent or any Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Neither the Administrative Agent, nor any Lender shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this Article or any property subject thereto.

9.4    *Guarantees Absolute and Unconditional.*  Each of the Borrower and each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Agent or any Lender upon the guarantee contained in this Article or acceptance of the guarantee contained in this Article; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Agents and the Lenders, on the other hand, likewise shall be conclusively presumed to have been

- 59 -

had or consummated in reliance upon the guarantee contained in this Article. Each of the Borrower and each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower and the Guarantors with respect to the Obligations. Each of the Borrower and the Guarantors understands and agrees that the guarantee contained in this Article shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Agent or any Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any Guarantor or any other Person against any Agent or any Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Guarantors or the Borrower), other than payment or performance, which constitutes, or might be construed to constitute, an equitable or legal discharge of any of the Borrower or the Guarantors for the Obligations, or of the Borrower or the Guarantors under the guarantee contained in this Article, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Borrower or such Guarantor any Agent or any Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower or any Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by any Agent or any Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower or any Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower or any Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve the Borrower or such Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Agent or any Lender against the Borrower or such Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

9.5     *Reinstatement.* The guarantee contained in this Article shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by any Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its or their respective property, or otherwise, all as though such payments had not been made.

9.6     *Additional Guarantors.* Each Subsidiary of the Borrower (as required to become a party to this Agreement pursuant to Section 7.18 of this Agreement) shall become a Guarantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement and shall thereafter have the same rights, benefits and obligations as a Guarantor party hereto on the date hereof.

- 60 -

## ARTICLE X

## MISCELLANEOUS

10.1 *Amendments and Waivers*. Any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Borrower and the Required Lenders (and, if the rights or duties of the Administrative Agent, by the Administrative Agent); provided that no such amendment or waiver shall, unless signed by all the Lenders, (i) subject any Lender to any obligation to make additional loans, (ii) reduce the principal of or rate of interest on any Loan or other Obligation, or any fees hereunder, (iii) postpone the date fixed for any payment of principal of or interest on any Loan, or any fees hereunder, (iv) change the definition of "Required Lenders" or the percentage of Lenders which shall be required for the Lenders or any of them to take any action under this Section or any other provision of this Agreement, (v) amend this Section 10.1 or (vi) effect a release of all or substantially all of the Collateral other than to facilitate the provisions of Section 7.9.2. Delivery of an executed counterpart of such written instrument by telecopy or other electronic means shall be effective delivery of a manually executed counterpart of such written instrument.

10.2 *Compliance with Laws*. It is the intention of the parties to comply with applicable usury laws (now or later enacted). Accordingly, and notwithstanding any provision to the contrary in this Agreement, the other Security Documents or any other Loan Document, in no event will this Agreement or any other Loan Document require the payment or permit the collection of interest in excess of the maximum amount permitted by those laws. If, under any circumstances, the fulfillment of any provision of this Agreement or of any other Loan Document will involve exceeding the limit prescribed by applicable law for the contracting for or charging or collecting interest, then the obligation to be fulfilled will, ipso facto, be reduced to the allowable limit, and if, under any circumstances, the Administrative Agent or any Lender ever receives pursuant to any of the Loan Documents anything of value as interest or that is deemed to be interest under applicable law that would exceed the Highest Lawful Rate, the amount that would otherwise be excessive interest will be applied to the reduction of the principal amount owing on the Loans or on account of any other indebtedness owed by Borrower to the Administrative Agent or such Lender, and not to the payment of interest; or, if any portion of the excessive interest exceeds the unpaid balance of principal of that indebtedness, then the excess amount will be refunded to Borrower. In determining whether or not the interest paid or payable with respect to any indebtedness owed by Borrower to the Administrative Agent or such Lender exceeds the Highest Lawful Rate, Borrower and Lender will, to the maximum extent permitted by applicable law, (a) characterize any non principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects of them, (c) amortize, prorate, allocate and spread the total amount of interest throughout the full term of the indebtedness so that the actual rate of interest on account of the indebtedness does not exceed the maximum amount permitted by applicable law, and (d) allocate interest between portions of the indebtedness so that no portion will bear interest at a rate greater than that permitted by applicable law.

- 61 -

10.3  *INDEMNITY.*

10.3.1  **IN ADDITION TO ANY OTHER INDEMNIFICATIONS HEREIN OR IN ANY OTHER LOAN DOCUMENTS, THE BORROWER AND EACH GUARANTOR, JOINTLY AND SEVERALLY, AGREE TO INDEMNIFY AND DEFEND AND HOLD HARMLESS ON A CURRENT BASIS THE INDEMNIFIED PARTIES, FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, COSTS, INTEREST, CHARGES, COUNSEL FEES AND OTHER EXPENSES AND PENALTIES OF ANY KIND WHICH ANY OF THE INDEMNIFIED PARTIES MAY SUSTAIN OR INCUR IN CONNECTION WITH ANY INVESTIGATIVE, ADMINISTRATIVE OR JUDICIAL PROCEEDING (WHETHER OR NOT THE ADMINISTRATIVE AGENT OR ANY LENDER SHALL BE DESIGNATED A PARTY THERETO) OR OTHERWISE BY REASON OF OR ARISING OUT OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS AND/OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  THE INDEMNIFICATION PROVISIONS IN THIS SECTION SHALL BE ENFORCEABLE REGARDLESS OF WHETHER THE LIABILITY IS BASED ON PAST, PRESENT OR FUTURE ACTS, CLAIMS OR LEGAL REQUIREMENTS (INCLUDING ANY PAST, PRESENT OR FUTURE BULK SALES LAW, ENVIRONMENTAL LAW, FRAUDULENT TRANSFER ACT, OCCUPATIONAL SAFETY AND HEALTH LAW, OR PRODUCTS LIABILITY, SECURITIES OR OTHER LEGAL REQUIREMENT), AND REGARDLESS OF WHETHER ANY PERSON (INCLUDING THE PERSON FROM WHOM INDEMNIFICATION IS SOUGHT) ALLEGES OR PROVES THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE PERSON SEEKING INDEMNIFICATION OR OF ANY OTHER INDEMNIFIED PARTY, OR THE SOLE OR CONCURRENT STRICT LIABILITY IMPOSED ON THE PERSON SEEKING INDEMNIFICATION OR ON ANY OTHER INDEMNIFIED PARTY, BUT SHALL NOT APPLY TO ANY LIABILITIES, LOSSES, DAMAGES, COSTS, INTEREST, CHARGES, FEES, EXPENSES OR PENALTIES ARISING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF THE INDEMNIFIED PARTY SEEKING INDEMNIFICATION UNDER THIS SECTION; WITH THE FOREGOING INDEMNITY SURVIVING SATISFACTION OF ALL OBLIGATIONS AND THE TERMINATION OF THIS AGREEMENT UNLESS ALL SUCH OBLIGATIONS HAVE BEEN SATISFIED WHOLLY IN CASH FROM THE BORROWER AND THE GUARANTORS AND NOT BY WAY OF REALIZATION AGAINST ANY COLLATERAL OR THE CONVEYANCE OF ANY PROPERTY IN LIEU THEREOF, AND PROVIDED THAT SUCH INDEMNITY SHALL NOT EXTEND TO ANY CLAIM, LOSS, DAMAGE, LIABILITY, FINE, PENALTY, CHARGE, PROCEEDING, ORDER, JUDGMENT, ACTION, OR REQUIREMENT ARISING FROM THE ACTS OR OMISSIONS OF ANY INDEMNIFIED PARTY SUBSEQUENT TO ANY INDEMNIFIED PARTY BECOMING THE OWNER OF SUCH PROPERTY.**

10.3.2  Any amount to be paid under Section 10.3 to the Administrative Agent or any other Agent or any of the Lenders shall be a demand obligation owing by the Borrower and the Guarantors, jointly and severally, and if not paid within fifteen (15) days of

- 62 -

demand shall bear interest from the date of expenditure by such Agent or the Lenders, as the case may be, until paid at a per annum rate equal to the Default Rate. The obligations of the Borrower and the Guarantors under Section 10.3 shall survive payment of the Obligations and the assignment of any right hereunder.

10.4    *Expenses.*

10.4.1    The Borrower and each Guarantor, jointly and severally, shall pay (a) all reasonable out-of-pocket expenses of the Administrative Agent, including, without limitation, fees and disbursements of counsel for the Administrative Agent in connection with the preparation of this Agreement and the other Loan Documents (including, without limitation, the furnishing of any written or oral opinions or advice incident to this transaction) and, if appropriate, the recordation of the Loan Documents, any waiver or consent hereunder or any amendment hereof or any Default or alleged Default hereunder), and (b) if an Event of Default occurs, all out-of-pocket expenses incurred by the Administrative Agent, including, without limitation, fees and disbursements of counsel in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom, fees of auditors, consultants, engineers and other Persons incurred in connection therewith (including, without limitation, the supervision, maintenance or disposition of the Collateral) and investigative expenses incurred by the Administrative Agent in connection therewith, which amounts shall be deemed compensatory in nature and liquidated as to amount upon notice to the Borrower by the Administrative Agent and which amounts shall include, but not be limited to (i) all court costs, (ii) attorneys' fees, (iii) fees and expenses of auditors and accountants incurred to protect the interests of the Lenders, and (iv) fees and expenses incurred in connection with the participation by the Administrative Agent as a member of the creditors' committee in a case commenced under any Insolvency Proceeding, together with interest at the per annum interest rate equal to the Default Rate, calculated on a basis of a calendar year of 365 or 366 days, as the case may be, counting the actual number of days elapsed, on each such amount from the date of notification to Borrower that the same was expended, advanced, or incurred by the Administrative Agent until the date it is repaid to the Administrative Agent, with the obligations under Section 10.4 surviving the non-assumption of this Agreement in a case commenced under any Insolvency Proceeding and being binding upon the Borrower, each Guarantor, and/or a trustee, receiver, custodian, or liquidator of the Borrower or any Guarantor appointed in any such case.

10.4.2    **THE BORROWER AND EACH GUARANTOR, JOINTLY AND SEVERALLY, SHALL INDEMNIFY EACH LENDER AGAINST ANY TRANSFER TAXES, DOCUMENTARY TAXES, ASSESSMENTS OR CHARGES MADE BY ANY GOVERNMENTAL AUTHORITY BY REASON OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.**

10.4.3    Any amount to be paid under Section 10.4 to any Lender shall be a demand obligation owing by the Borrower and each Guarantor and if not paid within fifteen (15) days of demand shall bear interest from the date of expenditure by the Lender until paid at a per annum rate equal to the Default Rate. The obligations of the Borrower and each

- 63 -

Guarantor under <u>Section 10.4</u> shall survive payment of the Obligations and the assignment of any right hereunder.

10.5 *Survival*. All representations, warranties and covenants made by or on behalf of the Borrower or any of its Subsidiaries in this Agreement or the other Loan Documents herein or in any certificate or other instrument delivered by it or in its behalf under the Loan Documents shall be considered to have been relied upon by the Administrative Agent and the Lenders shall survive the delivery to the Administrative Agent and the Lenders of such Loan Documents or the extension of the Loans (or any part thereof), regardless of any investigation made by or on behalf of the Administrative Agent or any other Agent or the Lenders.

10.6 *Applicable Law; Venue; Waiver of Jury Trial.*

10.6.1 THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND PERFORMED IN NEW YORK, AND THE APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA, EXCEPT TO THE EXTENT ANOTHER JURISDICTION'S LAW IS EXPRESSLY ELECTED IN ANY LOAN DOCUMENT TO GOVERN OR APPLY TO SUCH LOAN DOCUMENT OR TO THE EXTENT THE LAWS OF ANY JURISDICTION WHERE COLLATERAL IS LOCATED REQUIRE APPLICATION OF SUCH LAWS WITH RESPECT TO SUCH COLLATERAL.

10.6.2 ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, ANY OTHER AGENT, THE LENDERS OR THE BORROWER OR ANY GUARANTOR IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWER AND EACH GUARANTOR IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 14.1</u>. THE BORROWER AND EACH GUARANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT THE BORROWER OR SUCH GUARANTOR, AS APPLICABLE, HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR

- 64 -

NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER AND EACH GUARANTOR HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

**10.6.3 THE BORROWER, EACH GUARANTOR, THE ADMINISTRATIVE AGENT, ANY OTHER AGENT AND EACH LENDER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION THAT RELATES TO OR ARISES OUT OF ANY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE ACTS OR OMISSIONS OF THE ADMINISTRATIVE AGENT, OR THE LENDERS IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR OTHERWISE WITH RESPECT THERETO. THE PROVISIONS OF THIS SECTION ARE A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT'S, EACH OTHER AGENT'S AND, EACH LENDER'S ENTERING INTO THIS AGREEMENT.**

10.7 *Invalid Provisions, Severability*. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof or thereof, such provision shall be fully severable, this Agreement and the other Loan Documents shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof, and the remaining provisions hereof and thereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of this Agreement or the other Loan Documents a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

10.8 *ENVIRONMENTAL INDEMNIFICATION*. **THE BORROWER AND EACH GUARANTOR, JOINTLY AND SEVERALLY, SHALL INDEMNIFY, DEFEND AND HOLD THE ADMINISTRATIVE AGENT, EACH OTHER AGENT AND EACH LENDER AND EACH OF THEIR SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND AFFILIATES AND EACH TRUSTEE FOR THE BENEFIT OF THE ADMINISTRATIVE AGENT OR THE LENDERS UNDER ANY SECURITY DOCUMENT (COLLECTIVELY, THE "<u>INDEMNIFIED PARTIES</u>") HARMLESS ON A CURRENT BASIS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, FINES, PENALTIES, CHARGES, ADMINISTRATIVE AND JUDICIAL PROCEEDINGS AND ORDERS, JUDGMENTS, REMEDIAL ACTIONS, REQUIREMENTS AND ENFORCEMENT ACTIONS OF ANY KIND, AND ALL COSTS AND EXPENSES INCURRED IN CONNECTION THEREWITH (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) (THE "<u>CLAIMS</u>"), ARISING DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, FROM (A) THE PRESENCE OF ANY HAZARDOUS SUBSTANCES ON, UNDER, OR FROM ANY PROPERTY OF THE**

- 65 -

BORROWER OR ANY OF ITS SUBSIDIARIES, WHETHER PRIOR TO OR DURING THE TERM HEREOF, (B) ANY ACTIVITY CARRIED ON OR UNDERTAKEN ON OR OFF ANY PROPERTY OF THE BORROWER OR ANY OF ITS SUBSIDIARIES, WHETHER PRIOR TO OR DURING THE TERM HEREOF, AND WHETHER BY THE BORROWER, ANY SUBSIDIARY, OR ANY PREDECESSOR IN TITLE, EMPLOYEE, AGENT, CONTRACTOR, OR SUBCONTRACTOR OF THE BORROWER OR ANY OF ITS SUBSIDIARIES OR ANY OTHER PERSON AT ANY TIME OCCUPYING OR PRESENT ON SUCH PROPERTY (BUT EXCLUDING INDEMNIFIED PARTIES), IN CONNECTION WITH THE HANDLING, TREATMENT, REMOVAL, STORAGE, DECONTAMINATION, CLEANUP, TRANSPORTATION, OR DISPOSAL OF ANY HAZARDOUS SUBSTANCES AT ANY TIME LOCATED OR PRESENT ON OR UNDER ANY PROPERTY OF THE BORROWER OR ANY SUBSIDIARY OF THE BORROWER, (C) ANY RESIDUAL CONTAMINATION ON OR UNDER ANY PROPERTY OF THE BORROWER OR ANY SUBSIDIARY OF THE BORROWER, OR (D) ANY CONTAMINATION OF ANY PROPERTY OR NATURAL RESOURCES ARISING IN CONNECTION WITH THE GENERATION, USE, HANDLING, STORAGE, TRANSPORTATION OR DISPOSAL OF ANY HAZARDOUS SUBSTANCES BY THE BORROWER OR ANY SUBSIDIARY OF THE BORROWER OR ANY EMPLOYEE, AGENT, CONTRACTOR, OR SUBCONTRACTOR OF THE BORROWER OR ANY SUBSIDIARY OF THE BORROWER WHILE SUCH PERSONS ARE ACTING WITHIN THE SCOPE OF THEIR RELATIONSHIP WITH THE BORROWER OR ANY SUBSIDIARY OF THE BORROWER, IRRESPECTIVE OF WHETHER ANY OF SUCH ACTIVITIES WERE OR WILL BE UNDERTAKEN IN ACCORDANCE WITH APPLICABLE REQUIREMENTS OF LAW, INCLUDING ANY OF THE FOREGOING IN THIS SECTION ARISING FROM THE SOLE NEGLIGENCE, COMPARATIVE NEGLIGENCE OR CONCURRENT NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES OR THE SOLE OR CONCURRENT STRICT LIABILITY IMPOSED ON ANY OF THE INDEMNIFIED PARTIES, BUT NOT ANY OF THE FOREGOING IN THIS SECTION ARISING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF THE INDEMNIFIED PARTY SEEKING INDEMNIFICATION UNDER THIS SECTION. THE FOREGOING INDEMNITY SHALL SURVIVE THE SATISFACTION OF ALL OBLIGATIONS, THE TERMINATION OF THIS AGREEMENT AND ANY TRANSFER OF THE PROPERTY OF THE BORROWER, ANY GUARANTOR OR ITS SUBSIDIARIES BY FORECLOSURE OR BY A DEED IN LIEU OF FORECLOSURE FOR ANY LENDER'S ENVIRONMENTAL LIABILITY, REGARDLESS OF WHETHER CAUSED BY, OR WITHIN THE CONTROL OF, THE BORROWER AND EACH GUARANTOR OR SUCH SUBSIDIARY UNLESS, AFTER SUCH FORECLOSURE OR DEED IN LIEU OF FORECLOSURE, SUCH AGENT OR LENDER HAS CAUSED SUCH ENVIRONMENTAL LIABILITY AND FURTHER EXCLUDING CLAIMS THAT RESULT FROM ACTIONS TAKEN BY A PERSON (OTHER THAN THE BORROWER OR ANY AFFILIATES OF THE BORROWER) AFTER SUCH FORECLOSURE OR DEED IN LIEU THEREOF.

10.9 *Communications Via Internet.* The Borrower and each Guarantor hereby authorize the Administrative Agent and each other Agent and each Lender and their respective counsel, engineers and advisors to communicate and transfer documents and other information

09-50397 - #1101  File 04/19/10  Enter 04/19/10 14:59:17  Main Document  Pg 148 of 183

(including, without limitation, confidential information) concerning this transaction or the Borrower and its Subsidiaries and the Property or the business affairs of the Borrower and its Subsidiaries via the Internet or other electronic communication without regard to the lack of security of such communications.

10.10 *USA Patriot Act Notice Public Material.* Each Lender hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower and such Guarantor, which information includes the name and address of the Borrower and such Guarantor, as applicable, and other information that will allow such Lender to identify the Borrower and such Guarantor in accordance with the Act. The Borrower and each of its Subsidiaries agrees promptly to comply with each such request.

The Borrower and each Guarantor hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower or each Guarantor hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public side" Lenders (i.e., Lenders that do not wish to receive material non public information with respect to the Borrower, any Guarantor or their securities) (each, a "Public Lender"). The Borrower and each Guarantor hereby agrees that (w) all Borrower Materials (other than SEC Reports) that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (x) by marking Borrower Materials "PUBLIC," the Borrower and each Guarantor shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as either publicly available information or not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or such Guarantor or their securities for purposes of United States Federal and state securities laws; (y) all SEC Reports and all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials (other than SEC Reports) that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor." The Borrower and each Guarantor shall be in compliance with all requirements to deliver information under this Agreement if they have made such information available to the Administrative Agent and, to the extent required, Lenders other than Public Lenders, and the failure of Public Lenders to receive information made available to other Lenders shall not result in any breach of this Agreement.

10.11 *EXCULPATION PROVISIONS.* EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS

RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

10.12 *Increased Cost and Reduced Return.*

10.12.1 If on or after the date hereof, in the case of any Loan, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Administrative Agent or any other Agent or any Lender (or its Lending Installation) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall impose, modify or deem applicable any reserve (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System), special deposit, insurance assessment or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Administrative Agent or any other Agent or any Lender (or its Lending Installation) and the result of any of the foregoing is to reduce the amount of any sum received or receivable by the Administrative Agent or any other Agent or Lender (or its Lending Installation) under this Agreement with respect thereto, by an amount reasonably deemed by the Administrative Agent or any other Agent or Lender to be material, then, within fifteen (15) days after demand by the Administrative Agent or any other Agent or Lender (with a copy to the Administrative Agent), the Borrower and each Guarantor, jointly and severally, shall pay to the Administrative Agent or any other Agent or Lender such additional amount or amounts as will compensate the Administrative Agent or any other Agent or Lender for such increased cost or reduction.

10.12.2 If the Administrative Agent or any other Agent or any Lender shall have reasonably determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change in any such rule or regulation, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on capital of the Administrative Agent or any other Agent or any Lender as a consequence of the Administrative Agent's, any other Agent's or Lender's obligations hereunder to a level below that which the Administrative Agent or any other Agent or any Lender could have achieved but for such adoption, change, request or directive (taking into consideration its policies with respect to capital adequacy) by an amount deemed by the Administrative Agent or any other Agent or any Lender to be material, then from time to time,

within fifteen (15) days after demand by the Administrative Agent or any other Agent or any Lender (with a copy to the Administrative Agent), the Borrower and each Guarantor, jointly and severally, shall pay to the Administrative Agent or any other Agent or any Lender such additional amount or amounts as will compensate the Administrative Agent or any other Agent or any Lender for such reduction.

10.12.3 Each Lender, the Administrative Agent or any other Agent will promptly notify the Borrower and the Administrative Agent of any event of which it has knowledge, occurring after the date hereof, which will entitle the Administrative Agent or any other Agent or Lender to compensation pursuant to this Section and will designate a different Lending Installation if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the sole judgment of the Administrative Agent or any other Agent or Lender, as the case may be, be otherwise disadvantageous to the Administrative Agent or any other Agent or Lender. A certificate of the Administrative Agent or any other Agent or Lender, as the case may be, claiming compensation under this Section and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error. In determining such amount, the Administrative Agent or any other Agent or Lender, as the case may be, may use any reasonable averaging and attribution methods.

10.13 *Taxes*.

10.13.1 For the purpose of <u>Section 10.13</u>, the following terms have the following meanings:

"**Taxes**" means any and all present or future taxes, duties, levies, imposts, deductions, charges or withholdings with respect to any payment by the Borrower or any Guarantor pursuant to this Agreement or under any other Loan Document, and all penalties and interest with respect thereto, *excluding* (a) in the case of each Lender and the Administrative Agent or any other Agent, taxes imposed on its income, and franchise or similar taxes imposed on it, by a jurisdiction under the laws of which such Lender or the Administrative Agent or any other Agent (as the case may be) is organized or in which its principal executive office is located, in which its Lending Installation is located or in which it would be subject to tax due to some connection other than that created by this Agreement and (b) in the case of each Lender, any United States withholding tax at the time such Lender first becomes a party to this Agreement.

"**Other Taxes**" means any present or future stamp or documentary taxes and any other excise or property taxes, or similar charges or levies and all penalties and interest with respect thereto, which arise from the making of any payment pursuant to this Agreement or under any other Loan Document or from the execution or delivery of this Agreement or any other Loan Document.

10.13.2 Any and all payments by the Borrower or any Guarantor to or for the account of any Lender or the Administrative Agent hereunder or under any other Loan Document shall be made without deduction for any Taxes or Other Taxes; <u>provided that</u>, if the Borrower or any Guarantor shall be required by law to deduct any Taxes or Other Taxes from any such payments, the sum payable shall be increased as necessary so that after making all

- 69 -

required deductions (including deductions applicable to additional sums payable under Section 10.12) such Lender or the Administrative Agent or any other Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (a) the Borrower or such Guarantor shall make such deductions, (b) the Borrower or such Guarantor shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law and (c) the Borrower or such Guarantor shall furnish to the Administrative Agent the original or a certified copy of a receipt evidencing payment thereof.

      10.13.3    The Borrower and each Guarantor, jointly and severally, agree to indemnify each Lender, the Administrative Agent and any other Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes on amounts payable under this Section) paid by such Lender or the Administrative Agent or any other Agent (as the case may be). This indemnification shall be paid within fifteen (15) days after such Lender or the Administrative Agent or any other Agent (as the case may be) makes appropriate demand therefor.

      10.13.4    At least five (5) Business Days prior to the first date on which interest or fees are payable hereunder for the account of any Lender, each Lender that is not incorporated under the laws of the United States of America, or a state thereof, agrees that it will deliver to each of the Borrower and the Administrative Agent two duly completed copies of United States Internal Revenue Service Form W-8 BEN or W-8 ECI or W-8 IMY or W-8 EXP or such other form as may be applicable and allowable under the Internal Revenue Code and the regulations thereunder (collectively, a "Withholding Form"), certifying in either case that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes. Each Lender which so delivers a Withholding Form further undertakes to deliver to each of the Borrower and the Administrative Agent two additional copies of such form (or a successor form) on or before the date that such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Form so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by the Borrower or the Administrative Agent, in each case certifying that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes, unless an event (including without limitation any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such Withholding Forms inapplicable or which would prevent such Lender from duly completing and delivering any such Withholding Form with respect to it and such Lender advises the Borrower and the Administrative Agent that it is not capable of receiving payments without any deduction or withholding of United States federal income tax.

      10.13.5    For any period with respect to which a Lender has failed to provide the Borrower or the Administrative Agent with the appropriate form pursuant to Section 10.13.4 (unless such failure is due to a change in treaty, law or regulation occurring subsequent to the date on which such form originally was required to be provided which renders all such Withholding Forms inapplicable or which would prevent such Lender from duly completing and delivering any such Withholding Form with respect to it), such Lender shall not be entitled to indemnification under Section 10.13.2 or 10.13.3 with respect to Taxes

- 70 -

imposed by the United States; provided that if a Lender, which is otherwise exempt from or subject to a reduced rate of withholding tax, becomes subject to Taxes because of its failure to deliver a form required hereunder, the Borrower shall take such steps (at the expense of such Lender) as such Lender shall reasonably request to assist such Lender to recover such Taxes.

10.13.6    If the Borrower or any Guarantor is required to pay additional amounts to or for the account of any Lender pursuant to Section 10.13, then such Lender will change the jurisdiction of its Lending Installation if, in the judgment of such Lender, such change (i) will eliminate or reduce any such additional payment which may thereafter accrue and (ii) is not otherwise disadvantageous to such Lender in its sole judgment.

10.13.7    The Obligations of Borrower and each Guarantor under this Section shall survive the payment of the Obligation and the assignment of any right hereunder.

10.14    *Collateral Matters; Hedging Agreements.* The benefit of the Security Documents and of the provisions of this Agreement relating to the Collateral shall also extend to and be available to those Lenders or their Affiliates which are counterparties to the Hedging Agreements on a pro rata basis in respect of any Hedging Agreement Obligations of Borrower or any of its Subsidiaries, whether or not such Person is a Lender at the time of entering into the Hedging Agreement or remains a Lender hereunder; provided that it is the intention of the Lenders that receipt of payment in respect of Hedging Agreement Obligations of Borrower and its Subsidiaries under any Hedging Agreement with a Lender or any Affiliate of a Lender from realization of any Collateral, shall be subject to the terms of the Intercreditor Agreement and the Security Documents. Any Person which is not a signatory to the Credit Agreement which is seeking to benefit from this Section or any of the Security Documents acknowledges and agrees that the Administrative Agent has entered into the Intercreditor Agreement and the Security Documents on behalf of such Person, the Agents, Lenders and Affiliates thereof, and by their acceptance of the benefits of the Security Documents hereby agrees to be bound by the terms of this Agreement, the Intercreditor Agreement and such Security Documents, acknowledges receipt of copies of the Intercreditor Agreement and such Security Documents and consents to the rights, powers, remedies, indemnities and exculpations given to the Administrative Agent thereunder.

10.15    *Intercreditor Agreement; Loan Documents.* Each Lender acknowledges and agrees that the Administrative Agent has entered into the Intercreditor Agreement and the Security Documents on behalf of itself, any other Agents, if any, and Lenders, and each of them (by their signature hereto or acceptance of the benefits of the Security Documents) hereby agrees to be bound by the terms of the Intercreditor Agreement and such Security Documents, acknowledge receipt of copies of the Intercreditor Agreement and such Security Documents and consents to the rights, powers, remedies, indemnities and exculpations given to the Administrative Agent thereunder. For so long as the Intercreditor Agreement shall be in effect, the terms and conditions of this Agreement and the other Loan Documents are subject to the terms of the Intercreditor Agreement. In the event of any inconsistency between this Agreement or any other Loan Document and the terms of the Intercreditor Agreement, the Intercreditor Agreement shall control. In the event of any inconsistency between this Agreement and the terms of any other Loan Document (other than the Intercreditor Agreement), this Agreement shall control.

10.16 *Arranger and other Agents.* None of the Persons identified on the facing page or the signature pages of this Agreement as the "Lead Arranger and Sole Book Runner" or as an Agent (other than the Administrative Agent) shall have any right, power, obligation, liability, responsibility or duty under this Agreement or any other Loan Document other than, except in the case of the Arranger, those applicable to all Lenders as such. Without limiting the foregoing, none of the Arranger or any Agent (other than the Administrative Agent) shall have or be deemed to have any fiduciary relationship with any Lender or Borrower or any of its Subsidiaries. Borrower and each Lender acknowledges that it has not relied, and will not rely, on any of the Arranger or any Agent (other than the Administrative Agent) in deciding to enter into this Agreement or in taking or not taking any action hereunder or under the Loan Documents.

10.17 *Ratification of Loan Documents.* Each of the Administrative Agent, the Borrower and each Guarantor hereby ratifies and affirms its obligations under the Loan Documents (as amended, restated or otherwise modified on the Effective Date), each of which (as amended, restated or otherwise modified on the Effective Date) shall continue in full force and effect. The Loan Parties represent and warrant that the Existing Debt is owing pursuant to the Loan Documents and is not subject to any counterclaim, reduction or setoff.

## ARTICLE XI

## AGENTS

11.1 *Appointment.* Wayzata Investment Partners LLC has been appointed Administrative Agent hereunder and under each other Loan Document, and each of the Lenders irrevocably authorizes the Administrative Agent to act as the Administrative Agent of such Lender. The Administrative Agent or any other Agent agree to act as such upon the express conditions contained in this Article XI. The Administrative Agent or any other Agent shall have no fiduciary relationship in respect of any Lender by reason of this Agreement or any other Loan Document.

11.2 *Powers of the Agents.* The Administrative Agent and any other Agents shall have and may exercise such powers under the Loan Documents as are specifically delegated to them by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Administrative Agent and any other Agents shall have no implied duties to the Lenders, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by them.

11.3 *General Immunity.* Neither the Administrative Agent or any other Agent nor any of their directors, officers, agents or employees shall be liable to any Lender for any action taken or omitted to be taken by it or them hereunder or under any other Loan Document or in connection herewith or therewith **(INCLUDING ANY OF THE FOREGOING ARISING FROM THE SOLE OR CONCURRENT NEGLIGENCE OF THE ADMINISTRATIVE AGENT, SUCH OTHER AGENT OR SUCH DIRECTORS, OFFICERS, ADMINISTRATIVE AGENTS OR EMPLOYEES)**, unless such action or omission arises from the gross negligence or willful misconduct of the Administrative Agent, such other Agent or such directors, officers, agents or employees.

11.4　*No Responsibility for Loans, Recitals, etc.*　Neither the Administrative Agent or any other Agent nor any of their respective directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into, or verify (a) any statement, warranty or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements of any obligor under any Loan Document, including, without limitation, any agreement by the Borrower or any Guarantor to furnish information directly to each Lender; (c) the satisfaction of any condition specified in Article V; or (iv) the validity, effectiveness or genuineness of any Loan Document or any other instrument or writing furnished in connection therewith.

11.5　*Action on Instructions of Lenders.*　The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Loan Document in accordance with written instructions signed by the Lenders or the Required Lenders, as the case may be, and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders. The Administrative Agent and any other Agents shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

11.6　*Employment of Agents and Counsel.*　The Administrative Agent and any other Agent may execute any of their respective duties hereunder and under any other Loan Document by or through employees, agents, and attorneys-in-fact and shall not be responsible to the Lenders, except as to money or securities received by it or its authorized agents, for the default or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care. The Administrative Agent and any other Agent shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder and under any other Loan Document.

11.7　*Reliance on Documents, Counsel.*　The Administrative Agent and any other Agent shall be entitled to rely upon any notice, consent, certificate, affidavit, letter, telegram, electronic transmission, facsimile, e-mail, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper Person, and, in respect to legal matters, upon the opinion of counsel selected by the Administrative Agent, which counsel may be employees of the Administrative Agent.

11.8　*Reimbursement and Indemnification of Agents.*　**The Lenders agree to REIMBURSE and INDEMNIFY the Administrative Agent and each other Agent on a current basis ratably in proportion to their Percentage Shares (a) for any amounts not reimbursed by the Borrower or any Guarantor for which such Agent is entitled to reimbursement by the Borrower or any Guarantor under the Loan Documents, and (b) for any other expenses incurred by such Agent on behalf of the Lenders, in connection with the preparation, execution, delivery, administration and enforcement of the Loan Documents. The Lenders also agree to REIMBURSE and INDEMNIFY the Administrative Agent, each other Agent on a current basis ratably in proportion to their Percentage Shares for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred**

by or asserted against such Agent in any way relating to or arising out of the Loan Documents or any other document delivered in connection therewith or the transactions contemplated thereby, or the enforcement of any of the terms thereof or of any such other documents (INCLUDING, WITHOUT LIMITATION, ANY OF THE FOREGOING ARISING OUT OF THE NEGLIGENCE, WHETHER SOLE OR CONCURRENT, OF SUCH AGENT), provided that no Lender shall be liable to such Agent for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of such Agent. The obligations of the Lenders under this Section 11.8 shall survive payment of the Obligations and termination of this Agreement.

11.9     *Rights as a Lender.*  The Administrative Agent and each other Agent shall have the same rights and powers hereunder and under any other Loan Document as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall, unless the context otherwise indicates, include each Agent in its individual capacity. The Administrative Agent, each other Agent and each other Lender may accept deposits from, lend money or otherwise extend credit to, and generally engage in any kind of trust, debt, equity or other transaction, in addition to those contemplated by this Agreement or any other Loan Document, with the Borrower or any of its Affiliates unless the Borrower or such Affiliate is specifically restricted hereunder. Neither the Administrative Agent or any other Agent, in its individual capacity, is obligated to remain a Lender hereunder.

11.10     *Lender Credit Decision.*  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Agent or any other Lender and based on the financial statements prepared by the Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents.

11.11     *Successor Agent.*  The Administrative Agent and any other Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower, such resignation to be effective upon the appointment of a successor Agent or, if no successor Agent has been appointed, forty-five days after the retiring Agent gives notice of its intention to resign. Upon any such resignation, the remaining Lenders by majority in interest shall have the right to appoint, with the approval of the Borrower if no Default then exists hereunder, which approval will not be unreasonably withheld or delayed, on behalf of the Borrower and the Lenders, a successor Agent. If no successor Agent shall have been so appointed by the Lenders with a majority in interest within thirty (30) days after the resigning Agent's giving notice of its intention to resign, then the resigning Agent may appoint, on behalf of the Borrower and the Lenders, a successor Agent. If any Agent has resigned or been removed and no successor Agent has been appointed, the Lenders may perform all the duties of such Agent hereunder and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and for all other purposes shall deal directly with the Lenders. No successor Agent shall be deemed to be appointed hereunder until such successor Agent has accepted the appointment. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor

Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Agent. Upon the effectiveness of the resignation or removal of any Agent, the resigning or removed Agent shall be discharged from its duties and obligations hereunder and under the Loan Documents. After the effectiveness of the resignation or removal of an Agent, the provisions of this Article XI shall continue in effect for the benefit of such Agent in respect of any actions taken or omitted to be taken by it while it was acting as an Agent hereunder and under the other Loan Documents.

11.12 *Applicable Parties.* The provisions of this Article are solely for the benefit of the Administrative Agent, any other Agents and the Lenders, and, except with respect to the appointment of a successor Agent, the Borrower shall not have any rights as a third party beneficiary or otherwise under any of the provisions of this Article. In performing functions and duties hereunder and under the other Loan Documents, each of the Administrative Agent and any other Agent shall each act solely as the contractual agent of the Lenders and does not assume, nor shall either of them be deemed to have assumed, any obligation or relationship of trust or agency with or for the Borrower or any legal representative, successor, and assign of the Borrower.

## ARTICLE XII

## SET-OFF; RATABLE TREATMENTS

12.1 *Set-off.* In addition to, and without limitation of, any rights of the Lenders under applicable law, if any Event of Default occurs and is continuing, any and all deposits (including all account balances, whether provisional or final and whether or not collected or available) and any other Debt at any time held or owing by any Lender or any Affiliate thereof to or for the credit or account of the Borrower or any Guarantor may be offset and applied toward the payment of the Obligations, whether or not the Obligations, or any part hereof, shall then be due. Each Lender or Affiliate thereof making such an offset and application shall give the Borrower and the other Lenders written notice of such offset and application promptly after effecting it.

12.2 *Ratable Treatments; Adjustments.*

12.2.1 Except to the extent otherwise expressly provided herein, (a) each payment by the Borrower or any Guarantor, as applicable, of fees payable to the Lenders shall be made for the account of the Lenders pro rata in accordance with their Percentage Shares, (b) each payment of principal of Loans shall be made for the account of the Lenders pro rata in accordance with the principal balances of their Loans, and (c) each payment of interest on the Loans shall be made for the account of the Lenders pro rata in accordance with their respective shares of the aggregate amount of interest due and payable to the Lenders under the Loans.

12.2.2 The Administrative Agent shall distribute all payments with respect to the Obligations to the Lenders promptly upon receipt in like funds as received. In the event that any payments made hereunder by the Borrower or any Guarantor at any particular time are insufficient to satisfy in full the Obligations due and payable at such time, such payments shall be applied (a) first, to fees and expenses due pursuant to the terms of this

09-50397 - #1101   File 04/19/10   Enter 04/19/10 14:59:17   Main Document   Pg 157 of 183

Agreement or any other Loan Document, (b) second, to accrued interest, (iii) third, to the principal of the Loans, and (iv) last, to any other Obligations.

12.2.3   If any Lender (for purposes of this Section, a "<u>Benefited Lender</u>") shall at any time receive any payment of all or part of its portion of the Obligations, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in <u>Section 8.1.4</u> or <u>8.1.5</u>, or otherwise) in an amount greater than such Lender was entitled to receive pursuant to the terms hereof, such Benefited Lender shall purchase for cash from the other Lenders such portion of the Obligations of such other Lenders, or shall provide such other Lenders with the benefits of any such Collateral or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds with each of the Lenders according to the terms hereof. If all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded and the purchase price and benefits returned by such Lender, to the extent of such recovery, but without interest.   The Borrower and each Guarantor agrees that each such Lender so purchasing a portion of the Obligations of another Lender may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion. If any Lender ever receives, by voluntary payment, exercise of rights of set-off or banker's lien, counterclaim, cross-action or otherwise, any funds of the Borrower or any Guarantor to be applied to the Obligations, or receives any proceeds by realization on or with respect to any Collateral, all such funds and proceeds shall be forwarded immediately to the Administrative Agent for distribution in accordance with the terms of this Agreement.

## ARTICLE XIII

## BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS

13.1   *Successors and Assigns.*  The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of the Borrower, each Guarantor, each other Subsidiary of the Borrower, the Administrative Agent, any other Agents and the Lenders and their respective successors and assigns, except that (a) the Borrower and each Guarantor shall not have any right to assign its rights or obligations under the Loan Documents and (b) any assignment by any Lender must be made in compliance with <u>Section 13.3</u>.  Notwithstanding clause (a) of this <u>Section 13.1</u>, any Lender may at any time, without the consent of the Borrower, any Guarantor or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Note, if any, to a Federal Reserve Bank or an Affiliate of a Lender or an Approved Fund.   Any assignee by executing an Assignment and Assumption agrees by acceptance thereof to be bound by all the terms and provisions of the Loan Documents.  The Administrative Agent, acting for this purpose as an agent of the Borrower and each Guarantor, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders and amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive absent clearly demonstrable error, and the Borrower, each Guarantor and each of the Administrative Agent and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all

purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender or any of the Agents, at any reasonable time and from time to time upon reasonable prior notice.

13.2 *Participations; Voting Rights; Set-offs by Participants.*

13.2.1 Any Lender may, in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Lender, any Note held by such Lender or any other interest of such Lender under the Loan Documents. In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, such Lender shall remain the holder of any such Loan for all purposes under the Loan Documents, all amounts payable by the Borrower and each Guarantor under this Agreement shall be determined as if such Lender had not sold such participating interests, and the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.

13.2.2 Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Loan Documents other than any amendment, modification or waiver with respect to any Loan in which such Participant has an interest which forgives principal, interest or fees or reduces the interest rate or fees payable with respect to any such Loan, or postpones any date fixed for any regularly-scheduled payment of principal of, or interest or fees on, any such Loan.

13.2.3 The Borrower and each Guarantor agree that each Participant shall be deemed to have the right of set-off provided in Section 12.1 in respect of its participating interest in amounts owing under the Loan Documents to the same extent as if the amount of its participating interest were owing directly to it as a Lender under the Loan Documents, and each Lender shall retain the right of set-off provided in Section 12.1 with respect to the amount of participating interests sold to each Participant. The Lenders agree to share with each Participant, and each Participant, by exercising the right of set-off provided in Section 12.1, agrees to share with each Lender, any amount received pursuant to the exercise of its right of set-off, such amounts to be shared in accordance with Section 12.2 as if each Participant were a Lender.

13.3 *Assignments.*

13.3.1 Any Lender may, in accordance with applicable law, at any time assign to one or more banks or other entities ("Purchasers") all or any part of its rights and obligations under the Loan Documents by completing and executing an Assignment and Assumption. The consent of the Borrower and the Administrative Agent, which consents shall not be unreasonably withheld or delayed, shall be required prior to an assignment becoming effective with respect to a Purchaser which is not a Lender or an Affiliate of a Lender or an Approved Fund; *except that*, if a Default has occurred and is continuing, the consent of the Borrower shall not be required. Each such assignment shall (unless it is to a Lender or an Affiliate thereof, or each of the Borrower and the Administrative Agent otherwise consents) be

- 77 -

in an amount not less than the lesser of (i) $5,000,000 or (ii) the remaining amount of the assigning Lender's Loans (calculated as at the date of such assignment).

13.3.2    Upon (a) execution of such Assignment and Assumption by the Administrative Agent or, in circumstances where the consent of the Administrative Agent is not required, the delivery to the Administrative Agent of the Assignment and Assumption, fully completed and executed, and (b) unless waived by the Administrative Agent, payment of a $3,500 processing fee to the Administrative Agent for its sole account for processing such Assignment and Assumption, such Assignment and Assumption shall become effective on the effective date specified in such Assignment and Assumption.  The Assignment and Assumption shall contain a representation by the Purchaser to the effect that none of the consideration used to purchase the Loans under the applicable Assignment and Assumption are "plan assets" as defined under ERISA and that the rights and interests of the Purchaser in and under the Loan Documents will not be "plan assets" under ERISA.  On and after the effective date of such Assignment and Assumption, such Purchaser shall for all purposes be a Lender party to this Agreement and any other Loan Document executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the Loans assigned to such Purchaser.  Upon the consummation of any assignment to a Purchaser pursuant to this Section 13.3.2, the transferor Lender, the Administrative Agent and the Borrower shall, if requested, make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such Purchaser reflecting such assignment.

13.4    *Dissemination of Information*.  The Borrower and each Guarantor authorizes each Lender to disclose to any Participant or Purchaser or any other Person acquiring an interest in the Loan Documents by operation of law (each a "Transferee") and any prospective Transferee any and all information in such Lender's possession concerning the creditworthiness of the Borrower and its Subsidiaries.

13.5    *Tax Treatment*.  If any interest in any Loan Document is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer, to comply with the provisions of Section 10.13.4.

13.6    *Disclosure of Information*.  Notwithstanding any of the other provisions of this Agreement or the other Loan Documents, the Administrative Agent and any other Agents and each Lender (and each employee, representative, or other agent of the Administrative Agent and each such Lender) may disclose to any and all Persons, without limitation of any kind, the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent, any other Agents or the Lenders relating to such tax treatment and tax structure; provided that, with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this authorization shall only apply to

such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

## ARTICLE XIV

## NOTICES

14.1  *Notices.* Except as otherwise specifically permitted herein, all notices, requests and other communications to any party hereunder shall be in writing (including electronic transmission, facsimile transmission or similar writing) and shall be given to such party: (a) in the case of the Borrower, each Guarantor or the Administrative Agent, at its address or facsimile number set forth on the signature pages hereof, (b) in the case of any Lender, at its address or facsimile number set forth on the signature pages hereof or in any Assignment and Assumption which has become effective pursuant to <u>Article XIII</u> or (c) in the case of any party, at such other address or facsimile number as such party may hereafter specify for the purpose by notice to the Administrative Agent and the Borrower in accordance with the provisions of this <u>Section 14.1</u>. Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when transmitted to the facsimile number specified in this Section and confirmation of receipt is received (the receipt thereof shall be deemed to have been acknowledged upon the sending Person's receipt of its facsimile machine's confirmation of successful transmission; <u>provided</u> that if the day on which such facsimile is received in not a Business Day or is after 4:00 p.m. on a Business Day, then the receipt of such facsimile shall be deemed to have been acknowledged on the next following Business Day), (ii) if given by mail, three (3) Business Days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid, or (iii) if given by any other means, when delivered (or, in the case of electronic transmission, received) at the address specified in this Section; except that notices to the Administrative Agent under <u>Article II</u> shall not be effective until received by the Administrative Agent.

14.2  *Change of Address.* The Borrower, each Guarantor, the Administrative Agent and any Lender may each change the address for service of notice upon it by a notice in writing to the other parties hereto.

## ARTICLE XV

## COUNTERPARTS

15.1  *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. This Agreement shall become effective at such time as the counterparts hereof which, when taken together, bear the signature of the Borrower, each Guarantor, the Administrative Agent and each Lender, shall be delivered to the Administrative Agent. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic means shall be effective as a delivery of a manually executed counterpart of this Agreement.

15.2  *ENTIRE AGREEMENT.* **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES**

HERETO WITH RESPECT TO THE SUBJECT HEREOF AND THEREOF AND SHALL SUPERSEDE ANY PRIOR AGREEMENT BETWEEN THE PARTIES HERETO, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT HEREOF OR THEREOF. FURTHERMORE, IN THIS REGARD, THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF SUCH PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG SUCH PARTIES.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Borrower, each Guarantor, the Lenders and the Administrative Agent have executed this Agreement as of the date first above written.

**BORROWER:**

SARATOGA RESOURCES, INC.


By_____
Name: Thomas F. Cooke
Title:   Chairman and Chief Executive Officer

Address:

7500 San Felipe, Suite 675
Houston, Texas 77063
Attention: President

Telephone: (713) 458-1560
Telecopy:   (713) 458-1561
E-mail: aclifford@saratogaresources.net

[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED CREDIT AGREEMENT]

**GUARANTORS:**

HARVEST OIL AND GAS, LLC

By:_____
Name: Thomas F. Cooke
Title:   Operating Manager

Address:

67201 Industry Lane
Covington, Louisiana  70433
Attention: President

Telephone: (512) 478-5717
Telecopy:  (512) 445-2365
E-mail: aclifford@saratogaresources.net

With a copy to:

7500 San Felipe, Suite 675
Houston, Texas 77063
Attention: President

[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

THE HARVEST GROUP LLC


By:_____
Name: Thomas F. Cooke
Title:   Operating Manager

Address:

67201 Industry Lane
Covington, Louisiana  70433
Attention: President

Telephone: (512) 478-5717
Telecopy:   (512) 445-2365
E-mail: aclifford@saratogaresources.net

With a copy to:

7500 San Felipe, Suite 675
Houston, Texas 77063
Attention: President


LOBO OPERATING, INC.


By:_____
Name: Thomas F. Cooke
Title:   President

Address:

7500 San Felipe, Suite 675
Houston, Texas 77063
Attention: President

Telephone: (713) 458-1560
Telecopy:   (713) 458-1561
E-mail: aclifford@saratogaresources.net


[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

LOBO RESOURCES, INC.


By:_____
Name: Thomas F. Cooke
Title:  President

Address:

7500 San Felipe, Suite 675
Houston, Texas 77063
Attention: President

Telephone: (713) 458-1560
Telecopy:  (713) 458-1561
E-mail: aclifford@saratogaresources.net

[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

**ADMINISTRATIVE AGENT**

**WAYZATA INVESTMENT PARTNERS LLC**


By_____
Name:
Title:    Authorized Signatory

Address:

701 East Lake Street, Suite 300
Wayzata, Minnesota 55391
Attention: Raphael Wallander

Telephone: (952) 345-0727
Telecopy:  (952) 345-8901
E-mail: rwallander@wayzpartners.com

and

Attention:  Linda Gans
Telephone: (952) 345-0718
Telecopy: (952) 345-8901
E-mail: lgans@wayzpartners.com


With a copy to:

Vinson & Elkins L.L.P.
2001 Ross Ave., Suite 3700
Dallas, Texas 75201
Attention: James A. Markus

Telephone: (214) 220-7836
Telecopy:  (214) 999-7836
E-mail: jmarkus@velaw.com


[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

**LENDER:**

**WAYZATA OPPORTUNITIES FUND II,
L.P.,** as a Lender
By: WOF II GP, L.P., its General Partner
By: WOF II GP, LLC, its General Partner


By_____
Name:
Title:   Authorized Signatory

Address:

701 East Lake Street, Suite 300
Wayzata, Minnesota 55391
Attention: Raphael Wallander
Telephone: (952) 345-0727
Telecopy:  (952) 345-8901
E-mail: rwallander@wayzpartners.com
Attention: Susan Peterson

Telephone: (952) 345-0716
Telecopy:  (952) 345-8901
E-mail: speterson@wayzpartners.com

With a copy to:

Vinson & Elkins L.L.P.
2001 Ross Ave., Suite 3700
Dallas, Texas 75201
Attention: James A. Markus

Telephone: (214) 220-7836
Telecopy:  (214) 999-7836
E-mail: jmarkus@velaw.com


[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

**LENDER:**

**WAYZATA OPPORTUNITIES FUND LLC,** as a Lender
By: Wayzata Investment Partners LLC, its
Manager


By_____
Name:
Title: Authorized Signatory

Address:

701 East Lake Street, Suite 300
Wayzata, Minnesota 55391
Attention: Raphael Wallander
Telephone: (952) 345-0727
Telecopy: (952) 345-8901
E-mail: rwallander@wayzpartners.com
Attention: Susan Peterson

Telephone: (952) 345-0716
Telecopy: (952) 345-8901
E-mail: speterson@wayzpartners.com

With a copy to:

Vinson & Elkins L.L.P.
2001 Ross Ave., Suite 3700
Dallas, Texas 75201
Attention: James A. Markus

Telephone: (214) 220-7836
Telecopy: (214) 999-7836
E-mail: jmarkus@velaw.com

[SIGNATURE PAGE TO SARATOGA RESOURCES, INC. AMENDED AND RESTATED
CREDIT AGREEMENT]

# EXHIBIT C

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

None.

# EXHIBIT D

## FORM OF OIL WELL LIEN ACT RELEASE

Property:_____
Amount_____
Claimant:_____

STATE OF _____                    §
                                                    §
PARISH/COUNTY OF _____          §

### Release of Lien and Privilege

**BEFORE ME**, the undersigned authority, a Notary Public in and for the jurisdiction noted above, and in the presence of the undersigned competent witnesses, came and appeared, as Affiant,

_____

who, being first duly sworn, did depose and state:

1.      That he/she is the _____, a duly authorized representative of _____ ("Claimant"), whose address for purposes hereof is _____, and that he/she is authorized to make and cause to be filed this Release of Lien and Privilege filed against _____ ("Harvest"), whose address for purposes hereof is 67201 Industry Lane, Covington, Louisiana 70433.

2.      That Claimant provided labor and/or materials (the "Work") to Harvest for the benefit of the property described in the Lien attached as <u>Exhibit 1</u>. To secure payment for the Work, Claimant filed in the mortgage records of the Parish of _____, State of Louisiana, a lien and/or statement of privilege (the "Lien"), recorded at _____, in the principal amount of $_____. A copy of the Lien is attached hereto as <u>Exhibit 1</u>, which includes a description of the property affected by the Lien and this Release of Lien and Privilege.

3.    That Claimant, for and in consideration of payment in the amount of $_____, the sufficiency of which is hereby acknowledged, and the receipt of which shall have occurred prior to the recording of this Release of Lien and Privilege, does hereby RELEASE AND DISCHARGE Harvest from any and all liens and encumbrances of any kind arising from the Work, including, but not limited to, the principal amount owed as identified in the Lien and all interest and attorneys' fees related thereto.

4.    That Claimant does hereby authorize and direct the Clerk of Court and *Ex Officio* Recorder of Mortgages for the Parish of _____, State of Louisiana, to CANCEL AND ERASE the Lien Statement recorded at _____ and to note this Release of Lien and Privilege in the margins of the inscription of the aforementioned Lien recorded in the records of that office, which presently burdens the property described in paragraph 2, above.

5.    That Claimant does hereby covenant and agree that it will, at the request of Harvest and without further consideration, execute and deliver such other documents and instruments, and take such other action, as may be necessary to more effectively release and discharge any and all liens and encumbrances of any kind arising from the Work.

**IN WITNESS WHEREOF**, this instrument is executed on the ___ day of _____, 2009, in the presence of the undersigned competent witnesses and me, Notary, after a reading of the whole.

**WITNESSES:**                      **CLAIMANT**

_____
Printed Name: _____      By: _____
                                    Name:_____
                                    Title: _____

_____
Printed Name: _____

2

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _____ DAY
OF_____, 2009.

_____
NOTARY PUBLIC

# EXHIBIT E

## FORM OF AMENDED ORGANIZATIONAL DOCUMENTS

RESTATED CERTIFICATE OF FORMATION
OF
SARATOGA RESOURCES, INC.

## ARTICLE ONE

The entity formed hereby is a for-profit corporation (the "Corporation") and the name of the Corporation is Saratoga Resources, Inc.

## ARTICLE TWO

The period of duration of the Corporation is perpetual.

## ARTICLE THREE

The purpose for which the Corporation is organized is to engage in the transaction of any and all lawful businesses for which corporations may be incorporated under the Texas Business Corporation Act.

## ARTICLE FOUR

The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 100,100,000 of which (a) 100,000,000 shares shall be designated as Common Stock, par value $0.001 per share, and (b) 100,000 shares shall be designated as Preferred Stock, par value $0.001 per share. Notwithstanding anything herein to the contrary, from and after the date these Amended and Restated Articles of Incorporation become effective, the Corporation shall be prohibited from issuing nonvoting equity securities in accordance with and to the extent required by Section 1123(a)(6) of the United States Bankruptcy Code, as amended. This Paragraph (6) shall have no further force and effect beyond that required by Section 1123(a)(6) and for as long as Section 1123(a)(6) is in effect and applicable to the Corporation.

The following is a statement of the designations, preferences, limitations, and relative rights, including voting rights, in respect of the classes of stock of the Corporation and of the authority with respect thereto expressly vested in the Board of Directors of the Corporation:

## COMMON STOCK

(1) Each share of Common Stock of the Corporation shall have identical rights and privileges in every respect. The holders of shares of Common Stock shall be entitled to vote upon all matters submitted to a vote of the shareholders of the Corporation and shall be entitled to one vote for each share of Common Stock held.

(2) Subject to the prior rights and preferences, if any, applicable to shares of the Preferred Stock or any series thereof, the holders of shares of the Common Stock shall be entitled to receive such dividends (payable in cash, stock, or otherwise) as may be declared thereon by the Board of Directors at any time and from time to time out of any funds of the Corporation legally available therefor.

(3) In the event of any voluntary or involuntary liquidation, dissolution, or winding-up of the Corporation, after distribution in full of the preferential amounts, if any, to be distributed to the holders of shares of the Preferred Stock or any series thereof, the holders of shares of the Common Stock shall be entitled to receive all of the remaining assets of the Corporation available for distribution to its shareholders, ratably in proportion to the number of shares of the Common Stock held by them. A liquidation, dissolution, or winding-up of the Corporation, as such terms are used in this Paragraph (3), shall not be deemed to be occasioned by or to include any merger of the Corporation with or into one or more corporations or other entities, any acquisition or exchange of the outstanding shares of one or more classes or series of the Corporation, or any sale, lease, exchange, or other disposition of all or a part of the assets of the Corporation.

## PREFERRED STOCK

(4) Shares of the Preferred Stock may be issued from time to time in one or more series, the shares of each series to have such designations, preferences, limitations, and relative rights, including voting rights, as shall be stated and expressed herein or in a resolution or resolutions providing for the issue of such series adopted by the Board of Directors of the Corporation. Each such series of Preferred Stock shall be designated so as to distinguish the shares thereof from the shares of all other series and classes. The Board of Directors of the Corporation is hereby expressly authorized, subject to the limitations provided by law, to establish and designate series of the Preferred Stock, to fix the number of shares constituting each series, and to fix the designations and the preferences, limitations, and relative rights, including voting rights, of the shares of each series and the variations of the relative rights and preferences as between series, and to increase and to decrease the number of shares constituting each series, provided that the Board of Directors may not decrease the number of shares within a series to less than the number of shares within such series that are then issued. The relative powers, rights, preferences, and limitations may vary between and among series of Preferred Stock in any and all respects so long as all shares of the same series are identical in all respects, except that shares of any such series issued at different times may have different dates from which dividends thereon cumulate. The authority of the Board of Directors of the Corporation with respect to each series shall include, but shall not be limited to, the authority to determine the following:

(a) The designation of such series;

(b) The number of shares initially constituting such series;

(c) The rate or rates and the times at which dividends on the shares of such series shall be paid, the periods in respect of which dividends are payable, the conditions upon such dividends, the relationship and preferences, if any, of such dividends to dividends payable on any other class or series of shares, whether or not such dividends shall be cumulative, partially cumulative, or noncumulative, if such dividends shall be cumulative or partially cumulative, the date or dates from and after which, and the amounts in which, they shall accumulate, whether such dividends shall be share dividends, cash or other dividends, or any combination thereof, and if such dividends shall include share dividends, whether such share dividends shall be payable in shares of the same or any other class or series of shares of the

2

Corporation (whether now or hereafter authorized), or any combination thereof and the other terms and conditions, if any, applicable to dividends on shares of such series;

(d) Whether or not the shares of such series shall be redeemable or subject to repurchase at the option of the Corporation or the holder thereof or upon the happening of a specified event, if such shares shall be redeemable, the terms and conditions of such redemption, including but not limited to the date or dates upon or after which such shares shall be redeemable, the amount per share which shall be payable upon such redemption, which amount may vary under different conditions and at different redemption dates, and whether such amount shall be payable in cash, property, or rights, including securities of the Corporation or another corporation;

(e) The rights of the holders of shares of such series (which may vary depending upon the circumstances or nature of such liquidation, dissolution, or winding up) in the event of the voluntary or involuntary liquidation, dissolution, or winding-up of the Corporation and the relationship or preference, if any, of such rights to rights of holders of stock of any other class or series. A liquidation, dissolution, or winding-up of the Corporation, as such terms are used in this subparagraph (e), shall not be deemed to be occasioned by or to include any merger of the Corporation with or into one or more corporations or other entities, any acquisition or exchange of the outstanding shares of one or more classes or series of the Corporation, or any sale, lease, exchange, or other disposition of all or a part of the assets of the Corporation;

(f) Whether or not the shares of such series shall have voting powers and, if such shares shall have such voting powers, the terms and conditions thereof, including, but not limited to, the right of the holders of such shares to vote as a separate class either alone or with the holders of shares of one or more other classes or series of stock and the right to have more (or less) than one vote per share; provided, however, that the right to cumulate votes for the election of directors is expressly denied and prohibited;

(g) Whether or not a sinking fund shall be provided for the redemption of the shares of such series and, if such a sinking fund shall be provided, the terms and conditions thereof;

(h) Whether or not a purchase fund shall be provided for the shares of such series and, if such a purchase fund shall be provided, the terms and conditions thereof;

(i) Whether or not the shares of such series, at the option of either the Corporation or the holder or upon the happening of a specified event, shall be convertible into stock of any other class or series and, if such shares shall be so convertible, the terms and conditions of conversion, including, but not limited to, any provision for the adjustment of the conversion rate or the conversion price;

(j) Whether or not the shares of such series, at the option of either the Corporation or the holder or upon the happening of a specified event, shall be exchangeable for securities, indebtedness, or property of the Corporation and, if such shares shall be so

3

exchangeable, the terms and conditions of exchange, including, but not limited to, any provision for the adjustment of the exchange rate or the exchange price; and

(k) Any other preferences, limitations, and relative rights as shall not be inconsistent with the provisions of this Article Four or the limitations provided by law.

(5) Except as otherwise required by law or in any resolution of the Board of Directors creating any series of Preferred Stock, the holders of shares of Preferred Stock and all series thereof who are entitled to vote shall vote together with the holders of shares of Common Stock, and not separately by class.

## ARTICLE FIVE

No holder of any shares of capital stock of the Corporation, whether now or hereafter authorized, shall, as such holder, have any preemptive or preferential right to receive, purchase, or subscribe to (a) any unissued or treasury shares of any class of stock (whether now or hereafter authorized) of the Corporation, (b) any obligations, evidences of indebtedness, or other securities of the Corporation convertible into or exchangeable for, or carrying or accompanied by any rights to receive, purchase, or subscribe to, any such unissued or treasury shares, (c) any right of subscription to or to receive, or any warrant or option for the purchase of, any of the foregoing securities, or (d) any other securities that may be issued or sold by the Corporation.

## ARTICLE SIX

Cumulative voting for the election of directors is expressly denied and prohibited.

## ARTICLE SEVEN

No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(a) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(b) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

4

(c) The contract or transaction is fair as to the Corporation as of the time it is authorized, approved, or ratified by the Board of Directors, a committee thereof, or the shareholders.

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

This provision shall not be construed to invalidate a contract or transaction which would be valid in the absence of this provision or to subject any director or officer to any liability that he would not be subject to in the absence of this provision.

## ARTICLE EIGHT

The Corporation shall indemnify any person who was, is, or is threatened to be made a named defendant or respondent in a proceeding (as hereinafter defined) because the person (i) is or was a director or officer of the Corporation or (ii) while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent that a corporation may grant indemnification to a director under the Texas Business Corporation Act, as the same exists or may hereafter be amended.

Such right shall be a contract right and as such shall run to the benefit of any director or officer who is elected and accepts the position of director or officer of the Corporation or elects to continue to serve as a director or officer of the Corporation while this Article Eight is in effect. Any repeal or amendment of this Article Eight shall be prospective only and shall not limit the rights of any such director or officer or the obligations of the Corporation with respect to any claim arising from or related to the services of such director or officer in any of the foregoing capacities prior to any such repeal or amendment of this Article Eight. Such right shall include the right to be paid or reimbursed by the Corporation for expenses incurred in defending any such proceeding in advance of its final disposition to the maximum extent permitted under the Texas Business Corporation Act, as the same exists or may hereafter be amended. If a claim for indemnification or advancement of expenses hereunder is not paid in full by the Corporation within ninety days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, and, if successful in whole or in part, the claimant shall be entitled to be paid also the expenses of prosecuting such claim. It shall be a defense to any such action that such indemnification or advancement of costs of defense are not permitted under the Texas Business Corporation Act, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors or any committee thereof, special legal counsel, or shareholders) to have made its determination prior to the commencement of such action that indemnification of, or advancement of costs of defense to, the claimant is permissible in the circumstances nor an actual determination by the Corporation (including its Board of Directors or any committee thereof, special legal counsel, or shareholders) that such indemnification or advancement is not permissible, shall be a defense to the action or create a presumption that such indemnification or advancement is not permissible. In the event of the

5

death of any person having a right of indemnification under the foregoing provisions, such right shall inure to the benefit of his heirs, executors, administrators, and personal representatives. The rights conferred above shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, bylaw, resolution of shareholders or directors, agreement, or otherwise.

The Corporation may additionally indemnify any person covered by the grant of mandatory indemnification contained above to such further extent as is permitted by law and may indemnify any other person to the fullest extent permitted by law.

To the extent permitted by then applicable law, the grant of mandatory indemnification to any person pursuant to this Article Eight shall extend to proceedings involving the negligence of such person.

As used herein, the term "proceeding" means any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, arbitrative, or investigative, any appeal in such an action, suit, or proceeding, and any inquiry or investigation that could lead to such an action, suit, or proceeding.

## ARTICLE NINE

Any action of the Corporation which, under the provisions of the Texas Business Corporation Act or any other applicable law, is required to be authorized or approved by the holders of any specified fraction which is in excess of one-half or any specified percentage which is in excess of 50% of the outstanding shares (or of any class or series thereof) of the Corporation shall, notwithstanding any law, be deemed effectively and properly authorized or approved if authorized or approved by the vote of the holders of more than 50% of the outstanding shares entitled to vote thereon (or, if the holders of any class or series of the Corporation's shares shall be entitled by the Texas Business Corporation Act or any other applicable law to vote thereon separately as a class, by the vote of the holders of more than 50% of the outstanding shares of each such class or series). Without limiting the generality of the foregoing, the foregoing provisions of this Article Nine shall be applicable to any required shareholder authorization or approval of: (a) any amendment to the Articles of Incorporation; (b) any plan of merger, share exchange, or reorganization involving the Corporation; (c) any sale, lease, exchange, or other disposition of all, or substantially all, the property and assets of the Corporation; and (d) any voluntary dissolution of the Corporation.

Directors of the Corporation shall be elected by a plurality of the votes cast by the holders of shares entitled to vote in the election of directors of the Corporation at a meeting of shareholders at which a quorum is present.

Except as otherwise provided in this Article Nine or as otherwise required by the Texas Business Corporation Act or other applicable law, with respect to any matter, the affirmative vote of the holders of a majority of the Corporation's shares entitled to vote on that matter and represented in person or by proxy at a meeting of shareholders at which a quorum is present shall be the act of the shareholders.

6

Nothing contained in this Article Nine is intended to require shareholder authorization or approval of any action of the Corporation whatsoever unless such approval is specifically required by the other provisions of the Articles of Incorporation, the bylaws of the Corporation, or by the Texas Business Corporation Act or other applicable law.

## ARTICLE TEN

The street address of the registered office of the Corporation is 7500 San Felipe, Suite 675, Houston, Texas 77063, and the name of its registered agent at such address is Thomas F. Cooke.

## ARTICLE ELEVEN

The number of directors of the Corporation shall not be less than one (1) nor more than eleven (11), and may be increased or decreased from time to time in the manner provided by law or by By-Laws of the Corporation.

The number of directors currently constituting the Board of Directors is four and the name and address of each person who is to serve as director until the next annual meeting of shareholders and until such director's successor is elected and qualified or, if earlier, until such director's death, resignation, or removal as director, are as follows:

| NAME | ADDRESS |
|------|---------|
| Thomas F. Cooke | 7500 San Felipe, Suite 675 Houston, Texas 77063 |
| Andy C. Clifford | 7500 San Felipe, Suite 675 Houston, Texas 77063 |
| Kevin Smith | 7500 San Felipe, Suite 675 Houston, Texas 77063 |
| Rex H. White | 7500 San Felipe, Suite 675 Houston, Texas 77063 |

## ARTICLE TWELVE

To the fullest extent permitted by applicable law, a director of the Corporation shall not be liable to the Corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director, except that this Article Twelve does not eliminate or limit the liability of a director of the Corporation to the extent the director is found liable for:

(a) a breach of the director's duty of loyalty to the Corporation or its shareholders;

7

(b) an act or omission not in good faith that constitutes a breach of duty of the director to the Corporation or an act or omission that involves intentional misconduct or a knowing violation of the law;

(c) a transaction from which the director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or

(d) an act or omission for which the liability of a director is expressly provided by an applicable statute.

Any repeal or amendment of this Article Twelve by the shareholders of the Corporation shall be prospective only and shall not adversely affect any limitation on the personal liability of a director of the Corporation arising from an act or omission occurring prior to the time of such repeal or amendment. In addition to the circumstances in which a director of the Corporation is not personally liable as set forth in the foregoing provisions of this Article Twelve, a director shall not be liable to the Corporation or its shareholders to such further extent as permitted by any law hereafter enacted, including without limitation any subsequent amendment to the Texas Miscellaneous Corporation Laws Act or the Texas Business Corporation Act.

## ARTICLE THIRTEEN

Any action which may be taken, or which is required by law or the Articles of Incorporation or bylaws of the Corporation to be taken, at any annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted.

09-50397 - #1101   File 04/19/10   Enter 04/19/10 14:59:17   Main Document   Pg 183 of 183